UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                                    :
NUTRICIA NORTH AMERICA, INC.,                       :
                                                    :
                        Plaintiff,                  :        Court No. 16-00008
                                                    :
            v.                                      :
                                                    :
UNITED STATES,                                      :
                                                    :
                        Defendant.                  :
_____:

## <u>**ORDER**</u>

Upon consideration of Plaintiff Nutricia North America, Inc.'s Motion for Summary Judgment, and upon consideration of other papers and proceedings had herein and upon due deliberation, it is hereby:

**ORDERED** that Plaintiff's Motion for Summary Judgment be, and hereby is granted.


_____
Timothy C. Stanceu, Senior Judge

Dated:                     , 2022
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| NUTRICIA NORTH AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 16-00008 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to USCIT R. 56, Plaintiff, Nutricia North America, Inc. ("Nutricia"), submits this Motion for Summary Judgment. Plaintiff is concurrently filing a 56.3 Statement of Undisputed Material Facts. Plaintiff relies on affidavits, depositions, expert reports, entry papers, samples, and the required documents filed with Customs and produced during discovery. This Motion is made and based upon the pleadings and papers on file herein, the Points, Authorities, and Exhibits attached and submitted, for the proposition that no genuine issue of material fact exists as to the correct classification of the goods at issue in this matter, and Plaintiff is entitled summary judgment in its favor.

**WHEREFORE**, Plaintiff respectfully requests that this court:

(1) Grant Plaintiff's motion for summary judgment;

(2) Order U.S. Customs and Border Protection ("CBP") to classify the subject products under HTSUS subheading 3004.50.5040, reliquidate the subject entries, and issue refunds to Plaintiff of all lawful duties, plus interest;

(3) Order CBP to secondarily classify the subject products under subheading

9817.00.96, HTSUS, reliquidate the subject entries, and issue refunds to Plaintiff

of all lawful duties, plus interest; and

(4) Grant such further relief such as attorney's fees and costs as it deems proper.

Respectfully Submitted,

By:     John B. Brew
        Alex Schaefer
        Crowell & Moring LLP
        1001 Pennsylvania Avenue, N.W.
        Washington, D.C.  20004
        jbrew@crowell.com

        /s/Frances P. Hadfield
        Crowell & Moring LLP
        590 Madison Avenue
        20th Floor
        New York, NY 10022
        fhadfield@crowell.com

Dated: January 21, 2022
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |  |
|---|---|---|
| ———————————————— | : |  |
| NUTRICIA NORTH AMERICA, INC., | : | **PUBLIC VERSION** |
|  | : |  |
| Plaintiff, | : | Court No. 16-00008 |
|  | : |  |
| v. | : |  |
|  | : |  |
| UNITED STATES, | : |  |
|  | : |  |
| Defendant. | : |  |
| ———————————————— | : |  |

---

## MEMORANDUM OF LAW AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

By:   John B. Brew
      Alex Schaefer
      Crowell & Moring LLP
      1001 Pennsylvania Avenue, N.W.
      Washington, D.C.  20004
      jbrew@crowell.com

      /s/Frances P. Hadfield
      Crowell & Moring LLP
      590 Madison Avenue
      20th Floor
      New York, NY 10022
      fhadfield@crowell.com

Dated: January 21, 2022
       New York, New York

# TABLE OF CONTENTS

**Page**

MERCHANDISE AT ISSUE .................................................................................... 1

TARIFF PROVISIONS AT ISSUE........................................................................... 2

QUESTIONS PRESENTED....................................................................................... 3

JURISDICTION ......................................................................................................... 3

STATEMENT OF FACTS FOR WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED
.................................................................................................................................... 4

    A.    Medical Rationale for the Imported Products ........................................ 4

    B.    Use and Physical Characteristics of the Subject Imports...................... 5

        1.    MSUD Lophlex® LQ ................................................................ 6

        2.    Periflex® Infant, and Periflex® Junior..................................... 7

        3.    Neocate ® Junior ....................................................................... 9

            a.    Eosinophilic Esophagitis (EoE) .................................... 9

            b.    Short Bowel Syndrome (SBS) ..................................... 10

        4.    Ketocal® 4:1 Liquid ............................................................... 11

            a.    Intractable/Refractory Epilepsy .................................. 11

            b.    Glucose Transporter Type 1 Deficiency (GLUT 1)..................... 12

    C.    The Recognition of the Imported Products in the Trade...................... 13

    D.    Expectation of the Ultimate Purchasers .............................................. 14

    E.    The Economic Practicality of So Using the Imported Products ......................... 15

    F.    The Channels of Trade in which the Imported Merchandise Moves.................. 17

    G.    The Environment of the Sale .............................................................. 18

    H.    CBP Rulings ....................................................................................... 18

SUMMARY OF ARGUMENT ................................................................................ 19

STANDARD OF REVIEW ...................................................................................... 23

ARGUMENT ............................................................................................................ 24

I.    The Subject Medical Foods are Classified as "Medicaments for Therapeutic Use" Under Heading 3004 .................................................................................................... 24

    A.    Applicable Rules of Interpretation..................................................... 24

    B.    The Plain Terms of Heading 3004 Describe the Subject Medical Foods ............ 25

    C.    The Subject Medical Foods are of the Same Class or Kind as Medicaments under Heading 3004 ......................................................... 28

**TABLE OF CONTENTS**

(continued)

**Page**

1.  Medical Foods are Used the Same as Medicaments ................................ 29

2.  Medical Foods Have Physical Characteristics Similar to
    Medicaments .................................................................................... 30

3.  Medical Foods Are Recognized in the Trade as Medicaments ............... 31

4.  Purchasers of Medical Foods Have the Same Expectations as
    Purchasers of Medicaments .............................................................. 32

5.  Given the High Cost of Medical Foods, It Is Only Practical to Use
    Them as Medicaments ....................................................................... 33

6.  Medical Foods are Sold in the Same Channels of Trade as
    Medicaments ..................................................................................... 33

7.  Medical Foods Are Sold in an Environment Similar to that of
    Medicaments ..................................................................................... 34

II.   The Subject Medical Foods Cannot be Classified Under 2106 ...................... 35

A.  The Subject Medical Foods Cannot be Classified under Heading 2106
    Because This Provision Doesn't Include Products Classified Elsewhere .......... 35

B.  Chapter 21, Note 1 Excludes Products of Heading 3004 From
    Classification under Heading 2106 ........................................................ 35

C.  CBP's Classification Determination Is Fatally Flawed .................................... 36

D.  The Explanatory Notes Confirm the Medical Foods are Not Classified
    Under Heading 2106 ............................................................................. 38

III.  The Subject Medical Foods are Secondarily Classified under Heading 9817 ................. 40

A.  The Subject Medical Foods Are Specially Designed for Handicapped
    Persons ................................................................................................ 40

B.  CBP Incorrectly Concluded that Medical Foods Are Not Classified Under
    Heading 9817 ...................................................................................... 43

CONCLUSION .............................................................................................. 44

PLAINTIFF'S 56.3 STATEMENT OF MATERIAL FACTS FOR WHICH THERE IS NO
GENUINE ISSUE TO BE TRIED

PLAINTIFF'S EXHIBIT LIST

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bauer Nike Hockey USA, Inc. v. United States,*
  393 F.3d 1246 (Fed.Cir. 2004)...........................................................................37

*Bausch & Lomb v. United States,*
  148 F.3d 1363 (Fed. Cir. 1998).........................................................................24

*Conair Corp v. United States,*
  29 CIT 888 (2005) ............................................................................................24

*Cummins Inc., v. United States,*
  454 F.3d 1361 (Fed. Cir. 2006).........................................................................24

*Dependable Packaging Solutions, Inc. v. United States,*
  757 F.3d 1374 (Fed. Cir. 2014).........................................................................25

*Estee Lauder v. United States,*
  815 F. Supp. 2d 1287 (CIT 2012) ................................................................24, 35

*Franklin v. United States,*
  289 F.3d 753 (Fed. Cir. 2002)...........................................................................25

*Inabata Specialty Chems. v. United States,*
  29 C.I.T. at 422-423 .....................................................................................26, 36

*J.E. Bernard & Co., Inc. v. United States,*
  58 Cust. Ct. 23 (1967)....................................................................................26, 36

*Len-Ron Mfg. Co. v. United States,*
  118 F. Supp. 2d 1266 (2000) .............................................................................28

*Lenox Collections v. United States,*
  20 CIT 194 (1996) ............................................................................................29

*Mita Copystar Am. v. United States,*
  21 F.3d 1079 (Fed. Cir. 1994)...........................................................................25

*Orlando Food Corp. v. United States,*
  140 F.3d 1437 (Fed. Cir. 1998).....................................................................23, 24

*Pillowtex Corp. v. United States,*
  171 F.3d 1370 (Fed. Cir. 1999).........................................................................24

*Primal Lite, Inc. v. United States*,
   182 F.3d 1362 (Fed.Cir. 1999)................................................................28, 29

*Rubies Costume, Co. v. United States*,
   337 F.3d 1350 (Fed. Cir. 2003)......................................................................43

*Sigvaris, Inc. v. United States*,
   899 F.3d 1308 (Fed. Cir. 2018)......................................................................40

*Starkey Labs. v. United States*,
   22 CIT 360 (1998) ...........................................................................................40

*Travenol Labs. v. United States*,
   17 CIT 69 (1993) .......................................................................................41, 44

*United States v. Alltransport, Inc.*,
   44 C.C.P.A. 149 (1957) .............................................................................26, 36

*United States v. Carborundum Co.*,
   63 CCPA 98 (1976) .....................................................................20, 21, 29, 38

*Warner-Lambert Co. v. United States*,
   407 F.3d 1207 (Fed. Cir. 2005), (2)......................................24, 25, 26, 28

*Wilton Indus., Inc. v. United States*,
   741 F.3d 1263 (Fed.Cir. 2013).......................................................................24

**Statutes**

19 U.S.C. § 1625.................................................................................................19

19 U.S.C. § 1515...................................................................................................4

19 U.S.C. §1515(b)............................................................................................3, 4

21 U.S.C. § 360ee..................................................................................1, 26, 36

21 U.S.C. § 360ee(b)(3)....................................................................................42

28 U.S.C. §1581(a) ...............................................................................................3

28 U.S.C. § 2640(a)(1).......................................................................................24

42 U.S.C. § 1395ww(t)(4)..................................................................................16

42 U.S.C. §12102 (1)..........................................................................................41

42 U.S.C. §12102 (2)(A).....................................................................................41

42 U.S.C. § 12102 (2)(B)...............................................................................................41, 42, 43

96 Stat. 2329, 2346 (1983)......................................................................................................40

**Code of Federal Regulations**

19 C.F.R. §174.22 ...................................................................................................................3, 4

21 C.F.R. §101.9(j)(8)...............................................................................................................27

21 C.F.R. § 101.9(j)(8)(a) and (b).............................................................................................31

21 C.F.R. §101.9(j)(8)(b)...........................................................................................................30

**Other Authorities**

54 Fed. Reg. 21182 (May 12, 1989) .........................................................................................40

TD 92-77, 26 Cust Bull Dec 240, 246 (1992)..........................................................................41

**MEMORANDUM OF LAW AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to USCIT R. 56, Plaintiff, Nutricia North America, Inc. ("Nutricia"), submits this Memorandum of Law in Support of its Motion for Summary Judgment.

**MERCHANDISE AT ISSUE**

This case presents a dispute over the proper Harmonized Tariff Schedules of the United States (HTSUS) classification of certain medical foods, which are a unique class of products defined and regulated by the Food and Drug Administration (FDA) under the Orphan Drug Act. 21 U.S.C. § 360ee. The five imported products are:

1.   MSUD Lophlex®,
2.   Periflex® Infant,
3.   Periflex® Junior,
4.   Neocate ® Junior, and
5.   Ketocal® Liquid

These products are medical food formulas that are specially designed, produced and intended for use primarily by infants or children who suffer from a variety of diseases or disorders. Plaintiff's Exhibit (Ex.)1, Expert Reports of Dr. Joel Lavine (Lavine Reports). Medical foods are defined by statute as:

> "A food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."

21 U.S.C. § 360ee. Medical foods are used for "any disease or condition that occurs so infrequently in the United States that there is no reasonable expectation that a medical food for such disease or condition would be developed without [financial assistance]." 21 U.S.C. § 360ee.

## TARIFF PROVISIONS AT ISSUE

The following HTSUS provisions are at issue:

### Heading 2106

2106    Food preparations not elsewhere specified or included:
2106.90        Other:
2106.90.99            Other:
2106.90.9998                Other

### Chapter 21, Notes

1.      This chapter does not over: . . . .

        (f)     Yeast put up as a medicament or other products of heading 3003 or 3004

### Heading 3004

3004    Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of
        mixed or unmixed products for therapeutic or prophylactic uses, put up in
        measured doses (including those in the form of transdermal administration
        systems) or in forms or packings for retail sale:

3004.50        Other, containing vitamins or other products of heading 2936:
3004.50.50            Other:
3004.50.5040                Other.

### Chapter 30, Notes

1.      This chapter does not cover:

        (a)     Foods or beverages (such as dietetic, diabetic or fortified foods, food
                supplements, tonic beverages and mineral waters), other than nutritional
                preparations for intravenous administration (Section IV)

### Heading 9817

9817.00.96:    Articles specially designed or adapted for the use or benefit of the blind or other
               physically or mentally handicapped persons; parts and accessories (except parts
               and accessories of braces and artificial limb prosthetics) that are specially
               designed or adapted for use in the foregoing articles: Other

**Chapter 98, Subchapter XVII, U.S. Notes**

4.　　(a) For purposes of subheadings 9817.00.92, 9817.00.94 and 9817.00.96, the term "blind or other physically or mentally handicapped persons" includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working.

(b) Subheadings 9817.00.92, 9817.00.94 and 9817.00.96 do not cover –

　　(i) articles for acute or transient disability;
　　(ii) spectacles, dentures, and cosmetic articles for individuals not substantially disabled;
　　(iii) therapeutic and diagnostic articles; or
　　(iv) medicine or drugs.

## QUESTIONS PRESENTED

1. Whether the evidence presented demonstrates that the imported medical foods are medicaments used for nutrition therapy classified in heading 3004?

2. Whether the imported products were designed, prescribed, sold and used by handicapped persons and should be secondarily classified under subheading 9817.00.96?

## JURISDICTION

This Court has jurisdiction over Plaintiff's appeal of U.S. Customs and Border Protection's (CBP's) denial of its protests pursuant to 28 U.S.C. §1581(a). Between November 13, 2014 and November 26, 2014, Plaintiff imported the subject merchandise in protest numbers 1101-15-100252 and 1001-15-100172 in four entries: 01-4122568-0, 101-4122571-4, 101-4134968-8, and 101-4134831-8. Ex.2, Compl.¶1; Answer, ¶1. Plaintiff is the importer of record for these four entries and paid the duties owed. Ex.2, Compl. ¶2; Answer,¶2. CBP liquidated the four entries of the subject merchandise under subheading 2106.90.9998, which provides for "Food preparations not elsewhere specified or included: Other…Other." Ex.2, Compl ¶6; Answer,¶6. On November 27, 2015, Plaintiff timely filed protest number 1101-15-100252 and requested accelerated disposition pursuant to 19 C.F.R. §174.22 and 19 U.S.C. §1515(b). Ex.2, Compl. ¶9;Answer¶9.

On December 1, 2015, Plaintiff timely filed protest number 1001-15-100172 and requested accelerated disposition pursuant to 19 C.F.R. § 174.22 and 19 U.S.C. §1515(b). Ex.2, Compl.¶10; Answer ¶10. Protests 1101-15-100252 and 1001-15-100172 were deemed denied. 19 C.F.R § 174.22. 19 U.S.C. § 1515(b). Ex.2, Compl. ¶11; Answer¶11. Plaintiff brings this action to contest the deemed denial of protest numbers 1101-15-100252 and 1001-15-100172 by CBP under 19 U.S.C. § 1515. Ex.2, Compl. ¶4; Answer¶4. Nutricia requests that this Court determine that CBP incorrectly classified the subject medical foods in heading 2106, and classify the subject products under heading 3004, and secondarily in subheading 9817.00.96, as a matter of law.

<u>**STATEMENT OF FACTS FOR WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED**</u>

Nutricia is a specialized medical nutrition company and is part of the Medical Nutrition Division of Groupe Danone, Paris. Ex.3 at 761. Nutricia manufactures products designed and used in the management of neurological diseases, metabolic disorders, and gastrointestinal disorders and diseases requiring nutritional therapy. Ex.2, Compl ¶¶23, 41, 53, 64, 75.  Nutricia's U.S. business focuses primarily on pediatric medical nutrition for rare conditions, and does not make or market any conventional infant formulas. *Id.*; Ex.3; *See* Ex.4, Dep. Del-Toro.

**A.      Medical Rationale for the Imported Products**

Plaintiff's expert, Dr. Joel Lavine, is a licensed medical doctor with over thirty-five years of experience in pediatric care, specializing in gastroenterology, hepatology and nutrition. Ex.1. He treats patients who suffer from diseases and disorders, and are disabled or handicapped. *Id.*  He explains why these products are used, why he would prescribe these products to infants and children suffering from diagnosed diseases or disorders, and the medical rationale for each of the five medical foods at issue here. Ex.1, Lavine Reports at 5.

All living things require a variety of proteins in order to live, grow and function. *Id.* In humans, "all proteins are composed of varying primary sequences containing varying amounts and

ratios of 20 different amino acids." *Id.* "Amino acids are a carbon molecule with an amino group and a carboxylic acid and a side chain of variable composition." *Id.* In some people, "differences in DNA inheritance can result in proteins that are absent, faulty or lacking in requisite functional activity. Depending on the type of defect inherited, an enormous number of detrimental consequences may result in impaired metabolism, development, allergy, or immunity." *Id.*

"The prime source of amino acids required for people to produce proteins comes from consumed foods that contain protein within plant and animal matter." *Id.* Once consumed, proteins "must undergo digestion, a process involving partial breakdown by acids produced in the stomach, and host-driven, enzymatically-catalyzed breakdown of the ingested protein into much smaller components called peptides (made of amino acids), and further into the fundamental building blocks of proteins, amino acids. *Id.* Children who suffer from various diseases or disorders are either unable to breakdown certain amino acids in natural form, or require special combinations of amino acids to avoid serious health risks and perform normal life activities. *Id.* at 1, 6. Nutricia designed and produced the imported products to treat these diseases and disorders. Ex.3.

**B.     Use and Physical Characteristics of the Subject Imports**

The products at issue in this case all are used to treat, alleviate, palliate or prevent, certain diseases, syndromes, symptoms or conditions. Ex.1, Lavine Reports at 1-6, 9. In addition, the essential ingredients, which provide the efficacy of the products are specifically produced amino acids and other ingredients that must be uniquely manufactured to provide the desired medical purpose. *Id.* at 10, 11, 13, 14. Below we describe the use (i.e., diseases or disorders that the product were designed to treat) and the physical characteristics of each of the five subject imports.

1.      **MSUD Lophlex® LQ**

MSUD Lophlex® LQ is used as nutrition therapy for children who suffer from a severe,

life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase

complex (BCKDC) deficiency, (also called Maple Syrup Urine Disease or MSUD), an inborn

error of the metabolism. Ex.2, Compl. ¶25, 29, 31, 35; Ex.5A; Ex.6, Yanicelli Dep. 46:22–48:1;

Ex.1, Lavine Report at 15-16.  Dr. Lavine explained that:

> MSUD is caused by a deficiency of the enzyme BCKDC, which leads to a buildup of the
> branched-chain amino acids (BCAA) (leucine, isoleucine, valine and their respective
> ketoacids). Persons with MSUD are unable to properly metabolize proteins in part
> composed of these specific amino acids, leading to a toxic level of leucine, valine and
> isoleucine in the blood and brain…high levels of BCAA, especially leucine and its
> ketoacid, may cause a person to have intractable vomiting, severe weakness (lethargy),
> seizures and coma. MSUD is a permanent medical condition that is not curable.
>
> ***
>
> BCAA are essential amino acids that must be provided to an acceptable degree in a healthy
> person's diet. Therefore, the treatment of a person with MSUD must be supervised by a
> healthcare professional. Persons with MSUD must contact their healthcare professional
> regularly to discuss and monitor their blood amino acid levels.
>
> ***
>
> MSUD Lophlex® LQ is a primary therapy or treatment for managing patients with MSUD
> by managing intake of certain amino acids.

Ex.1, Lavine Reports at 15-18; Ex.5; Ex.6 at. 46:22-48:15

To treat MSUD, Nutricia designed MSUD Lophlex® LQ using the following amino acids

or amino acid analogue mixture:

> L-lysine acetate, L-proline, L-tyrosine, L-arginine, glycine, L-serine, L-aspartic
> acid, L-alanine, L-threonine, L-cystine, L-phenylalanine, L-histidine, N-acetyl L-
> methionine, L-tryptophan and taurine.

Ex.1, Lavine Reports at 10; Ex.5; Ex.7.  These ingredients are specially manufactured by

pharmaceutical suppliers like [⬛⬛⬛⬛⬛]. Ex.8. Some of the above listed amino

acids are chemically synthesized to purity prior to inclusion in the formula, whereas others are

obtained through purification after fermentation using biotechnology. *Id.* All are pharmaceutical

grade products, analyzed using high-pressure liquid chromatography to assure content purity absent of heavy metals, radioactivity, and bacterial/fungal contamination. *Id;* Ex.5A. These ingredients provide "the minimal amount of BCAA needed for life, without providing any excess that elicits toxicity." Ex.1, Lavine Report at 10. The provision of the amino acids listed, without provision of the BCAA, is the essence of why this Nutricia's formula is unique. *Id.* No other food could provide the amino acids needed for life while excluding the leucine, valine and isoleucine components that pose a risk to the child because (due to MSUD) their body cannot break those components down. *Id.* Other ingredients include "water (to assure lack of mixing/dilution/solubilization errors by users), apple, grape, blackcurrant and elderberry juice concentrates to provide carbohydrates needed for energy and taste." Ex.1, Dr. Lavine Report at 10; Ex.7.

### 2. Periflex® Infant, and Periflex® Junior

Periflex® Infant and Periflex® Junior are used to treat Phenylketonuria (PKU), which affects about 1 in 12,000 births. Ex.1, Lavine Report at 7-9. *Phenylketonuria (PKU)* is an:

> [a]utosomal recessively-inherited inborn error of metabolism of phenylalanine characterized by deficiency of 1) phenylalanine hydroxylase caused by mutation in the phenylalanine hydroxylase gene (PAH) . . . The disorder is characterized by inadequate formation of L-tyrosine, elevation of serum L-phenylalanine, urinary excretion of phenylpyruvic acid and other derivatives, and accumulation of phenylalanine and its metabolites, which can produce brain damage resulting in severe mental retardation, often with seizures, other neurologic abnormalities such as retarded myelination and deficient melanin formation leading to hypopigmentation of the skin and eczema.

Ex.9. The prevailing treatment for PKU is a diet low or absent in foods that contain phenylalanine, which is a common and nutritionally essential amino acid, and the inclusion of certain supplements to provide the minimum amount of phenylalanine required for synthesis of body proteins. Ex.1, Lavine Report at 11,18. Babies need to use a special formula lacking phenylalanine with (if possible) a small amount of breast milk. All newborns in the United States are tested for this within

a few days of birth as part of mandated metabolic testing because without nutritional management and treatment from birth on, a child with PKU could suffer severe, irreversible intellectual disability rendering him/her completely unable to take care of him/herself for the rest of their life. *See* Ex.10; Ex.1, Lavine Report at 7-9. "Babies who are diagnosed early and maintain a diet with appropriately restricted doses of phenylalanine can enjoy normal health and life span." *Id.* at 19. The effectiveness of the treatment is determined and monitored through regular blood tests that measure serum phenylalanine and tyrosine in order to determine that there are adequate, but not excessive amounts of phenylalanine and tyrosine available for requisite bodily functions. *Id.* Periflex® Junior is used to treat PKU in children over one year old. *Id.* Periflex® Infant is used to treat children with PKU under one year of age. *Id.*

To treat PKU in children under the age of one, Nutricia designed Periflex ® Infant with the following amino acid or amino acid analogue mixture:

> L-arginine L-aspartate, L-leucine, L-lysine acetate, L-tyrosine, L-glutamine, L-proline, L-valine, glycine, L-isoleucine, L-threonine, L-serine, L-histidine, L-alanine, L-cystine, L-tryptophan, L-methionine, magnesium L-aspartate.

Ex.1, Lavine Report at 11; Ex.11. The amino acid phenylalanine is absent from this formula. *Id.* These ingredients are specially manufactured by pharmaceutical suppliers like [████████████], and provide the essence of Periflex® Infant. Ex.12; Ex.1, Lavine Report at 11. The seventeen amino acids in this formula, some of which can be converted into other amino acids (not phenylalanine), are not found in food in this form naturally. Ex.1, Lavine Report at 20; Ex.12. All of the above are pharmaceutical grade ingredients, analyzed using high-pressure liquid chromatography to assure content purity absent of heavy metals, radioactivity, and bacterial/fungal contamination. *Id;* Ex.12. Dr. Lavine stated that Periflex provides "[t]he minimal amount of BCAA needed for life, without providing any excess that elicits toxicity." Ex.1, Lavine Report at 10-11.

There are no foods that could provide the proteins needed for host protein synthesis that exclude phenylalanine as a component. *Id.* Other ingredients in Periflex ® Infant, include "essential vitamins, minerals, fats and carbohydrates needed to maintain life functions for all people." Ex.1, Lavine Report at 11*; See* Ex.12.

Like Periflex ® Infant, Nutricia designed Periflex ® Jr. for children over one with the following amino acids or amino acid analogue mixture:

> L-glutamine, L-proline, L-asparagine, L-lysine hydrochloride, L-tyrosine, L-leucine, L-valine, L-serine, L-isoleucine, L-alanine, L-threonine, L-arginine, L-cystine, L-citrulline, L-histidine, L-methionine, L-tryptophan and taurine.

Ex.1, Lavine Report at 11; Ex.14. Other constituent ingredients in Periflex ® Jr. include essential vitamins, minerals, fats and carbohydrates needed to maintain life functions for all people. Ex.14.

The only way to eliminate phenylalanine (while providing all nutrients needed for life) is to provide the child amino acid ingredients that are listed above, while providing other amino acids in appropriate quantities and ratios needed to synthesize total body proteins. Ex.1, Lavine Report at 20.

### 3.   Neocate ® Junior

Nutricia designed, and health care professionals prescribe, Neocate® Junior to treat patients who suffer from: (1) Eosinophilic Esophagitis (EoE), (2) Short Bowel Syndrome (SBS), which we describe below, as well as other diseases and disorders. *Id.* at 21-29.

#### a.   Eosinophilic Esophagitis (EoE)

Neocate ® Junior is used to treat Eosinophilic Esophagitis (EoE), an immune-mediated disease of the esophagus with an estimated prevalence at 19 per 100,000 persons. *Id.* Persons with EoE have a particular type of white blood cell (eosinophil) that builds up in the lining of the conduit that connects their mouth to their stomach (esophagus). *Id.* Dr. Lavine explained that

Eosinophil infiltration is a reaction provoked by foods, other allergens or acid reflux.  It impairs passage of food and propulsive movement (diminished diameter, amplitude and velocity). It can produce swallowing pain that blunts appetite and intake. This disease sometimes accompanies anaphylactic reactions or asthma. EoE can be managed with nutritional therapy. However, if EoE is left untreated, it may cause esophageal narrowing from swelling (or fixed strictures) and damage the esophageal tissue.  Strictures may predispose to food impactions in the esophagus, which may require endoscopic retrieval to remove. EoE usually presents in infants, toddlers, and children of elementary school age.

*Id.* at 21-22. Neocate ® Junior works by eliminating the antigens in food responsible for provoking the response, while providing all essential nutrients that are needed for normal growth and development. *Id.*

### b.     Short Bowel Syndrome (SBS)

Short Bowel Syndrome (SBS) is defined as "a loss of intestinal surface for absorption of nutrients caused by the surgical removal of a section of bowel. Treatment is with parenteral nutrition in the acute phase." Ex.15. Dr. Lavine explained that Short bowel syndrome (SBS) may occur when those portions of the small intestine have been removed or when portions of the small intestine are missing or damaged at birth. Ex.1, Lavine Report at 23. A person with SBS may also require enteral tube feeding by placing food, fluids, and/or drugs directly into the stomach or small intestine through a tube inserted through the nose or directly through the abdomen into the stomach. *Id.* "SBS affects the available absorptive surface area due to limited length of the small intestine, so that time required for absorption of nutrients after time required for digestion is insufficient. *Id.* The reported incidence of SBS is approximately 24 per 100,000 births.  *Id.* It is a permanent and incurable condition.

SBS requires ongoing therapy, monitoring and management and Neocate® Junior is used by persons with SBS as nutritional therapy. *Id.* Neocate ® Jr. is used because it provides all of the needed and essential amino acids in the appropriate proportions for maintaining all bodily functions - without having to undergo digestion prior to absorption within intestinal remnants. *Id.*

10

Providing Neocate® Jr. to a child allows absorption of amino acids to commence the moment upon arrival in the proximal small intestine. *Id.* This approach allows maximal uptake of amino acids, given the limited available surface area of small bowel and the time available to absorb it. *Id.*

To treat children with these conditions, Nutricia designed Neocate® Junior with the following amino acids and amino acid analogues:

> L-Arginine (2.4%), L-Glutamine (2.3%), L-Lysine, L-Aspartate (2%), and less than 2% of each of the following: L-Leucine, L-Phenylalanine, L-proline, L-valine, Glycine, L-Isoleucine, N-Acetyl-L-Methionine, L-Threonine, L-Histidine, L-Serine, L-Alanine, L-Tryptophan, L-Tyrosine, L-Cystine, Taurine.

Ex.1, Lavine Report at 13; Ex.16. These amino acids are specially manufactured by pharmaceutical suppliers like [                    ], and provide the essence of Neocate® Junior. Ex.17; Ex.1, Lavine Report at 13.   In addition, "[a]ll of these amino acids are non-allergenic and non-immunogenic (due to their low molecular weight unrecognized by the immune system), but provide all of the building blocks needed, once circulated in the body, to synthesize all needed proteins for bodily function."  Ex. 1, Lavine Report at 13.  Other constituent ingredients in the formula include essential vitamins, minerals, fats and carbohydrates needed to maintain life functions for all people. *Id.* at 13; Ex. 16.

### 4.    Ketocal® 4:1 Liquid

Nutricia designed, and health care professionals prescribe, Ketocal® Liquid to treat patients who suffer from: (1) Intractable/Refractory Epilepsy, (2) Glucose Transporter Type 1 Deficiency (GLUT 1), which are describe below, as well as other diseases or disorders. Ex.5E.

### a.    Intractable/Refractory Epilepsy

Intractable or refractory epilepsy is a neurological disorder in which a person's seizures fail to adequately subside with appropriately dosed pharmacologic therapy for convulsions. Ex.1, Lavine Report at 29. These seizures are called "uncontrolled" or "refractory." *Id.* Nutrition therapy

11

is an alternative or supplemental treatment for persons with intractable epilepsy. *Id.* A "ketogenic" diet that is high in fat, low in carbohydrates, and contains controlled proportions of protein. *Id.*

### b.      Glucose Transporter Type 1 Deficiency (GLUT 1)

Glucose Transporter Type 1 deficiency (GLUT 1) is a lifelong genetic metabolic disorder that occurs as a result of mutation in the SLC2A1 gene. Ex.1, Lavine Report. at 30-31. It is incurable and presents in infancy. *Id.* at 30. "The disorder impairs glucose transport to the brain." *Id.* The ketogenic diet, which treats intractable childhood epilepsy, is the principal treatment for persons with GLUT1. *Id.* This diet provides an alternative substrate (ketones instead of glucose) for the brain to utilize as an energy source. *Id.* Persons with GLUT1 demonstrate epilepsy, developmental delays, acquired microcephaly, cognitive impairment and varying degrees of spasticity, ataxia, and dystonia. *Id.* Persons with GLUT 1 may also suffer from seizures and movement disorders. *Id.*

Ketocal 4:1 Liquid is formulated "to provide the first ready-to-feed nutritionally complete formula specifically developed to meet the nutritional needs of children 1-10 years of age, who suffer from a variety of intractable epilepsy syndromes that are insufficiently responsive to treatment with a combination of two or more pharmacologic anti-convulsants." Ex.1, Lavine Report at 14. This formula provides a 4:1 ratio of 4 grams of fat to every gram of "non-fat" protein and carbohydrate. *Id.* This formula is suitable for use as a sole source of nutrition and can be administered via a gastrostomy or nasogastric tube, which many recipients require due to their difficulty in swallowing, reflux related to their oft-severe neurologic impairment, or aversion to its taste. *Id.* The proteins in this formula are from cow milk protein (casein and whey), along with some amino acids to optimize the dietary needs for appropriate amino acid ratios for optimal nutrition. *Id.* The great proportion of fat to carbohydrate is known to reduce the intensity and

frequency of seizure episodes, and provides the essence of Ketocal.  The majority of calories in this formula comes from a variety of fat sources. *Id.* at 14-15. These fats are:

> "Refined vegetable oil (high oleic sunflower, soy, palm), alpina oil, C. Cohnii oil, mono and diglycerides, and soy lecithin. Carnitine and taurine are supplements for cellular transport and metabolism of fats."

*Id.* at 15; Ex.18. Other ingredients are water, proteins, minimal carbohydrates, vitamins, minerals and fiber. Ex.18.

### C.    The Recognition of the Imported Products in the Trade.

Nutricia's formulas are marketed to physicians like other medical products. Ex.1, Lavine Report at 33. These products are well recognized by the medical profession. *Id.* For example, Dr. Lavine was provided samples of these products and kept Neocate ® Junior and Neocate ® Infant in his office to provide to patients. *Id.* Dr. Lavine explained that "parents would generally not be aware of their existence or utility in treating their child's problem because they are not products such as Similac or Enfamil that are advertised on television, radio, or the internet; and available in almost all grocery stores or pharmacies." *Id.* Dr. Lavine also explained that "[p]hysicians that recommend/prescribe the medical food formulas indicate the manufacturer, name, and rationale for prescribing the formula and direct the guardians of these children to access and explain about how to order the formula." *Id.*

Dr. Lavine stated [g]iven the recognized utility of the imported products as medicaments and as first-line or second-line therapies, hospitals and outpatient care facilities keep them in their inventory at all times." *Id.*  Dr. Lavine stated he personally found this to be the case when he was on faculty at UCSF, Harvard, UCSD and Columbia. *Id.* Moreover, these products have been the subject of hundreds of use and efficacy studies written by and for medical experts. Nutricia provided the government 220 of these studies during discovery. Ex.19 (providing 120 sample

13

studies from 2005-2015). These studies have covered such topics as the impacts of diet therapy for children with EoE, and the efficacy and long-term outcomes of amino acid formulas. Ex.19.

### D.      Expectation of the Ultimate Purchasers

The ultimate purchasers of the subject medical foods are the legal guardians of a newborn or child with a serious medical condition, usually the mother or father. Ex.1, Lavine Report at 9, 33. The expectation for the ultimate purchaser is that the Nutricia product will prevent or ameliorate the symptoms suffered by their child, which would otherwise occur for a particular condition if the child were to eat an otherwise normal age-appropriate diet. *Id.* "These products are used to prevent or mitigate disease manifestation or progression while facilitating growth and development to the fullest extent. In some cases, delay in diagnosis or institution of appropriate nutritional intervention leaves a child with impaired development or growth." *Id.* at 9. "Once diagnosis is made and nutritional medicament provided, further impairment is avoided." *Id.*

For the ultimate purchaser, once a newborn or child is diagnosed with one of the diseases recognized to be alleviated by these formulas, the physician (often in concert with a nutritionist) will recommend or prescribe the formula to be initiated and maintained. *Id.* Once the medical food treatment is started, the physician monitors progress and adherence at regular intervals to assure that growth and development is optimal, and that clinical and metabolic expectations are met. *Id.* Parents understand that these products are expensive, but they "may have medical insurance that covers the cost of the formula, usually requiring a physician's prescription, with follow-up by the physician with the insurance company to justify the need for the food medicament." *Id;* Ex.13, (Letters of Medical Necessity, HCPCS, and WIC).

### E.      The Economic Practicality of So Using the Imported Products

Plaintiff's expert Mr. Robles, conducted an analysis of the costs of the subject imports with the costs of products in the non-medical baby food industry to determine whether these products are commercially fungible. Ex. 21, Expert Report of Pablo Robles at 3 (Robles Report). Mr. Robles has a PhD in economics from The University of Chicago.   He concluded that "the economic features of Nutricia's at-issue products are significantly different from those of the relevant comparator products, making it unlikely that consumers view the two sets of products as substitutes." *Id.* His economic analysis indicated that: consumers would find it economically impractical to use at-issue products as substitutes for relevant comparator products (e.g., grocery store available baby foods such as Similac, Enfamil, etc.) in the non-medical baby food industry. *Id.* He found:

- Consumers of the at-issue products face medical requirements that consumers of non-medical baby food products do not. This is because the at-issue products (unlike non-medical baby food products) are recommended to be consumed under medical supervision and are commonly sold through healthcare institutions.

- Prices paid by consumers of at-issue products during the relevant period were significantly higher than the prices paid for products in the non-medical baby food industry.

- While the at-issue products are often covered by insurance, relevant comparator products in the non-medical baby food industry are not.

Mr. Robles stated "[p]roducts are economic substitutes if consumers shift their consumption from one product to the other in response to a price change in one of the products. *Id. at 9.* "A pre-requisite for substitute products is that consumers have knowledge of the existence of both products, and therefore, can shift their purchases in response to the price change in one of the products." *Id.* Medical food products such as the at-issue products have significantly higher retail

prices than baby food purchased at a grocery store. Ex. 21, Robles Report at 24. In examining products sold in 2014 Mr. Robles found:

- MSUD Lophlex® [ █████████ ] sold for over █████ more than Gerber Toddler pouches ($ .37/fl. oz.).

- Periflex® Infant sold for [ █████████ ] over █████ more than Enfamil Infant ($.16/fl. oz.).

- Periflex® Junior sold for [ █████████ ] over █████ more than Similac ($.13/fl. oz.).

- Neocate ® Junior sold for [ █████████ ] over █████ more than Similac ($.13/fl. oz.).

- Ketocal® Liquid sold for [ █████████ ] over █████ more than Enfamil ($.23/fl. oz.).

*Id.* He found it would not make economic sense for consumers of products in the non-medical baby food industry to consider the at-issue products as potential substitutes. *Id.*

Further, Nutricia's products are primarily reimbursed as a medical benefit. Ex.22, Dep. Bruce at 12. Many of the patients purchasing Nutricia's products go to a durable medical equipment provider so they may receive medical reimbursement from an insurance company for Nutricia's products. *Id.* Non-medical baby foods are generally not covered by insurance. Ex.21, Robles Report at 26. State mandates cover medical foods for certain conditions if a health professional indicates that they are medically necessary. *Id.*

To obtain insurance reimbursement coverage for a product, the product must have a Healthcare Common Procedure Coding System (HCPCS, called "hick picks") number. HCPCS are a collection of standardized codes that represent medical procedures, supplies, products and services that the government categorizes as needed for the aged and disabled. *See* 42 U.S.C. § 1395ww(t)(4). The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers for products and are issued by the U.S. Government. *See* 42 U.S.C. §1395ww(t)(4). Nutricia's products have HCPCS codes and qualify for private insurance reimbursement and the insurance codes for the imported products are listed inside Nutricia's

materials (e.g., one of the HCPCS codes for Neocate is B4161). Ex.13. Nutricia provides a service to assist persons seeking reimbursement for the purchase of their medical foods. Ex.13. Persons who purchase such essential medical food obtain reimbursement of this cost from private commercial insurance payers (e.g., Aetna or Blue Cross/Blue Shield). *Id.* Dr. Lavine indicated that "his staff would typically help a patient apply for insurance reimbursement." Ex.1, Lavine Report at 9. Nutricia's records indicate that at least 96% of their sales are covered by some form of insurance or government support. Ex.21, Robles Report at 26 & n. 58. Nutricia also provides examples of forms to be used by patients to assist with this process. Ex.13.

F.     **The Channels of Trade in which the Imported Merchandise Moves**

Nutricia's national medical sales teams sell to hospitals, home healthcare or durable medical equipment retailers and wholesalers. Ex.22, Bruce Dep. at 12. The reason for this chain of sale is that purchase of at-issue products can be covered by insurance, which may require consent or a prescription from healthcare professionals *Id.* Medical food infant formulas are typically prescribed by a medical professional and must be requested from a pharmacist, or are distributed directly to institutions such as hospitals and medical clinics. Ex.23.

Nutricia's largest wholesaler is a medical wholesaler [██████████████████████] Ex. 22, Bruce Dep. at 14. Medical food infant formulas are marketed by sales representatives to doctors or healthcare professionals who then prescribe them to patients. Ex.21, Robles Report at 14, 16. The "largest sales channel in the medical food industry is the institutional sales channel, which accounted for 42.8% of sales in the medical food industry for the 2014-2020 period." *Id.* at 14.

Healthy baby formulas are sold through traditional retailers such as grocery stores or big box stores (e.g., Target). *See* Ex.21, Robles Report at 5. Consumers of products in the non-medical baby food industry purchase their products mostly through traditional retail channels such as 1)

supermarkets (83%); 2) pharmacies (11.5%); 3) convenience stores (2%); 4) independent retailers (1.6%); and 5) other (1.1%). Ex. 21, Robles Report at 16.

### G.  The Environment of the Sale

Most advertising and marketing of medical foods takes place in conferences, training sessions in healthcare institutes, and awareness campaigns. *See* Ex.21, Robles Report at 15 & Exhibit 3. This is because healthcare providers then prescribe or recommend the medical food products to the ultimate users. Ex.1, Lavine Report at 34.  The products themselves have labels that state the product should be taken under "medical supervision," and the indications or diseases for which the product should be used. *See* Ex.21, Robles Report at 6, 35; Ex.20. The labels specifically indicate that they are used for the nutritional management of medical conditions. For example, the MSUD Lophlex label indicates that it is a "[f]ood for special medical purpose" Periflex indicates that it is "[a]phenylamine-free, powdered infant formula with iron for the dietary management of Phenylketonuria (PKU)," the Neocate Junior label states it is "[f]or the dietary management of cow and soy milk allergy, multiple food protein intolerance, eosinophilic esophagitis, short bowel syndrome, and conditions of gastrointestinal tract impairment and malabsorption requiring an elemental diet: A Medical Food." Ex.20A-D.

### H.  CBP Rulings

In 1990, CBP issued Nutricia a binding ruling classifying PKU products (e.g., Analog XP or Maxamum XP) under heading 3004, Ex.24, HQ 083000 (Sept. 19, 1990).  The products in the 1990 ruling are substantially similar or identical to the Periflex products at issue in this case. In 2007, CBP issued three separate rulings classifying other PKU products as medicaments under heading 3004. *See* Ex.25, NY N005717 (Jan. 26, 2007), NY N006048 (Feb. 6, 2007), and NY N006049 (Feb. 6, 2007).

However, in 2004, CBP issued another ruling classifying PKU products as other food preparations under heading 2106. Ex.26, HQ 966779 (Jan. 16, 2004). CBP did not revoke its prior 1990 ruling that classified PKU products under heading 3004, pursuant to 19 U.S.C. § 1625. Instead, CBP stated that HQ 083000 was revoked by operation of law as a result of changes to chapter 30, note 1(a).  In 2014, CBP formally revoked the three 2007 PKU rulings and reclassified those PKU products from heading 3004 to heading 2106. Ex.27, 48 Cus. Bul. & Dec. No. 35 (Sept. 3, 2014).   Later in 2014, CBP issued a ruling to Nutricia in response to Nutricia's protest challenging CBP's liquidation of entries of certain metabolic and gastrointestinal medical foods similar to those at issue here. Ex.28, HQ H121544 (Oct. 6, 2014).  In HQ H121544, CBP rejected Nutricia's arguments that the products (besides PKU products) were classified under heading 3004 as medicaments, and secondarily classified under heading 9817, and classified the medical foods as other food preparations under heading 2106. *Id.* CBP classified the PKU products under heading 3004 because it's 2014 revocation of the rulings on PKU products was not effective until November 3, 2014 and the entries subject to the protest were made prior to this date. *Id.*

## SUMMARY OF ARGUMENT

The two questions before the Court are: (1) whether the subject products are medicaments of heading 3004 as Plaintiff contends, or "other" food preparations of heading 2106 as CBP contends; and (2) whether the products are designed for the benefit of handicapped persons and as such may be classified under heading 9817.  As to the first question, a brief review of the structure of the tariff schedule and the relevant headings and provisions reveals that the subject products must be classified as medicaments of heading 3004.  Heading 2106 is limited to food preparations "not elsewhere specified."  This provision is what the courts have referred to as an "expansive basket heading that only applies in the absence of another applicable heading."  Thus, to the extent that the subject products are medicaments, classification in heading 2106 is foreclosed.  Even if

19

this Court were to conclude that the subject products are *prima facie* classifiable in <u>both</u> provisions, the operation of GRI 3(a) would require classification in the more specific "medicaments" provision rather than the "expansive basket" food preparations provision. In order for CBP to prevail it must demonstrate that the subject products are <u>not</u> medicaments. It cannot do so, because the tariff provisions coupled with the record evidence establish that the subject products are indeed medicaments.

First and foremost, the subject products are conceived, designed, produced, marketed, and sold for "therapeutic or prophylactic use," which is the defining characteristic of a medicament. They are indicated for use in the treatment of a variety of diseases, predominantly in children – in some instances they are in fact the only or primary available treatment to ameliorate these severe and sometimes fatal conditions. Indeed, medical professionals refer to the deployment of these products as "nutritional **therapy,**" thus confirming their therapeutic use and value. Put simply, as FDA-regulated "medical foods" the subject products are the "medicine" that doctors variously prescribe or recommend to treat the children suffering from the referenced diseases. The products' therapeutic character is incontrovertible, and the factors that the Court set out in *United States v. Carborundum Co.,* 63 CCPA 98, 102 (1976) underscore their status as medicaments:

- They are used exclusively as medicaments (*i.e.*, as nutritional therapy); healthy children do not consume them (in some cases such consumption would be dangerous).

- They are produced and marketed in the same manner as other medicaments, with the marketing principally focused on healthcare providers rather than consumers.

- They are understood to be medicaments by both the doctors who prescribe/recommend them and the consumers who ultimately purchase them. Their costs may be eligible for reimbursement by health insurers as would be the case for other medicaments.

- They are priced as medicaments – the record shows prices as much as ████████ ] higher than their non-medical food counterparts.

20

- They are sold in the same channels as medicaments – consumers purchase them through medical distributors and/or "behind the counter" at a pharmacy; they are not sold in conventional retail food channels.

In short, application of the *Carborundum* factors to these products and the factual record establishes that they are medicaments from concept to consumption and at every intervening stage.

In response to these facts, CBP seeks to narrow the scope of heading 3004 by interposing additional requirements, namely that medicaments must (1) feature an active ingredient, and (2) cure a disease. Both arguments fail. There is nothing about the language of heading 3004 requiring that a medicament feature a specific active ingredient; to the contrary, its coverage is defined by use in "therapeutic or prophylactic" applications. This precisely aligns with the use of the subject products, whose efficacy in those applications is the reason why they are FDA-regulated as medical foods and recommended or prescribed to patients. The Explanatory Notes to heading 3004 are instructive in that regard: they confirm that food supplements targeting general health and well-being are excluded from the heading, but only to the extent that they feature "no indication as to use for the prevention or treatment of any ailment." The subject products have precisely such an indication. They are specifically indicated and prescribed or recommended to prevent or treat very particular ailments. CBP's other contention, that the products must "cure" a disease, is similarly baseless - it conflates a "curative" product with a "therapeutic" one. There is no known "cure" for the common cold – the notion that the panoply of medicines available to treat its symptoms therefore are not "medicaments" borders on the absurd, and it enjoys no support in the language of the tariff schedule. Given their therapeutic and prophylactic characteristics as underscored by the *Carborundum* analysis, the subject products are demonstrably medicaments of heading 3004. As such, plaintiff submits that classification under heading 2106 is foreclosed, and

even if the Court concludes that the products are *prima facie* classifiable as both foods and medicaments, GRI 3(a) requires classification under heading 3004 as the more specific provision.

The second question before the court is whether the subject products are secondarily classifiable under heading 9817, as articles specially designed to benefit handicapped persons. As set out above and detailed in Plaintiff's argument below, there is no doubt that the subject products are conceived, designed, produced, marketed, prescribed/indicated, and sold to treat specific diseases. The issue therefore is whether the patients suffering from these diseases are "handicapped" within the meaning of the heading (which was statutorily designed to be of broad application). More specifically, under U.S. Note 4, the question is whether patients are suffering from a physical ailment that substantially limits one or more major life activities. To ask this question is to answer it: the patients for whom the subject products are indicated typically cannot metabolize any naturally occurring protein without suffering adverse, and often acute or even life-threatening, effects. In lay terms, they cannot eat what they require to grow and survive without getting sick, and often dangerously so. In that light, these conditions impair virtually <u>every</u> "major life activity," none of which is possible absent basic nutrition.

The Americans with Disabilities Act features a definition of "handicapped" that is nearly identical to that in the tariff schedule, and it describes "major life activities" as including but not limited to "caring for oneself, performing manual tasks, and seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." It goes on to include the operation of major bodily functions, such as "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." The inability to metabolize protein – the most fundamental nutritional building block – without serious adverse effects

represents an impairment to virtually <u>all</u> of these activities and functions. Plaintiff's expert, a medical doctor who treats patients suffering from these conditions, has confirmed that they are "handicapped" within the meaning of the ADA, and there is no basis on which to conclude that the analysis should be any different under the HTSUS. CBP's only response is to argue that these patients must simply "avoid" certain categories of food (as would be the case for a person with diabetes or a peanut allergy), and that their conditions do not impair "the physical act of eating." These arguments both misapprehend the patients' conditions and unduly narrow the scope of heading 9817. For patients with these diseases, mere "avoidance" of particular discrete food categories (sugary foods, peanuts, etc.) in favor of others is insufficient or impossible – their treatment (and again often the only possible treatment) requires the particularized nutritional therapy that the subject products represent. CBP's seizing on the purported lack of an impediment to the "physical act of eating" while ignoring the profound and pervasive effects of these conditions on virtually all life activities is an impossibly narrow reading of the language of the HTSUS and its recognition of what it means to be "handicapped."

The subject products are medicaments of heading 3004 and secondarily they are articles specially designed to benefit handicapped persons of heading 9817. Our detailed arguments and analysis follow below.

## **STANDARD OF REVIEW**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). Summary judgment may be granted based on the pleadings, depositions, answers to interrogatories, and affidavits filed with the court. *See* USCIT R. 56. A classification decision involves two steps. The first step addresses the proper meaning of the relevant tariff Headings, which is a question of law. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir.

1998). The second step determines the nature of the imported merchandise and whether it falls into the relevant Heading, which is a question of fact. *Id.* In cases concerning the classification of an article, "summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." *Bausch & Lomb v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998); *see also Cummins Inc., v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006) ("when the nature of the merchandise is undisputed…the classification issue collapses entirely into a question of law"). Whether Customs has properly classified imported merchandise under the appropriate tariff provision is a question of law that the court reviews *de novo*. *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999); 28 U.S.C. § 2640(a)(1). A Customs decision is not entitled to deference if it: (1) overlooks "some" characteristics of the article to be classified, *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1210-11 (Fed. Cir. 2005), (2) contains conclusory statements and fails to apply the law to the facts, *Conair Corp v. United States*, 29 CIT 888, 898 (2005), or (3) a review of the tariff schedule or the ENs reveals fundamental flaws in Customs' analysis. *Estee Lauder v. United States*, 815 F. Supp. 2d 1287, 1298 (CIT 2012).

## ARGUMENT

**I.     The Subject Medical Foods are Classified as "Medicaments for Therapeutic Use" Under Heading 3004**

### A.     Applicable Rules of Interpretation

Tariff classification is governed by the General Rules of Interpretation ("GRIs"), which are applied in numerical order. *Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1266 (Fed.Cir. 2013). GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1. When a tariff term is not defined in the HTSUS or legislative history, the term's correct meaning is its common meaning. A court may rely upon its own understanding of terms used, and may consult standard lexicographic and

scientific authorities, to determine the meaning of a tariff term. *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994). Although not dispositive, the Explanatory Notes "clarify the scope of the HTSUS subheadings and offer guidance in their interpretation." *Franklin v. United States*, 289 F.3d 753, 758 (Fed. Cir. 2002) (citation omitted).

According to GRI 3(a), when a product is *prima facie* classifiable under two or more headings, "the heading which provides the most specific description shall be preferred to headings providing a more general description." GRI 3(a).  Under Additional U.S. Rule of Interpretation ("ARI") 1(a), "a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use." *Dependable Packaging Solutions, Inc. v. United States*, 757 F.3d 1374, 1378 (Fed. Cir. 2014).

**B.      The Plain Terms of Heading 3004 Describe the Subject Medical Foods**

Heading 3004 provides for:

 "Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses, put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale."

The medical foods here meet each of the requirements of the terms of this heading.  They are: (1) medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses, and (2) put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale. *Warner-Lambert Co.*, 425 F.3d at 1384.

First, medical foods are "medicaments for therapeutic uses."  The term "medicaments" is defined as: "a  substance  used  in  therapy" *Available   at*   https://www.merriam-

webster.com/dictionary/medicament. The term "therapeutic" has been defined by this court as "relating to . . . the treatment, remediating, or curing of a disorder or disease." *Warner-Lambert*, 341 F. Supp. 2d at 1277 (citing Stedman's Medical Dictionary 1821 (27th ed. 2000)). The term "therapeutic" also has been defined as embracing "the alleviative or palliative, as well as the curative or healing qualities." *J.E. Bernard & Co., Inc. v. United States*, 58 Cust. Ct. 23, 28-29 (1967); *United States v. Alltransport, Inc.*, 44 C.C.P.A. 149, 152 (1957) (a product is medicinal if it is "of use, or believed by the prescriber or user fairly and honestly to be of use, in curing or alleviating, or palliating or preventing, some disease or affliction of the human frame.") A medicament has therapeutic uses even if does not "cure" a disease. *Inabata Specialty Chems. v. United States*, 29 C.I.T. at 422-423.

Nutrition therapy is a type of therapy defined as the "administration of food and fluids to support metabolic processes of a patient who is malnourished or at high risk for becoming malnourished." Ex.29, Nutrition therapy, *Mosby's Dictionary of Medicine, Nursing & Health Professions* (9th ed. 2013). It is also defined as "Nutritional diagnostic, therapy, and counseling services for the purpose of disease management which are furnished by a registered dietitian or nutrition professional."[1]

Plaintiff's products are FDA "medical foods," which are substances designed and used in therapy for disease management, and fall squarely within the definition of "medicaments for therapeutic use" in heading 3004. 21 U.S.C. § 360ee; *See supra* 1-4. The FDA has stated that "medical foods" must: (1) meet distinctive nutritional requirements of a disease or condition, (2)

---

[1] https://www.eatrightpro.org/payment/coding-and-billing/mnt-vs-nutrition-education (last visited Nov .18, 2021).

be used under medical supervision, and (3) be intended for the specific dietary management of a disease or condition.[2]  FDA regulations further state a "medical food":

> a.   Is a specially formulated and processed product (as opposed to a naturally occurring foodstuff used in its natural state) for the partial or exclusive feeding of a patient by means of oral intake or enteral feeding by tube, meaning a tube or catheter that delivers nutrients beyond the oral cavity directly into the stomach or small intestine;

> b.   Is intended for the dietary management of a patient who, because of therapeutic or chronic medical needs, has limited or impaired capacity to ingest, digest, absorb, or metabolize ordinary foodstuffs or certain nutrients, or who has other special medically determined nutrient requirements, the dietary management of which cannot be achieved by the modification of the normal diet alone;

> c.   It provides nutritional support specifically modified for the management of the unique nutrient needs that result from the specific disease or condition, as determined by medical evaluation;

> d.   It is intended to be used under medical supervision; and

> e.   It is intended only for a patient receiving active and ongoing medical supervision wherein the patient requires medical care on a recurring basis for, among other things, instructions on the use of the medical food.

21 C.F.R. §101.9(j)(8). These regulations confirm "medical foods" meet the plain terms of heading 3004, because such products are substances designed and used as therapy for patients suffering from diseases for which "modification of the normal diet alone" cannot be used to alleviate or treat the patient's disease.

This conclusion is supported by plaintiff's expert, Dr. Lavine, who described the products as "medicaments," and as "first-line or second-line therapies, hospitals and outpatient care facilities keep them in their inventory at all times." Ex.1, Lavine Report at 33.  Dr. Lavine said the imported products were used as part of their "nutrition therapy." Ex.1, Lavine Report at 16, 22, 31. Specifically, Dr. Lavine found:

---

[2] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-frequently-asked-questions-about-medical-foods-second-edition.

- MSUD Lophlex® LQ is used as nutrition therapy for children who suffer from a severe, life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase complex (BCKDC) deficiency. Ex. 1, Lavine Report at 15-16.

- Periflex® Infant and Junior are used to treat PKU in children under and over one year old, respectively. *Id.* Nutrition therapy is the primary treatment for persons with PKU. *Id.*

- Neocate® Junior is used by patients with Eoe or SBS as nutritional therapy. SBS affects the available absorptive surface area due to limited length of the small intestine, so that time required for absorption of nutrients after time required for digestion is insufficient. *Id.*

- Ketocal® Liquid is a nutritional therapy to treat patients with intractable or refractory epilepsy, which is a neurological disorder in which a person's seizures fail to adequately subside with appropriately dosed pharmacologic therapy for convulsions. *Id.* at 29.

Each of the subject medical foods is a substance used to treat patients with a disease, and accordingly these products are "medicaments for therapeutic use" classified under heading 3004.

Second, there is no dispute that the products meet the other requirements of heading 3004, namely the products are "put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale." Ex.20, 30 at 2.

**C.   The Subject Medical Foods are of the Same Class or Kind as Medicaments under Heading 3004**

Heading 3004 is a "use" provision. *Warner-Lambert Co.*, 425 F.3d at 1384. When applying a "principal use" provision, the court first determines the "class or kind" of goods that are covered by the "principal use" described in the tariff provision and second whether the subject merchandise falls within that class or kind. *See Len-Ron Mfg. Co. v. United States*, 118 F. Supp. 2d 1266, 1282 (2000). The purpose of "principal use" provisions in the HTSUS is to classify particular merchandise according to the ordinary use of such merchandise. *Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1364 (Fed.Cir. 1999). This has been defined as the "predominant use, rather than

28

simply one possible use" and the "use which exceeds any other single use." *Lenox Collections v.*
*United States*, 20 CIT 194, 196 (1996). In the "principal use" analysis, the court "must ascertain
the class or kind of goods which are involved and decide whether the subject merchandise is a
member of that class." *E.M. Chems.*, 20 CIT at 388.

Courts have consistently examined seven factors, called the "*Carborundum*" factors, to
determine whether or not imported product falls within the class or kind of goods in a tariff
provision. These factors include:

1. the use of the merchandise;
2. the general physical characteristics of the merchandise;
3. the recognition in the trade of this use;
4. the expectation of the ultimate purchasers.
5. the economic practicality of so using the import;
6. the channels of trade in which the merchandise moves; and
7. the environment of the sale (e.g., the manner in which the merchandise is advertised
and displayed).

*E.M. Chems.*, 20 CIT at 388 (citing *Carborundum Co.*, 63 CCPA at 102) (subsequent history
omitted).

In defining a class or kind of merchandise, the courts have developed a "totality of the
circumstances test," which requires examination of these factors that are individually indicative,
but only collectively conclusive, of the "class or kind" to which particular merchandise belongs.
*Id.* In 1999, the Federal Circuit described the test to determine if an imported product is of the
same "class or kind" under ARI 1 as a "commercial fungibility" test. *Primal Lite, Inc.*, 182 F.3d
at 1365. ("We construe the call for a determination as to the [class or kind]of goods that are
commercially fungible with the imported goods.").

### 1.    Medical Foods are Used the Same as Medicaments

The use of the merchandise is not contested by the parties. Ex.1, Ex.30 (Dr. Gregory Report
at 5). The products are used to alleviate, palliate or prevent, certain diseases, syndromes, symptoms

or conditions. Ex.1, Lavine Report at 9.  Each of the products is used as nutrition therapy to treat specific medical conditions and disorders. *See supra* 5-19.  This use is the same as the use of medicaments classified under heading 3004.  Medical foods are required to treat patients suffering from specific illnesses because medications and diets are not effective in treating these illnesses. 21 C.F.R. §101.9(j)(8)(b). Dr. Lavine explained that in many cases, these formulas are the only source of nutrition that the newborn or child may receive. Ex.1, Lavine Report at 30. On some occasions, placement of a nasogastric tube or percutaneous gastrostomy tube may be needed and tube feedings may be used for feedings of the Nutricia product (for instance, in children with short bowel syndrome). *Id.* Dr. Lavine indicated in his report that in his medical practice, "many of the newborns, infants, and older children with the panoply of disorders described are admitted to the hospital for protracted times in order to recover from surgery, mitigate symptoms, or to find the optimal nutritional formula and provisional methods to optimize a child's development." *Id.* Moreover, these medical foods should not be used by healthy individuals as part of a normal diet, and are used under the supervision of a health care professional.  *Id.* at 1.

## 2. Medical Foods Have Physical Characteristics Similar to Medicaments

Like medicaments under heading 3004, the subject imports have been designed, produced, studied and prescribed to treat specific illnesses. Ex.5. The essential ingredients that provide the efficacy of the products (except Ketocal) are pharmaceutical grade individual amino acids that must be specially manufactured by companies like [        ], which are known to produce other medicaments, to meet the desired medical purpose of each product.  Ex.1, Lavine Report; Ex.12.  In the Statement of Facts, Section B, we described in detail the unique ingredients for each product.  MSUD Lophlex® LQ, Periflex ® Infant, Periflex ® Jr., Neocate® Junior all are produced using different specially manufactured, pharmaceutical grade individual amino acids that are combined to treat the diseases for which the product is indicated. *See supra* at 6-15. Ketocal®

Liquid is specially manufactured with isolated ingredients and fat sources to create a high fat to carbohydrate ratio needed to reduce the intensity and frequency of seizure episodes. *Id.* By definition medical foods such as those at issue here must possess unique physical characteristics (not appearing in normal foods) because medical foods are only used when "modification of the normal diet alone" is not sufficient to treat the illness of the patient. *See* 21 C.F.R. § 101.9(j)(8)(a) and (b).

### 3. Medical Foods Are Recognized in the Trade as Medicaments

Nutricia's formulas are recognized as medicaments by physicians, other medical professionals and patients. Ex.1, Lavine Report at 33. For example, Dr. Lavine stated that he was provided samples of these products and kept Neocate ® Junior and Neocate ® Infant in his office to provide to patients. *Id.* Dr. Lavine explained that "parents would generally not be aware of their existence or utility in treating their child's problem because they are not products such as Similac or Enfamil that are advertised on television, radio, or the internet; and available in almost all grocery stores or pharmacies." *Id.*   Dr. Lavine explained that "[p]hysicians that recommend/prescribe the medical food formulas indicate the manufacturer, name, and rationale for prescribing the formula and direct the guardians of these children to access and explain about how to order the formula." *Id.* He stated, "[g]iven the recognized utility of the imported products as medicaments and as first-line or second-line therapies, hospitals and outpatient care facilities keep them in their inventory at all times." *Id.*  Dr. Lavine confirmed he personally found this to be the case when he was on faculty at UCSF, Harvard, UCSD and Columbia. *Id.* He stated that "[a]s the Chief for Pediatric Nutrition at UCSD and Columbia for 25 years total, I believe my comments echo the appropriate and expected standard of care." *Id.* The recognition of the use of the subject medical foods in the trade is further confirmed by the hundreds of efficacy studies by and for

medical experts covering such topics as the impacts of diet therapy for children with EoE, and long-term outcomes of amino acid formulas. Ex.19.

### 4. Purchasers of Medical Foods Have the Same Expectations as Purchasers of Medicaments

Dr. Lavine explained that the ultimate purchaser is the legal guardian of an ill newborn or child with a serious medical condition, usually the parent. Ex.1, Lavine Reports at 9. The expectation for the ultimate purchaser is that the Nutricia product will prevent or ameliorate the symptoms suffered by his or her child, which would otherwise occur for a particular condition if the child were to eat an otherwise normal age-appropriate diet. Id.  Dr, Lavine stated: "[t]hese products are used to prevent or mitigate disease manifestation or progression while facilitating growth and development to the fullest extent. For the ultimate purchaser, once a newborn or child is diagnosed with one of the diseases or conditions recognized to be addressed by these formulas, the physician (often in concert with a nutritionist) would recommend or prescribe the formula to be initiated and maintained." *Id.* Once the medical food treatment is started, the patient would expect the treating physician to monitor the progress and adherence at regular intervals to assure that the patient's growth and development is optimal, and that clinical and metabolic expectations are met. *Id.* In short, like patients who take other medicaments, patients who take Nutricia's medical foods expect that the symptoms suffered from diseases will be alleviated, and they will need constant consultation with medical professionals to maintain the prescribed therapy.

### 5.      Given the High Cost of Medical Foods, It Is Only Practical to Use Them as Medicaments

Nutricia has provided undisputed evidence that its products are sold at higher costs as compared to other non-medical products on the market. *See supra at* 18. In examining products sold in 2014, Mr. Robles found that Nutricia's medical foods were [▮▮▮▮▮▮▮▮] more costly than non-medical foods. Ex.21, Robles Report at 24. Given the substantial price difference, setting aside the fact that healthy persons should not know about or take medical foods, it would not make economic sense for consumers of medical foods to use these products for non-medical purposes. *Id.* Due to their higher cost, patients who are prescribed the subject medical foods must and do seek insurance reimbursement for these products. Ex.13.

### 6.      Medical Foods are Sold in the Same Channels of Trade as Medicaments

Nutricia's national medical sales teams sell to hospitals, home healthcare or durable medical equipment retailers and wholesalers. Ex.22, Bruce Dep. at 12. Nutricia's products are not sold through grocery stores, big box stores, and food distributors. *Id*.; Ex.21. Robles Report at 14,16. Nutricia's largest wholesaler is a medical wholesaler, [▮▮▮▮▮▮▮▮▮▮▮▮▮▮] Ex.22, Bruce Dep. at 14. He found that the "largest sales channel in the medical food industry is the institutional sales channel, which accounted for 42.8% of sales in the medical food industry for the 2014-2020 period." Ex.21, Robles Report at 14.

In contrast, non-medical baby food products are sold through traditional retailers such as grocery stores or big box stores, (e.g., Target or Walmart). Ex.21, Robles Report at 5. Consumers of products in the non-medical baby food industry purchase their products mostly through traditional retail channels, such as (1) supermarkets (83%), (2) pharmacies (11.5%), (3) convenience stores (2%), (4) independent retailers (1.6%), and (5) other (1.1%). Ex.21, Robles Report at 16. These facts confirm that the imported medical foods move in the same channels for

trade as medicaments of heading 3004, and not the same channels as other food preparations of heading 2106.

### 7.   Medical Foods Are Sold in an Environment Similar to that of Medicaments

Nutricia's products are packaged, advertised, marketed and sold in an environment that is most similar to that of a medicament, not a food. *See* Ex.21, Robles Report at 6. The locations of purchase are also significantly different. *Id.* at 35.  Like other medicaments, the products are packaged with labels that include dosage amounts, warnings that the products must be administered only under medical supervision, and indications as to what diseases each product is designed to treat. Ex.20; *see supra* at 21. There are no cute babies on Nutricia's labels. Nutricia does not "advertise" its medical foods in the traditional sense. It markets these products at medical or health conferences, training sessions to doctors, health care providers and healthcare institutes, and awareness campaigns. *See* Ex.21, Robles Report at 15.  Traditional marketing of non-medical baby foods is targeted to final consumers, while marketing of medical foods is targeted to healthcare professionals who prescribe the products. Ex.21, Robles Report at 6.  While Nutricia had no advertising spend on TV or in magazines, in 2014 the non-medical baby food industry spent approximately $104.5 million on advertising, including $76.8 million on TV and $25.2 million on magazines. Ex.21, Robles Report at 17 & n.48.  Finally, as explained above, the vast majority of medical food purchasers buy the product though healthcare distributors, institutes, providers, pharmacies or hospitals. *Id.* at 6. This environment of sale is like that of medicaments, not foods.

In sum, the subject medical foods were designed, manufactured, studied and prescribed/recommended by medical professionals to treat the diseases suffered by infants and children.  Here, the analysis of all seven Carborundum factors confirms that medical foods are in the same class or kind as "medicaments for therapeutic use" classified under heading 3004.  These

34

products have the same or similar unique physical characteristics, use, economic practicality of such use, recognition in the trade, expectations of purchasers, channels of trade, and environment of sale as medicaments, and must be classified under 3004, not as food preparations under heading 2106.

## II.    The Subject Medical Foods Cannot be Classified Under 2106

### A.    The Subject Medical Foods Cannot be Classified under Heading 2106 Because This Provision Doesn't Include Products Classified Elsewhere

Under GRI 1, the imported medicaments cannot be classified in heading 2106,  This heading provides for: "Food preparations not elsewhere specified or included." This provision is a residual or basket provision that only covers articles "**not elsewhere specified or included**." Heading 2106, HTSUS (emphasis added).  Pursuant to GRI 1, and the plain terms of this heading, a good is only classified in heading 2106 if it is not classified elsewhere.  Because the medical foods are classified as medicaments under heading 3004, they cannot be classified under heading 2106. *R.T. Foods, Inc. v. United States*, 36 C.I.T. 1637, 1644 (CIT 2012) ("The Court finds that the products do not *prima facie* fit under heading 2106, HTSUS, which is an expansive basket heading that only applies in the absence of another applicable heading.")

### B.    Chapter 21, Note 1 Excludes Products of Heading 3004 From Classification under Heading 2106

GRI 1 states that classification is first determined according to the terms of the heading, and the terms of "any relative section or chapter notes."  Note 1(f) to chapter 21 **excludes** from classification under chapter 21 "**products of heading 3003 or 3004**." As demonstrated above, the imported articles are medical foods, which are medicaments classified under heading 3004. Accordingly, pursuant to GRI 1, the products are precluded from classification in heading 2106, or any provision in chapter 21.

35

### C.      CBP's Classification Determination Is Fatally Flawed

The ruling that formed the basis of CBP's denial of Nutricia's protests (HQ H121544) incorrectly classified medical foods as other food preparations under heading 2106. Ex.28 First, CBP incorrectly defined the term "medicament for therapeutic uses" in heading 3004 by requiring the product to (1) have an active ingredient, and (2) cure a disease.  There is no basis for such a narrow definition and the courts have consistently ruled that to be a "medicament for therapeutic uses" under heading 3004 the product does not need an active ingredient or cure a disease. *See e.g.*, *J.E. Bernard & Co., Inc.,* 58 Cust. Ct. at 28-29 (1967); *Alltransport, Inc.,* 44 C.C.P.A. at 152 (1957). "It is not necessary that a substance cure a disease to be described as 'therapeutic.'" *Inabata Specialty Chems.*, 29 C.I.T. at 423. Courts have confirmed that the term "medicament" is defined as a "substance used in therapy," and "therapy" includes "treatment" of an incurable disease that often involves remediation, palliative care, or alleviating the symptoms of a disease. Ex.31. The unique physical and chemical characteristics of the subject medical foods themselves act as active ingredients, and the products are recognized as providing the required nutritional therapy, alleviating and remediating incurable diseases.  21 U.S.C. § 360ee.  Indeed, in HQ H121544, CBP concedes that medical foods are used to treat metabolic diseases, or are "part of the overall treatment regimen." Ex.28.

Second, CBP improperly concluded chapter 30, note 1(a) excludes any product that may be considered a food from chapter 30.  Note 1(a) states "[f]oods or beverages -such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters, other than nutritional preparations for intravenous administration (Section IV)," may not be classified in Chapter 30.  It does not state that all foods or beverages classifiable in chapter 21 are excluded from chapter 30. The exclusion is limited to certain types of foods and beverages -- such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters.  Medical foods

are not like the types of foods listed in note 1(a) and this note does not exclude medical foods from classification under chapter 30.

Importantly, CBP ignores that medicaments possibly classifiable as foods (e.g., products that provide nutrients) are excluded from classification under chapter 21 pursuant to chapter 20, note 1(f). The chapter 21 and 30 notes are mutually exclusive (goods of chapter 21 cannot be classified in chapter 30, and goods of heading 3004 cannot be classified in chapter 21). The Federal Circuit has held that when there are two mutually exclusive chapter notes, the product must be classified according to the terms of the headings, GRI 1 and GRI 3(a), and the most specific provision prevails. *See Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246, 1252-1253 (Fed.Cir. 2004) (citing *Sharp Microelectronics Tech., Inc. v. United States*, 122 F.3d 1446, 1450-51 (Fed.Cir. 1997). In *Bauer*, the court found that hockey pants were *prima facie* classifiable under chapter 62 (track, ski, swim and other garments) and 95 (sports equipment). The notes to chapter 62 (Section XI) excluded goods of chapter 95, and the notes to chapter 95 excluded goods of chapter 62. The court held that CBP could not rely on the notes to chapter 62 to exclude classification under chapter 95, and that CBP had to use the rule of relative specificity before applying the exclusionary notes. *Id. at* 1252-53. Similarly, here the Court should reject CBP's reliance on the chapter 30 exclusionary note, and should classify medical foods under heading 3004 (medicaments) because this heading is more specific than heading 2106 (other food preparations).

Third, in H121544 CBP incorrectly described the physical characteristics and uses for medical foods. CBP wrongly suggests that (1) the products merely lack substances that trigger symptoms of a disease, (2) do not mitigate or repress symptoms, and (3) do not effectuate a chemical or biological change in the patient. The subject medical foods do not merely lack

37

substances that trigger symptoms.  They are designed to include individual amino acids that the body needs, but the patient cannot tolerate.  In all foods, these amino acids are in naturally occurring proteins, but these amino acids (or fats to carbohydrates for Ketocal) have to be separately produced and added to create a consumable product for patients with a given disease. Ex. 1, Lavine Report at 7-8; Ex.5.  Medical foods are also not merely a part of an elimination diet (e.g., persons with peanut allergies avoid eating nuts) as suggested by CBP.  By definition, medical foods are used when treatment of patients is not resolved by "modification of the normal diet alone."  Elimination diets (e.g., dietic or diabetic) include foods that simply lack substances (e.g., without sugar or nuts).  Foods in such diets are commonly eaten by healthy individuals, but medical foods are not. Ex. 1, Lavine Report at 1.  Contrary to CBP findings, medical foods do mitigate and repress symptoms of a given disease.  For example, patients who take Periflex mitigate the risks of severe brain damage and patients who take MSUD Lophlex and Ketocal mitigate the risks of seizures.  *Id.*  In mitigating these symptoms, medical foods effectuate chemical and biological changes in the patients – preventing the diseases the products are designed to treat. *Id.*

Finally, H121544 fails to consider the *Carborundum* factors, which is required to determine classification of use a provision such as heading 3004. This is likely because each of these factors confirm that the subject medical foods belong to the class or kind of goods that are medicaments, and are not commercially fungible with food preparations.

### D.    The Explanatory Notes Confirm the Medical Foods are Not Classified Under Heading 2106

The ENs to heading 2106 state:

16) Preparations, often referred to as food supplements, based on extracts from plants, fruit concentrates, honey, fructose, etc. and containing added vitamins and sometimes minute quantities of iron compounds.  These preparations are often put up in packagings with indications that they maintain general health or well-being.  Similar preparations, however, intended for the prevention or treatment of diseases or ailments are excluded (heading 30.03 or 30.04).

Explanatory Notes, Heading 2106, HTSUS (2012), Ex. 53.

The ENs to heading 3004 state:

[T]his heading excludes food supplements containing vitamins or mineral salts which are put up for the purpose of maintaining health or well-being but have no indication as to use for the prevention or treatment of any disease or ailment.

Explanatory Notes, Heading 3004, HTSUS (2012), Ex. 54.

Based on the ENs, foods that merely maintain the general health and well-being of individuals are classified under heading 2106.  But foods that are intended for the prevention or treatment of diseases or ailments, or provide an indication as to use for the prevention or treatment of any disease or ailment, are classified under heading 3004. The subject medical foods are expressly designed, produced and prescribed/recommended for the treatment of specific diseases. Ex.3,5.  This was CBP's proper conclusion when it classified PKU products under heading 3004 in HQ 08300, in which it stated "these preparations are intended to treat a specific condition and not to provide for general well-being and health."  Ex.24.

Notably the ENs do not require products "cure" a disease or have an "active ingredient" to be classified under heading 3004. Also, contrary to CBP's conclusions in H121544, the ENs confirm that the 2007 changes to chapter 30 note 1(a) (stating that nutritional preparations for intravenous administration remain classified under chapter 30), did not require any medicament with nutrition to be classified in chapter 21 unless it is taken intravenously. The above cited language in the ENs was in effect in 2014, and established that food preparations intended to prevent or treat a disease remain classified under heading 3004. Ex. 53, 54. If anything, the change to chapter 30 note 1(a) expanded the scope of chapter 30 to include food preparations that do not treat a disease, but are taken intravenously. Thus, the ENs confirm that the subject medical foods are not classified under heading 2106 and are properly classified under heading 3004.

39

III.     **The Subject Medical Foods are Secondarily Classified under Heading 9817**

A.     **The Subject Medical Foods Are Specially Designed for Handicapped Persons**

Goods classified in Chapters 1 through 97, which are based on the international Harmonized System (HS) nomenclature, may also be classified under a secondary classification within Chapter 98, which includes special provisions of U.S. law.  *See e.g., Sigvaris, Inc. v. United States*, 899 F.3d 1308 (Fed. Cir. 2018).  Subheading 9817.00.96 provides for the duty-free importation of articles that are designed to benefit handicapped persons.  The simple policy behind this provision is that governments should not impose barriers to handicapped persons' access to such articles.

Congress passed the Educational, Scientific, and Cultural Materials Importation Act of 1982 in order to give effect to the Nairobi Protocol to the Florence Agreement on the Importation of Educational, Scientific, and Cultural Materials "with a view to contributing to the cause of peace through freer exchange of ideas and knowledge across national boundaries." ("Nairobi Protocol"). 96 Stat. 2329, 2346 (1983); *see Starkey Labs. v. United States*, 22 CIT 360, 361 (1998). At this time, the TSUS was amended to include duty free treatment for articles benefitting the handicapped.  In 1989, the old TSUS provisions were implemented into the new HTSUS under subheading 9817.00.96, which covers:

> Articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons. . . .

54 Fed. Reg. 21182 (May 12, 1989).

To be classified under this provision the product must be specially designed or used for the benefit of handicapped persons.  U.S. Note 4 defines the term "physically or mentally handicapped persons" as:

> (a)      For purposes of subheadings 9817.00.92, 9817.00.94 and 9817.00.96, the term "blind or other physically or mentally handicapped persons" includes any

person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working.

The term "other physically or mentally handicapped persons" is broadly defined in U.S. Note 4, listing many types of impairments of major life activities. This definition mirrors the definition provided in the ADA, which states that a disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. §12102 (1). Major life activities under the ADA include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102 (2)(A). A major life activity under the ADA also includes the operation of a major bodily function, including but not limited to, "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102 (2)(B). In short, a person with a disability under the ADA is a handicapped person as defined by U.S. Note 4 and subheading 9817.00.96.

Congress recognized that the Nairobi Protocol imposed "strict obligations" on the United States, and the Protocol was "intended to afford duty-free treatment not only for articles for the blind, but all other handicapped persons without regard to the source of their affliction." S. Rep. No. 97-564, at 16- 17; TD 92-77, 26 Cust Bull Dec 240, 246 (1992). While the Nairobi Protocol is broad in scope, the drafters in Congress intended "even 'more liberalized treatment' than contemplated by the Nairobi Protocol." *Travenol Labs. v. United States*, 17 CIT 69, 77 (1993) (holding that plaintiff's devices imported for persons with end-stage renal disease were entitled to be imported duty free.) (citing S. Rep. No. 97-564, at 20). Thus, the term "handicapped" under subheading 9817.00.96 must be broadly construed and includes a wide range of disabilities.

Here, the evidence establishes that the subject medical foods are specially designed for the benefit of handicapped persons, and are secondarily classified under subheading 9817.00.96. First, there is no dispute that Nutricia's medical foods are specially designed for the benefit of infants and children who suffer from a variety of diseases and disorders. Ex.3, 5. Indeed, by law the FDA requires that "medical foods" like those at issue here be specially designed for the benefit of persons that suffer a disease or condition requiring nutritional therapy supervised by a physician. 21 U.S.C. § 360ee(b)(3).

Second, infants and children, who suffer from the diseases and disorders for which Nutricia's medical foods were designed to treat, are "mentally or physically handicapped" as this term is defined under subheading 9817.00.96. Section B of the Statement of Facts above, details how each of these products are used to treat children suffering from specific diseases (*i.e.*, MSUD Lophlex® LQ – BCKDC; Periflex® Infant and Periflex® Junior – PKU; Neocate® Junior - EoE, SBS and others; Ketocal® Liquid - Intractable/Refractory Epilepsy, GLUT 1 and others). *See supra* at 5-12.

These diseases or disorders impair major life activities of the patients who are prescribed and use medical foods, namely, these diseases prevent patients from "caring for oneself," because the basic act of eating requires supervision of a health care professional, and nutritional therapy so that the patient does not suffer adverse metabolic, gastrointestinal or neurological symptoms (*e.g.*, brain damage, seizures, coma or death). Without medical foods, all of a patient's major life activities would be impaired. As such, these diseases and disorders are considered disabilities that impair major life activities under the ADA. Ex.1, Lavine Report; 42 U.S.C. § 12102 (2)(B). Major life activities under the ADA include the operation of a major bodily function, such as "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain,

respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. §12102 (2)(B).  Dr. Lavine has confirmed that his patients, who have diseases requiring the use of the subject medical foods, suffer from disabilities covered by the ADA. Ex.1, Lavine Report. Thus, patients who have these diseases suffer impairment of major life activities and are handicapped under the terms of U.S. Note 4 and subheading 9817.00.96.

Accordingly, the subject medical foods were designed for the benefit of persons whose major life actives have been impaired, and these products are properly classified under subheading 9817.00.96.

### B.    CBP Incorrectly Concluded that Medical Foods Are Not Classified Under Heading 9817

In HQ H121544, CBP found that the above diseases and disorders do not impair the major life activities of the patients who take medical foods. Ex.28.  CBP stated that patients merely have to avoid certain categories of food, and that these disorders "do not impair the physical act of eating." HQ H121544. CBP's reasoning is flawed in three critical respects.

First, these products are not part of an elimination diet, where persons must avoid certain foods like sugar and peanuts. *See* Ex.1, Lavine Report at 22-23. Persons on elimination diets may easily find natural foods that lack certain ingredients and which are commonly eaten by all healthy persons. Conversely, patients with these diseases and conditions must take medical foods as part of nutritional therapy and medical foods often are the sole source of nutrient for the patient. *Id.* at 14; Ex 5A-E. Medical foods enable patients to obtain the required nutrients to sustain life by using specially designed and formulated ingredients (e.g., individual amino acids). Ex. 5A-E.

Second, CBP misinterprets what constitutes a major life activity, and too narrowly construes the applicable tariff provisions in violation of the clear intent of the statute. *Rubies Costume, Co. v. United States*, 337 F.3d 1350, 1357 (Fed. Cir. 2003) (this court "interpret[s]

statutory language to carry out legislative intent") (citing *Nippon Kogaku (USA), Inc. v. United States*, 69 C.C.P.A. 89, 673 F.2d 380, 383 (1982); *Travenol Labs. v. United States*, 17 CIT 69, 77 (1993) (provisions of subheading 9817.00.96 should be broadly construed).  As explained above, the ADA confirms that metabolic, gastrointestinal and similar diseases do impair major life activities. *See supra,* at 42-44.

Third, contrary to CBP's findings, some patients cannot conduct the physical act of eating, and take medical foods so that they may eat (*e.g.,* patients with EoE, restricted esophagus, or patients with SBS who are tube fed, use Neocate as a treatment, *see supra* at 10).  While some patients may physically "eat," others cannot normally digest foods and if they did not consume medical foods would suffer severe impairment or death. They suffer from conditions which impair virtually all of the listed major life activities.  Ex.1., Lavine Reports 5,10 and Second Lavine Report.  In short, patients who suffer from the diseases and disorders Nutricia's medical foods were designed to treat have their major life activities impaired.  Medical foods provide life altering and saving benefits to the patients who must take these products.  To suggest that a person's inability to digest food is not a major life activity is a gross mischaracterization of the impairments suffered by the infants and children with the diseases that the subject medical foods were designed to treat.  Thus, the subject medical foods are used for the benefit of handicapped persons falling squarely within the terms of U.S. Note 4(a), and the products are secondarily classified in subheading 9817.00.96.

## CONCLUSION

There are no material facts in dispute and the Court has sufficient facts to determine the proper classification of the subject merchandise.  For the foregoing reasons, Plaintiff respectfully requests that this Court find that the products at issue are classifiable in Heading 3004, HTSUS and secondarily classifiable in subheading 9817.00.96, HTSUS.

By:   John B. Brew
Alex Schaefer
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
jbrew@crowell.com


/s/Frances P. Hadfield
Crowell & Moring LLP
590 Madison Avenue
20th Floor
New York, NY 10022
fhadfield@crowell.com

Dated: January 21, 2022
New York, New York

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT</u>
## <u>STANDARD CHAMBER PROCEDURE 2(B)</u>

I, Frances P. Hadfield, counsel at Crowell & Moring LLP, who is responsible for the foregoing brief, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with the type-volume limitation of 14,000 words under USCIT Standard Chamber Procedure 2(B) and contains 13,781 words.


    /s  Frances P. Hadfield   


Dated: January 21, 2022
      New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: Hon. Timothy C. Stanceu, Chief Judge

|  |  |  |
|---|---|---|
| NUTRICIA NORTH AMERICA, INC., | : | |
| | : | **PUBLIC VERSION** |
| Plaintiff, | : | Ct.No.16-00008 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFF'S 56.3 STATEMENT OF MATERIAL FACTS FOR WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

1.      Plaintiff, Nutricia North America, Inc. (Nutricia) is the importer of record for the two protests: 1101-15-100252 and 1001-15-100172; and four entries at issue in this case: 101-4122568-0, 101-4122571-4, 101-4134968-8, 101-4134831-8. Ex.2, Compl. ¶ 2, Answer ¶ 2.

2.      Nutricia manufactures and imports medical food products designed and used in the management of neurological diseases, metabolic conditions and disorders, and gastrointestinal disorders and diseases requiring nutritional therapy. Ex.2, Compl ¶ 23, 41, 53, 64, 75.

3.      Nutricia is a specialized medical nutrition company and is part of the Medical Nutrition Division of Groupe Danone, Paris. Ex. 3 at 761

4.      Plaintiff paid all liquidated duties, charges, exactions and fees for the four entries at issue prior to commencement of this action. Ex.2, Compl. ¶ 3; Answer ¶ 3.

5.      U.S. Customs and Border Protection (CBP) liquidated the four entries of the subject merchandise under subheading 2106.90.9998, HTSUS, which provides for "Food preparations not elsewhere specified or included: Other…Other." Ex. 2, Compl. ¶ 6; Answer, ¶ 6.

6.     On November 27, 2015, Plaintiff timely filed protest number 1101-15-100252 and requested accelerated disposition pursuant to 19 C.F.R. § 174.22 and 19 U.S.C. § 1515(b). Ex. 2, Compl. ¶ 9; Answer ¶ 9.

7.     On October 6, 2014, CBP issued ruling HQ H121544 classifying the subject or similar merchandise under Heading 2106, HTSUS. Ex. 2 Compl. ¶ 12, Answer ¶ 12; Ex. 28.

8.     On December 1, 2015, Plaintiff timely filed protest number 1001-15-100172 and requested accelerated disposition pursuant to 19 C.F.R. § 174.22 and 19 U.S.C. § 1515(b). Ex.2, Compl. ¶ 10; Answer ¶ 10. Protests 1101-15-100252 and 1001-15-100172 were deemed denied. 19 C.F.R § 174.22. 19 U.S.C. § 1515(b). Ex. 2, Compl. ¶ 11; Answer ¶ 11.

9.     The five imported products at issue in this case are:

1.     MSUD Lophlex® LQ,
2.     Periflex® Infant,
3.     Periflex® Junior,
4.     Neocate ® Junior, and
5.     Ketocal® Liquid

Ex. 1, Expert Reports of Dr. Lavine (Dr. Lavine Reports); Ex. 2, Compl. ¶ 5; Answer ¶ 5, Ex. 30.

10.    The imported products are infant and child formulas. Exs. 1, 7, 14, 16, 18, 30, 31.

11.    These five imported products are "medical foods," which are defined by the Orphan Drug Act. Pub. L. 97-414, 96 Stat. 2049, (1983) (amended 1988, Pub. L. 100-290, 102 Stat. 90) as:

> "A food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."

21 U.S.C. § 360ee(b)(3). Ex. 1, Dr. Lavine Reports.

12.     Three of the imported products at issue in this case are used to manage and treat specific inborn errors of metabolism or diseases (1) MSUD Lophlex® LQ; (2) Periflex® Infant, and (3) Periflex® Junior. Ex. 1, Expert Report of Joel Lavine; Ex. 2, Compl. ¶ 25, 47. 76; Ex. 5.

13.     MSUD Lophlex® LQ is prescribed by healthcare professionals to children who suffer from a severe, life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase complex (BCKDC) deficiency, which is an inborn error of the metabolism due to a defective inherited gene encoding BCKDC. Ex. 1, Ex.2, Compl. ¶ 25, 29, 31, 35; Ex.5A; Ex.6, Yanicelli Dep. 46:22–48:1. An alternative name for this disease is maple syrup urine disease (MSUD). Ex. 1; Ex. 2, Compl. ¶ 25, 27; *See* http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Maple-Syrup-Urine-Disease-MSUD/ (last viewed 1/18/22); Ex. 5.

14.     Periflex® Infant or Periflex® Junior are prescribed by a healthcare professional to persons who suffer an inherited metabolic disorder or disease called Phenylketonuria (PKU). Ex. 1, Dr. Lavine Report at 7-9; Ex. 2, Compl. ¶ 43, 47, 76; Ex. 5B,5C.

15.     Neocate ® Junior is used to manage and treat a broad variety of gastrointestinal conditions, diseases, disorders, and syndromes including Eosinophilic Esophagitis (EoE) and Short Bowel Syndrome (SBS). Ex. 1, Expert Report of Dr. Lavine; Ex. 2, Compl. ¶ 65; Ex. 5D; Ex. 32, Dep. Ohja at 39.

16.     Ketocal® 4:1 Liquid is used to manage and treat a broad variety of neurological conditions, diseases, disorders, and syndromes. Ex. 2, Compl. ¶ 54.; Ex. 5E.

17.     All of the imported products may be used for enteral (oral or tube) feeding. Ex. 1, Expert Report of Dr. Lavine at 14, 23, 33; Exs. 3, 7, 11, 14, 16, 18, Ex. 32, Dep. Rachel Ohja at 11. Oral feeding or tube feeding is used for placing food, fluids, and/or drugs directly into the stomach or small intestine through a tube inserted through the nose or via a stoma that flows directly into the

stomach. Each is also called enteral feeding or enteral nutrition. Tube feedings may be implemented when one is unable or unwilling to swallow, which can occur when the composition of requisite formula is so distasteful that a patient refuses to ingest it. Ex. 1, First report of Dr. Lavine at 14, 23, 33. Ex. 32.

18. Nutricia's products are available for retail sale to hospitals, home healthcare or durable medical equipment retailers and wholesalers. Ex.22, Bruce Dep, at 12.

19. Nutricia's largest wholesaler is a medical wholesaler [McKesson Medical and Surgical]. Ex.22, Dep of Bruce at 14.

20. Medical food infant formulas are also marketed by sales representatives to medical institutional distributors healthcare professionals who then sell to the patients. Ex.1, Expert Report of Dr. Lavine; Ex.21, Robles Report at 14, 16.

21. Between 2014-2020, Nutricia's top ten sales accounts were to the following customers in the following amounts of cases of products sold:



Exhibit 21, Expert Report of Mr. Pablo Robels at Ex.5, Customer Sales 2014-2021 (Good Data).

22. The ultimate purchasers of the subject medical foods are the legal guardians of a newborn or child with a serious medical condition, usually the mother or father. Ex.1, Lavine Report at 9.

23.     The expectation for the ultimate purchasers is that the imported Nutricia products will prevent or ameliorate the symptoms suffered by their child, which would otherwise occur for a particular condition if the child were to eat an otherwise normal age-appropriate diet. Ex.1, Lavine Report at 9.

24.     In 2014 (and continuing to today), medical foods sold for a ███████████] cost than non-medical food infant formulas. Ex.21, Robles Expert Report.

25.     ██████████████████████] sold for over ████ more than Gerber Toddler pouches ($ .37/fl. oz.). Ex.21, Robles Report at 24.]

26.     █████████████████████] over ████ more than Enfamil Infant ($.16/fl. oz.). Ex.21, Robles Report at 24.]

27.     █████████████████████] over ████ more than Similac Go and Grow ($.13/fl. oz.). Ex.21, Robles Report at 24.]

28.     █████████████████████ over ████ more than Similac Go and Grow ($.13/fl. oz.). Ex.21, Robles Report at 24.]

29.     █████████████████████] over ████ more than Enfamil Premium Ready to Use ($.23/fl. oz.).] Ex.21, Robles Report at 24.

30.     Non-medical baby foods are generally not covered by insurance. Ex.21, Robles Report at 26.

31.     State mandates cover medical foods for certain conditions if a health professional indicates that they are medically necessary. Ex.21, Robles Report at 26. These insurance coverage requirements and conditions vary by state. *Id.*

32.     To obtain insurance reimbursement coverage for a product, the product must have a Healthcare Common Procedure Coding System (HCPCS also called "hick picks") number.

5

33.    Nutricia's products are typically reimbursed as a medical benefit. Ex.22, Bruce Dep. at 12.

34.    The Healthcare Common Procedure Coding System (HCPCS also called "hick picks") are a collection of standardized codes that represent medical procedures, supplies, products and services and were established in order to provide a standardized coding system for describing the specific items and services provided in the delivery of health care. *See* 42 U.S.C. § 1395ww(t)(4). HCPCS are issued by the US Government. *Id.* The Nutricia products at issue in this case have HCPCS codes and qualify for private insurance reimbursement. Ex. 13; Ex.21, Robles Report at 26 & n. 58.

35.    MSUD Lophlex® LQ has a HCPCS number, which is B4157. Ex. 7.

36.    Periflex® Infant and Periflex®Junior have a HCPCS number, which is B4162. Ex. 11,14.

37.    Neocate® Junior has two HCPCS numbers, which are either B4161 or B4153. Ex. 16.

38.    Ketocal 4:1 Liquid has a HCPCS number, which is B4154.

39.    Persons who purchase medical foods such as the imported products may obtain reimbursement of this cost from certain private commercial insurance payers (e.g., private insurance such as Aetna or Blue Cross/Blue Shield). Ex. 1, Expert Reports of Dr. Lavine; *See* Metabolics *http://www.medicalfood.com/Reimbursement/Coverage-by-State/*; Exs. 7, 13, 23.

40.    Under the Americans with Disabilities Act Amendments Act of 2008 (Amendments Act), effective January 1, 2009, which amended the Americans with Disabilities Act of 1990 (ADA) "disability" means a physical or mental impairment that substantially limits one or more major life activities of such individual. 42 U.S.C. § 12102. The parties agree that MSUD Lophlex® LQ, Periflex® Infant, Periflex® Junior, and Ketocal® Liquid are used to treat persons with disabilities under the ADA. *See* Ex. 30, Expert Report of Dr. Gregory at 2; Ex.1, Expert Report of Dr. Lavine.

## I.   <u>Medical Definitions</u>

41.   ***Amino Acid*** is defined as "An organic acid in which one of the hydrogen atoms on a carbon atom has been replaced by $NH_2$. Amino Acid usually refers to an arninocarboxylic acid. However, taurine is also an [amino acid]." Amino Acid, Stedman's Medical Dictionary (27th ed. 2000). Ex. 33.

42.   ***Anaphylaxis*** is defined as "An induced systemic or generalized sensitivity; at times the term is used for anaphylactic shock. The term is commonly used to denote the immediate, transient kind of immunologic (allergic) reaction characterized by contraction of smooth muscle and dilation of capillaries due to release of pharmacologically active substances (histamine, bradykinin, serotonin, and slow-reacting substance), classically initiated by the combination of antigen (allergen) with mast-cell-fixed, cytophilic antibody (chiefly IgE); the reaction can be initiated, also, by relatively large quantities of serum aggregates (antigen-antibody complexes, and others) that seemingly activate complement leading to production of anaphylatoxins. SYN anaphylactic reaction." *Anaphylaxis, Stedman's Medical Dictionary* (27th ed. 2000). Ex. 34.

43.   ***Antibody*** is defined as "any of a large number of number proteins of high molecular weight that are produced normally by specialized B cells after stimulation by an antigen and act specifically against the antigen in an immune response, that are produced abnormally by some cancer cells, and that typically consist of four subunits including two heavy chains and two light chains." *See* Merriam-Webster, *antibody,* https://www.merriam-webster.com/dictionary/antibody (last visited Apr. 12, 2021).

44.   ***Branched-chain amino acids (BCAA)*** are defined as **"**leucine, isoleucine, and valine; they are incorporated into proteins or catabolized for energy." Branched-chain amino acids (BCAA), Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013). Ex. 35.

45. ***Branched-chain alpha ketoacid dehydrogenase complex (BCKDC)*** is defined as a mitochondrial multienzyme complex that catalyzes a series of reactions that form the first irreversible step in the catabolism of the essential branched-chain amino acids: leucine, isoleucine, and valine. After transamination of these amino acids to their respective $\alpha$-keto acids, BCKDC catalyzes the irreversible oxidative decarboxylation and subsequent formation of acyl-CoAs [aceyl-coenzyme A compounds]. Mark T. Johnson et al., Targeting E3 Component of $\alpha$-keto Acid Dehydrogenase Complexes, 324 METHODS IN ENZYMOLOGY 465, 465 (2000). Ex. 36.

46. ***Condition*** is defined as "a usually defective state of health." *See* https://www.merriam-webster.com/dictionary/condition.

47. ***(Cow's) Milk Allergy*** is defined as "an abnormal response by the body's immune system to milk and products containing milk." Mayo Clinic, Milk allergy, https://www.mayoclinic.org/diseases-conditions/milk-allergy/symptoms-causes/syc-20375101 (last visited 1/18/2022); Ex.1 Expert Report of Dr. Lavine.

48. ***Disease*** is defined as "a condition of the living animal or plant body or of one of its parts that impairs normal functioning and is typically manifested by distinguishing signs and symptoms." *See Disease, Merriam-Webster Dictionary Online,* https://www.merriam-webster.com/dictionary/disease.

49. ***Disorder*** is defined as "an abnormal physical or mental condition." *See Disorder, Merriam-Webster Dictionary Online,* https://www.merriam-webster.com/dictionary/disorder.

50. ***Dravet Syndrome*** is defined as: "An intractable epilepsy syndrome, named after Dr. C. Dravet, that begins in the first year of life, after a period of apparently normal development, usually with febrile seizures or secondarily generalized tonic-clonic (grand mal) seizures, and then, from the second year of life onward, progresses to include - myoclonic seizures, - atypical absences, -

afebrile - clonic or - focal seizures, and episodes of - convulsive status epilepticus; the - prognosis is unfavorable, with significant developmental delay from the second year of life onward, and neurological manifestations such as - ataxia and - pyramidal tract signs. Also called - severe myoclonic epilepsy of infancy (SMEI)." *Dravet Syndrome, Epilepsy from A to Z, A Dictionary of Medical Terms* (4th ed. 2004). Ex. 37.

51. ***Eosinophil*** is defined as: "A type of granulocyte that can be stained red with eosin dye, also called eosinophilic granulocyte; a subtype of leukocyte." *Eosinophil, Epilepsy from A to Z, A Dictionary of Medical Terms* (4th ed. 2004). Ex. 38.

52. ***Epilepsy*** is defined as "A chronic disorder characterized by paroxysmal brain dysfunction due to excessive neuronal discharge, and usually associated with some alteration of consciousness. The clinical manifestations of the attack may vary from complex abnormalities of behavior including generalized or focal convulsions to momentary spells of impaired consciousness." *Epilepsy, Stedman's Medical Dictionary* (27th ed. 2000). Ex. 39.

53. ***Food allergy*** is defined as "a hypersensitive state that results from the ingestion, inhalation, or other contact with a specific food antigen. Symptoms of sensitivity to specific foods can include allergic rhinitis, bronchial asthma, urticaria, angioneurotic edema, dermatitis, pruritus, headache, labyrinthitis and conjunctivitis, nausea, vomiting, diarrhea, pylorospasm, colic, spastic constipation, mucous colitis, and perianal eczema. Food allergens are protein in nature and elicit an immunoglobulin response. The most common foods that cause allergic reactions are wheat, milk, eggs, fish and other seafoods, chocolate, corn, nuts (particularly peanuts), strawberries, chicken, pork, legumes, tomatoes, cucumbers, garlic, and citrus fruits." *Food allergy, Mosby's Dictionary of Medicine, Nursing & Health Professions* (9th ed. 2013). Ex. 40.

54. ***Food intolerance or food sensitivity*** is defined as a condition that "occurs when a person has difficulty digesting a particular food.  This can lead to symptoms such as intestinal gas, abdominal pain or diarrhea." American Academy of Allergy Asthma & Immunology, Food Intolerance Definition, https://www.aaaai.org/conditions-and-treatments/conditions-dictionary/food-intolerance.

55. ***Food Protein-Induced Enterocolitis Syndrome (FPIES)*** is defined as "a type of non-IgE mediated food allergy that can present with severe vomiting, diarrhea, food avoidance and dehydration.  Like other food allergies, FPIES reactions are triggered by eating a particular food. The most common triggers include cow milk, soy and grains (rice, barley, oats).  The most severe forms of FPIES can lead to drop in energy, change in body temperature and low blood pressure leading to hospitalization.  FPIES is frequently misdiagnosed early on as a potential severe blood infection or repeated infections of a gastrointestinal virus.  Unlike most food allergies there is no blood or skin testing available for diagnosis.  The primary treatment is strict avoidance of the triggering food.  Most children outgrow FPIES by age 3 or 4." American College of Allergy, Asthma, & Immunology, Food Protein-Induced Enterocolitis Syndrome (FPIES), https://acaai.org/allergies/types/food-allergies/types-food-allergy/fpies; Ex. 1, Expert Report of Dr. Lavine.

56. ***Gastrointestinal disorders*** are defined as any compromising condition or disease that occurs within the gastrointestinal tract.  https://www.drugs.com/article/gastrointestinal-disorders.html. The organs that make up the gastrointestinal tract are the mouth, esophagus, stomach, small intestine, large intestine, and anus. *See id.*

57. ***Glucose Transporter Type 1 Deficiency (GLUT 1)*** is defined as "an inherited condition that affects the nervous system.  Signs and symptoms generally develop within the first few months

of life and may include recurrent seizures (epilepsy) and involuntary eye movements.  Affected people may also have microcephaly (unusually small head size) that develops after birth, developmental delay, intellectual disability and other neurological problems such as spasticity, ataxia (difficulty coordinating movements), and dysarthria.   Approximately 10% of affected people have the "non-epileptic" form of GLUT1 deficiency syndrome which is associated with all the typical symptoms of the condition, without seizures.  GLUT1 deficiency syndrome is caused by changes (mutations) in the SLC2A1 gene is inherited in an autosomal dominant manner. Although there is currently no cure for GLUT1 deficiency, a special diet (called a ketogenic diet) may help alleviate symptoms." National Institutes of Health Genetic and Rare Diseases Information Center, *Glucose transporter type 1 deficiency syndrome,* https://rarediseases.info.nih.gov/diseases/9265/glucose-transporter-type-1-deficiency-syndrome; Ex. 1, Expert Report of Dr. Lavine.

58.    **IgE** is defined as "one of the five classes of antibodies produced by the body. It is concentrated in the lungs, skin, and mucous membranes.  It provides the primary defense against environmental antigens and is believed to be responsive to immunoglobulin A. IgE reacts with certain antigens to trigger the release of chemical mediators that cause anaphylactic hypersensitivity reactions characterized by wheal and flare." *Immunoglobulin E (IgE), Mosby's Dictionary of Medicine, Nursing & Health Professions* (9th ed. 2013); Ex. 1, Expert Report of Dr. Lavine. Ex. 41.

59.    **Infant formula** is defined as "a food which purports to be or is represented for special dietary use solely as a food for infants by reason of its simulation of human milk or its suitability as a complete or partial substitute for human milk." Federal Food, Drug, and Cosmetic Act Sec. 201(z)). Ex. 42.

60.   ***Malabsorption*** is defined as "imperfect, inadequate, or otherwise disordered gastrointestinal absorption." *Malabsorption, Stedman's Medical Dictionary* (27th ed. 2000). Ex. 43.

61.   ***Medicament*** is defined as "a substance used in therapy." https://www.merriam-webster.com/dictionary/medicament (last visited 1/21/22).

62.   ***Metabolic disorder*** is defined as "any pathophysiological dysfunction that results in a loss of metabolic control of homeostasis [self- regulation] in the body." *Metabolic disorder, Mosby's Dictionary of Medicine, Nursing & Health Professions* (9th ed. 2013). Ex. 44.

63.   ***Myoclonic Astatic Epilepsy (Doose syndrome)*** is defined as "myoclonic-astatic epilepsy of early childhood (MAEC)", which is "a type of epilepsy usually arising in early childhood after the first year of life, more commonly in boys, with rare major generalized tonic-clonic (grand mal) seizures as well as various different types of minor seizures." *Myoclonic Astatic Epilepsy, Epilepsy from A to Z, A Dictionary of Medical Terms* (4th ed. 2004). Ex. 45.

64.   ***Nutrition therapy*** is defined as a nutrition-based diagnosis as well as therapeutic and counseling services. Centers for Disease Control and Prevention, Medical Nutrition Therapy, https://www.cdc.gov/diabetes/dsmes-toolkit/reimbursement/medical-nutrition-therapy.html (last visited November 17, 2021). Nutrition therapy is also defined as "…administration of food and fluids to support metabolic processes of a patient who is malnourished or at high risk for becoming malnourished." Nutrition therapy, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013). Ex. 46.

65.   "***Medical nutrition therapy***" is defined as "the treatment of a medical condition, for example diabetes mellitus, through changes in diet, by adjusting quantity, quality and methods of nutrient intake." Nature Research, Nutrition therapy. https://www.nature.com/subjects/nutrition-

12

therapy (last visited November 18, 2021).  It is also defined as "Nutritional diagnostic, therapy, and counseling services for the purpose of disease management which are furnished by a registered dietitian or nutrition professional. Academy of Nutrition and Dietetics, MNT Versus Nutrition Education.   https://www.eatrightpro.org/payment/coding-and-billing/mnt-vs-nutrition-education (last visited November 18, 2021).

66.    ***Phenylketonuria (PKU)*** is defined as an

> [a]utosomal recessively-inherited inborn error of metabolism of phenylalanine characterized by deficiency of 1) phenylalanine hydroxylase caused by mutation in the phenylalanine hydroxylase gene (PAH) . . . The disorder is characterized by inadequate formation of L-tyrosine, elevation of serum L-phenylalanine, urinary excretion of phenylpyruvic acid and other derivatives, and accumulation of phenylalanine and its metabolites, which can produce brain damage resulting in severe mental retardation, often with seizures, other neurologic abnormalities such as retarded myelination and deficient melanin formation leading to hypopigmentation of the skin and eczema.

Ex. 9, Stedman's Medical Dictionary (27th ed. 2000). Ex. 47.

67.    ***Phenylalanine (Phe)*** is defined as "2-Amino-3-phenylpropionic acid; the L-isomer is one of the common amino acids in proteins; a nutritionally essential amino acid." *Phenylalanine (Phe, F), Stedman's Medical Dictionary* (27th ed. 2000). Ex. 48.

68.    ***Prophylactic*** is defined as "1. tending to ward off or prevent something, particularly disease. 2. pertaining to prophylaxis.  3. an agent that tends to ward off disease." *Prophylactic, Dorland's Illustrated Medical Dictionary* (29th ed. 2000). Ex. 49.

69.    ***Pyruvate Dehydrogenase Deficiency (PDHD)*** is a condition characterized by the buildup of a chemical called lactic acid in the body and a variety of neurological problems.  Signs and symptoms of this condition usually first appear shortly after birth, and they can vary widely among affected individuals.  The most common feature is a potentially life-threatening buildup of lactic acid (lactic acidosis), which can cause nausea, vomiting, severe breathing problems, and an abnormal heartbeat.  People with pyruvate dehydrogenase deficiency usually have neurological

problems as well.  Most have delayed development of mental abilities and motor skills, such as sitting and walking.  Other neurological problems can include intellectual disability, seizures, weak muscle tone (hypotonia), poor coordination, and difficulty walking.  Some affected individuals have abnormal brain structures, such as underdevelopment of the tissue connecting the left and right halves of the brain (corpus callosum), wasting away (atrophy) of the exterior part of the brain known as cerebral cortex, or patches of damaged tissue (lesions) on some parts of the brain.  Because of the severe health effects, many individuals with pyruvate dehydrogenase deficiency do not survive past childhood, although some may live into adolescence or adulthood." National Institutes of Health U.S. National Library of Medicine, *Pyruvate dehydrogenase deficiency,* https://ghr.nlm.nih.gov/condition/pyruvate-dehydrogenase-deficiency.

70.    ***Refractory seizure*** is defined as the "failure of two or more drugs [to control epileptic episodes], and occurrence of one or more seizures per month over 18 months." Epilepsy Foundation,                *Definition              of              Refractory              Seizures,* https://www.epilepsy.com/learn/professionals/refractory-seizures/overview/definition-refractory-seizures.

71.    ***Rett's Syndrome*** is defined as "a pervasive developmental disorder affecting the gray matter of the brain, occurring exclusively in females and present from birth.  It is progressive and is characterized by autistic behavior, ataxia, dementia, seizures, and loss of purposeful use of the hands, with cerebral atrophy, mild hyperammonemia, and decreased levels of biogenic amines." *Rett's syndrome, Mosby's Dictionary of Medicine, Nursing & Health Professions* (9th ed. 2013). Ex. 50

72.    ***Soy Allergy*** is defined as an "allergy to soy, a product of soybeans, [and] is a common food allergy.  Often, soy allergy starts in infancy with reaction to soy-based infant formula.  Although

most children outgrow soy allergy, some carry the allergy into adulthood. Mayo Clinic, *Soy allergy,*

https://www.mayoclinic.org/diseases-conditions/soy-allergy/symptoms-causes/syc-20377802; Ex.

1, Expert Report of Dr. Lavine.

73.    ***Short Bowel Syndrome (SBS)*** is defined as "a loss of intestinal surface for absorption of

nutrients caused by the surgical removal of a section of bowel. Treatment is with parenteral nutrition

in the acute phase." *Short Bowel Syndrome, Mosby's Dictionary of Medicine, Nursing & Health*

*Professions* (9th ed. 2013); Ex. 1, Expert Report of Dr. Lavine. Ex. 51        .

74.    ***Syndrome*** is defined as "a group of signs and symptoms that occur together and

characterize a particular abnormality or condition." *See Syndrome, Merriam-Webster Dictionary*

*Online,* https://www.merriam-webster.com/dictionary/syndrome (last visited 1/18/2022).

75.    ***Tuberous Sclerosis*** is defined as "a familial, neurocutaneous disease characterized by

epilepsy, mental deterioration, adenoma sebaceum, nodules and sclerotic patches on the cerebral

cortex, retinal tumors, depigmented leaf-shaped macules on the skin, tumors of the heart or kidneys,

and cerebral calcifications." *Tuberous Sclerosis, Mosby's Dictionary of Medicine, Nursing &*

*Health Professions* (9th ed. 2013). Ex. 52.

**II.    MSUD Lophlex® LQ**

76.    MSUD Lophlex® LQ is used as nutrition therapy for children with MSUD. Exhibit 6, Dep.

Yannicelli, p. 48, lines 11-15 (stating that MSUD Lophlex LQ is administered to children ages

one-plus and older).

77.    The ingredients listed for MSUD Lophlex® LQ are:

Water, Apple Juice from Concentrate (34.1%), Grape Juice from Concentrate (6.9%),
Blackcurrant Juice from Concentrate (2.5%), L-Lysine Acetate, L-Proline, Citric Acid, L-
Tyrosine, L-Arginine, Glycine, L-Serine, L-Aspartic Acid, L-Alanine, L-Threonine, Corn
Syrup Solids, L-Cystine, L-Phenylalanine, Dicalcium Phosphate, L-Histidine, Elderberry
Juice from Concentrate (0.6%), Maltodextrin, Magnesium Acetate, N-Acetyl L-Methionine,
L-Tryptophan, Choline Bitartrate, C. Cohnii Oil*, Sugar, Microcrystalline Cellulose,
Natural Flavor, Fruit Concentrate (Apple, Blackcurrant, Radish), L-Ascorbic Acid, Taurine,

15

Guar Gum, Sunflower Lecithin, Xanthan Gum, M-Inositol, Potassium Sorbate (preservative to delay spoilage), Artificial Sweetener: Sucralose, Ferrous Lactate, Artificial Sweetener: Acesulfame Potassium, Sodium Benzoate (preservative to delay spoilage), Zinc Sulfate, L-Carnitine, Niacinamide, DL-alpha Tocopherol Acetate, Calcium D-Pantothenate, Manganese Sulfate, Cupric Sulfate, Thiamine Chloride Hydrochloride, Pyridoxine Hydrochloride, Vitamin A Palmitate, Riboflavin, Folic Acid, Potassium Iodide, Ascorbyl Palmitate, Mixed Tocopherols, Sodium Molybdate, D-Biotin, Sodium Selenite, Chromium Chloride, Phylloquinone, Vitamin $D_3$, Cyanocobalamin.

*A Source of Docosahexaenoic Acid (DHA).

Ex. 7, Ex. 20 (label).

78.     MSUD Lophlex® LQ is an amino acid-based formula. The amino acids in this formula include: L-Lysine Acetate, L-Proline, L-Tyrosine, L-Arginine, L-Serine, L-Aspartic Acid, L-Alanine, L-Threonine, L-Cystine, L-Phenylalanine, L-Histidine, N-Acetyl L-Methionine, L-Tryptophan, Taurine, and L-Carnitine. Ex. 1, Expert Report of Dr. Lavine; Exs. 5, 7.

79.     The amino acids in MSUD Lophlex® LQ were purchased from pharmaceutical suppliers. Ex. 8.

80.     MSUD Lophlex® LQ is designed to eliminate the amino acids isoleucine, leucine and valine (BCAA-free) while providing all other essential nutrients. Ex. 1, Expert Report of Dr. Lavine; Ex. 5.

81.     Amino acid-based, BCAA-free formulas are prescribed by licensed healthcare professionals as part of the diet essential for the MSUD patient's nutrition and health therapy. Ex.1; Expert Report of Dr. Lavine; Ex. 20, label.

82.     The statement "use under medical supervision" appears on MSUD Lophlex® LQ's label. Ex. 20, Label, "MSUD Lophlex LQ, Mixed Berry Blast," Nutricia Website, https://shop.medicalfood.com/product/251/msud-lophlex-lq-mixed-berry (last viewed 1/18/22) Must only be used under strict medical supervision in individuals with a proven metabolic disorder. Ex. 20; Ex. 5.

83.     The administration and dosage of MSUD Lophlex® LQ taken by an individual patient is determined by a healthcare professional. Ex. 1, Expert Report of Dr. Lavine.

84.     The treatment of a person with MSUD must be supervised by a healthcare professional in order to discuss and monitor status, compliance and blood amino acid levels. Ex. 1, Expert Report of Dr. Lavine. Monitoring is an essential part of MSUD management as frequent adjustments to the diet are necessary to meet nutritional growth and health maintenance needs while assuring the individual remains in metabolic control. Ex. 1, Expert Report of Dr. Lavine.

85.     Persons requiring MSUD Lophlex® LQ suffer from a severe life-threatening medical disorder and a permanent impairment of their ability to tolerate foods containing proteins or peptides. Exhibit 6, Dep. Yannicelli, p. 76, lines 21-25, p. 77, lines 17-25, p. 78, lines 2-4.

86.     The two main approaches to the treatment of maple syrup urine disease (MSUD) include: (1) long-term daily dietary management; and (2) treatment of episodes of acute metabolic decompensation. Exhibit 6, Dep. Yannicelli, p. 54, lines 9-13.

87.     Treatment of MSUD requires the dietary restriction of branched-chain amino acids (BCAAs) because it is an enzyme defect, branched-chain alpha-ketoacid dehydrogenase deficiency. Exhibit 6, Yannicelli Dep., p. 50, lines 8-17; Ex. 1, Expert Report of Dr. Lavine.

88.     Nutritional therapy, consisting of BCAA-free foods, prevents the accumulation of BCAA in the brain and blood of patients with MSUD, and hence the devastating effects of MSUD on the brain are avoided. Exhibit 4, Del Toro Dep., p. 71, line 13.

89.     Amino acid-based, BCAA-free formulas such as MSUD Lophlex® LQ are requisite nutritional therapy for patients who have MSUD. Ex. 1., Expert Report of Dr. Lavine.

90.     MSUD Lophlex is a primary therapy or treatment for managing patients with MSUD by managing intake of certain amino acids. Exhibit 6, Yannicelli Dep., p. 54, lines 9-13; see also

"Maple Syrup Urine Disease (MSUD) Treatment & Management," Medscape, available at https://emedicine.medscape.com/article/946234-treatment (last viewed 1/18/22); Ex. 1, Expert Report of Dr. Lavine.

91.     Without management and therapy from birth (and life-long), a person with MSUD would suffer severe irreversible brain damage. Exhibit 6, Yannicelli Dep., p. 47, lines 11-15. If not treated aggressively throughout life, MSUD is a chronic disease that could result in severe mental retardation and death. *Id.;* Ex. 1, Expert Report of Dr. Lavine.

92.     Healthy individuals have no reason to consume MSUD Lophlex® LQ. Exhibit 4, Dep. Del Toro, p. 71, lines 1-15.

93.     A healthy individual who consumed MSUD Lophlex LQ® as their major modality of nutrition over an extended period of time would have significant problems and suffer malnutrition because it lacks (by design) the branched chain amino acids that healthy humans need. are unable to synthesize. Exhibit 4, Del Toro Dep., p. 71, lines 1-15; Ex. 1, Expert Report of Dr. Lavine.

94.     MSUD causes impairment of major life activities. Exhibit 6, Yannicelli Dep., p. 84, lines 5-12, p. 85, lines 9-19. Ex. 1, Expert Report pf Dr. Lavine.

95.     Persons with MSUD have a physical handicap as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102. Ex. 1, Second Expert Report of Dr. Lavine.

96.     A person with untreated MSUD suffers from a physical or mental impairment that substantially limits the following major life activities: Performing manual tasks, eating, learning, reading, concentrating, and thinking. Ex. 1, Second Expert Report of Dr. Lavine.

97.     A person with MSUD suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain functions. Ex. 1, Second Expert Report of Dr. Lavine.

### III.   Periflex® Junior and Periflex® Infant

98.   Periflex® Infant and Periflex® Junior are used to treat Phenylketonuria (PKU). *See* Ex. 11,

14.

99.   The ingredients in Periflex® Junior are:

Corn Syrup Solids, Canola Oil, High Oleic Safflower Oil, L-Glutamine, L-Proline, L-Asparagine, L-Lysine Hydrochloride, Tripotassium Citrate, L-Tyrosine, L-Leucine, and 2% or less of each of the following: Disodium Hydrogen Phosphate, L-Valine, L-Serine, L-Isoleucine, Tricalcium Citrate, Tricalcium Phosphate, L-Alanine, Maltodextrin, L-Threonine, Magnesium Hydrogen Phosphate, L-Citrulline, L-Arginine, L-Cystine, Choline Bitartrate, Taurine, Fractionated Coconut Oil, CAEM (An Emulsifier), L-Histidine, L-Methionine, L-Tryptophan, L-Ascorbic Acid, M-Inositol, Ferrous Sulfate, Zinc Sulfate, L-Carnitine, DL-Alpha Tocopherol Acetate, Manganese Sulfate, Niacinamide, Calcium D-Pantothenate, Cupric Sulfate, Thiamine Chloride Hydrochloride, Pyridoxine Hydrochloride, Riboflavin, Vitamin A Acetate, Folic Acid, Potassium Iodide, Chromium Chloride, Sodium Selenite, Sodium Molybdate, Phylloquinone, D-Biotin, Vitamin $D_3$, Cyanocobalamin.  The unflavored version also contains: 2% or less of Sugar.  The orange flavored version also contains: Sugar, Citric Acid, Artificial Flavors, and 2% or less of each of the following: Artificial Sweetener, Sucralose, Artificial Colors (Beta Carotene, Beet Red).

Ex. 14.

100.   The following amino acids or amino acid analogue are in Periflex® Junior:

[L-glutamine, L-proline, L-asparagine, L-lysine hydrochloride, L-tyrosine, L-leucine, L-valine,

L-serine, L-isoleucine, L-alanine, L-threonine, L-arginine, L-cystine, L-citrulline, L-histidine, L-

methionine, L-tryptophan and taurine]. Ex.1, Lavine Report at 11; Ex.14.

101.   The ingredients in Periflex® Infant are:

Corn Syrup Solids, Refined Vegetable Oil (Soy, Coconut), High Oleic Sunflower Oil, Calcium Phosphate Dibasic, L-Arginine L-Aspartate, Tripotassium Citrate, L-Leucine, L-Lysine Acetate, L-Tyrosine, L-Glutamine, L-Proline, L-Valine, Glycine, L-Isoleucine, CAEM (An Emulsifier), L-Threonine, L-Serine, L-Histidine, L-Alanine, Sodium Chloride, L-Cystine, L-Tryptophan, L-Methionine, Magnesium Acetate, Magnesium L-Aspartate, Potassium Chloride, M. Alpha Oil*, Choline Bitartrate, M-Inositol, C. Cohnii Oil**, L-Ascorbic Acid, Ferrous Sulfate, Zinc Sulfate, Taurine, Carnitine, Niacinamide, Sunflower Oil, DL-Alpha Tocopherol Acetate, Calcium D-Pantothenate, Cupric Sulfate, Manganese Sulfate, Pyridoxine Hydrochloride, Riboflavin, Vitamin A Acetate, Thiamine Chloride Hydrochloride, Ascorbyl Palmitate, Potassium Iodide, Chromium Sulfate, DL-Alpha Tocopherol, Phylloquinone, Sodium Molybdate, Folic Acid, Sodium Hydrogen Selenite, D-Biotin, Vitamin $D_3$, Cyanocobalamin.
*A Source of Arachidonic Acid (ARA)

** A Source of Docosahexaenoic Acid (DHA)
Ex. 11.

102.    The amino acids in the Periflex® Infant formula include: L-Arginine, L-Aspartate, L-Leucine, L-Lysine Acetate, L-Tyrosine, L-Glutamine, L-Proline, L-Valine, Glycine, L-Isoleucine, L-Threonine, L-Serine, L-Histidine, L-Alanine, L-Cystine, L-Tryptophan, L-Methionine, Taurine, and Carnitine.] Ex. 11.

103.    The statement "use under medical supervision" appears on Periflex® Infant and Periflex® Junior's labels. Ex. 20.

104.    The amino acids in Periflex® Infant and Periflex® Junior are purchased from pharmaceutical suppliers. Ex. 12.

105.    Periflex® Infant or Periflex® Junior are prescribed by a healthcare professional to persons have Phenylketonuria (PKU).  Ex.1, Expert Report of Dr. Lavine; Ex.2, Compl. ¶ 43, 47, 76.

106.    The treatment of a person with PKU must be supervised by a healthcare professional. Exhibit 6, Yannicelli Dep., p. 41, lines 23025, p. 42, lines 2-5 (stating that Periflex may not be consumed alone because it would result in severe protein malnutrition and it requires medical supervision).

107.    Healthy individuals have no reason to consume Periflex® Infant and Periflex® Junior. Exhibit 6, Yannicelli Dep., p. 42, lines 8-16.

108.    If someone who didn't have PKU were to use Periflex® Infant or Periflex® Junior as a sole source of nutrition, s/he would end up with severe protein malnutrition if not carefully monitored, medically supervised and managed throughout his/her life. Exhibit 6, Yannicelli Dep., p. 42, lines 8-16.

109.    Persons with PKU cannot process a specific amino acid called phenylalanine (Phe), which is an essential component of proteins in food. Ex.1, Expert Report of Dr. Lavine. Ex.2, Compl. ¶ 43. http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/.

110.    Consuming too much Phe from food leads to a toxic accumulation of Phe in the blood and brain of a person with PKU. http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/. Ex.1, Expert Report of Dr. Lavine.

111.    Untreated children with PKU experience developmental delays and severe brain problems such as seizures. Ex.1, Expert Report of Dr. Lavine; Ex.2, Compl. ¶ 45.

112.    There is no cure for PKU, but it can be treated effectively with proper diet and special nutritional products designed for persons with PKU.  Ex.1, Expert Report of Dr. Lavine; Ex.2, Compl. ¶ 45.

113.    Newborn screening in the United States includes testing for PKU so that medicament treatment can be instituted prior to manifestation of symptoms. "Phenylketonuria," Nutricia Website,  http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/ (last visited May 5, 2021) (stating the importance of diagnosing and treating an infant within days after birth to prevent permanent effects from untreated PKU); Ex.1, Expert Report of Dr. Lavine.

114.    Nutrition therapy is the primary treatment for persons with PKU. *Id*. (stating that PKU "can be treated effectively with proper diet and special nutritional products designed for persons with PKU"). Ex. 1, Expert Report of Dr. Lavine.

115.    PKU is managed with a low Phe diet consisting of foods low in protein and a Phe-free formula. Ex. 1, Expert report of Dr. Lavine; *See* "What is Phenylketonuria?", Nutricia Website, http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/       (last visited Apr. 21, 2021).

116.   Nutrition Management of PKU includes the frequent monitoring of blood Phe levels. *Id.*

117.   Untreated PKU can lead to intellectual disability, developmental delays, and severe mental problems, such as seizures. *See* Exhibit 6, Yannicelli Dep., p. 41, lines 7-17

118.   In addition to foods such as fruits, vegetables, and grains, individuals with PKU must drink a special Phe-free metabolic formula to supply the body with the necessary protein requirements the body needs for growth and maintenance, without the addition of the offending amino acid, phenylalanine. *Id.*

119.   This Phe-free diet should begin as soon as possible after birth and <u>experts recommend such people stay on the diet throughout their lives.</u> Ex. 1, Expert Report of Dr. Lavine.

120.   Without perpetual food management and treatment from birth, a patient with PKU would suffer severe, irreversible intellectual disability rendering a patient completely unable to take care of him/herself and require 24-hour per day care. Ex. 1, Expert Report of Dr. Lavine.

121.   A person with PKU suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, reading, concentrating, thinking, and communicating. Ex. 1, Second Expert Report of Dr. Lavine.

122.   A person with PKU suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function. Ex. 1, Second Expert Report of Dr. Lavine.

123.   Periflex® Infant and Periflex® Junior are nutritional therapy treatments for persons with PKU. Ex. 1, Second Expert Report of Dr. Lavine.

**IV.   <u>Neocate® Junior:</u>**

124.   Neocate® Junior is used to manage a variety of syndromes and conditions. Ex. 32, Ohja Dep., p. 8, lines 4-8. They range from Eosinophilic Esophagitis (EoE) to short bowel syndrome

(SBS) due to the surgical removal of a large portion of the small intestine. *Id*. at lines 9-12; Ex.1, Expert report of Dr. Lavine.

125.    The ingredients in Neocate Junior® are:

> Corn Syrup Solids (52%), Refined Vegetable Oils ((Palm Kernel and/or Coconut Oil (8%), Canola Oil (8%), High Oleic Safflower Oil (8%)), L-Arginine (2.4%), L-Glutamine (2.3%), L-Lysine L-Aspartate (2%), and less than 2% of each of the following: Tripotassium Citrate, Calcium Phosphate Dibasic, L-Leucine, L-Phenylalanine, L-Proline, Silicon Dioxide, L-Valine, Glycine, L-Isoleucine, N-Acetyl-L-Methionine, L-Threonine, Mono and Diglycerides, Sodium Chloride, L-Histidine, L-Serine, L-Alanine, Magnesium Acetate, Calcium Phosphate Tribasic, Choline Bitartrate, L-Tryptophan, L-Tyrosine, Diacetyl Tartaric Acid Esters of Mono and Diglycerides, M-Inositol, L-Ascorbic Acid, L-Cystine, Propylene Glycol Alginate, Taurine, Ferrous Sulfate, L-Carnitine, Zinc Sulfate, DL-Alpha Tocopherol Acetate, Niacinamide, Calcium D-Pantothenate, Manganese Sulfate, Cupric Sulfate, Riboflavin, Thiamine Chloride Hydrochloride, Pyridoxine Hydrochloride, Vitamin A Acetate, Folic Acid, Potassium Iodide, Chromium Chloride, Sodium Molybdate, Sodium Selenite, Phylloquinone, D-Biotin, Vitamin $D_3$, Cyanocobalamin.

 Ex. 16, 20.

126.    The amino acids in this formula include: L-Arginine, L-Glutamine, L-Lysine L-Aspartate, L-Leucine, L-Phenylalanine, L-Proline, L-Valine, Glycine, L-Isoleucine, N-Acetyl-L-Methionine, L-Threonine, L-Histidine, L-Serine, L-Alanine, L-Tryptophan, L-Tyrosine, L-Cystine, Taurine, L-Carnitine. Ex. 17.

127.    The amino acids in Neocate Junior® were purchased from pharmaceutical suppliers. Ex. 17.

128.    The statement "use under medical supervision" appears on Neocate® Junior's label. Ex. 20.

129.    The administration and dosage of Neocate® Junior taken by a patient is determined by a healthcare professional. Ex. 32, Ojha Dep., p. 48, lines 19-22, p. 49, lines 1-2. This is because the administration requires regular monitoring to adjust for tolerance, and growth. *Id.* The correct dosage of Neocate Junior taken by an individual patient is determined by a physician or healthcare professional. *Id.*

## A.    Eosinophilic Esophagitis (EoE)

130.    Eosinophilic Esophagitis (EoE) is a chronic immune-antigen-mediated disease of the esophagus that results from an aberrant individual response to dietary antigens (an antigen is a molecule that precipitates an immune response). Ex. 1, Second Expert Report of Dr. Lavine.

131.    Persons with EoE have a particular type of white blood cell (eosinophil) that builds up in the lining of the conduit that connects their mouths to their stomachs (esophagus). Ex. 1, Second Expert Report of Dr. Lavine.  It impairs passage of food and propulsive movement (diminished diameter, amplitude and velocity). *Id.*

132.    EoE can produce swallowing pain that blunts appetite and intake. Ex. 1, Second Expert Report of Dr. Lavine.

133.    EoE sometimes accompanies anaphylactic reactions or asthma. Ex. 1, Second Expert Report of Dr. Lavine.

134.    EoE can be managed with nutritional therapy. Ex. 1, Second Expert Report of Dr. Lavine.

135.    However, if EoE is left untreated, it may cause esophageal narrowing from swelling (or fixed strictures) and damage the esophageal tissue. Ex. 1, Second Expert Report of Dr. Lavine. Children with strictures may be predisposed to food impactions in the esophagus, which may require endoscopic retrieval to remove impacted food. EoE usually presents in infants, toddlers, and children of elementary school age. *Id.*

136.    Neocate® Junior is prescribed by health care professionals to children with EoE. Ex. 1, Expert Reports of Dr. Lavine.

137.    Dietary therapy is the primary method of treatment of EoE in the pediatric population. Ex. 1, Expert Reports of Dr. Lavine.

138.    EoE is an incurable condition. Ex. 1, Expert Reports of Dr. Lavine.

139.    A person with EoE suffers from a physical or mental impairment that substantially limits the following major life activities: Eating. Ex. 1, Second Expert Report of Dr. Lavine at 9.

140.    A person with EoE suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Digestion and growth. Ex. 1, Second Expert Report of Dr. Lavine at 9.

141.    Neocate® Junior eliminates the antigens in food (usually specific proteins or peptides) responsible for provoking the allergic response, while providing all essential nutrients that are needed for normal growth and development. Ex. 1, Second Expert Report of Dr. Lavine.

142.     Neocate® Junior is recommended for use by persons with EoE as nutritional therapy because alternative treatments utilize systemic steroids with substantive side effects worsening over time, or use diets that eliminate a wide variety of foods that may or may not be contributing irritants (including milk, eggs, wheat, nuts, shellfish, soy). Ex. 1, Second Expert Report of Dr. Lavine.

143.    This avoidance diet for EoE is difficult to implement and maintain and requires frequent endoscopies to assess response to empiric food eliminations (eggs, milk, soy, gluten, nuts, shellfish, generally conjointly).  Ex. 1, Second Expert Report of Dr. Lavine.

## B.    Short Bowel Syndrome (SBS)

144.    Short bowel syndrome (SBS) may occur when substantive portions of the small intestine have been removed. Ex. 1, Second Expert Report of Dr. Lavine.

145.    SBS may also result when portions of the small intestine are missing or damaged at birth (such as gastroschisis, omphalocele, and intestinal atresia); or short bowel may result shortly after birth due to necrotizing enterocolitis associated with prematurity. Ex. 1, Expert Report of Dr. Lavine.

146.     SBS treatment may require nutrition through a central vein (parenteral nutrition) to prevent malnutrition. Ex. 1, Second Expert Report of Dr. Lavine.

147.     Alternatively, enteral tube feeding is used in those who tolerate placing food, fluids, and/or drugs directly into the stomach or small intestine through a tube inserted through the nose or directly through the abdomen into the stomach (gastrostomy) or duodenum (duodenostomy). Ex. 1, Second Expert Report of Dr. Lavine.

148.     Enteral feeds are often provided as a continuous slow-rate feeding with a pump to enhance absorption by not overwhelming intestinal capacity with bolus volumes. Ex. 1, Second Expert Report of Dr. Lavine.

149.     Neocate® Junior is a nutritional therapy used by persons with SBS.

150.     SBS affects the available absorptive surface area due to the limited length of the small intestine, so that time required for absorption of nutrients after time required for digestion is insufficient. Ex. 1, Second Expert Report of Dr. Lavine.

151.     Some contributing factors to SBS complications include vomiting, chronic diarrhea with fluid and electrolyte loss, enterocolitis and/or proctocolitis. Ex. 1, Second Expert Report of Dr. Lavine.

152.     Further problems may include small bowel bacterial overgrowth, altered functional motility, remnants of dysfunctional bowel, surgical diversion, or post-surgical anastomotic strictures (areas where ends of intestine were sewn together). Ex. 1, Second Expert Report of Dr. Lavine.

153.     SBS requires ongoing therapy, monitoring and management. Ex. 1, Second Expert Report of Dr. Lavine.

154.   A person with SBS suffers from a physical or mental impairment that substantially limits the following major life activities: caring for oneself, eating, sleeping. Ex. 1, Second Expert Report of Dr. Lavine.

155.   A person with SBS suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Normal cell growth and digestion. Ex. 1, Second Expert Report of Dr. Lavine.

## V.   Ketocal® 4:1 LQ Liquid

156.   The ketogenic diet is a high fat, low carbohydrate, controlled protein diet used for the treatment of epilepsy. Ex. 6, Yannicelli Dep., p. 18, lines 20-22.  It is a medical treatment used when anti-epileptic medications have been found insufficient for seizure control. Ex.6, Yannicelli Dep., p. 21, lines 2-9; Ex. 1, Expert Report of Dr. Lavine at

157.   The Ingredients in Ketocal 4:1 Liquid are:

> Water, Refined Vegetable Oil (High Oleic Sunflower, Soy, Palm), Sodium Caseinate (Milk), Whey Protein Concentrate (Milk), Soy Fiber, Corn Starch, Inulin, CAEM (an Emulsifier), Dipotassium Phosphate, Gum Arabic, Calcium Chloride, M. Alpina Oil*, Magnesium Acetate, Potassium Chloride, C. Cohnii Oil**, Microcrystalline Cellulose, Fructooligosaccharide , L-Ascorbic Acid, Calcium Phosphate Monobasic, Mono and Diglycerides, Trisodium Citrate, Sodium Hydroxide, Choline Chloride, L-Cystine, Calcium Phosphate Dibasic, Propylene Glycol Alginate, Ferrous Lactate, L-Carnitine, Taurine, M-Inositol, L-Tryptophan, Zinc Sulfate, DL-Alpha Tocopheryl Acetate, Soy Lecithin, Niacinamide, Calcium D-Pantothenate, Manganese Sulfate, Ascorbyl Palmitate, Cupric Sulfate, Thiamine Chloride Hydrochloride, Pyridoxine Hydrochloride, Riboflavin, Vitamin A Acetate, Mixed Tocopherols, DL-Alpha Tocopherol, Folic Acid, Potassium Iodide, Chromium Chloride, Sodium Selenite, Sodium Molybdate, Phylloquinone, D-Biotin, Vitamin D3, Cyanocobalamin.

Exhibit 18, 20.

158.   The statement "use under medical supervision" appears on Ketocal® 4:1 LQ Liquid labeling. Ex. 20.

159.   The administration and dosage of Ketocal® 4:1 LQ Liquid taken by an individual patient is determined by a healthcare professional. Ex. 4, Dep. Del Toro, p. 59, line 12-18.

160.    Ketosis is a metabolic state characterized by raised levels of ketone bodies in the body tissues, which reduce seizures. Ex. 6, Dep. Yannicelli, p. 64, lines 13-15 ("[F]asting and producing ketones has a positive effect on seizure reduction.").

161.    Ketocal® 4:1 LQ Liquid is specially designed and formulated to initiate and maintain a state of ketosis. Ex. 6, Yannicelli Dep., p. 20, lines 15-16 ("Ketocal is a product that can be used in the ketogenic diet.").

162.    Ketones are metabolites produced from the breakdown of fatty acids that provide fuel for the body. They provide an alternative fuel to the brain in lieu of carbohydrates in those on a high-fat, low-carbohydrate diet. Ex.1, Expert Report of Dr. Lavine.

## A.    Intractable or refractory epilepsy

163.    Ketocal® Liquid is a nutritional therapy treatment for persons with intractable or refractory epilepsy. Ex. 1, Second Expert Report of Dr. Lavine.

164.    Intractable or refractory epilepsy is a neurological disorder in which a person's seizures fail to adequately subside with appropriately dosed pharmacologic therapy for convulsions. Ex. 1, Second Expert Report of Dr. Lavine.

165.    A person with intractable or refractory epilepsy suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, reading, concentrating, thinking, and communicating. Ex. 1, Second Expert Report of Dr. Lavine.

166.    A person with intractable or refractory epilepsy suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function. Ex. 1, Second Expert Report of Dr. Lavine.

## B.     Glucose Transporter Type 1 deficiency (GLUT 1)

167.    Glucose Transporter Type 1 deficiency (GLUT 1) is a lifelong genetic metabolic disorder that occurs as a result of mutation in the SLC2A1 gene.  Ex. 1, Expert Report of Dr. Lavine at 30. It is incurable and presents infancy. *Id.*

168.    Ketocal® Liquid is a nutritional therapy treatment for persons with GLUT 1. Ex. 1, Expert Report of Dr. Lavine at 31.

169.    The disorder impairs glucose transport to the brain.  Persons with GLUT1 suffer from epilepsy, developmental delays, acquired microcephaly, cognitive impairment and varying degrees of spasticity, ataxia, and dystonia. Ex. 1, Expert Report of Dr. Lavine at 29.  Persons with GLUT 1 may also suffer from seizures and movement disorders. *Id.*

170.    A person with Glucose Transporter Type 1 deficiency (GLUT 1) suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, reading, concentrating, thinking, and communicating. Ex. 1, Second Expert Report of Dr. Lavine.

171.    A person with Glucose Transporter Type 1 deficiency (GLUT 1) suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function. Ex. 1, Second Expert Report of Dr. Lavine.

Respectfully Submitted,

John B. Brew
Alex Schaefer
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
jbrew@crowell.com

/s/Frances P. Hadfield
Crowell & Moring LLP
590 Madison Avenue
20th Floor
New York, NY 10022
fhadfield@crowell.com


Dated: January 21, 2022
          New York, New York

**Plaintiff's Exhibit List**

| Exhibit No. | Description |
|---|---|
| Exhibit 1 | Expert Reports of Dr. Joel Lavine (Dr. Lavine). |
| Exhibit 2 | Complaint and Answer |
| Exhibit 3 | Danone and Nutricia Medi-Cal Resource |
| Exhibit 4 | Miguel Del-Toro Deposition |
| Exhibit 5A | MSUD Medical Rationale |
| Exhibit 5B | Periflex Medical Rationale |
| Exhibit 5C | Periflex Reformulation Medical Rationale |
| Exhibit 5D | Neocate Junior Medical Rationale |
| Exhibit 5E | KetoCal Medical Rationale |
| Exhibit 6 | Yannicelli Deposition |
| Exhibit 7 | Bates Flip Chart at 0000046 MSUD |
| Exhibit 8 | Amino Acid Supplier Bates 01-0000249-255 |
| Exhibit 9 | Definition Phenylketonuria (PKU), Stedman's Medical Dictionary (27th ed. 2000) |
| Exhibit 10 | NICHD |
| Exhibit 11 | Bates Flip Chart 00000021 – Periflex Infant |
| Exhibit 12 | Bates 1-0000213-222 – Pharmaceutical Supplier |
| Exhibit 13 | Insurance Template Letters |
| Exhibit 14 | Bates Flip Chart 00000022 – Periflex Junior |
| Exhibit 15 | Definition -Short Bowel Syndrome, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013) |
| Exhibit 16 | Bates Flip Chart 00000009 - Neocate |
| Exhibit 17 | Bates 1-0000118-124 – Pharmaceutical Supplier |
| Exhibit 18 | Bates Flip Chart 0000091 - Ketocal |
| Exhibit 19 | Product Studies |
| Exhibit 20A | MSUD Sample Labels |
| Exhibit 20B | Periflex Infant Sample Labels |
| Exhibit 20C | Periflex Junior Sample Labels |
| Exhibit 20D | Neocate Junior Sample Labels |
| Exhibit 20E | KetoCal Sample Labels |
| Exhibit 21 | Declaration and Expert Report of Pablo Robles |
| Exhibit 22 | Deposition Gerald Bruce |
| Exhibit 23 | Bates Doc 0000479 - Reimbursement |
| Exhibit 24 | HQ 083000 (Sept. 19, 1990) |
| Exhibit 25 | New York Rulings (NY N005717 (Jan. 26, 2007), NY N006048 (Feb. 6, 2007), and NY N006049 (Feb. 6, 2007) |
| Exhibit 26 | HQ 966779 (Jan. 16, 2004 |
| Exhibit 27 | 48 Cus. Bul. & Dec. No. 35 (Sept. 3, 2014). |
| Exhibit 28 | HQ H121544 (Oct. 6, 2014) |

DCACTIVE-64376709.2

| Exhibit 29 | Definition - Nutrition therapy, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013) |
| --- | --- |
| Exhibit 30 | Expert Report of Dr. Gregory. |
| Exhibit 31 | Medicaments Definition - Merriam-Webster |
| Exhibit 32 | Ohja Deposition |
| Exhibit 33 | Amino Acid Definition |
| Exhibit 34 | Anaphylaxis Definition |
| Exhibit 35 | Branched-chain amino acids (BCAA) Definition |
| Exhibit 36 | Branched-chain alpha ketoacid dehydrogenase complex (BCKDC) Definition |
| Exhibit 37 | Dravet Syndrome Definition |
| Exhibit 38 | Eosinophil Definition |
| Exhibit 39 | Epilepsy Definition |
| Exhibit 40 | Food allergy Definition |
| Exhibit 41 | IgE Definition |
| Exhibit 42 | Infant formula Definition |
| Exhibit 43 | Malabsorption Definition |
| Exhibit 44 | Metabolic disorder Definition |
| Exhibit 45 | Myoclonic Astatic Epilepsy (Doose syndrome) Definition |
| Exhibit 46 | Nutrition therapy Definition |
| Exhibit 47 | Phenylketonuria (PKU) Definition |
| Exhibit 48 | Phenylalanine (Phe) Definition |
| Exhibit 49 | Prophylactic  Definition |
| Exhibit 50 | Rett's Syndrome Definition |
| Exhibit 51 | Short Bowel Syndrome (SBS) Definition |
| Exhibit 52 | Tuberous Sclerosis Definition |
| Exhibit 53 | ENs Heading 2106 (2012 -2016) |
| Exhibit 54 | ENs Heading 3004 (2012-2016) |

DCACTIVE-64376709.2