UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

———————————————————————— :
                                                        :
NUTRICIA NORTH AMERICA, INC.,            :
                                                        :
                              Plaintiff,              :          Court No. 16-00008
                                                        :
                  v.                                    :
                                                        :
UNITED STATES,                                   :
                                                        :
                              Defendant.            :
———————————————————————— :

## <u>**ORDER**</u>

Upon consideration of Plaintiff Nutricia North America, Inc.'s Motion for Summary Judgment, and upon consideration of other papers and proceedings had herein and upon due deliberation, it is hereby:

**ORDERED** that Plaintiff's Motion for Summary Judgment be, and hereby is granted.


                                                    _____
                                                    Timothy C. Stanceu, Senior Judge

Dated:                             , 2022
            New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                        :
NUTRICIA NORTH AMERICA, INC.,           :
                                        :
                   Plaintiff,           :        **PUBLIC VERSION**
                                        :
                                        :
              v.                        :        Court No. 16-00008
                                        :
UNITED STATES,                          :
                                        :
                   Defendant.           :
_____:

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to USCIT R. 56, Plaintiff, Nutricia North America, Inc. ("Nutricia"), submits this Motion for Summary Judgment.  Plaintiff is concurrently filing a 56.3 Statement of Undisputed Material Facts. Plaintiff relies on affidavits, depositions, expert Report, entry papers, samples, and the required documents filed with U.S. Customs and Border Protection and produced during discovery.  This Motion is made and based upon the pleadings and papers on file herein, the Points, Authorities, and Exhibits attached and submitted, for the proposition that no genuine issue of material fact exists as to the correct classification of the goods at issue in this matter, and Plaintiff is entitled summary judgment in its favor.

**WHEREFORE**, Plaintiff respectfully requests that this court:

(1) Grant Plaintiff's motion for summary judgment;

(2) Order U.S. Customs and Border Protection ("CBP") to classify the subject products under Harmonized Tariff Schedules of the United States ("HTSUS") subheading 3004.50.5040, reliquidate the subject entries, and issue refunds to Plaintiff of all lawful duties, plus interest;

(3) Order CBP to secondarily classify the subject products under subheading 9817.00.96, HTSUS, reliquidate the subject entries, and issue refunds to Plaintiff of all lawful duties, plus interest; and

(4) Grant such further relief such as attorney's fees and costs as it deems proper.

Respectfully Submitted,

By:     /s/ *John B. Brew*
        John B. Brew
        Alex Schaefer
        Crowell & Moring LLP
        1001 Pennsylvania Avenue, N.W.
        Washington, D.C.  20004
        jbrew@crowell.com

        Maria Vanikiotis
        Alexander T. Rosen
        Crowell & Moring LLP
        590 Madison Avenue
        20th Floor
        New York, NY 10022

Dated: August 31, 2022
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |  |
|---|---|---|
| NUTRICIA NORTH AMERICA, INC., | : | **CONFIDENTIAL VERSION** |
|  | : |  |
| Plaintiff, | : | Court No. 16-00008 |
|  | : |  |
| v. | : |  |
|  | : |  |
| UNITED STATES, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

---

## MEMORANDUM OF LAW AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

By:    /s/ *John B. Brew*
John B. Brew
Alex Schaefer
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
jbrew@crowell.com

Maria Vanikiotis
Alexander T. Rosen
Crowell & Moring LLP
590 Madison Avenue
20th Floor
New York, NY 10022

Dated: August 31, 2022
        New York, New York

# TABLE OF CONTENTS

**Page**

MERCHANDISE AT ISSUE .................................................................................. 1

TARIFF PROVISIONS AT ISSUE ....................................................................... 1

QUESTIONS PRESENTED .................................................................................. 3

JURISDICTION ................................................................................................... 3

STATEMENT OF FACTS FOR WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED
.................................................................................................................. 4

    A.    Medical Rationale for the Imported Products ........................................ 4

    B.    Use and Physical Characteristics of the Subject Imports ....................... 6

        1.    MSUD Lophlex® LQ ................................................................. 6

        2.    Periflex® Infant, and Periflex® Junior .................................... 8

        3.    Neocate ® Junior .................................................................... 10

            a.    Eosinophilic Esophagitis (EoE) ................................... 10

            b.    Short Bowel Syndrome (SBS) ...................................... 11

        4.    Ketocal® 4:1 Liquid ............................................................... 12

            a.    Intractable/Refractory Epilepsy ................................... 13

            b.    Glucose Transporter Type 1 Deficiency (GLUT 1) .................... 13

    C.    The Recognition of the Imported Products in the Trade ....................... 14

    D.    Expectation of the Ultimate Purchasers .............................................. 14

    E.    The Economic Practicality of So Using the Imported Products ........................ 15

    F.    The Channels of Trade in which the Imported Merchandise Moves .................. 17

    G.    The Environment of the Sale ............................................................... 18

    H.    CBP Rulings........................................................................................ 19

SUMMARY OF ARGUMENT ............................................................................ 19

STANDARD OF REVIEW .................................................................................. 24

ARGUMENT ....................................................................................................... 25

I.    The Subject Medical Foods are Classified as "Medicaments for Therapeutic Use" Under Heading 3004 ................................................................................................... 25

    A.    Applicable Rules of Interpretation ...................................................... 25

    B.    The Plain Terms of Heading 3004 Describe the Subject Medical Foods ........... 26

    C.    The Subject Medical Foods are of the Same Class or Kind as Medicaments under Heading 3004 ..................................................................................... 29

# TABLE OF CONTENTS

(continued)

**Page**

    1.    Medical Foods are Used the Same as Medicaments ................................ 30

    2.    Medical Foods Have Physical Characteristics Similar to Medicaments ........................................................................................ 31

    3.    Medical Foods Are Recognized in the Trade as Medicaments ............... 31

    4.    Purchasers of Medical Foods Have the Same Expectations as Purchasers of Medicaments ..................................................... 32

    5.    Given the High Cost of Medical Foods, It Is Only Practical to Use Them as Medicaments ................................................................. 33

    6.    Medical Foods are Sold in the Same Channels of Trade as Medicaments ........................................................................................ 33

    7.    Medical Foods Are Sold in an Environment Similar to that of Medicaments ........................................................................................ 34

II.    The Subject Medical Foods Cannot be Classified Under 2106 ....................................... 35

    A.    The Subject Medical Foods Cannot be Classified under Heading 2106 Because This Provision Doesn't Include Products Classified Elsewhere .......... 35

    B.    Chapter 21, Note 1 Excludes Products of Heading 3004 From Classification under Heading 2106 ........................................................ 35

    C.    CBP's Classification Determination Is Fatally Flawed ....................................... 35

    D.    The Explanatory Notes Confirm the Medical Foods are Not Classified Under Heading 2106 ................................................................. 39

III.    The Subject Medical Foods are Secondarily Classified under Heading 9817 ................. 40

    A.    The Subject Medical Foods Are Specially Designed for Handicapped Persons ....................................................................................... 40

    B.    CBP Incorrectly Concluded that Medical Foods Are Not Classified Under Heading 9817 .................................................................... 43

CONCLUSION ........................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bauer Nike Hockey USA, Inc. v. U.S.*,
  393 F.3d 1246 (Fed. Cir. 2004)...................................................................37, 38

*Bausch & Lomb v. United States*,
  148 F.3d 1363 (Fed. Cir. 1998)...................................................................24

*Conair Corp v. United States*,
  29 CIT 888 (2005) ......................................................................................25

*Cummins Inc., v. United States*,
  454 F.3d 1361 (Fed. Cir. 2006)...................................................................24

*Dependable Packaging Solutions, Inc. v. United States*,
  757 F.3d 1374 (Fed. Cir. 2014)...................................................................26

*E.M. Chemicals v. United States*,
  20 CIT 382, 923 F. Supp. 202 (1996).........................................................29, 30

*Estee Lauder v. United States*,
  36 CIT 1, 815 F. Supp. 2d 1287 (2012).......................................................25

*Franklin v. United States*,
  289 F.3d 753 (Fed. Cir. 2002)......................................................................25

*Inabata Specialty Chemicals v. United States*,
  29 CIT 419 (2005) ......................................................................................26, 27, 36

*J.E. Bernard & Co., Inc. v. U.S.*,
  58 Cust. Ct. 23, 262 F.Supp. 434 (1967) .....................................................26, 36

*Len-Ron Manufacturing Co. v. United States*,
  334 F.3d 1304 (Fed. Cir. 2003)...................................................................29

*Len-Ron Mfg. Co. v. United States*,
  24 CIT 948, 118 F. Supp. 2d 1266 (2000) ..................................................29, 30

*Mita Copystar Am. v. United States*,
  21 F.3d 1079 (Fed. Cir. 1994)......................................................................25

*Orlando Food Corp. v. United States*,
  140 F.3d 1437 (Fed. Cir. 1998)...................................................................24

i

*Pillowtex Corp. v. United States*,
    171 F.3d 1370 (Fed. Cir. 1999)................................................................24

*Primal Lite, Inc. v. United States*,
    182 F.3d 1362 (Fed. Cir. 1999)....................................................29, 30, 34

*R.T. Foods, Inc. v. U.S.*,
    36 CIT 1637, 887 F. Supp. 2d 1351 (2012) ............................................35

*Rubies Costume, Co. v. United States*,
    337 F.3d 1350 (Fed. Cir. 2003)................................................................44

*Starkey Labs. v. United States*,
    22 CIT 360, 6 F. Supp. 2d 910 (1998) ....................................................40

*Travenol Labs. v. United States*,
    17 CIT 69, 813 F. Supp. 840 (1993) ..................................................42, 44

*U.S. v. Alltransport, Inc.*,
    44 C.C.P.A. 149 (1957) ......................................................................26, 36

*United States v. Carborundum Co.*,
    63 CCPA 98, 536 F.2d 373 (1976) ......................................21, 29, 30, 34, 39

*Warner-Lambert Co. v. United States*,
    407 F.3d 1207 (Fed. Cir. 2005), (2) ..................................................24, 29

*Wilton Indus., Inc. v. United States*,
    741 F.3d 1263 (Fed. Cir. 2013)................................................................25

**Statutes**

19 U.S.C. § 1515..............................................................................................4

19 U.S.C. §1515(b) ..........................................................................................4

19 U.S.C. § 1625............................................................................................19

21 U.S.C. § 360ee......................................................................................1, 27

21 U.S.C. § 360ee(b)(3)............................................................6, 30, 32, 36, 42

28 U.S.C. §1581(a) ..........................................................................................3

28 U.S.C. § 2640(a)(1)..................................................................................24

42 U.S.C. § 1395ww(t)(4)..............................................................................17

42 U.S.C. § 1395x(vv)(1) ..............................................................................27

42 U.S.C § 12102 ...................................................................................7, 23, 41, 43, 44

42 U.S.C. §12102(1)(A)..........................................................................................41

42 U.S.C. §12102(2)(A)......................................................................................41, 43

42 U.S.C. § 12102 (2)(B)....................................................................................41, 43

**Code of Federal Regulations**

19 C.F.R. §174.22 ................................................................................................3, 4

21 C.F.R. § 101.9(j)(8)............................................................6, 28, 32, 38, 42

21 C.F.R. § 101.9(j)(8)(i) and (ii) ........................................................31, 43

21 C.F.R. §101.9(j)(8)(b)....................................................................................30

**Other Authorities**

54 Fed. Reg. 21187 (May 17, 1989) .........................................................41

S. Rep. No. 97-564..............................................................................................41

96 Stat. 2329, 2346 (1983).............................................................................40

TD 92-77, 26 Cust. Bull. Dec. 240, 246 (1992)...............................42

### MEMORANDUM OF LAW AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to USCIT R. 56, Plaintiff, Nutricia North America, Inc. ("Nutricia"), submits this Memorandum in Support of its Motion for Summary Judgment.

### MERCHANDISE AT ISSUE

This case presents a dispute over the proper Harmonized Tariff Schedules of the United States ("HTSUS") classification of certain Medical Foods, which are a unique class of products defined and regulated by the Food and Drug Administration ("FDA") under the Orphan Drug Act, 21 U.S.C. § 360ee. The five imported products are:

1.  MSUD Lophlex®,
2.  Periflex® Infant,
3.  Periflex® Junior,
4.  Neocate® Junior, and
5.  Ketocal® Liquid

These products are Medical Foods that are specially designed, produced and intended for use by infants or toddlers who suffer from a variety of diseases or disorders. Plaintiff's Exhibit (Ex.) 1, Expert Report of Dr. Jonah Essers ("Essers") at 1. Medical Foods are defined by statute as:

> "A food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."

21 U.S.C. § 360ee.

### TARIFF PROVISIONS AT ISSUE

The following HTSUS (2014) provisions are at issue:

**Heading 2106**

2106   Food preparations not elsewhere specified or included:
2106.90        Other:
2106.90.99            Other:
2106.90.9998              Other

**Chapter 21, Notes**

1.      This chapter does not cover: . . .

        (f)     Yeast put up as a medicament or other products of heading 3003 or 3004

**Heading 3004**

3004   Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed
       or unmixed products for therapeutic or prophylactic uses, put up in measured doses
       (including those in the form of transdermal administration systems) or in forms or
       packings for retail sale:

3004.50        Other, containing vitamins or other products of heading 2936:
3004.50.50            Other:
3004.50.5040              Other.

**Chapter 30, Notes**

1.      This chapter does not cover:

        (a)     Foods or beverages (such as dietetic, diabetic or fortified foods, food
                supplements, tonic beverages and mineral waters), other than nutritional
                preparations for intravenous administration (Section IV)

**Heading 9817**

9817.00.96:  Articles specially designed or adapted for the use or benefit of the blind or other
             physically or mentally handicapped persons; parts and accessories (except parts
             and accessories of braces and artificial limb prosthetics) that are specially
             designed or adapted for use in the foregoing articles: Other

**Chapter 98, Subchapter XVII, U.S. Notes**

4.      (a) For purposes of subheadings 9817.00.92, 9817.00.94 and 9817.00.96, the term "blind or other physically or mentally handicapped persons" includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working.

(b) Subheadings 9817.00.92, 9817.00.94 and 9817.00.96 do not cover –

(i) articles for acute or transient disability;
(ii) spectacles, dentures, and cosmetic articles for individuals not substantially disabled;
(iii) therapeutic and diagnostic articles; or
(iv) medicine or drugs.

## QUESTIONS PRESENTED

1. Whether the evidence presented demonstrates that the imported Medical Foods are medicaments used for nutrition therapy classified under heading 3004?

2. Whether the imported products are designed and used by handicapped persons, and should be secondarily classified under subheading 9817.00.96?

## JURISDICTION

This Court has jurisdiction over Plaintiff's appeal of U.S. Customs and Border Protection's ("CBP's") denial of its protests pursuant to 28 U.S.C. §1581(a).  Between November 13, 2014 and November 26, 2014, Plaintiff imported the subject merchandise in protest numbers 1101-15-100252 and 1001-15-100172 in four entries: 01-4122568-0, 101-4122571-4, 101-4134968-8, and 101-4134831-8. Ex. 2, Compl. ¶1; Answer, ¶1.  Plaintiff is the importer of record for these four entries and paid the duties owed.  Ex. 2, Compl. ¶2; Answer, ¶2. CBP liquidated the four entries under subheading 2106.90.9998, which provides for "Food preparations not elsewhere specified or included: Other…Other." Ex. 2, Compl ¶6; Answer ¶6.  On November 27, 2015, Plaintiff timely filed protest number 1101-15-100252 and requested accelerated disposition pursuant to 19 C.F.R.

§174.22 and 19 U.S.C. §1515(b). Ex. 2, Compl. ¶9; Answer ¶9. On December 1, 2015, Plaintiff

timely filed protest number 1001-15-100172 and requested accelerated disposition pursuant to 19

C.F.R. § 174.22 and 19 U.S.C. §1515(b). Ex. 2, Compl. ¶10; Answer ¶10. Protests 1101-15-

100252 and 1001-15-100172 were deemed denied. Ex. 2, Compl. ¶11; Answer ¶11. Plaintiff brings

this action to contest the deemed denial of protest numbers 1101-15-100252 and 1001-15-100172

by CBP under 19 U.S.C. § 1515. Ex. 2, Compl. ¶4; Answer ¶4. Nutricia requests that this Court

determine that CBP incorrectly classified the subject Medical Foods under heading 2106, and

classify the products under subheading 3004.50.50, and secondarily under subheading 9817.00.96,

as a matter of law.

## STATEMENT OF FACTS FOR WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED

Nutricia is a specialized medical nutrition company and is part of the Medical Nutrition

Division of Groupe Danone, Paris. Ex. 3 at 761. Nutricia designs and manufactures products used

in the management of neurological diseases, metabolic disorders, and gastrointestinal disorders

and diseases requiring nutritional therapy. Ex. 2, Compl. ¶¶23, 41, 53, 64, 75. Nutricia's U.S.

business focuses primarily on pediatric medical nutrition for rare conditions, and does not make

or market any conventional infant formulas. Ex. 3 at 761; Ex. 4, Dep. Del-Toro, 79:12-24.

### A.    Medical Rationale for the Imported Products

Plaintiff's expert, Dr. Jonah Essers, is a licensed medical doctor with over sixteen years of

experience in pediatric care. Essers at 6. He received a medical degree at Columbia University in

New York in 2003 and completed his pediatric residency at Children's National Medical Center in

Washington, D.C. *Id.* Dr. Essers also completed a fellowship in pediatric gastroenterology, and

received his master's degree in public health at Harvard University. *Id.* He then went on to

complete research training in the genetics of inflammatory bowel disease. *Id.* at 15. He is a board-

certified pediatric gastroenterologist. *Id.* Dr. Essers treats patients who suffer from diseases and

disorders, and are disabled or handicapped. *Id.* At any given time, he is responsible for the care delivery, coordination, and surveillance for approximately five hundred patients who rely on Medical Foods for nutritional therapy. *Id.* In his report, Dr. Essers discusses why these five imported Medical Foods are used, their medical rationale, and why he would prescribe these Medical Foods to infants and children suffering from diagnosed diseases or disorders. *See generally*, *id.*

The fundamental role of the human metabolism is to convert food into a usable form of energy. *Id.* at 8. The raw material for energy comes from proteins, fats, or carbohydrates. *Id*. Once ingested, all food needs to be digested, or broken down, into a usable form before it can be absorbed into the body, and byproducts must be excreted out of the body to prevent toxic buildup of waste. *Id.*at 8. Proteins are essential to the growth and function of all living organisms, and are comprised of varying sequences of twenty different amino acids.  *Id.* at 9.  Humans source proteins (amino acids) by ingesting plant or animal-based foods.  The body absorbs the amino acids into the blood stream, which sends it to the right organs and tissues. There the amino acids may construct new proteins, be converted into other needed amino acids or metabolized into energy for the body. *Id.* at 10.

Certain infants and children suffer from diseases and disorders, such as inborn errors of the metabolism (e.g., inherited mutations in the DNA code for building proteins required for metabolism of energy), short gut syndrome (damaged/decreased intestines impairing amino acid absorption), intractable seizures, and immune-mediated diseases.  *Id.* at 10-17.  Depending on the type of disease or disorder, these young patients face devastating consequences to their metabolisms, growth, and development. *Id.* The subject Medical Foods are designed, produced,

marketed, prescribed, and sold to treat infants and children suffering from these unique diseases and disorders. *Id*.

**B.      Use and Physical Characteristics of the Subject Imports**

The imported Medical Foods are articles used to treat patients suffering from specific illnesses or diseases because medications, alteration of diet and consumption of typical foods are not effective or possible. Essers at 3; 21 U.S.C. § 360ee(b)(3); 21 C.F.R. § 101.9(j)(8). These Medical Foods are used for the express purpose of reversing or stabilizing a disease. Essers at 3-4. Before a patient may use a Medical Food, the patient must undergo a comprehensive evaluation and a nutritional diagnosis by an expert such as a registered dietitian and/or a medical doctor with specific training in both the disease state and in nutritional therapy. *Id*. at 6. The essential ingredients of these Medical Foods, which provide the efficacy of the products, are specially produced amino acids and other ingredients that must be uniquely combined and manufactured to meet the desired medical purpose. *Id.* at 18. These ingredients are manufactured by pharmaceutical suppliers, and the unique composition of these amino acids provides the essence of the Medical Foods, targeting the unique biology of specific disease states. *Id.* at 18. Some amino acids are chemically synthesized to purity prior to inclusion in the formula, others are obtained through purification after fermentation using biotechnology. *Id.* at 18.

Below we describe the use of these Medical Foods (i.e., diseases or disorders that the products were designed to treat) and the physical characteristics and ingredients of each of the five products.

**1.      MSUD Lophlex® LQ**

MSUD Lophlex® LQ is used as nutrition therapy for children who suffer from a severe, life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase complex (BCKDC) deficiency, (also called Maple Syrup Urine Disease or MSUD), an inborn

error of the metabolism. Ex. 2, Compl. ¶¶ 25, 29, 31, 35; Ex. 5A at 2; Ex. 6, Yanicelli Dep. 46:22–48:1; Essers at 11. In this permanent and potentially fatal condition, children have impaired ability to metabolize three of the twenty essential amino acids: leucine, valine and isoleucine. Essers at 11. Since these three amino acids are still essential for life, a small amount of each must be consumed while still avoiding the normal amounts that might be found in a regular diet. *Id.* at 10-11. Finding such a defect early allows use of Medical Foods *in lieu* of full breast-feeding or normal infant formulas to avoid the toxic buildup of these three amino acids. *Id.* at 10. This halts the disease process. *Id.* at 10-11.  Many children with MSUD who take MSUD Lophlex® LQ may lead otherwise healthy lives. *Id.* Children cannot accomplish this healthy prognosis by eating a normal or avoidance diet. *Id.* at 11. Children with MSUD must contact their healthcare professional regularly to discuss and monitor their blood amino acid levels. *Id.* at 11. MSUD Lophlex® LQ is a primary therapy or treatment for managing patients with MSUD by managing intake of certain amino acids. *Id.*

A high level of BCAA, especially leucine, may cause a person to have intractable vomiting, severe weakness (lethargy), seizures and enter into a coma. *Id.* Under the ADA,[1] a person with untreated MSUD is handicapped and suffers from a physical and/or mental impairment that substantially limits major life activities like performing manual tasks, eating, learning, reading, concentrating, and thinking. *Id.* A person with MSUD also suffers from a physical and/or mental impairment that substantially limits or impacts major bodily functions like neurologic and brain functions. *Id.*

To treat MSUD, Nutricia designed MSUD Lophlex® LQ using the following amino acids:

L-lysine acetate, L-proline, L-tyrosine, L-arginine, glycine, L-serine, L-aspartic acid, L-alanine, L-threonine, L-cystine, L-phenylalanine, L-histidine, N-acetyl L-methionine, L-tryptophan and taurine.

---

[1] Americans with Disabilities Act of 1990.

*Id.* at 18; Ex. 7; *see also* Ex. 5.  These ingredients are specially manufactured by pharmaceutical suppliers like [█████████████]. Exs. 8; 8B. Some of the above-listed amino acids are chemically synthesized to purity prior to inclusion in the formula, whereas others are obtained through purification after fermentation using biotechnology. Essers at 18. All are pharmaceutical grade products, analyzed using high-pressure liquid chromatography to assure content purity absent of heavy metals, radioactivity, and bacterial/fungal contamination. *Id.*; Ex. 8B. These ingredients provide the minimal amount of BCAA needed for life, without providing any excess that elicits toxicity. Essers at 10. The provision of the amino acids listed, without provision of the BCAA, is the essence of why Nutricia's formula is unique. *Id.* at 18. No other food could provide the amino acids needed for life while excluding the leucine, valine and isoleucine components that pose a risk to the child because their body cannot break down those components. *Id.*   Other ingredients provided in the formula include: water, apple, grape, blackcurrent and elderberry juice concentrates, which are included to provide carbohydrates needed for energy and taste. *Id.* at 18; Ex. 7.

### 2.    Periflex® Infant, and Periflex® Junior

Periflex® Infant and Periflex® Junior are used to treat Phenylketonuria (PKU), which affects about 1 in 10,000 births. Essers at 11-12; Ex. 5B at 1. Phenylketonuria (PKU) is an:

> [a]utosomal recessively-inherited inborn error of metabolism of phenylalanine characterized by deficiency of 1) phenylalanine hydroxylase caused by mutation in the phenylalanine hydroxylase gene (PAH) . . . The disorder is characterized by inadequate formation of L-tyrosine, elevation of serum L-phenylalanine, urinary excretion of phenylpyruvic acid and other derivatives, and accumulation of phenylalanine and its metabolites, which can produce brain damage resulting in severe mental retardation, often with seizures, other neurologic abnormalities such as retarded myelination and deficient melanin formation leading to hypopigmentation of the skin and eczema.

Ex. 9. The prevailing treatment for PKU is a diet low or absent in foods that contain phenylalanine, which is a common amino acid, and the inclusion of certain supplements to provide the minimum amount of phenylalanine required for synthesis of body proteins. Essers at 11-12, 19-20, 24. All newborns in the United States are tested for PKU within a few days of birth. *Id.* at 24. Without nutritional management and treatment starting from birth, a child with PKU could suffer severe, irreversible intellectual disability rendering him/her completely unable to take care of him/herself for the rest of his/her life. *See* Ex. 10; Essers at 23-24. "Children who are diagnosed early in life and maintain low levels of phenylalanine are able lead completely normal lives." *Id.* at 24. Periflex® Junior is used to treat PKU in children over one year old. *Id.* Periflex® Infant is used to treat children with PKU under one year of age. *Id.*

To treat PKU in children under the age of one, Nutricia designed Periflex® Infant with the following amino acids:

> L-arginine L-aspartate, L-leucine, L-lysine acetate, L-tyrosine, L-glutamine, L-proline, L-valine, glycine, L-isoleucine, L-threonine, L-serine, L-histidine, L-alanine, L-cystine, L-tryptophan, L-methionine, magnesium L-aspartate.

*Id.* at 19; Ex. 11. The amino acid phenylalanine is absent from this formula. *Id.* These ingredients are specially manufactured by pharmaceutical suppliers like [█████████████], and provide the essence of Periflex® Infant. Exs. 8; 8C; Essers at 19. The seventeen amino acids in this formula, some of which can be converted into other amino acids (but not phenylalanine), are not naturally found in this form in food. Essers at 24; Ex. 8C. "[I]t is the unique composition of these amino acids that provides its essence as a Medical Food targeting the unique biology of one specific disease state." Essers at 19. All of the above are pharmaceutical grade ingredients that are analyzed using high-pressure liquid chromatography to assure content purity absent of heavy metals, radioactivity, and contamination. *Id.* at 20; Ex. 8C. It is not customary to consume foods

devoid in phenylalanine, and such foods taste "horrible." Essers Dep., 163:3-5. Other ingredients in Periflex® Infant, include: essential vitamins, minerals, fats and carbohydrates. Essers at 20; *see* Ex. 11.

Like Periflex® Infant, Nutricia designed Periflex® Jr. for children over one with the following amino acids:

> L-glutamine, L-proline, L-asparagine, L-lysine hydrochloride, L-tyrosine, L-leucine, L-valine, L-serine, L-isoleucine, L-alanine, L-threonine, L-arginine, L-cystine, L-citrulline, L-histidine, L-methionine, L-tryptophan and taurine.

Essers at 20; Ex. 14. Other ingredients in Periflex® Jr. include essential vitamins, minerals, fats and carbohydrates. Essers at 21; Ex. 14.

The only way to eliminate phenylalanine (while providing nutrients needed for life) is to provide the child amino acid ingredients that are listed above, while providing other amino acids in appropriate quantities and ratios needed to synthesize total body proteins and sustain life. Essers at 24.

### 3. Neocate® Junior

Neocate® Junior is used to treat patients who suffer from: (1) Eosinophilic Esophagitis (EoE), (2) Short Bowel Syndrome (SBS), which we describe below, as well as other diseases and disorders. Essers at 25-29.

### a. Eosinophilic Esophagitis (EoE)

Eosinophilic Esophagitis (EoE), is an immune-mediated disease of the esophagus. *Id.* at 13-14, 27-28. Persons with EoE have a particular type of white blood cell (eosinophil) that builds up in the lining of their esophagus, the conduit that connects the mouth to the stomach. *Id.* at 27. Dr. Essers explained:

> In EoE, the immune system residing in the esophagus over-reacts to one or more dietary proteins. This leads to activation of a type of white blood cell called an

eosinophil, a particular arm of the immune system responsible for causing allergic responses. Once activated, eosinophils traffic to and infiltrate the lining of the esophagus. This infiltration leads to damage and swelling of the esophagus wall, narrowing of the esophagus lumen, and eventual scarring of the esophagus known as a stricture. Strictures may predispose to food getting stuck or 'impacted' in the esophagus, which usually requires endoscopic removal under sedation. EoE commonly presents in young children. The clinical result is heartburn, chest pain, vomiting, and difficulty swallowing food. If left untreated, patients can develop inability to swallow solid or semi-solid food, malnutrition, and chronic pain. When children [have] trouble swallowing food, they will often refuse to eat food out of fear, discomfort, or emotional dysregulation.

This is one reason why an amino acid-based formula like Neocate® Junior is so essential to managing this disease—often liquids are the only nutrition a child will agree to consume. Since there are no proteins or peptides present, Neocate eliminates the substances responsible for provoking the allergic response, while providing all essential nutrients that are needed for normal growth and development

*Id.* at 27-28.

### b.      Short Bowel Syndrome (SBS)

SBS is defined as "a loss of intestinal surface for absorption of nutrients caused by the surgical removal of a section of bowel. Treatment is with parenteral nutrition in the acute phase." Ex. 15. SBS may occur when those portions of the small intestine have been removed or when portions of the small intestine are missing or damaged at birth. Essers at 25. SBS treatment may require parenteral nutrition (through a vein) to prevent malnutrition or enteral tube feeding in those who tolerate placing food, fluids, and/or drugs directly into the stomach or small intestine through a tube inserted through the nose or directly through the abdomen into the stomach (gastrostomy) or duodenum (duodenostomy). *Id.* at 13. Complications include vomiting, chronic diarrhea with fluid and electrolyte loss, enterocolitis and/or proctocolitis. *Id.* "Other problems may include small bowel bacterial overgrowth, altered functional motility, remnants of dysfunctional bowel, surgical diversion, or post-surgical anastomotic strictures (areas where ends of intestine were sewn together)." *Id.* SBS requires ongoing therapy, monitoring and management. *Id.* SBS affects the

available absorptive surface area due to limited length of the small intestine, so that time required for absorption of nutrients for digestion is insufficient. *Id.* at 12.

Neocate® Junior is used by children with SBS as nutritional therapy. *Id.* at 13. Neocate® Jr. is used because it provides all of the essential amino acids in the appropriate proportions for maintaining bodily functions - without having to undergo digestion prior to absorption within intestinal remnants. *Id.* at 27. Providing Neocate® Jr. to a child allows absorption of amino acids to commence the moment upon arrival in the proximal small intestine. *Id.* This approach allows maximal uptake of amino acids, given the limited available surface area of the small bowel and the time available to absorb it. *Id.*

To treat children with these and other conditions, Nutricia designed Neocate® Junior with the following amino acids:

> L-Arginine (2.4%), L-Glutamine (2.3%), L-Lysine, L-Aspartate (2%), and less than 2% of each of the following: L-Leucine, L-Phenylalanine, L-proline, L-valine, Glycine, L-Isoleucine, N-Acetyl-L-Methionine, L-Threonine, L-Histidine, L-Serine, L-Alanine, L-Tryptophan, L-Tyrosine, L-Cystine, Taurine.

Essers at 20; Ex. 16. These amino acids are specially manufactured by pharmaceutical suppliers like [█████████████]. Exs. 8; 8E; Essers at 20.  In addition, these amino acids are non-allergenic and non-immunogenic and provide the building blocks needed to synthesize needed proteins for bodily function.  Essers at 20. The unique composition of the amino acids provides the essence of the product, targeting the unique biology of a specific disease state.  *Id.* at 21. Other ingredients in the formula include: essential vitamins, minerals, fats and carbohydrates. Essers at 21; Ex. 16.

### 4.    Ketocal® 4:1 Liquid

Ketocal® Liquid is used to treat patients who suffer from: (1) Intractable/Refractory Epilepsy, (2) Glucose Transporter Type 1 Deficiency (GLUT 1), which are described below, as

well as other diseases or disorders. Ex. 5E at 1, 3. A "ketogenic" diet that is high in fat, low in carbohydrates, and contains controlled proportions of protein, is used to control epilepsy. *Id.* at 2.

### a.    Intractable/Refractory Epilepsy

Intractable or refractory epilepsy is a neurological disorder in which a person's seizures fail to adequately subside with appropriately dosed pharmacologic therapy for convulsions. Essers at 31. Nutrition therapy is an alternative or supplemental treatment for persons with intractable epilepsy. *Id.*

### b.    Glucose Transporter Type 1 Deficiency (GLUT 1)

Glucose Transporter Type 1 deficiency (GLUT 1) is a lifelong genetic metabolic disorder that occurs as a result of mutation in the SLC2A1 gene. *Id.* at 31-32. It is incurable and presents in infancy. *Id.* at 31. The ketogenic diet is the principal treatment for persons with GLUT1. *Id.* Persons with GLUT1 demonstrate epilepsy, developmental delays, acquired microcephaly, cognitive impairment and varying degrees of spasticity, ataxia, and dystonia. *Id.*

Ketocal® 4:1 Liquid is "designed for children ages 1-10 with intractable seizures who have failed multiple anti-seizure pharmaceuticals." *Id.* at 21. "It is designed for easy passage through a feeding tube since many children with intractable seizures are not neurologically capable of safely swallowing liquids and/or solid food." *Id.* Ketocal® is unique in that it provides a 4:1 ratio of fat calories to "non-fat" protein and carbohydrate calories. *Id.* The dearth of carbohydrate is what induces the ketogenic state that has high efficacy in treating intractable seizures. *Id.* This formula can be the sole source of nutrition if need be or can be combined with varying amounts of table food. The fats in Ketocal® are:

> Refined vegetable oil (high oleic sunflower, soy, palm), alpina oil, C. Cohnii oil, mono and diglycerides, and soy lecithin. Carnitine and taurine are added to further optimize digestion and metabolism.

13

*Id.* at 21. Other ingredients are: water, proteins, minimal carbohydrates, vitamins, minerals and fiber. Ex. 18. There is no naturally occurring food that will allow a child to have complete nutrition in the manner that Ketocal® provides, accordingly this ketogenic diet is popular among pediatric neurologists to treat patients with GLUT 1. Essers Dep., 133:5-134:8.

### C.    The Recognition of the Imported Products in the Trade.

Nutricia's formulas are marketed to physicians like other medical products. Essers at 35. These products are well recognized by the medical profession. *Id.* "Doctors often provide samples of these products to patients and work with patients to determine what Medical Food formulas their patients will tolerate. These formulas are not like apple sauce or baby foods. They are the culmination of decades of research in niche fields of medicine. These formulas represent state of the art nutritional therapy targeted against very specific ailments." *Id.* Physicians that recommend/prescribe Medical Foods indicate the rationale for prescribing the formula and direct the guardians of these children on how to order it. *Id.*

These products have been the subject of hundreds of use and efficacy studies written by and for medical experts. Nutricia provided the government 220 of these studies during discovery. Ex. 19 (providing 120 sample studies from 2005-2015). These studies have covered such topics as the impacts of diet therapy for children with EoE, and the efficacy and long-term outcomes of amino acid formulas. *Id.*

### D.    Expectation of the Ultimate Purchasers

The ultimate purchasers of the subject Medical Foods are the legal guardians of a newborn or child with a serious medical condition. Essers at 17. The expectation for the ultimate purchasers is that the Nutricia's Medical Foods will prevent or ameliorate the symptoms suffered by their child, which would otherwise occur for a particular condition if the child were to eat a normal diet. *Id.* These products are used to prevent or mitigate disease manifestation or progression while

facilitating growth and development. *Id.* If the diagnosis or institution of appropriate nutritional intervention is delayed it will impair the development or growth of the child. *Id.* Once a diagnosis is made and nutritional therapy provided, further impairment is avoided. *Id.* These products are not provided by the parents to infants or children as a supplement to foods. Essers Dep., 167:10-168:9.

For the ultimate purchaser, once a newborn or child is diagnosed with one of the diseases recognized to be alleviated by these Medical Foods, the physician will recommend or prescribe the formula to be initiated and maintained. Essers at 17. *"Lay families lack sophisticated understanding of normal human metabolism and disease pathophysiology." Id.* This renders them wholly reliant on their physicians and providers to determine how to safely feed their children. *Id.* The physician or medical provider is additionally responsible for monitoring growth, nutrition, and toxic sequelae. *Id.*

Parents understand that these products are expensive, but they may have medical insurance that covers the cost of the Medical Food, usually requiring a physician's prescription, with follow-up by the physician with the insurance company to justify the need for these products. *Id.*; Ex. 13 (Letters of Medical Necessity, HCPCS, and WIC).

### E.    The Economic Practicality of So Using the Imported Products

Plaintiff's expert Dr. Pablo Robles conducted an analysis comparing the costs of the subject Medical Foods with the costs of products in the baby food industry to determine whether these products are commercially fungible. Ex. 21, Expert Report of Pablo Robles, PhD, at 3-4 ("Robles"). Dr. Robles has a PhD in economics from The University of Chicago. *Id.* at 1.  He concluded that "the economic features of Nutricia's products are significantly different from those of the relevant comparator products, making it unlikely that consumers view the two sets of

products as substitutes." *Id.* at 4. His economic analysis indicated that: consumers would find it economically impractical to use at-issue products as substitutes for relevant comparator products (e.g., grocery store available baby foods such as Similac, Enfamil, etc.) in the baby food industry. *Id.* at 5. He found:

- Consumers of the products face medical requirements that consumers of baby food products do not. This is because the products (unlike baby food products) are recommended to be consumed under medical supervision and are commonly sold through healthcare institutions. *Id.*

- Prices paid by consumers of the products during the relevant period were significantly higher than the prices paid for products in the baby food industry. *Id.*

- The products are often covered by insurance, and relevant comparator products in the baby food industry are not. *Id.*

Robles stated "[p]roducts are economic substitutes if consumers shift their consumption from one product to the other in response to a price change in one of the products. *Id.* at 9. "A pre-requisite for substitute products is that consumers have knowledge of the existence of both products, and therefore, can shift their purchases in response to the price change in one of the products." *Id.* Medical Foods have significantly higher retail prices than baby food purchased at a grocery store. *Id.* at 24. In examining products sold in 2014 Robles found:

- MSUD Lophlex® [          ] sold for over [          ] Gerber Toddler pouches (\$ .37/fl. oz.).

- Periflex® Infant [          ] sold for over [          ] Enfamil Infant (\$.16/fl. oz.).

- Periflex® Junior [          ] sold for over [          ] Similac (\$.13/fl. oz.).

- Neocate® Junior [          ] sold for over [          ] Similac (\$.13/fl. oz.).

- Ketocal® Liquid [          ] sold for over [          ] Enfamil (\$.23/fl. oz.).

*Id.* at 23. He found it would not make economic sense for consumers of products in the baby food industry to consider the products as potential substitutes. *Id.* at 24.

Further, Nutricia's products are primarily reimbursed as a medical benefit. Ex. 22, Deposition of Gerald Bruce ("Bruce Dep."), 13:4-10. Many of the patients purchasing Nutricia's products go to a durable medical equipment provider so they may receive medical reimbursement from an insurance company for Nutricia's products. *Id.* State mandates cover medical foods for certain conditions if a health professional indicates that they are medically necessary. Robles at 26.  Baby foods are generally not covered by insurance. *Id.*

To obtain insurance reimbursement coverage for a product, the product must have a Healthcare Common Procedure Coding System (HCPCS, called "hick picks") number.  HCPCS is a collection of standardized codes that represents medical procedures, supplies, products and services that the government categorizes as needed for the aged and disabled. *See* 42 U.S.C. § 1395ww(t)(4). The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers for products and are issued by the U.S. Government. *See* 42 U.S.C. §1395ww(t)(4). Nutricia's products have HCPCS codes and qualify for private insurance reimbursement and the insurance codes for the imported products are listed inside Nutricia's materials (e.g., one of the HCPCS codes for Neocate® is B4161). *See, e.g.*, Ex. 13 at 14-15. Nutricia provides a service to assist persons seeking reimbursement for the purchase of their Medical Foods. *Id.* at 18-30. Nutricia also provides examples of forms to be used by patients to assist with this process. *Id.* Persons who purchase Medical Foods obtain reimbursement of this cost from private commercial insurance payers (*e.g.*, Aetna or Blue Cross/Blue Shield). Robles at 26 & n. 58. Nutricia's records indicate that at least 96% of their sales are covered by some form of insurance or government support. *Id.*

**F.    The Channels of Trade in which the Imported Merchandise Moves**

Nutricia's national medical sales teams sell to hospitals, home healthcare or durable medical equipment retailers, and wholesalers. Bruce Dep., 12:20-24.  The reason for this chain of

sale is that purchase of these products can be covered by insurance, which may require consent or a prescription from healthcare professionals. Robles at 34. Medical Foods are typically prescribed by a medical professional and must be requested from a pharmacist, or are distributed directly to institutions such as hospitals and medical clinics. Ex. 23.

Nutricia's largest customer is a medical surgical wholesaler [██████████████████ ████████]. Bruce Dep., 14:11-14. The "largest sales channel in the medical food industry is the institutional sales channel, which accounted for 42.8% of sales in the medical food industry for the 2014-2020 period." Robles at 14. Baby food is sold through traditional retailers such as grocery stores or big box stores (e.g., Target). *Id.* at 5. Specifically, consumers of products in the baby food industry purchase their products through: (1) supermarkets (84%); (2) pharmacies (11.5%); (3) convenience stores (2%); (4) independent retailers (1.6%); and (5) other (1.1%). *Id.* at 16.

### G.      The Environment of the Sale

Advertising and marketing of Medical Foods takes place in conferences, training sessions in healthcare institutes, and awareness campaigns. Robles at 15; Ex. 3 at 780. This is because healthcare providers then prescribe or recommend the Medical Foods to the ultimate users. Essers at 6. The products' labels state the product should be taken under "medical supervision." Robles at 18; Ex. 20. The labels state the "indications" or diseases for which the product should be used, and indicate that the products are used for the nutritional management of medical conditions. Ex. 20. For example, the MSUD Lophlex® label indicates that it is a "[f]ood for special medical purpose." The Periflex® label indicates that it is "[a]phenylamine-free, powdered infant formula with iron for the dietary management of Phenylketonuria (PKU)," and the Neocate® Junior label states it is "[f]or the dietary management of cow and soy milk allergy, multiple food protein intolerance, eosinophilic esophagitis, short bowel syndrome, and conditions of gastrointestinal tract impairment and malabsorption requiring an elemental diet: A Medical Food." Ex. 20, A-D.

## H.    CBP Rulings

In 1990, CBP issued Nutricia a binding ruling classifying PKU products (e.g., Analog XP or Maxamum XP) under heading 3004. Ex. 24, HQ 083000 (Sept. 19, 1990).  The products in the 1990 ruling are substantially similar or identical to the Periflex® products at issue here. In 2007, CBP issued three separate rulings classifying other PKU products as medicaments under heading 3004. Ex. 25, NY N005717 (Jan. 26, 2007), NY N006048 (Feb. 6, 2007), and NY N006049 (Feb. 6, 2007).

However, in 2004, CBP issued another ruling classifying PKU products as other food preparations under heading 2106. Ex. 26, HQ 966779 (Jan. 16, 2004). CBP did not revoke its prior 1990 ruling that classified PKU products under heading 3004, pursuant to 19 U.S.C. § 1625. Instead, CBP stated that HQ 083000 was revoked by operation of law as a result of changes to Chapter 30, Note 1(a).  In 2014, CBP formally revoked the three 2007 PKU rulings and reclassified those PKU products from heading 3004 to heading 2106. Ex. 27, 48 Cus. Bul. & Dec. No. 35 (Sept. 3, 2014).   Later in 2014, CBP issued a ruling to Nutricia in response to Nutricia's protest challenging CBP's liquidation of entries of certain metabolic and gastrointestinal Medical Foods similar to those here. Ex. 28, HQ H121544 (Oct. 6, 2014).   In HQ H121544, CBP rejected Nutricia's arguments that the products (besides PKU products) were classified under heading 3004 as medicaments and secondarily classified under heading 9817. CBP classified the Medical Foods as other food preparations under heading 2106. *Id.* CBP classified the PKU products under heading 3004 because its 2014 revocation of the rulings on PKU products was not effective until November 3, 2014 and the entries subject to the protest were made prior to this date. *Id.*

## SUMMARY OF ARGUMENT

The two questions before the Court are: (1) whether the subject products are more specifically classified as medicaments under heading 3004, as Plaintiff contends, or generically as

"other" food preparations under heading 2106 as CBP claims; and (2) whether the subject products are designed for the benefit of handicapped persons and as such, may be classified under heading 9817.  As to the first question, the structure of the tariff schedule, and its relevant headings and provisions, reveal that the subject products must be classified as medicaments under heading 3004. Heading 2106 is limited to food preparations "not elsewhere specified."  Courts have referred to this heading as an "expansive basket heading that only applies in the absence of another applicable heading."  As the subject products are medicaments, classification under heading 2106 is foreclosed. Even if this Court were to conclude that the subject products are *prima facie* classifiable in <u>both</u> provisions, GRI 3(a) would require classification in the more specific "medicaments" provision rather than the "expansive basket" food preparations provision. In order for CBP to prevail it must demonstrate that the subject products are <u>not</u> medicaments.  It cannot do so, because the tariff provisions, coupled with the record evidence, establish that the subject products are indeed medicaments.

First and foremost, the subject products were conceived, designed, produced, marketed, and sold for "therapeutic or prophylactic use" to treat persons with medical problems, which is the defining characteristic of a medicament.  They are indicated for use in the treatment of a variety of diseases, predominantly in very young children – in some instances they are the only, or primary, available treatment to ameliorate these severe and sometimes fatal conditions. Medical professionals refer to the deployment of these products as "nutritional **therapy,**" thus confirming their therapeutic use and value.    Put simply, as FDA-regulated "medical foods" the subject products are the "medicine" that doctors will prescribe or recommend to treat children suffering from the referenced diseases.  The products' therapeutic character is incontrovertible, and the

factors that the court set out in *United States v. Carborundum Co.,* 63 CCPA 98, 102, 536 F.2d

373, 377 (1976) underscore their status as medicaments:

- They are used exclusively as medicaments (*i.e.*, as nutritional therapy); healthy children do not consume them (in some cases such consumption would be dangerous).

- They are produced and marketed in the same manner as other medicaments, with the marketing principally focused on healthcare providers rather than consumers.

- They are understood to be medicaments by both the doctors who prescribe/recommend them and the consumers who ultimately purchase them. Their costs are eligible for reimbursement by health insurers as would be the case for other medicaments.

- They are priced as medicaments – the record shows prices as much as [ █████████ ] higher than their baby food counterparts.

- They are sold in the same channels as medicaments – consumers typically must purchase them through a doctor and/or "behind the counter" at a pharmacy; they are not sold in conventional retail food channels.

In short, application of the *Carborundum* factors establishes that the subject products are

medicaments from concept to consumption and at every intervening stage.

In response to these incontrovertible facts, CBP seeks to narrow the scope of heading 3004

by interposing additional requirements not found in the statutory language, namely that

medicaments must: (1) feature an active ingredient, and (2) cure a disease. Both arguments fail.

There is nothing about the language of heading 3004 requiring that a medicament feature a specific

active ingredient. To the contrary, its coverage is defined by use in "therapeutic or prophylactic"

applications. This precisely aligns with the use of the subject products, whose efficacy in those

applications is the reason why they are FDA regulated as Medical Foods and recommended or

prescribed to patients.  The Explanatory Notes ("ENs") to heading 3004 are instructive in that

regard: they confirm that food supplements targeting general health and well-being are excluded

from the heading, but only to the extent that they feature "no indication as to use for the prevention

or treatment of any ailment."  The subject products have precisely such an indication. They are specifically indicated and prescribed or recommended to prevent or treat very particular ailments. CBP's other contention, that the products must "cure" a disease, is similarly baseless - it conflates a "curative" product with a "therapeutic" one.  There is no known "cure" for the common cold – the notion that the panoply of medicines available to treat its symptoms therefore are not "medicaments" borders on the absurd, and it enjoys no support in the language of the tariff schedule. Given their therapeutic and prophylactic characteristics, the subject products are demonstrably medicaments of heading 3004.  As such, plaintiff submits that classification under heading 2106 is foreclosed, and even if the Court concludes that the products are *prima facie* classifiable as both foods and medicaments, GRI 3(a) requires classification under heading 3004 as the more specific provision.

The second question before the Court is whether the subject products are secondarily classifiable under heading 9817, as articles specially designed to benefit handicapped persons. They are.  There is no doubt that the subject products were scientifically conceived, specifically designed, produced, marketed, indicated, prescribed and sold to persons to treat specific diseases. These are not generic foods or supplements. The issue therefore is whether the patients suffering from these diseases are "handicapped" within the meaning of the heading (which was statutorily designed to be of broad application). Under U.S. Note 4, the question is whether patients are suffering from a physical ailment that substantially limits one or more major life activities.  To ask this question is to answer it: the patients for whom the subject products are indicated typically cannot metabolize any naturally occurring protein without suffering adverse, and often acute or even life-threatening, effects.  In lay terms, they cannot eat what they require to grow and survive

without getting sick, and often dangerously so.  These conditions impair virtually <u>every</u> "major life activity," none of which is possible absent basic nutrition.

The ADA features a definition of "disability" that is nearly identical to the definition of "handicapped" in the tariff schedule, and it describes "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, and seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C § 12102.  It goes on to include the operation of major bodily functions, such as "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* The inability to metabolize protein – the most fundamental nutritional building block – without serious adverse effects represents an impairment to virtually <u>all</u> of these activities and functions. Plaintiff's expert, a medical doctor who treats patients suffering from these conditions, has confirmed that they are "handicapped" within the meaning of the ADA, and there is no basis on which to conclude that the analysis should be any different under the HTSUS.  CBP's only response is to argue that these patients must simply "avoid" certain categories of food (as would be the case for a person with diabetes or a peanut allergy), and that their conditions do not impair "the physical act of eating." These arguments both misapprehend the patients' conditions and unduly narrow the scope of heading 9817.  For patients with these diseases, mere "avoidance" of particular discrete food categories (sugary foods, peanuts, etc.) in favor of others is not possible. Accordingly, their treatment (often the only possible treatment) requires the particularized nutritional therapy that the subject products represent.

CBP's seizing on the purported lack of an impediment to the "physical act of eating," while ignoring the profound and pervasive effects of these conditions on virtually all life activities, is an

impossibly narrow reading of the language of the HTSUS and its recognition of what it means to be "handicapped."

The subject products are nutrition therapy – that is, medicaments for therapeutic use of heading 3004 and secondarily they are articles specially designed to benefit handicapped persons of heading 9817.

<u>**STANDARD OF REVIEW**</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56. Summary judgment may be granted based on the pleadings, depositions, answers to interrogatories, and affidavits filed with the court. *Id.* A classification decision involves two steps. The first step addresses the proper meaning of the relevant tariff headings, which is a question of law. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). The second step determines the nature of the imported merchandise and whether it falls into the relevant heading, which is a question of fact. *Id.* In cases concerning the classification of an article, "summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." *Bausch & Lomb v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998); *see also Cummins Inc., v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006) ("when the nature of the merchandise is undisputed…the classification issue collapses entirely into a question of law."). Whether Customs has properly classified imported merchandise under the appropriate tariff provision is a question of law that the court reviews *de novo*. *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999); 28 U.S.C. § 2640(a)(1).  A Customs decision is not entitled to deference if it: (1) overlooks "some" characteristics of the article to be classified, *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1210-11 (Fed. Cir. 2005), (2) contains

conclusory statements and fails to apply the law to the facts, *Conair Corp v. United States*, 29 CIT 888, 898 (2005), or (3) a review of the tariff schedule or the ENs reveals fundamental flaws in Customs' analysis. *Estee Lauder v. United States*, 36 CIT 1, 12, 815 F. Supp. 2d 1287, 1298 (2012).

## ARGUMENT

I. **The Subject Medical Foods are Classified as "Medicaments for Therapeutic Use" Under Heading 3004**

A. **Applicable Rules of Interpretation**

Tariff classification is governed by the General Rules of Interpretation ("GRIs"), which are applied in numerical order. *Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1266 (Fed. Cir. 2013). GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." When a tariff term is not defined in the HTSUS or legislative history, the term's correct meaning is its common meaning. *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994).  A court may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities, to determine the meaning of a tariff term. *Id.*  Although not dispositive, the Explanatory Notes "clarify the scope of the HTSUS subheadings and [] offer guidance in their interpretation." *Franklin v. United States*, 289 F.3d 753, 758 (Fed. Cir. 2002).

According to GRI 3(a), when a product is *prima facie* classifiable under two or more headings, "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description." Under Additional U.S. Rule of Interpretation ("ARI") 1(a), "a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the

25

principal use[.]" *See also Dependable Packaging Solutions, Inc. v. United States*, 757 F.3d 1374, 1378 (Fed. Cir. 2014).

**B.      The Plain Terms of Heading 3004 Describe the Subject Medical Foods**

Heading 3004 provides for:

"Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses, put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale."

The Medical Foods here meet each of the requirements of the statutory terms of this heading.  They are: (1) medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses, and (2) put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale.

First, Medical Foods are "medicaments for therapeutic uses."  The term "medicaments" is defined as: "a substance used in therapy" *See Medicament Definition*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/medicament (last visited Aug. 25, 2022).  The term "therapeutic" has been defined by this court as "relating to . . . the treatment, remediating, or curing of a disorder or disease." *Inabata Specialty Chemicals v. United States*, 29 CIT 419, 423 (2005) (citing Stedman's Medical Dictionary 1821 (27th ed. 2000)). The term "therapeutic" also has been defined as embracing "the alleviative or palliative, as well as the curative or healing qualities." *J.E. Bernard & Co., Inc. v. U.S.*, 58 Cust. Ct. 23, 28-29, 262 F.Supp. 434, 438 (1967); *U.S. v. Alltransport, Inc.*, 44 C.C.P.A. 149, 152 (1957) (a product is medicinal if it is "of use, or believed by the prescriber or user fairly and honestly to be of use, in curing or alleviating, or palliating or preventing, some disease or affliction of the human frame"). A medicament has

therapeutic uses even if does not "cure" a disease. *Inabata Specialty Chems.*, 29 CIT at 422-423, 366 F. Supp. 2d 1358 at 1362.

Nutrition therapy is a type of therapy defined as the "administration of food and fluids to support metabolic processes of a patient who is malnourished or at high risk for becoming malnourished." Ex. 29, Nutrition therapy, *Mosby's Dictionary of Medicine, Nursing & Health Professions* (9th ed. 2013). It is also defined as "[n]utritional diagnostic, therapy, and counseling services for the purpose of disease management which are furnished by a registered dietitian or nutrition professional[.]" 42 U.S.C. § 1395x(vv)(1).

Plaintiff's products are "medical foods" as defined by the FDA, and fall squarely within the definition of "medicaments for therapeutic use" in heading 3004. 21 U.S.C. § 360ee; *see supra* 1-5. The FDA has stated that Medical Foods must: "(1) meet distinctive nutritional requirements of a disease or condition, (2) are used under medical supervision, and (3) are intended for the specific dietary management of a disease or condition."[2]  FDA regulations further state a "medical food":

a.  Is a specially formulated and processed product (as opposed to a naturally occurring foodstuff used in its natural state) for the partial or exclusive feeding of a patient by means of oral intake or enteral feeding by tube, meaning a tube or catheter that delivers nutrients beyond the oral cavity directly into the stomach or small intestine;

b.  Is intended for the dietary management of a patient who, because of therapeutic or chronic medical needs, has limited or impaired capacity to ingest, digest, absorb, or metabolize ordinary foodstuffs or certain nutrients, or who has other special medically determined nutrient requirements, the dietary management of which cannot be achieved by the modification of the normal diet alone;

---

[2] *See Guidance for Industry: Frequently Asked Questions About Medical Foods - Second Edition*, FDA (June 2007), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-frequently-asked-questions-about-medical-foods-second-edition (last visited August 25, 2022).

c.   Provides nutritional support specifically modified for the management of the unique nutrient needs that result from the specific disease or condition, as determined by medical evaluation;

d.   Is intended to be used under medical supervision; and

e.   Is intended only for a patient receiving active and ongoing medical supervision wherein the patient requires medical care on a recurring basis for, among other things, instructions on the use of the medical food.

21 C.F.R. §101.9(j)(8). These regulations confirm "medical foods" meet the plain terms of heading 3004 because such products are substances designed and used as therapy for patients requiring ongoing medical supervision and suffering from diseases for which "modification of the normal diet alone" cannot be used to alleviate or treat the patient's disease.

This conclusion is supported by Plaintiff's expert, Dr. Essers, who described the subject products as therapies that hospitals and outpatient care facilities keep in their inventory. Essers at 35.  The imported products are used as part of "nutrition therapy," specifically:

- MSUD Lophlex® LQ is used as nutrition therapy for children who suffer from a severe, life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase complex (BCKDC) deficiency.  Essers at 10-11.

- Periflex® Infant and Junior are used to treat PKU in children under and over one year old, respectively. *Id.* Nutrition therapy is the primary treatment for persons with PKU. *Id.* at 11-12.

- Neocate® Junior is used by patients with EoE or SBS as nutritional therapy. SBS affects the available absorptive surface area due to limited length of the small intestine, so that time required for absorption of nutrients after time required for digestion is insufficient. *Id.* at 12-15.

- Ketocal® Liquid is a nutritional therapy to treat patients with intractable or refractory epilepsy.  *Id*. at 15-16.

These formulas represent state of the art nutritional therapy targeted against very specific ailments. Each Medical Food is a substance used to treat patients with a disease, using nutritional therapy, and is therefore a "medicament for therapeutic use" classified under heading 3004.

Second, there is no dispute that the products meet the other requirements of heading 3004 – the products are "put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale." Ex. 20.

### C.   The Subject Medical Foods are of the Same Class or Kind as Medicaments under Heading 3004

Heading 3004 is a "use" provision. *Warner-Lambert Co.*, 425 F.3d at 1384. A use provision "classif[ies] particular merchandise according to the ordinary use of such merchandise[,]" *Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1364 (Fed. Cir. 1999), and "describ[es] articles in the manner in which they are used as opposed to by name[.]'" *Len-Ron Manufacturing Co. v. United States*, 334 F.3d 1304, 1308 (Fed. Cir. 2003). This has been defined as the "predominant use, rather than simply one possible use[.]" *Id.* at 1311.

ARI 1(a) addresses the classification of merchandise under a principal use provision, stating that classification "is to be determined in accordance with the use in the United States . . . of goods of that class or kind to which the imported goods belong[.]" When applying a "principal use" provision, the court first determines the "class or kind" of goods that are covered by the "principal use" described in the tariff provision, and second, whether the subject merchandise falls within that class or kind. *See Len-Ron Mfg. Co. v. United States*, 24 CIT 948, 966, 118 F. Supp. 2d 1266, 1282 (2000); *E.M. Chemicals v. United States*, 20 CIT 382, 388, 923 F. Supp. 202, 208 (1996).

Courts have consistently examined seven factors, called the "*Carborundum*" factors, to determine whether or not an imported product falls within the class or kind of goods in a tariff provision.  These factors include:

1.   the use of the merchandise;
2.   the general physical characteristics of the merchandise;
3.   the recognition in the trade of this use;
4.   the expectation of the ultimate purchasers.

5.   the economic practicality of so using the import;
6.   the channels of trade in which the merchandise moves; and
7.   the environment of the sale (e.g., the manner in which the merchandise is advertised and displayed).

*E.M. Chemicals*, 20 CIT at 388, 923 F. Supp. at 208 (citing *Carborundum Co.*, 63 CCPA at 102).

In defining a class or kind of merchandise, the courts have developed a "totality of the circumstances test," which requires examination of these factors that are individually indicative, but only collectively conclusive, of the "class or kind" to which particular merchandise belongs. *Len-Ron Mfg. Co.*, 24 CIT at 965, 118 F. Supp. 2d at 1282. In 1999, the Federal Circuit described the test to determine if an imported product is of the same "class or kind" under US ARI 1 as a "commercially fungible" test. *Primal Lite, Inc.*, 182 F.3d at 1365. Below we explain how the Medical Foods are of the same class or kind as medicaments under the *Carborundum* factors.

### 1.   Medical Foods are Used the Same as Medicaments

The use of the merchandise is not contested by the parties. Essers at 22-34; Ex. 30, Expert Report of Dr. Jesse F. Gregory, Ph.D. ("Gregory") at 5; Ex. 28, H121544 at 1-3. The products are used to alleviate or prevent certain diseases, syndromes, symptoms or conditions. Essers at 22. Each of the products is used as nutrition therapy to treat young children with specific and dangerous medical conditions and disorders. *Supra*, at 6-14. They have no other use. Medical Foods as a class are required to treat patients suffering from specific illnesses because medications and diets are not effective in treating these illnesses. 21 U.S.C. § 360ee(b)(3); 21 C.F.R. §101.9(j)(8)(b). On some occasions, placement of a nasogastric tube or percutaneous gastrostomy tube may be needed for feedings of the Nutricia product (e.g., in children with SBS). Essers at 13. These Medical Foods should not be used by healthy individuals as part of a normal diet, and are used under the supervision of a health care professional. *Id.* at 23, 36. "These formulas cannot be

readily obtained by the general community. They are expensive, often unpalatable, and potentially harmful to otherwise healthy patients." *Id.* at 36.

### 2. Medical Foods Have Physical Characteristics Similar to Medicaments

Like medicaments under heading 3004, the subject imports have been designed, produced, studied, and prescribed to treat specific illnesses. Ex. 5. The essential ingredients that provide the efficacy of the products (except Ketocal®) are pharmaceutical grade individual amino acids that must be specially manufactured by companies like [■■■■■■■■■■■■■■], which are known to produce other medicaments, to meet the desired medical purpose of each product. Essers at 18-20, 22; Ex. 8C.  In the Statement of Facts, Section B, we described in detail the unique ingredients for each product.  MSUD Lophlex® LQ, Periflex® Infant, Periflex® Jr., Neocate® Junior all are produced using different specially manufactured, pharmaceutical grade individual amino acids that are combined to treat the diseases for which the product is indicated. *See supra* at 6-14. Ketocal® Liquid is specially manufactured with isolated ingredients and fat sources to create a high fat to carbohydrate ratio needed to reduce the intensity and frequency of seizure episodes. *Id.* at 12-14. By definition, Medical Foods must possess unique physical characteristics (not appearing in normal foods) because Medical Foods are only used when "modification of the normal diet alone" is not sufficient to treat the illness of the patient. *See* 21 C.F.R. § 101.9(j)(8)(i) and (ii).

### 3. Medical Foods Are Recognized in the Trade as Medicaments

Nutricia's Medical Foods are recognized as medicaments (i.e., nutrition therapy) by physicians, other medical professionals, and patients. Essers at 34-35. For example, Dr. Essers stated that he was provided samples of these products and kept Neocate® Junior and Neocate® Infant in his office to provide to patients. *Id.* at 35. Parents would generally not be aware of Medical Foods existence or utility in treating their child's problem because they are not products such as Similac that are advertised on television, radio, or the internet, and available in grocery stores. *Id.*

at 34-35. Physicians recommend and prescribe Medical Foods, which indicate the rationale for prescribing the formula. *Id.* at 35. Physicians also direct patients on how to access and order Medical Foods. *Id.* Because of the recognized utility of the imported products as first-line or second-line therapies, hospitals and outpatient care facilities keep them in their inventory at all times. *Id.* The recognition of the use of the subject Medical Foods in the trade is further confirmed by the hundreds of efficacy studies covering such topics as the impacts of diet therapy for children with EoE, and long-term outcomes of amino acid formulas. Ex. 19.

### 4. Purchasers of Medical Foods Have the Same Expectations as Purchasers of Medicaments

"Medical grade formula is ultimately purchased by a child's legal guardian(s) for their ill children." Essers at 17. These guardians understand that the Medical Foods are not found "over the counter" on the shelves of grocery stores or pharmacies, and require a prescription from a medical provider, who is an expert in the disease state for which the product is indicated. *Id.* These products are very expensive as compared to baby foods – purchasers expect the extra cost and seek to defray the cost of the formulas through medical insurance. *Id.* The expectation for the ultimate purchaser is that the Nutricia product will prevent or ameliorate the symptoms their child suffers from—symptoms that would continue to occur if the child would (if he/she could) continue to eat a normal diet. *Id..* For the ultimate purchaser, once a newborn or child is diagnosed with one of the diseases or conditions recognized to be addressed by these formulas, the physician would recommend or prescribe the formula to be initiated and maintained. *Id.* The parents expect that the treating physician monitor progress and adherence, at regular intervals, to assure that the patient remains healthy and his/her growth and development is optimal, and that expectations are met. *Id.*; *see* 21 U.S.C. § 360ee(b)(3); 21 C.F.R. § 101.9(j)(8). Similar to patients who take other medicaments, parents whose children take Nutricia's Medical Foods expect that their child's

symptoms will be alleviated, and they will need constant consultation with medical professionals to maintain the prescribed therapy.

### 5.    Given the High Cost of Medical Foods, it is Only Practical to Use Them as Medicaments

Nutricia has provided undisputed evidence that its products are sold at higher costs as compared to other non-medical products on the market. *See supra*, at 15-15. In examining products sold in 2014, Dr. Robles found that Nutricia's Medical Foods were [███████████] costly than baby foods from well-known brands that have similar product characteristics. Robles at 24, 11. Given the substantial price difference, it would make no economic sense to use these products for non-medical purposes. Robles at 24. Due to their higher cost, patients who are prescribed the subject Medical Foods seek insurance reimbursement for these products. Ex. 13. For this reason, the subject Medical Foods are not commercially fungible with infant formulas. Robles at 37.

### 6.    Medical Foods are Sold in the Same Channels of Trade as Medicaments

Nutricia's national medical sales teams sell to hospitals, home healthcare or durable medical equipment retailers, and wholesalers. Bruce Dep., 12:20-24. Nutricia's products are not sold through or to grocery stores, big box stores, and food distributors. Robles at 14-16. Significantly, Nutricia's largest wholesaler is a medical wholesaler, [████████████ ████]. Bruce Dep., 14:11-14. Robles found that the largest sales channel of trade for medical foods is the institutional sales channel (i.e., medical institutions and distributors), which accounted for 42.8% of sales for the 2014-2020 period. Robles at 14.

In contrast, baby foods are sold through traditional retailers such as grocery stores or big box stores, (e.g., Target or Walmart). *Id.* at 5. Consumers of baby foods purchase their products in:(1) supermarkets (84%), (2) pharmacies (11.5%), (3) convenience stores (2%), (4) independent retailers (1.6%), and (5) other (1.1%). *Id.* at 16. These facts confirm that the imported Medical

Foods move in the same channels of trade as medicaments under heading 3004, and not the same channels as other food preparations under heading 2106.

### 7. Medical Foods Are Sold in an Environment Similar to that of Medicaments

Nutricia's products are packaged, advertised, marketed and sold in an environment that is similar to that of a medicament, not a food. *See id.* at 6. The products are packaged with labels that include dosage amounts, warnings that the products must be administered only under medical supervision, and indications as to what diseases each product is designed to treat. Ex. 20; *supra*, at 18. There are no cute babies on Nutricia's labels. Nutricia markets these products at medical or health conferences, training sessions to doctors, health care providers, healthcare institutes, and awareness campaigns. Robles at 15. Traditional marketing of baby foods is targeted to final consumers, while marketing of Medical Foods is targeted to healthcare professionals who prescribe the products. *See id.* Medical Food purchasers buy the product though healthcare distributors, institutes, providers, pharmacies or hospitals, not grocery stores. *Id.* at 6. Nutricia had no advertising spend on TV or in magazines. In contrast, in 2014 the baby food industry spent approximately $104.5 million on advertising, including $76.8 million on TV and $25.2 million on magazines. Robles at 17 & n.48. Overall, Medical Foods' environment of sale is like that of medicaments, not foods.

In sum, the analysis of all seven *Carborundum* factors confirms that the imported Medical Foods are in the same class or kind as "medicaments for therapeutic use." These products have the same or similar unique physical characteristics, use, economic practicality of such use, recognition in the trade, expectations of purchasers, channels of trade, and environment of sale as medicaments. These products are not fungible with typical infant formulas. *See Primal Lite, Inc.*, 182 F.3d at 1365 ("[W]e construe the call for a determination as to the [class or kind] of goods that

are commercially fungible with the imported goods."). Thus, the subject Medical Foods are classified as medicaments under heading 3004, not as other food preparations under heading 2106.

## II.     The Subject Medical Foods Cannot be Classified Under 2106

### A.     The Subject Medical Foods Cannot be Classified under Heading 2106 Because This Provision Doesn't Include Products Classified Elsewhere

Under GRI 1, the Medical Foods cannot be classed in heading 2106. This heading provides for: "Food preparations not elsewhere specified or included." This provision is a residual or basket provision that only covers articles "**not elsewhere specified or included**." Heading 2106, HTSUS (emphasis added). Pursuant to GRI 1, and the plain terms of this heading, a good is only classified under heading 2106 if not classified elsewhere. Because the Medical Foods are classified as medicaments for therapeutic use under heading 3004, they cannot be classified under heading 2106. *R.T. Foods, Inc. v. U.S.*, 36 CIT 1637, 1644, 887 F. Supp. 2d 1351, 1358 (2012) ("[T]he Court finds that the products do not *prima facie* fit under heading 2106, HTSUS, which is an expansive basket heading that only applies in the absence of another applicable heading.").

### B.     Chapter 21, Note 1 Excludes Products of Heading 3004 From Classification under Heading 2106

GRI 1 states that classification is first determined according to the terms of the heading, and the terms of "any relative section or chapter notes." Note 1(f) to chapter 21 **excludes** from classification under chapter 21 "**products of heading 3003 or 3004**." As demonstrated above, the imported articles are medicaments classified under heading 3004. Accordingly, pursuant to GRI 1 and note 1(f) of chapter 21, the products are precluded from classification in heading 2106, or any provision in chapter 21.

### C.     CBP's Classification Determination Is Fatally Flawed

The ruling that CBP relied upon to deny Nutricia's protests, HQ H121544, incorrectly classified Medical Foods as other food preparations under heading 2106. Ex. 28. First, CBP

incorrectly defined the term "medicament for therapeutic uses" in heading 3004 by requiring the product to (1) have an active ingredient, and (2) cure a disease. There is no basis for such a narrow definition. The terms of the provision do not mention "active ingredients" or "cures." The courts and CBP have consistently ruled that "therapeutic" or "medicinal" goods need not cure a disease and need not have an active ingredient. *See, e.g., J.E. Bernard & Co., Inc.*, 58 Cust. Ct. at 28-29 (1967) (ruling hearing aids are therapeutic devices despite not curing hearing loss); *Alltransport, Inc.*, 44 C.C.P.A. at 152-153 (1957) (ruling surgical sponges are medicinal articles despite not curing disease); HQ H253927 (Nov. 20, 2014) (Vitamin D2 capsules that do not cure a disease classified under heading 3004); NY N276775 (July 18, 2016) (allergen immunotherapy tablets that do not cure allergies classified under heading 3004). "[I]t is not necessary that a substance cure a disease to be described as 'therapeutic.'" *Inabata Specialty Chems.*, 29 CIT at 423. The term "medicament" is defined as a "substance used in therapy," and "therapy" includes "treatment" of an incurable disease that often involves remediation, palliative care, or alleviating the symptoms of a disease. *Id.*; Ex. 31. Even if such requirements existed as CBP suggests, the unique physical and chemical characteristics and composition of Medical Foods themselves act as active ingredients, and the products are recognized as providing the required nutritional therapy, alleviating and remediating incurable diseases. *See* 21 U.S.C. §360ee(b)(3). Indeed, in HQ H121544, CBP concedes that Medical Foods are used to treat metabolic diseases, or are "part of the overall treatment regimen." Ex. 28.

Second, CBP improperly concluded chapter 30, note 1(a) excludes any product that may be considered a food from chapter 30, HTSUS. Note 1(a) states "[f]oods or beverages (such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters), other than nutritional preparations for intravenous administration (section IV)" may not be classified in

chapter 30.  It does not state that all foods or beverages classifiable in chapter 21 are excluded from chapter 30.  The exclusion is to specific types of foods and beverages—dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters—none of which provide nutritional therapy to ameliorate diseases.  Medical Foods are not similar to the types of foods listed in note 1(a) and this note does not exclude Medical Foods from classification under chapter 30.  CBP also misreads the addition of the modifying clause "other than nutritional preparations for intravenous administration (Section IV)," suggesting it expands the exclusion of foods and beverages from chapter 30.  This clause narrowed the exclusion, allowing foods and beverages to be classified in chapter 30 as long as the products are taken intravenously.

Importantly, CBP ignores that medicaments possibly classifiable as foods (e.g., products that provide nutrients) are excluded from classification under chapter 21 pursuant to chapter 21, note 1(f).  The chapter 21 and 30 notes are mutually exclusive (goods of chapter 21 cannot be classified in chapter 30, and goods of heading 3004 cannot be classified in chapter 21).  The Federal Circuit has held that when there are two mutually exclusive chapter notes, the product must be classified according to the terms of the headings, GRI 1 and GRI 3(a), and the most specific provision prevails.  *See Bauer Nike Hockey USA, Inc. v. U.S.*, 393 F.3d 1246, 1252-1253 (Fed. Cir. 2004) (citing *Sharp Microelectronics Tech., Inc. v. U.S.*, 122 F.3d 1446, 1450-51 (Fed. Cir. 1997).  In *Bauer*, the court found that hockey pants were *prima facie* classifiable under chapter 62 (track, ski, swim and other garments) and 95 (sports equipment).  *Id.*  The notes to chapter 62 (Section XI) excluded goods of chapter 95, and the notes to chapter 95 excluded goods of chapter 62.  The court held that CBP could not rely on the notes to chapter 62 to exclude classification under chapter 95, and that CBP had to use the rule of relative specificity before applying the exclusionary notes.  *Id.* Similarly here, the Court should reject CBP's reliance on the chapter 30

exclusionary note, and classify medical foods under heading 3004 (medicaments) as this heading is more specific than heading 2106 (other food preparations).

Third, in HQ H121544 CBP incorrectly described the physical characteristics and uses for Medical Foods.  CBP wrongly suggested that: (1) the products merely lack substances that trigger symptoms of a disease, (2) do not mitigate or repress symptoms, and (3) do not effectuate a chemical or biological change in the patient.   The subject Medical Foods do not merely lack substances that trigger symptoms.  They are designed to include individual amino acids that the body needs, but the patient cannot tolerate.   In all foods, these amino acids are in naturally occurring proteins, but these amino acids (or fats to carbohydrates for Ketocal®) have to be separately produced and added to create a consumable product for patients with a given disease. Essers 10-16; Ex. 5.  Medical Foods are also not merely a part of an elimination diet (e.g., persons with peanut allergies avoid eating nuts) as suggested by CBP.  By definition, Medical Foods are used when treatment of patients is not resolved by modification of the normal diet alone.  *See* 21 C.F.R. § 101.9(j)(8).  Elimination diets (e.g., dietic or diabetic) include foods that are not Medical Foods and simply lack substances (e.g., without sugar or nuts).  Foods in such diets are commonly known/eaten by healthy individuals, but Medical Foods are not. *See* Essers at 34-36.  Contrary to CBP findings, Medical Foods do mitigate and repress symptoms of a given disease.  For example, patients who take Periflex® mitigate the risks of developmental delays and seizures, and patients who take MSUD Lophlex® and Ketocal® mitigate the risk of seizures. *Id.* at 11, 15-16.   In mitigating these symptoms, Medical Foods effectuate chemical and biological changes in the patients – preventing the disease states the products are designed to treat. *Id.* at 11-12, 15-16.

Finally, CBP in HQ H121544 failed to consider the *Carborundum* factors, which are required to determine classification of use a provision such as heading 3004.  This is likely because

each of these factors confirm that the subject Medical Foods belong to the class or kind of goods

that are medicaments, and are not commercially fungible with food preparations. *Supra* at 30-35.

### D.   The Explanatory Notes Confirm the Medical Foods are Not Classified Under Heading 2106

The ENs to heading 2106 (2012) state:

16) Preparations, often referred to as *food supplements*, based on extracts from plants, fruit concentrates, honey, fructose, etc. and containing added vitamins and sometimes minute quantities of iron compounds.  These preparations are often put up in packagings with indications that they maintain general health or well-being.  Similar preparations, however, intended for the prevention or treatment of diseases or ailments are **excluded (heading 30.03 or 30.04)**.

The ENs to heading 3004 (2012) state:

[T]his heading **excludes** food supplements containing vitamins or mineral salts which are put up for the purpose of maintaining health or well-being but have no indication as to use for the prevention or treatment of any disease or ailment.

Based on the ENs, foods that merely maintain the general health and well-being of

individuals are classified under heading 2106.  But foods that are intended for the prevention or

treatment of diseases or ailments, or provide an indication as to use for the prevention or treatment

of any disease or ailment, are classified under heading 3004.  The subject Medical Foods are

expressly designed, produced and prescribed and recommended for the treatment of specific

diseases. Exs. 3; 5.  This was CBP's proper conclusion when it classified PKU products under

heading 3004 in HQ 08300 (Sept. 19, 1990), stating "these preparations are intended to treat a

specific condition and not to provide for general well-being and health."  Ex. 24.

Notably the ENs do not require that products "cure" a disease or contain an "active

ingredient" to be classified under heading 3004.  Also, contrary to CBP's conclusions in HQ

H121544, the ENs confirm that the 2007 changes to chapter 30 note 1(a) (stating that nutritional

preparations for intravenous administration remain classified under chapter 30), did not require

any medicament with nutrition to be classified in chapter 21 unless it is taken intravenously.  The

above cited language in the ENs did not change in 2007, and food preparations intended to prevent or treat a disease remain classified under heading 3004. Ex. 17.  Thus, the ENs confirm that the subject Medical Foods are not classified under heading 2106 and are properly classified under heading 3004.

## III.    The Subject Medical Foods are Secondarily Classified under Heading 9817

### A.    The Subject Medical Foods Are Specially Designed for Handicapped Persons

Goods classified in Chapters 1 through 97, which are based on the international Harmonized System nomenclature, may also be classified under a secondary classification within Chapter 98, which includes special provisions of U.S. law.  Subheading 9817.00.96 provides for the duty-free importation of articles that are designed to benefit handicapped persons.  The simple policy behind this provision is that the government should not impose barriers to handicapped persons' access to such articles.

Congress passed the Educational, Scientific, and Cultural Materials Importation Act of 1982 in order to give effect to the Nairobi Protocol to the Florence Agreement on the Importation of Educational, Scientific, and Cultural Materials "with a view to contributing to the cause of peace through freer exchange of ideas and knowledge across national boundaries." ("Nairobi Protocol"). 96 Stat. 2329, 2346 (1983); *see Starkey Labs. v. United States*, 22 CIT 360, 361, 6 F. Supp. 2d 910 (1998). At that time, the TSUS was amended to include duty free treatment for articles benefitting the handicapped.  In 1989, the old TSUS provisions were implemented into the new HTSUS under subheading 9817.00.96, which covers:

> Articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons. . . .

54 Fed. Reg. 21187 (May 17, 1989) (Presidential Proclamation 5878 of May 12, 1989).

To be classified under this provision the product must be specially designed or used for the benefit of handicapped persons.  U.S. Note 4 of Subchapter XVII, Chapter 98, defines the term "physically or mentally handicapped persons" as:

> (a)      For purposes of subheadings 9817.00.92, 9817.00.94 and 9817.00.96, the term "blind or other physically or mentally handicapped persons" includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working.

The term "other physically or mentally handicapped persons" is broadly defined in U.S. Note 4, listing many types of impairments of major life activities. This definition mirrors the definition provided in the ADA, which states that a disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. §12102(1)(A).  Major life activities under the ADA include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2)(A). A major life activity under the ADA also includes the operation of a major bodily function, including but not limited to, "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102 (2)(B); *see, e.g.*, HQ 964169 (June 26, 2001).  In short, a person with a disability under the ADA is a handicapped person as defined by U.S. Note 4 and subheading 9817.00.96.

Congress recognized that the Nairobi Protocol imposed "strict obligations" on the United States, and was "intended to afford duty-free treatment not only for articles for the blind, but all other handicapped persons without regard to the source of their affliction." S. Rep. No. 97-564, at 16- 17; *see also* TD 92-77, 26 Cust. Bull. Dec. 240, 246 (1992).  While the Nairobi Protocol is

broad in scope, the drafters in Congress intended "even 'more liberalized treatment' than contemplated by the Nairobi Protocol." *Travenol Labs. v. United States*, 17 CIT 69, 77, 813 F. Supp. 840, 847 (1993) (citing S. Rep. No. 97-564, at 20). Thus, the term "handicapped" under subheading 9817.00.96 must be broadly construed and includes a wide range of disabilities.

Here, the evidence establishes that the subject Medical Foods are specially designed for the benefit of handicapped persons, and are secondarily classified under subheading 9817.00.96. First, there is no dispute that Nutricia's Medical Foods are specially designed for the benefit of infants and children who suffer from a variety of diseases and disorders, requiring nutritional therapy supervised by a physician, Exs. 3; 5, and therefore fit squarely within the FDA's definition of "medical foods." 21 U.S.C. § 360ee(b)(3); 21 C.F.R. § 101.9(j)(8).

Second, infants and children who suffer from the diseases and disorders for which Nutricia's Medical Foods were designed to treat, are "mentally or physically handicapped" as this term is defined under subheading 9817.00.96. Section B of the Statement of Facts details how each of these products are used to treat children suffering from specific diseases (*i.e.*, MSUD Lophlex® LQ – BCKDC; Periflex® Infant and Periflex® Junior – PKU; Neocate® Junior - EoE, SBS and others; Ketocal® Liquid - Intractable/Refractory Epilepsy, GLUT 1 and others).

These diseases or disorders impair major life activities of the patients who use Medical Foods, namely, these diseases prevent patients from "caring for oneself," because the basic act of eating requires supervision of a health care professional and nutritional therapy so that the patient does not suffer adverse metabolic, gastrointestinal or neurological symptoms (*e.g.*, brain damage, seizures, coma or death). Without Medical Foods, all of a patient's major life activities would be impaired. As such, these diseases and disorders are considered disabilities that impair major life activities under the ADA. Essers at 4, 11-16; 42 U.S.C. §12102 (2)(A). In addition, major life

activities include the operation of a major bodily function, such as "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. §12102 (2)(B).  Patients who have diseases requiring the use of Medical Foods suffer from these disabilities covered by the ADA, and are "handicapped" under the terms of U.S. Note 4 and subheading 9817.00.96.

Accordingly, the subject Medical Foods were designed for the benefit of persons whose major life actives have been impaired, and these products are properly classified under subheading 9817.00.96.

**B.      CBP Incorrectly Concluded that Medical Foods Are Not Classified Under Heading 9817**

In HQ H121544, CBP found that the above diseases and disorders do not impair the major life activities of the patients who take medical foods. Ex. 28. CBP stated that patients merely have to avoid certain categories of food, and that these disorders "do not impair the physical act of eating." HQ H121544. CBP's reasoning is flawed in three critical respects.

First, these products are not part of an elimination diet, where a person must avoid certain foods like sugar and peanuts. Individuals on elimination diets can easily find natural foods that lack certain ingredients and are commonly eaten by healthy people.  Conversely, the patients with these diseases and conditions <u>must</u> take medical foods as part of nutritional therapy and Medical Foods often are their sole source of nutrients. *See* 21 C.F.R. § 101.9(j)(8)(i)-(ii).  Nutritional therapy is recommended for those with multiple food allergies because alternative treatments may use steroids, which have side effects that worsen over time, or use diets that eliminate foods but possibly include irritants such as milk, soy, eggs, wheat, nuts. Essers at 15. Regardless, under the ADA, a person with untreated multiple food allergies is handicapped and suffers from a physical

43

impairment that substantially limits major life activities such as eating, digestion and normal cell growth. *Id.*

Second, CBP misinterprets what constitutes a major life activity, and too narrowly construes the applicable tariff provisions in violation of the clear intent of the statute. *See Rubies Costume, Co. v. United States*, 337 F.3d 1350, 1357 (Fed. Cir. 2003) (stating that courts "interpret statutory language to carry out legislative intent") (citing *Nippon Kogaku (USA), Inc. v. United States*, 69 C.C.P.A. 89, 673 F.2d 380, 383 (1982); *Travenol Labs*, 17 CIT at 77, 813 F. Supp. at 847 (noting the Congressional drafters of legislation implementing the Nairobi Protocol intended more liberalized treatment). The ADA confirms that metabolic, gastrointestinal and similar diseases do impair major life activities. *Supra*, at 41.

Third, contrary to CBP's findings, some patients cannot conduct the physical act of eating, and take medical foods so that they may eat (e.g., patients with EoE, restricted esophagus, or patients with SBS who are tube fed, use Neocate® as a treatment). *See supra*, at 10-12. If these patients did not consume Medical Foods, they would suffer severe impairment or death. These five Medical Foods act to reverse, reduce, or prevent impairment in digestion, neurologic activity, or cell growth. Essers at 4, 10-16, 30. To suggest that a person's inability to digest normal food is not a major life activity grossly mischaracterizes and fails to appreciate the severe impairments suffered by the infants and children with the diseases that the subject Medical Foods were designed to treat.  Patients who suffer from the diseases and disorders Nutricia's Medical Foods were designed to treat have their major life activities impaired. Thus, the subject Medical Foods are used for the benefit of handicapped persons falling squarely within the terms of U.S. Note 4(a), and the products are secondarily classified in subheading 9817.00.96.

## **<u>CONCLUSION</u>**

There are no material facts in dispute and the Court has sufficient facts to determine the

proper classification of the subject merchandise.  For the foregoing reasons, Plaintiff respectfully

requests that this Court find that the products at issue are classifiable in subheading 3004.50.50,

and secondarily classifiable in subheading 9817.00.96.


By:     /s/ *John B. Brew*
        John B. Brew
        Alex Schaefer
        Crowell & Moring LLP
        1001 Pennsylvania Avenue, N.W.
        Washington, D.C.  20004
        jbrew@crowell.com

        Maria Vanikiotis
        Alexander T. Rosen
        Crowell & Moring LLP
        590 Madison Avenue
        20th Floor
        New York, NY 10022

Dated: August 31, 2022
      New York, New York

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT</u>
## <u>STANDARD CHAMBER PROCEDURE 2(B)</u>

I, Maria Vanikiotis, counsel at Crowell & Moring LLP, who is responsible for the foregoing brief, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with the type-volume limitation of 14,000 words under USCIT Standard Chamber Procedure 2(B) and contains 13,827 words.

<u>/s/ Maria Vanikiotis</u>

Dated: August 31, 2022
        New York, New York

46

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: Hon. Timothy C. Stanceu, Chief Judge

_____

|  |  |  |
|---|---|---|
| NUTRICIA NORTH AMERICA, INC., | : | |
| | : | **PUBLIC VERSION** |
| Plaintiff, | : | Court No. 16-00008 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____ :

## PLAINTIFF'S 56.3 STATEMENT OF MATERIAL FACTS
## FOR WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

1.    Plaintiff, Nutricia North America, Inc. (Nutricia) is the importer of record for the two

protests: 1101-15-100252 and 1001-15-100172; and four entries at issue in this case: 101-

4122568-0, 101-4122571-4, 101-4134968-8, 101-4134831-8. Ex. 2, Compl. ¶¶ 1-2, Answer ¶¶ 1-

2.

2.    Nutricia manufactures and imports medical food products designed and used in the

management of neurological diseases, metabolic conditions and disorders, and gastrointestinal

disorders and diseases requiring nutritional therapy. Ex. 2, Compl. ¶¶ 23, 41, 53, 64, 75.

3.    Nutricia is a specialized medical nutrition company and is part of the Medical Nutrition

Division of Groupe Danone, Paris. Ex. 3 at 761.

4.    Plaintiff paid all liquidated duties, charges, exactions and fees for the four entries at issue

prior to commencement of this action. Ex. 2, Compl. ¶ 3; Answer ¶ 3.

5.    U.S. Customs and Border Protection (CBP) liquidated the four entries of the subject

merchandise under subheading 2106.90.9998, HTSUS, which provides for "Food preparations not

elsewhere specified or included: Other…Other." Ex. 2, Compl. ¶ 6; Answer, ¶ 6.

1

6.      On October 6, 2014, CBP issued ruling HQ H121544 classifying the subject or similar merchandise under Heading 2106, HTSUS. Ex. 2 Compl. ¶ 12, Answer ¶ 12; Ex. 28.

7.      On November 27, 2015, Plaintiff timely filed protest number 1101-15-100252 and requested accelerated disposition pursuant to 19 C.F.R. § 174.22 and 19 U.S.C. § 1515(b). Ex. 2, Compl. ¶ 9; Answer ¶ 9.

8.      On December 1, 2015, Plaintiff timely filed protest number 1001-15-100172 and requested accelerated disposition pursuant to 19 C.F.R. § 174.22 and 19 U.S.C. § 1515(b). Ex. 2, Compl. ¶ 10; Answer ¶ 10. Protests 1101-15-100252 and 1001-15-100172 were deemed denied. 19 C.F.R. § 174.22 and 19 U.S.C. § 1515(b); Ex. 2, Compl. ¶ 11; Answer ¶ 11.

9.      The five imported products at issue in this case are:

1.      MSUD Lophlex® LQ,
2.      Periflex® Infant,
3.      Periflex® Junior,
4.      Neocate® Junior, and
5.      Ketocal® Liquid

Ex. 1, Expert Reports of Dr. Jonah Essers ("Essers Report") at 1; Ex. 2, Compl. ¶ 5; Answer ¶ 5; Ex. 30,  Expert Report of Dr. Jesse F. Gregory, Ph.D. ("Gregory Report") at 2-5.

10.     These five imported products are "medical foods," which are defined by the Orphan Drug Act. Pub. L. 97-414, 96 Stat. 2049, (1983) (amended 1988, Pub. L. 100-290, 102 Stat. 90) as:

> "[A] food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."

21 U.S.C. § 360ee(b)(3); Essers Report at  3-4.

11.     Three of the imported products at issue in this case are used to manage and treat specific inborn errors of metabolism or diseases (1) MSUD Lophlex® LQ; (2) Periflex® Infant, and (3) Periflex® Junior. Essers Report at 10-12; Ex. 2, Compl. ¶¶ 25-26, 43, 47. 76; Exs. 5A; 5B; 5C.

12.     MSUD Lophlex® LQ is prescribed by healthcare professionals to children who suffer from a severe, life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase complex (BCKDC) deficiency, which is an inborn error of the metabolism due to a defective inherited gene encoding BCKDC. Essers Report at 10-11; Ex. 2, Compl. ¶¶ 25, 29, 31, 35; Ex. 5A; Ex. 6, Deposition of Steven Yannicelli ("Yannicelli Dep."), 46:22–48:1. An alternative name for this disease is maple syrup urine disease ("MSUD"). Essers Report at 10; Ex. 2, Compl. ¶ 25, 27; Ex. 5A;  *See MSUD - Maple Syrup Urine Disease Education & Support*, Nutricia, *available at* http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Maple-Syrup-Urine-Disease-MSUD/ (last visited Aug. 26, 2022).

13.     Periflex® Infant or Periflex® Junior are prescribed by a healthcare professional to persons who suffer an inherited metabolic disorder or disease called Phenylketonuria ("PKU").  Essers Report at 12; Ex. 2, Compl. ¶¶ 43, 47, 76; Exs. 5B; 5C.

14.     Neocate® Junior is used to manage and treat a broad variety of gastrointestinal conditions, diseases, disorders, and syndromes including Eosinophilic Esophagitis (EoE) and Short Bowel Syndrome (SBS). Essers Report at 13-14; Ex. 2, Compl. ¶ 65; Ex. 5D; Ex. 32, Deposition of Rachel Ohja ("Ohja Dep."), 40:13-41:3.

15.     Ketocal® 4:1 Liquid is used to manage and treat patients who suffer from: (1) Intractable/Refractory Epilepsy, (2) Glucose Transporter Type 1 Deficiency (GLUT 1), as well as other diseases or disorders. Ex. 5E at 1, 3; *see also* Ex. 2, Compl. ¶ 54.

16.     All of the imported products may be used for enteral (oral or tube) feeding. Essers Report at 13, 21, 30; Exs. 3; 7; 11; 14; 16; 18; Ohja Dep., 11:2-11. Oral feeding or tube feeding is used for placing food, fluids, and/or drugs directly into the stomach or small intestine through a tube inserted through the nose or via a stoma that flows directly into the stomach. Each is also called enteral feeding or enteral nutrition. Tube feedings may be implemented when one is unable or unwilling to swallow, which can occur when the composition of requisite formula is so distasteful that a patient refuses to ingest it. Essers Report at 13, 21, 30.

17.     Nutricia's products are available for retail sale to hospitals, home healthcare or durable medical equipment retailers and wholesalers. Ex. 22, Deposition of Gerald Bruce ("Bruce Dep."), 12:20-24.

18.     Nutricia's largest wholesaler is a medical surgical wholesaler [█████████████████ █████] *Id.*, 14:11-14.

19.     Medical food infant formulas are also sold by sales representatives to doctors or healthcare professionals who then sell to the patients. Essers Report at 35; Ex. 21, Expert Report of Pablo Robles, Ph.D. ("Robles Report") at 14, 16.

20.     Between 2014-2020, Nutricia's top ten sales accounts were to the following customers in the following amounts of cases of products sold:



Robles Report at Ex. 5, Customer Sales 2014-2021.

21.    The ultimate purchasers of the subject medical foods are the legal guardians of a newborn or child with a serious medical condition, usually the mother or father. Essers Report at 17.

22.    The expectation for the ultimate purchasers is that the imported Nutricia products will prevent or ameliorate the symptoms suffered by their child, which would otherwise occur for a particular condition if the child were to eat an otherwise normal age-appropriate diet. *Id.*

23.    In 2014 (and continuing to today), medical foods sold for substantially more than non-medical food infant formulas with similar product characteristics from well-known brands. Robles Report at 21-25, 11.

24.    In 2014, MSUD Lophlex® [          sold for over [          ] Gerber Toddler pouches (\$ .37/fl. oz.). *Id.* at 23.

25.    In 2014, Periflex® Infant [          ] sold for over [          ] Enfamil Infant (\$.16/fl. oz.). *Id.*

26.    In 2014, Periflex® Junior [          ] sold for over [          ] Similac Go and Grow (\$.13/fl. oz.). *Id.*

27.    In 2014, Neocate® Junior [          ] over [          ] Similac Go and Grow (\$.13/fl. oz.). *Id.*

28.    In 2014, Ketocal® Liquid [          ] sold for over [          ] Enfamil Premium Ready to Use (\$.23/fl. oz.). *Id.*

29.    Non-medical baby foods are generally not covered by insurance. *Id.* at 26.

30.    State mandates cover medical foods for certain conditions if a health professional indicates that they are medically necessary. *Id.* These insurance coverage requirements and conditions vary by state. *Id.*

31.     To obtain insurance reimbursement coverage for a product, the product must have a Healthcare Common Procedure Coding System (HCPCS also called "hick picks") number.

32.     Nutricia's products are typically reimbursed as a medical benefit. Bruce Dep., 13:4-10.

33.     The HCPCS is a collection of standardized codes that represent medical procedures, supplies, products and services and was established in order to provide a standardized coding system for describing the specific items and services provided in the delivery of health care. *See* 42 U.S.C. § 1395ww(t)(4). HCPCS numbers are issued by the US Government. *Id.* The Nutricia products at issue in this case have HCPCS codes and qualify for private insurance reimbursement. Ex. 13; Robles Report at 26 & n. 58.

34.     MSUD Lophlex® LQ has a HCPCS number, which is B4157. Ex. 7.

35.     Periflex® Infant and Periflex®Junior have a HCPCS number, which is B4162. Exs. 11; 14.

36.     Neocate® Junior has two HCPCS numbers, which are either B4161 or B4153. Ex. 16.

37.     Ketocal® 4:1 Liquid has a HCPCS number, which is B4154. Ex. 18.

38.     Persons who purchase medical foods such as the imported products may obtain reimbursement of this cost from certain private commercial insurance payers (e.g., private insurance such as Aetna or Blue Cross/Blue Shield). Essers Report at 17; *See Formula coverage*, Nutricia website, *http://www.medicalfood.com/Reimbursement/Coverage-by-State/* (last visited Aug. 29, 2022); Ex. 13.

39.     Under the Americans with Disabilities Act Amendments Act of 2008 (Amendments Act), effective January 1, 2009, which amended the Americans with Disabilities Act of 1990 (ADA) "disability" means a physical or mental impairment that substantially limits one or more major life activities of such individual. 42 U.S.C. § 12102. The parties agree that MSUD Lophlex® LQ,

6

Periflex® Infant, Periflex® Junior, and Ketocal® Liquid are used to treat persons with disabilities under the ADA. *See* Gregory Report at 8; Essers Report at 4. Plaintiff submits that Neocate® Junior is also used to treat a disability. *See infra*, ¶¶ 139-140, 154-55.

## I.   <u>Medical Definitions</u>

40.   ***Amino Acid*** is defined as "An organic acid in which one of the hydrogen atoms on a carbon atom has been replaced by $NH_2$. Amino Acid usually refers to an arninocarboxylic acid. However, taurine is also an [amino acid]." Ex. 33, Amino Acid, Stedman's Medical Dictionary (27th ed. 2000).

41.   ***Anaphylaxis*** is defined as "An induced systemic or generalized sensitivity; at times the term is used for anaphylactic shock. The term is commonly used to denote the immediate, transient kind of immunologic (allergic) reaction characterized by contraction of smooth muscle and dilation of capillaries due to release of pharmacologically active substances (histamine, bradykinin, serotonin, and slow-reacting substance), classically initiated by the combination of antigen (allergen) with mast-cell-fixed, cytophilic antibody (chiefly IgE); the reaction can be initiated, also, by relatively large quantities of serum aggregates (antigen-antibody complexes, and others) that seemingly activate complement leading to production of anaphylatoxins." Ex. 34, *Anaphylaxis*, Stedman's Medical Dictionary (27th ed. 2000).

42.   ***Antibody*** is defined as "any of a large number of number proteins of high molecular weight that are produced normally by specialized B cells after stimulation by an antigen and act specifically against the antigen in an immune response, that are produced abnormally by some cancer cells, and that typically consist of four subunits including two heavy chains and two light chains." *See Antibody*, Merriam-Webster, https://www.merriam-webster.com/dictionary/antibody (last visited Aug. 29, 2022).

43.     ***Branched-chain amino acids (BCAA)*** are defined as **"**leucine, isoleucine, and valine; they are incorporated into proteins or catabolized for energy." Ex. 35, Branched-chain amino acids (BCAA), Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013).

44.     ***Branched-chain alpha ketoacid dehydrogenase complex (BCKDC)*** is defined as a mitochondrial multienzyme complex that catalyzes a series of reactions that form the first irreversible step in the catabolism of the essential branched-chain amino acids: leucine, isoleucine, and valine.  After transamination of these amino acids to their respective $\alpha$-keto acids, BCKDC catalyzes the irreversible oxidative decarboxylation and subsequent formation of acyl-CoAs [acetyl-coenzyme A compounds]. Ex. 36, Mark T. Johnson et al., *Targeting E3 Component of α-keto Acid Dehydrogenase Complexes*, 324 METHODS IN ENZYMOLOGY 465, 465 (2000).

45.     ***Condition*** is defined as "a usually defective state of health." *See Condition*, Miriam-Webster, https://www.merriam-webster.com/dictionary/condition (last visited Aug. 29, 2022).

46.     ***(Cow's) Milk Allergy*** is defined as "an atypical immune system response to milk and products containing milk." *Milk Allergy*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/milk-allergy/symptoms-causes/syc-20375101 (last visited Aug. 29, 2022); Essers Report at 14-15.

47.     ***Disease*** is defined as "a condition of the living animal or plant body or of one of its parts that impairs normal functioning and is typically manifested by distinguishing signs and symptoms." *Disease,* Merriam-Webster,  https://www.merriam-webster.com/dictionary/disease (last visited Aug. 29, 2022).

48.     ***Disorder*** is defined as "an abnormal physical or mental condition." *See Disorder,* Merriam-Webster, https://www.merriam-webster.com/dictionary/disorder (last visited Aug. 29, 2022).

49.    ***Dravet Syndrome*** is defined as: "An intractable epilepsy syndrome, named after Dr. C. Dravet, that begins in the first year of life, after a period of apparently normal development, usually with febrile seizures or secondarily generalized tonic-clonic (grand mal) seizures, and then, from the second year of life onward, progresses to include myoclonic seizures, atypical absences, afebrile clonic or focal seizures, and episodes of convulsive status epilepticus; the prognosis is unfavorable, with significant developmental delay from the second year of life onward, and neurological manifestations such as ataxia and pyramidal tract signs. Also called severe myoclonic epilepsy of infancy (SMEI)." Ex. 37, *Dravet Syndrome*, Epilepsy from A to Z, A Dictionary of Medical Terms (4th ed. 2004).

50.    ***Eosinophil*** is defined as: "A type of granulocyte that can be stained red with eosin dye, also called eosinophilic granulocyte; a subtype of leukocyte." Ex. 38, *Eosinophil*, Epilepsy from A to Z, A Dictionary of Medical Terms (4th ed. 2004).

51.    ***Epilepsy*** is defined as "A chronic disorder characterized by paroxysmal brain dysfunction due to excessive neuronal discharge, and usually associated with some alteration of consciousness. The clinical manifestations of the attack may vary from complex abnormalities of behavior including generalized or focal convulsions to momentary spells of impaired consciousness." Ex. 39, *Epilepsy*, Stedman's Medical Dictionary (27th ed. 2000).

52.    ***Food allergy*** is defined as "a hypersensitive state that results from the ingestion, inhalation, or other contact with a specific food antigen. Symptoms of sensitivity to specific foods can include allergic rhinitis, bronchial asthma, urticaria, angioneurotic edema, dermatitis, pruritus, headache, labyrinthitis and conjunctivitis, nausea, vomiting, diarrhea, pylorospasm, colic, spastic constipation, mucous colitis, and perianal eczema. Food allergens are protein in nature and elicit an immunoglobulin response. The most common foods that cause allergic reactions are wheat,

milk, eggs, fish and other seafoods, chocolate, corn, nuts (particularly peanuts), strawberries, chicken, pork, legumes, tomatoes, cucumbers, garlic, and citrus fruits." Ex. 40, *Food allergy*, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013).

53.     ***Food intolerance or food sensitivity*** is defined as a condition that "occurs when a person has difficulty digesting a particular food.  This can lead to symptoms such as intestinal gas, abdominal pain or diarrhea." *Food Intolerance Definition*, American Academy of Allergy Asthma & Immunology, https://www.aaaai.org/Tools-for-the-Public/Allergy,-Asthma-Immunology-Glossary/Food-Intolerance-Defined (last visited Aug. 29, 2022).

54.     ***Food Protein-Induced Enterocolitis Syndrome (FPIES)*** is defined as "a type of non-IgE mediated food allergy that can present with severe vomiting, diarrhea, food avoidance and dehydration.  Like other food allergies, FPIES reactions are triggered by eating a particular food. The most common triggers include cow milk, soy and grains (rice, barley, oats).  The most severe forms of FPIES can lead to drop in energy, change in body temperature and low blood pressure leading to hospitalization.  FPIES is frequently misdiagnosed early on as a potential severe blood infection or repeated infections of a gastrointestinal virus.  Unlike most food allergies there is no blood or skin testing available for diagnosis.  The primary treatment is strict avoidance of the triggering food.  Most children outgrow FPIES by age 3 or 4." *Food Protein-Induced Enterocolitis Syndrome (FPIES)*, American College of Allergy, Asthma, & Immunology, https://acaai.org/allergies/types/food-allergies/types-food-allergy/fpies (last visited Aug. 29, 2022); Essers Report at 30.

55.     ***Gastrointestinal disorders*** are defined as any compromising condition or disease that occurs within the gastrointestinal tract. *Gastrointestinal Disorders*, Drugs.com, https://www.drugs.com/article/gastrointestinal-disorders.html (last visited Aug. 29, 2022). The

organs that make up the gastrointestinal tract are the mouth, esophagus, stomach, small intestine, large intestine, and anus. *See id.*

56.     ***Glucose Transporter Type 1 Deficiency (GLUT 1)*** is defined as "an inherited condition that affects the nervous system. Symptoms generally develop within the first few months of life and may include recurrent seizures (epilepsy) and involuntary eye movements. Other symptoms include microcephaly (unusually small head size) that develops after birth, developmental delay, intellectual disability and other neurological problems such as spasticity, ataxia (difficulty coordinating movements), and dysarthria. A 'non-epileptic' form of GLUT1 deficiency syndrome is associated with all the typical symptoms of the condition without seizures. GLUT1 deficiency syndrome is caused by changes in the SLC2A1 gene and is inherited in an autosomal dominant manner." *Glucose transporter type 1 deficiency syndrome*, National Institutes of Health Genetic and Rare Diseases Information Center,  https://rarediseases.info.nih.gov/diseases/9265/glucose-transporter-type-1-deficiency-syndrome (last visited Aug. 29, 2022); Essers Report at 31-32.

57.     ***IgE*** is defined as "one of the five classes of antibodies produced by the body. It is concentrated in the lungs, skin, and mucous membranes.  It provides the primary defense against environmental antigens and is believed to be responsive to immunoglobulin A. IgE reacts with certain antigens to trigger the release of chemical mediators that cause anaphylactic hypersensitivity reactions characterized by wheal and flare." Ex. 41, *Immunoglobulin E (IgE)*, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013).

58.     ***Infant formula*** is defined as "a food which purports to be or is represented for special dietary use solely as a food for infants by reason of its simulation of human milk or its suitability as a complete or partial substitute for human milk." Ex. 42, Federal Food, Drug, and Cosmetic Act Sec. 201(z).

59.   **Malabsorption** is defined as "imperfect, inadequate, or otherwise disordered gastrointestinal absorption." Ex. 43, *Malabsorption*, Stedman's Medical Dictionary (27th ed. 2000).

60.   **Medicament** is defined as "a substance used in therapy." *Medicament*, Merriam-Webster, https://www.merriam-webster.com/dictionary/medicament (last visited Aug. 29, 2022).

61.   **Metabolic disorder** is defined as "any pathophysiological dysfunction that results in a loss of metabolic control of homeostasis [self- regulation] in the body." Ex. 44, *Metabolic disorder*, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013).

62.   **Myoclonic Astatic Epilepsy (Doose syndrome)** is defined as "myoclonic-astatic epilepsy of early childhood (MAEC)", which is "a type of epilepsy usually arising in early childhood after the first year of life, more commonly in boys, with rare major generalized tonic-clonic (grand mal) seizures as well as various different types of minor seizures." Ex. 45, *Myoclonic Astatic Epilepsy*, Epilepsy from A to Z, A Dictionary of Medical Terms (4th ed. 2004).

63.   **Nutrition therapy** is defined as a nutrition-based diagnosis as well as therapeutic and counseling services. *Medical Nutrition Therapy*, Centers for Disease Control and Prevention, Medical Nutrition Therapy, https://www.cdc.gov/diabetes/dsmes-toolkit/reimbursement/medical-nutrition-therapy.html (last visited Aug. 29, 2022). Nutrition therapy is also defined as "…administration of food and fluids to support metabolic processes of a patient who is malnourished or at high risk for becoming malnourished." Ex. 46, Nutrition therapy, *Mosby's Dictionary of Medicine, Nursing & Health Professions* (9th ed. 2013).

64.   "**Medical nutrition therapy**" is defined as "the treatment of a medical condition, for example diabetes mellitus, through changes in diet, by adjusting quantity, quality and methods of nutrient intake." *Nutrition therapy*, Nature Research, https://www.nature.com/subjects/nutrition-

therapy (last visited Aug. 29, 2022).  It is also defined as "Nutritional diagnostic, therapy, and counseling services for the purpose of disease management which are furnished by a registered dietitian or nutrition professional." 42 U.S.C. § 1395x(vv)(1).

65.    ***Phenylketonuria (PKU)*** is defined as an

> [a]utosomal recessively-inherited inborn error of metabolism of phenylalanine characterized by deficiency of 1) phenylalanine hydroxylase caused by mutation in the phenylalanine hydroxylase gene (PAH) . . . The disorder is characterized by inadequate formation of L-tyrosine, elevation of serum L-phenylalanine, urinary excretion of phenylpyruvic acid and other derivatives, and accumulation of phenylalanine and its metabolites, which can produce brain damage resulting in severe mental retardation, often with seizures, other neurologic abnormalities such as retarded myelination and deficient melanin formation leading to hypopigmentation of the skin and eczema.

Ex. 47, Phenylketonuria, *Stedman's Medical Dictionary* (27th ed. 2000).

66.    ***Phenylalanine (Phe)*** is defined as "2-Amino-3-phenylpropionic acid; the L-isomer is one of the common amino acids in proteins; a nutritionally essential amino acid." Ex. 48, *Phenylalanine (Phe, F),* Stedman's Medical Dictionary (27th ed. 2000).

67.    ***Prophylactic*** is defined as "1. tending to ward off or prevent something, particularly disease. 2. pertaining to prophylaxis.  3. an agent that tends to ward off disease." Ex. 49, *Prophylactic*, Dorland's Illustrated Medical Dictionary (29th ed. 2000).

68.    ***Pyruvate Dehydrogenase Deficiency (PDHD)*** is a condition "characterized by the buildup of a chemical called lactic acid in the body and a variety of neurological problems.  Signs and symptoms of this condition usually first appear shortly after birth, and they can vary widely among affected individuals.  The most common feature is a potentially life-threatening buildup of lactic acid (lactic acidosis), which can cause nausea, vomiting, severe breathing problems, and an abnormal heartbeat.  People with pyruvate dehydrogenase deficiency usually have neurological problems as well.  Most have delayed development of mental abilities and motor skills, such as sitting and walking.  Other neurological problems can include intellectual disability, seizures, weak

13

muscle tone (hypotonia), poor coordination, and difficulty walking.  Some affected individuals have abnormal brain structures, such as underdevelopment of the tissue connecting the left and right halves of the brain (corpus callosum), wasting away (atrophy) of the exterior part of the brain known as cerebral cortex, or patches of damaged tissue (lesions) on some parts of the brain.  Because of the severe health effects, many individuals with pyruvate dehydrogenase deficiency do not survive past childhood, although some may live into adolescence or adulthood." *Pyruvate dehydrogenase deficiency*, National Institutes of Health U.S. National Library of Medicine, https://ghr.nlm.nih.gov/condition/pyruvate-dehydrogenase-deficiency (last visited Aug. 29, 2022).

69.     ***Refractory seizures*** are those "not controlled with seizure medications." *Refractory Seizures*, Epilepsy Foundation, https://www.epilepsy.com/learn/professionals/refractory-seizures/overview/definition-refractory-seizures (last visited Aug. 29, 2022).

70.     ***Rett's Syndrome*** is defined as "a pervasive developmental disorder affecting the gray matter of the brain, occurring exclusively in females and present from birth.  It is progressive and is characterized by autistic behavior, ataxia, dementia, seizures, and loss of purposeful use of the hands, with cerebral atrophy, mild hyperammonemia, and decreased levels of biogenic amines." Ex. 50, *Rett's syndrome*, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013).

71.     ***Soy Allergy*** is defined as "an abnormal response of the body to the proteins found in soy." General Guidelines for Soy Allergy, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/wellness-and-prevention/soy-allergy-diet (last visited Aug. 30, 2022); Essers Report at 27. It "occurs most often in infants and children, [although] it can appear at any age." *Soy Allergy*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/11320-soy-allergy (last visited Aug. 29, 2022).

72.     ***Short Bowel Syndrome (SBS)*** is defined as "a loss of intestinal surface for absorption of nutrients caused by the surgical removal of a section of bowel. Treatment is with parenteral nutrition in the acute phase." *Short Bowel Syndrome, Mosby's Dictionary of Medicine, Nursing & Health Professions* (9th ed. 2013); Essers Report at 12-13.

73.     ***Syndrome*** is defined as "a group of signs and symptoms that occur together and characterize a particular abnormality or condition." *See Syndrome*, Merriam-Webster, https://www.merriam-webster.com/dictionary/syndrome (last visited Aug. 29, 2022).

74.     ***Tuberous Sclerosis*** is defined as "a familial, neurocutaneous disease characterized by epilepsy, mental deterioration, adenoma sebaceum, nodules and sclerotic patches on the cerebral cortex, retinal tumors, depigmented leaf-shaped macules on the skin, tumors of the heart or kidneys, and cerebral calcifications." Ex. 52, *Tuberous Sclerosis*, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013).

## II.     Overview of Biochemistry and Amino Acid Metabolism

75.     The fundamental role of the human metabolism is to convert food into a usable form of energy. Essers Report at 8. . Once ingested, all food needs to be digested, or broken down, into a usable form before it can be absorbed into the body, and byproducts must be excreted out of the body to prevent toxic buildup of waste. *Id.*

76.     Proteins are essential to the growth and function of all living organisms, and are comprised of varying sequences of twenty different amino acids. *Id.* at 9.

77.     The body absorbs the amino acids into the blood stream, which sends it to the right organs and tissues. *Id.* at 10. There the amino acids may construct new proteins, be converted into other needed amino acids or metabolized into energy for the body. *Id.*

78.     Certain infants and children suffer from diseases and disorders, such as inborn errors of the metabolism (e.g., inherited mutations in the DNA code for building proteins required for

metabolism of energy), short gut syndrome (damaged/decreased intestines impairing amino acid absorption), intractable seizures, and immune-mediated diseases. *Id.* at 10-17. Depending on the type of disease or disorder, these young patients face devastating consequences to their metabolisms, growth, and development. *Id.*

### III.   **MSUD Lophlex® LQ**

79.     MSUD Lophlex® LQ is used as nutrition therapy for children with MSUD. Yannicelli Dep., 48:11-15 (stating that MSUD Lophlex® LQ is administered to children ages one-plus and older).

80.     The ingredients listed for MSUD Lophlex® LQ are:

> Water, Apple Juice from Concentrate (34.1%), Grape Juice from Concentrate (6.9%), Blackcurrant Juice from Concentrate (2.5%), L-Lysine Acetate, L-Proline, Citric Acid, L-Tyrosine, L-Arginine, Glycine, L-Serine, L-Aspartic Acid, L-Alanine, L-Threonine, Corn Syrup Solids, L-Cystine, L-Phenylalanine, Dicalcium Phosphate, L-Histidine, Elderberry Juice from Concentrate (0.6%), Maltodextrin, Magnesium Acetate, N-Acetyl L-Methionine, L-Tryptophan, Choline Bitartrate, C. Cohnii Oil*, Sugar, Microcrystalline Cellulose, Natural Flavor, Fruit Concentrate (Apple, Blackcurrant, Radish), L-Ascorbic Acid, Taurine, Guar Gum, Sunflower Lecithin, Xanthan Gum, M-Inositol, Potassium Sorbate (preservative to delay spoilage), Artificial Sweetener: Sucralose, Ferrous Lactate, Artificial Sweetener: Acesulfame Potassium, Sodium Benzoate (preservative to delay spoilage), Zinc Sulfate, L-Carnitine, Niacinamide, DL-alpha Tocopherol Acetate, Calcium D-Pantothenate, Manganese Sulfate, Cupric Sulfate, Thiamine Chloride Hydrochloride, Pyridoxine Hydrochloride, Vitamin A Palmitate, Riboflavin, Folic Acid, Potassium Iodide, Ascorbyl Palmitate, Mixed Tocopherols, Sodium Molybdate, D-Biotin, Sodium Selenite, Chromium Chloride, Phylloquinone, Vitamin $D_3$, Cyanocobalamin.

>     *A Source of Docosahexaenoic Acid (DHA).

Ex. 7; Ex. 20A (label).

81.     MSUD Lophlex® LQ is an amino acid-based formula. The amino acids in this formula include: L-Lysine Acetate, L-Proline, L-Tyrosine, L-Arginine, L-Serine, L-Aspartic Acid, L-Alanine, L-Threonine, L-Cystine, L-Phenylalanine, L-Histidine, N-Acetyl L-Methionine, L-Tryptophan, Taurine, and L-Carnitine. Essers Report at 18; Exs. 5A; 7.

82.     The amino acids in MSUD Lophlex® LQ were purchased from pharmaceutical companies. Exs. 8; 8B. These amino acids are processed in laboratories, and then mixed with exacting precision to target disease biology.  Ex. 8.

83.     MSUD Lophlex® LQ is designed to eliminate the amino acids isoleucine, leucine and valine (BCAA-free) while providing all other essential nutrients. Essers Report at 22-23; Ex. 5A.

84.     The provision of the amino acids listed, without provision of the BCAA, is the essence of why Nutricia's formula is unique. *Id.* at 18. No other food could provide the amino acids needed for life while excluding the leucine, valine and isoleucine components that pose a risk to the child because their body cannot break those components down. *Id.*

85.     Amino acid-based, BCAA-free formulas are prescribed by licensed healthcare professionals as part of the diet essential for the MSUD patient's nutrition and health therapy. Essers Report at 11, 23, 36; Ex. 20A (label).

86.     The statement "use under medical supervision" appears on MSUD Lophlex® LQ's label. Ex. 20A, Label. It must only be used under strict medical supervision in individuals with a proven metabolic disorder. *Id.*; Ex. 5A.

87.     The administration and dosage of MSUD Lophlex® LQ taken by an individual patient is determined by a healthcare professional. Essers Report at 11.

88.     The treatment of a person with MSUD must be supervised by a healthcare professional in order to discuss and monitor status, compliance and blood amino acid levels. *Id.* Monitoring is an essential part of MSUD management as frequent adjustments to the diet are necessary to meet nutritional growth and health maintenance needs while assuring the individual remains in metabolic control. *Id.*

89.     Persons requiring MSUD Lophlex® LQ suffer from a severe life-threatening medical disorder and a permanent impairment of their ability to tolerate foods containing proteins or peptides. Yannicelli Dep., 76:21-25, 77:17-25, 78:2-4.

90.     The two main approaches to the treatment of maple syrup urine disease (MSUD) include: (1) long-term daily dietary management; and (2) treatment of episodes of acute metabolic decompensation. *Id.*, 54:9-13.

91.     Treatment of MSUD requires the dietary restriction of branched-chain amino acids (BCAAs) because it is an enzyme defect, branched-chain alpha-ketoacid dehydrogenase deficiency. *Id.*, 50:8-17; Essers Report at 10-11.

92.     Nutritional therapy, consisting of BCAA-free foods, prevents the accumulation of BCAA in the brain and blood of patients with MSUD, and hence the devastating effects of MSUD on the brain are avoided. Ex. 4, Deposition of Miguel Del Toro ("Del Toro Dep."), 71:7-15.

93.     Amino acid-based, BCAA-free formulas such as MSUD Lophlex® LQ are requisite nutritional therapy for patients who have MSUD. Essers Report at 11.

94.     MSUD Lophlex® is a primary therapy or treatment for managing patients with MSUD by managing intake of certain amino acids. Yannicelli Dep., 54:9-13; *see also Maple Syrup Urine Disease (MSUD) Treatment & Management*, Medscape, https://emedicine.medscape.com/article/946234-treatment (last visited Aug. 29, 2022); Essers Report at 11.

95.     Without management and therapy from birth (and life-long), a person with MSUD would suffer severe irreversible brain damage. Yannicelli Dep., 47:11-15. If not treated aggressively throughout life, MSUD is a chronic disease that could result in severe mental retardation and death. *Id.*; Essers Report at 22.

96.     Healthy individuals have no reason to consume MSUD Lophlex® LQ. Del Toro Dep., 71:1-15.

97.     A healthy individual who consumed MSUD Lophlex® LQ as their major modality of nutrition over an extended period of time would have significant problems and suffer malnutrition because it lacks (by design) the branched chain amino acids that healthy humans need. Del Toro Dep., 71:1-15; Essers Report at 23.

98.     MSUD causes impairment of major life activities. Yannicelli Dep., 84:5-12, 85:9-19; Essers Report at 11.

99.     Persons with MSUD have a physical handicap as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102. *Id.*

100.    A person with untreated MSUD suffers from a physical or mental impairment that substantially limits the following major life activities: Performing manual tasks, eating, learning, reading, concentrating, and thinking. *Id.*

101.    A person with MSUD suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain functions. *Id.*

**IV.    Periflex® Junior and Periflex® Infant**

102.    Periflex® Infant and Periflex® Junior are used to treat Phenylketonuria (PKU). *See* Exs. 11; 14.

103.    The ingredients in Periflex® Junior are:

> Corn Syrup Solids, Canola Oil, High Oleic Safflower Oil, L-Glutamine, L-Proline, L-Asparagine, L-Lysine Hydrochloride, Tripotassium Citrate, L-Tyrosine, L-Leucine, and 2% or less of each of the following: Disodium Hydrogen Phosphate, L-Valine, L-Serine, L-Isoleucine, Tricalcium Citrate, Tricalcium Phosphate, L-Alanine, Maltodextrin, L-Threonine, Magnesium Hydrogen Phosphate, L-Citrulline, L-Arginine, L-Cystine, Choline Bitartrate, Taurine, Fractionated Coconut Oil, CAEM (An Emulsifier), L-Histidine, L-Methionine, L-Tryptophan, L-Ascorbic Acid, M-Inositol, Ferrous Sulfate, Zinc Sulfate, L-Carnitine, DL-Alpha Tocopherol Acetate, Manganese Sulfate, Niacinamide, Calcium D-Pantothenate, Cupric Sulfate, Thiamine Chloride Hydrochloride, Pyridoxine

Hydrochloride, Riboflavin, Vitamin A Acetate, Folic Acid, Potassium Iodide, Chromium Chloride, Sodium Selenite, Sodium Molybdate, Phylloquinone, D-Biotin, Vitamin $D_3$, Cyanocobalamin.  The unflavored version also contains: 2% or less of Sugar.  The orange flavored version also contains: Sugar, Citric Acid, Artificial Flavors, and 2% or less of each of the following: Artificial Sweetener, Sucralose, Artificial Colors (Beta Carotene, Beet Red).

Ex. 14.

104.   The following amino acids or amino acid analogue are in Periflex® Junior:

L-glutamine, L-proline, L-asparagine, L-lysine hydrochloride, L-tyrosine, L-leucine, L-valine, L-serine, L-isoleucine, L-alanine, L-threonine, L-arginine, L-cystine, L-citrulline, L-histidine, L-methionine, L-tryptophan and taurine. Essers Report at 19-20; Ex. 14.

105.   The ingredients in Periflex® Infant are:

Corn Syrup Solids, Refined Vegetable Oil (Soy, Coconut), High Oleic Sunflower Oil, Calcium Phosphate Dibasic, L-Arginine L-Aspartate, Tripotassium Citrate, L-Leucine, L-Lysine Acetate, L-Tyrosine, L-Glutamine, L-Proline, L-Valine, Glycine, L-Isoleucine, CAEM (An Emulsifier), L-Threonine, L-Serine, L-Histidine, L-Alanine, Sodium Chloride, L-Cystine, L-Tryptophan, L-Methionine, Magnesium Acetate, Magnesium L-Aspartate, Potassium Chloride, M. Alpha Oil*, Choline Bitartrate, M-Inositol, C. Cohnii Oil**, L-Ascorbic Acid, Ferrous Sulfate, Zinc Sulfate, Taurine, Carnitine, Niacinamide, Sunflower Oil, DL-Alpha Tocopherol Acetate, Calcium D-Pantothenate, Cupric Sulfate, Manganese Sulfate, Pyridoxine Hydrochloride, Riboflavin, Vitamin A Acetate, Thiamine Chloride Hydrochloride, Ascorbyl Palmitate, Potassium Iodide, Chromium Sulfate, DL-Alpha Tocopherol, Phylloquinone, Sodium Molybdate, Folic Acid, Sodium Hydrogen Selenite, D-Biotin, Vitamin $D_3$, Cyanocobalamin.

*A Source of Arachidonic Acid (ARA)

** A Source of Docosahexaenoic Acid (DHA)

Ex. 11.

106.   The amino acids in the Periflex® Infant formula include: L-Arginine, L-Aspartate, L-Leucine, L-Lysine Acetate, L-Tyrosine, L-Glutamine, L-Proline, L-Valine, Glycine, L-Isoleucine, L-Threonine, L-Serine, L-Histidine, L-Alanine, L-Cystine, L-Tryptophan, L-Methionine, Taurine, and Carnitine. Ex. 11.

107.    The amino acids in Periflex® Infant and Periflex® Junior are purchased from pharmaceutical companies. Exs. 8; 8C (Periflex® Infant); 8D (Periflex® Junior). These amino acids are processed in laboratories, and then mixed with exacting precision to target disease biology.  Ex. 8.  The amino acids in this formula, some of which can be converted into other amino acids (but not phenylalanine), are not naturally found in this form in food.  Essers Report at 24. "[I]t is the unique composition of these amino acids that provides its essence as a Medical Food targeting the unique biology of one specific disease state." Essers Report at 19.

108.    The statement "use under medical supervision" appears on Periflex® Infant and Periflex® Junior's labels. Ex. 20.

109.    Periflex® Infant or Periflex® Junior are prescribed by a healthcare professional to persons have Phenylketonuria (PKU).  Essers Report at 24-25; Ex. 2, Compl. ¶ 43, 47, 76.

110.    The treatment of a person with PKU must be supervised by a healthcare professional. Yannicelli Dep., 42:4-18 (stating that Periflex® may not be consumed alone because it would result in severe protein malnutrition and it requires medical supervision).

111.    Healthy individuals have no reason to consume Periflex® Infant and Periflex® Junior. *Id.*, 42:8-16.

112.    If someone who didn't have PKU were to use Periflex® Infant or Periflex® Junior as a sole source of nutrition, s/he would end up with severe protein malnutrition if not carefully monitored, medically supervised and managed throughout his/her life. *Id.*

113.    Persons with PKU cannot process a specific amino acid called phenylalanine (Phe), which is an essential component of proteins in food. Essers Report at 12, 23. Ex. 2, Compl. ¶ 43; *PKU - Phenylketonuria Education & Support*, Nutricia website, http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/ (last visited Aug. 29, 2022).

114.    Consuming too much Phe from food leads to a toxic accumulation of Phe in the blood and brain of a person with PKU. *PKU - Phenylketonuria Education & Support*, Nutricia Website, http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/ (last visited Aug. 29, 2022); *Id.* at 23-24.

115.    Untreated children with PKU experience developmental delays and severe brain problems such as seizures. *Id.*; Ex. 2, Compl. ¶ 45.

116.    There is no cure for PKU, but it can be treated effectively with proper diet and special nutritional products designed for persons with PKU.  Essers Report at 24; Ex. 2, Compl. ¶ 45.

117.    Newborn screening in the United States includes testing for PKU so that medicament treatment can be instituted prior to manifestation of symptoms. *PKU - Phenylketonuria Education & Support*, Nutricia Website, http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/ (last visited Aug. 29, 2022) (stating the importance of diagnosing and treating an infant within days after birth to prevent permanent effects from untreated PKU); Essers Report at 24.

118.    Nutrition therapy is the primary treatment for persons with PKU. *Id*. (stating that persons with PKU "must drink a special PHE-free formula[] that supplies additional protein the body needs for growth and maintenance, without the addition of PHE"). "PKU - Phenylketonuria Education & Support," Nutricia Website, http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/ (last visited Aug. 29, 2022); Essers Report at 24.

119.    PKU is managed with a low Phe diet consisting of foods low in protein and a Phe-free formula. Essers Report at 24; "PKU - Phenylketonuria Education & Support," Nutricia Website, http://www.medicalfood.com/Learning-Center/Metabolic-Conditions/Phenylketonuria/ (last visited Aug. 29, 2022).

120.    Nutrition Management of PKU includes the frequent monitoring of blood Phe levels. Essers Report at 24-25.

121.    Untreated PKU can lead to intellectual disability, developmental delays, and severe mental problems, such as seizures. *See* Yannicelli Dep., 41:7-17.

122.    In addition to foods such as fruits, vegetables, and grains, individuals with PKU must drink a special Phe-free metabolic formula to supply the body with the necessary protein requirements the body needs for growth and maintenance, without the addition of the offending amino acid, phenylalanine. *Id.* 41:18-25.

123.    This Phe-free diet should begin as soon as possible after birth and experts recommend such people stay on the diet throughout their lives. Essers Report at 11.

124.    Without perpetual food management and treatment from birth, a patient with PKU would suffer severe, irreversible intellectual disability rendering a patient completely unable to take care of him/herself and require 24-hour per day care. *Id.* at 23-24.

125.    A person with PKU suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, reading, concentrating, thinking, and communicating. *Id.* at 12.

126.    A person with PKU suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function. *Id.*

127.    Periflex® Infant and Periflex® Junior are nutritional therapy treatments for persons with PKU. *Id.*

**V.       Neocate® Junior:**

23

128.    Neocate® Junior is used to manage a variety of syndromes and conditions. Ohja Dep., 8:4-8. They range from Eosinophilic Esophagitis (EoE) to short bowel syndrome (SBS) due to the surgical removal of a large portion of the small intestine. *Id.*, 8:9-12; Essers Report at 13-14.

129.    The ingredients in Neocate® Junior are:

> Corn Syrup Solids (52%), Refined Vegetable Oils ((Palm Kernel and/or Coconut Oil (8%), Canola Oil (8%), High Oleic Safflower Oil (8%)), L-Arginine (2.4%), L-Glutamine (2.3%), L-Lysine L-Aspartate (2%), and less than 2% of each of the following: Tripotassium Citrate, Calcium Phosphate Dibasic, L-Leucine, L-Phenylalanine, L-Proline, Silicon Dioxide, L-Valine, Glycine, L-Isoleucine, N-Acetyl-L-Methionine, L-Threonine, Mono and Diglycerides, Sodium Chloride, L-Histidine, L-Serine, L-Alanine, Magnesium Acetate, Calcium Phosphate Tribasic, Choline Bitartrate, L-Tryptophan, L-Tyrosine, Diacetyl Tartaric Acid Esters of Mono and Diglycerides, M-Inositol, L-Ascorbic Acid, L-Cystine, Propylene Glycol Alginate, Taurine, Ferrous Sulfate, L-Carnitine, Zinc Sulfate, DL-Alpha Tocopherol Acetate, Niacinamide, Calcium D-Pantothenate, Manganese Sulfate, Cupric Sulfate, Riboflavin, Thiamine Chloride Hydrochloride, Pyridoxine Hydrochloride, Vitamin A Acetate, Folic Acid, Potassium Iodide, Chromium Chloride, Sodium Molybdate, Sodium Selenite, Phylloquinone, D-Biotin, Vitamin $D_3$, Cyanocobalamin.

Exs. 16; 20D.

130.    The amino acids in this formula include: L-Arginine, L-Glutamine, L-Lysine L-Aspartate, L-Leucine, L-Phenylalanine, L-Proline, L-Valine, Glycine, L-Isoleucine, N-Acetyl-L-Methionine, L-Threonine, L-Histidine, L-Serine, L-Alanine, L-Tryptophan, L-Tyrosine, L-Cystine, Taurine, L-Carnitine. Exs. 16; 8E.

131.    The amino acids in Neocate® Junior were purchased from pharmaceutical companies. Exs. 8; 8E. These amino acids are processed in laboratories, and then mixed with exacting precision to target disease biology. Ex. 8. These amino acids are non-allergenic and non-immunogenic and provide the building blocks needed to synthesize needed proteins for bodily function. Essers Report at 20. The unique composition of the amino acids provides the essence of the product, targeting the unique biology of a specific disease state. *Id.* at 21.

24

132.    The statement "use under medical supervision" appears on Neocate® Junior's label. Ex. 20D.

133.    The administration and dosage of Neocate® Junior taken by a patient is determined by a healthcare professional. Ohja Dep., 48:19-49:2.  This is because the administration requires regular monitoring to adjust for tolerance, and growth. *Id.*  The correct dosage of Neocate® Junior taken by an individual patient is determined by a physician or healthcare professional. *Id.*

### A.    Eosinophilic Esophagitis (EoE)

134.    Eosinophilic Esophagitis (EoE) is a chronic immune-antigen-mediated disease of the esophagus that results from an aberrant individual response to dietary antigens (an antigen is a molecule that precipitates an immune response). Essers Report at 13-14.

135.    Persons with EoE have a particular type of white blood cell (eosinophil) that builds up in the lining of the conduit that connects their mouths to their stomachs (esophagus). *Id.* at 14.  It impairs passage of food and propulsive movement (diminished diameter, amplitude and velocity). *Id.*

136.    EoE can produce swallowing pain that blunts appetite and intake. *Id.*

137.    EoE sometimes accompanies anaphylactic reactions or asthma. *Id.*

138.    EoE can be managed with nutritional therapy. *Id.*

139.    However, if EoE is left untreated, it may cause esophageal narrowing from swelling (or fixed strictures) and damage the esophageal tissue. *Id.*    Children with strictures may be predisposed to food impactions in the esophagus, which may require endoscopic retrieval to remove impacted food. *Id.* at 27.  EoE usually presents in infants, toddlers, and children of elementary school age. *Id.* at 14.

140.    Neocate® Junior is prescribed by health care professionals to children with EoE. *Id.* at 28.

141.    Dietary therapy is the primary method of treatment of EoE in the pediatric population. *Id.*

142. EoE is an incurable condition. *Id.* at 14.

143. A person with EoE suffers from a physical or mental impairment that substantially limits the following major life activities: Eating. *Id.*

144. A person with EoE suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Digestion and growth. *Id.*

145. Neocate® Junior eliminates the antigens in food (usually specific proteins or peptides) responsible for provoking the allergic response, while providing all essential nutrients that are needed for normal growth and development. *Id.* at 28.

146. Neocate® Junior is recommended for use by persons with EoE as nutritional therapy because alternative treatments utilize systemic steroids with substantive side effects worsening over time, or use diets that eliminate a wide variety of foods that may or may not be contributing irritants (including milk, eggs, wheat, nuts, shellfish, soy). *Id.*

147. This avoidance diet for EoE is difficult to implement and maintain and requires frequent endoscopies to assess response to empiric food eliminations (eggs, milk, soy, gluten, nuts, shellfish, generally conjointly). *Id.* at 28-29.

## B.      Short Bowel Syndrome (SBS)

148. Short Bowel Syndrome (SBS) may occur when substantive portions of the small intestine have been removed. *Id.* at 25.

149. SBS may also result when portions of the small intestine are missing or damaged at birth (due to conditions such as gastroschisis, omphalocele, and intestinal atresia); or may result shortly after birth due to necrotizing enterocolitis associated with prematurity. *Id.* at 25-26.

150. SBS treatment may require nutrition through a central vein (parenteral nutrition) to prevent malnutrition. *Id.* at 26.

151.    Alternatively, enteral tube feeding is used in those who tolerate placing food, fluids, and/or drugs directly into the stomach or small intestine through a tube inserted through the nose or directly through the abdomen into the stomach (gastrostomy) or duodenum (duodenostomy). *Id.* at 13.

152.     Enteral feeds are often provided as a continuous slow-rate feeding with a pump to enhance absorption by not overwhelming intestinal capacity with bolus volumes. *Id.*; *Enteral Tube Nutritio*n, Children's Health of Orange County, https://www.choc.org/programs-services/gastroenterology/intestinal-rehabilitation-program/enteral-tube-nutrition/ (last visited Aug. 29, 2022).

153.    Neocate® Junior is a nutritional therapy used by persons with SBS.  Essers Report at 13.

154.    SBS affects the available absorptive surface area due to the limited length of the small intestine, so that time required for absorption of nutrients after time required for digestion is insufficient. *Id.* at 12.

155.    Complications from SBS include vomiting, chronic diarrhea with fluid and electrolyte loss, enterocolitis and/or proctocolitis. *Id.* at 13.

156.    Further problems may include small bowel bacterial overgrowth, altered functional motility, remnants of dysfunctional bowel, surgical diversion, or post-surgical anastomotic strictures (areas where ends of intestine were sewn together). *Id.* at 13.

157.    SBS requires ongoing therapy, monitoring and management. *Id.*

158.    A person with SBS suffers from a physical or mental impairment that substantially limits the following major life activities: caring for oneself, eating, sleeping. *Id.*

159.    A person with SBS suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Normal cell growth and digestion. *Id.*

**VI.**   **Ketocal® 4:1 LQ Liquid**

160.    The ketogenic diet is a high fat, low carbohydrate, controlled protein diet used for the treatment of epilepsy. Yannicelli Dep., 18:20-22.  It is a medical treatment used when anti-epileptic medications have been found insufficient for seizure control. *Id.*, 21:2-9; Essers Report at 16.

161.    The Ingredients in Ketocal® 4:1 Liquid are:

> Water, Refined Vegetable Oil (High Oleic Sunflower, Soy, Palm), Sodium Caseinate (Milk), Whey Protein Concentrate (Milk), Soy Fiber, Corn Starch, Inulin, CAEM (an Emulsifier), Dipotassium Phosphate, Gum Arabic, Calcium Chloride, M. Alpina Oil*, Magnesium Acetate, Potassium Chloride, C. Cohnii Oil**, Microcrystalline Cellulose, Fructooligosaccharide , L-Ascorbic Acid, Calcium Phosphate Monobasic, Mono and Diglycerides, Trisodium Citrate, Sodium Hydroxide, Choline Chloride, L-Cystine, Calcium Phosphate Dibasic, Propylene Glycol Alginate, Ferrous Lactate, L-Carnitine, Taurine, M-Inositol, L-Tryptophan, Zinc Sulfate, DL-Alpha Tocopheryl Acetate, Soy Lecithin, Niacinamide, Calcium D-Pantothenate, Manganese Sulfate, Ascorbyl Palmitate, Cupric Sulfate, Thiamine Chloride Hydrochloride, Pyridoxine Hydrochloride, Riboflavin, Vitamin A Acetate, Mixed Tocopherols, DL-Alpha Tocopherol, Folic Acid, Potassium Iodide, Chromium Chloride, Sodium Selenite, Sodium Molybdate, Phylloquinone, D-Biotin, Vitamin D3, Cyanocobalamin.

Exs. 18; 20E.

162.    The statement "use under medical supervision" appears on Ketocal® 4:1 LQ Liquid labeling. Ex. 20E.

163.    The administration and dosage of Ketocal® 4:1 LQ Liquid taken by an individual patient is determined by a healthcare professional. Del Toro Dep., 59:12-18.

164.    Ketosis is a metabolic state characterized by raised levels of ketone bodies in the body tissues, which reduce seizures. Yannicelli Dep., 64:13-15 ("[F]asting and producing ketones has a positive effect on seizure reduction.").

165.    Ketocal® 4:1 LQ Liquid is specially designed and formulated to initiate and maintain a state of ketosis. *Id.*, 20:15-16 ("Ketocal is a product that can be used in the ketogenic diet."). Ketocal® is unique in that it provides a 4:1 ratio of fat calories to "non-fat" protein and

carbohydrate calories. Essers Report at 21; Ex. 8. There is no naturally occurring food that will allow a child to have complete nutrition in the manner that Ketocal® provides. The dearth of carbohydrate is what induces the ketogenic state that has high efficacy in treating intractable seizures. Essers Report at 21. This formula can be the sole source of nutrition if need be or can be combined with varying amounts of table food. Ex. 12, Deposition of Jonah Essers M.D. ("Essers Dep."), 133:5-11.

166.    Ketones are metabolites produced from the breakdown of fatty acids that provide fuel for the body. They provide an alternative fuel to the brain in lieu of carbohydrates in those on a high-fat, low-carbohydrate diet. Essers Report at 16, 30.

### A.    Intractable or refractory epilepsy

167.    Ketocal® Liquid is a nutritional therapy treatment for persons with intractable or refractory epilepsy. *Id.* at 31.

168.    Intractable or refractory epilepsy is a neurological disorder in which a person's seizures fail to adequately subside with appropriately dosed pharmacologic therapy for convulsions. *Id.*

169.    A person with intractable or refractory epilepsy suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, reading, concentrating, thinking, and communicating. *Id.*

170.    A person with intractable or refractory epilepsy suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function. *Id.*

## B.    Glucose Transporter Type 1 deficiency (GLUT 1)

171.    Glucose Transporter Type 1 deficiency (GLUT 1) is a lifelong genetic metabolic disorder that occurs as a result of mutation in the SLC2A1 gene.  *Id.* It is incurable and presents infancy. *Id.*

172.    Ketocal® Liquid is a nutritional therapy treatment for persons with GLUT 1. *Id.* at 32.

173.    The disorder impairs glucose transport to the brain. *Id.* at 31.  Persons with GLUT1 suffer from epilepsy, developmental delays, acquired microcephaly, cognitive impairment and varying degrees of spasticity, ataxia, and dystonia. *Id.*  Persons with GLUT 1 may also suffer from seizures and movement disorders. *Id.*

174.    A person with GLUT 1 suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, reading, concentrating, thinking, and communicating. *Id.* at 32.

175.    A person with GLUT 1 suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function. *Id.*

## C.    Pyruvate Dehydrogenase Deficiency (PDHD)

176.    Pyruvate Dehydrogenase Deficiency (PDHD) is a metabolic disorder arising from an incurable genetic mutation resulting from deficiency of certain proteins that facilitate function in the pyruvate dehydrogenase complex. *Id.* at 32.

177.    Nutrition therapy using Ketocal® 4 :1 LQ Liquid is a recognized treatment for persons with PDHD. Untreated PDHD results in damage to the brain. *Id.*

178.    A person with PDHD suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, seeing, walking,

standing, lifting, bending, speaking, sleeping, learning, reading, concentrating, thinking, and communicating. *Id.*

179.   A person with PDHD suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function and respiration (rapid). *Id.*

180.   Ketocal® Liquid is a nutritional therapy treatment for persons with PDHD. *Id.*

### D.   **Myoclonic Astatic Epilepsy (Doose syndrome)**

181.   Myoclonic astatic epilepsy (aka Doose Syndrome) is a rare form of generalized idiopathic epilepsy.   Doose Syndrome is characterized by the development of myoclonic seizures and/or myoclonic astatic seizures. *Id.* Myoclonic seizures are brief shock-like jerks of a muscle or group of muscles.   It is an incurable genetic disorder. *Id.*

182.   Ketocal® Liquid is a nutritional therapy treatment for persons with Doose Syndrome. *Id.*

183.   A person with Doose Syndrome suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, seeing, walking, standing, lifting, bending, speaking, sleeping, learning, reading, concentrating, thinking, and communicating. *Id.* at 32-33.

184.   A person with Doose Syndrome suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function. *Id.* at 33.

### E.   **Tuberous Sclerosis Complex**

185.   Tuberous Sclerosis Complex is a genetic disorder that causes noncancerous (benign) tumors to develop in many parts of the body. *Id.*

186.   Ketocal® Liquid is a nutritional therapy for persons with tuberous sclerosis complex. *Id.*

31

187.    People with Tuberous Sclerosis Complex may suffer from various symptoms including excess fluid in and around the brain, heart complications, kidney damage, lung failure, risk of cancerous (malignant) tumors, and or vison damage. *Id.*

188.    Persons with Tuberous Sclerosis Complex may also suffer from seizures.  It is an incurable lifelong disorder. *Id.*

189.    A person with Tuberous Sclerosis Complex suffers from a physical or mental impairment that substantially limits the following major life activities: Caring for oneself, performing manual tasks, seeing, walking, standing, lifting, bending, speaking, sleeping, learning, reading, concentrating, thinking, and communicating. *Id.*

190.    A person with Tuberous Sclerosis Complex suffers from a physical or mental impairment that substantially limits or impacts the following major bodily functions: Neurologic and brain function. *Id.*

### F.    Rett Syndrome

191.    Rett Syndrome is a rare non-inherited genetic postnatal neurological disorder. *Id.*

192.    Rett Syndrome leads to severe impairment affecting every aspect of life, including the ability to speak, walk, eat, and breathe.  It is a permanent and incurable condition. *Id.*

193.    Ketocal® Liquid is a nutritional therapy for persons with Rett Syndrome. *Id.*

### G.    Dravet Syndrome

194.    Dravet Syndrome is a neurological disorder presenting in infancy. *Id.* at 34.

195.    Dravet Syndrome is considered an epileptic encephalopathy, or disorder of the brain usually due to a defect in the SCN1A gene, coding for a sodium ion channel that regulates sodium in and out of cells. It is a severe form of epilepsy because it is characterized by frequent, prolonged, and oft-intractable seizures. *Id.*

196.    Mortality is elevated in persons with Dravet Syndrome above that found in the general population of epilepsy patients.  *Id.*

197.    Dravet Syndrome generally results in developmental delays, speech impairment, ataxia, and hypotonia.  It is an incurable and permanent condition. *Id.*

198.    Anti-convulsant medications are the usual first-line therapy, while a ketogenic diet is a desirable second-line option or addition. *Id.*

199.    KetoCal® 4 :1 LQ Liquid is a nutritional therapy for persons with Dravet Syndrome. *Id.*

Respectfully Submitted,

*/s/ John B. Brew*
John B. Brew
Alex Schaefer
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
jbrew@crowell.com

Maria Vanikiotis
Alexander T. Rosen
Crowell & Moring LLP
590 Madison Avenue
20th Floor
New York, NY 10022

Dated: August 31, 2022
        New York, New York

**Plaintiff's Exhibit List**

| Exhibit No. | Description |
|---|---|
| 1 | Expert Report of Dr. Jonah Essers ("Essers Report" or "Essers") |
| 2 | Complaint and Answer |
| 3 | Danone and Nutricia Medi-Cal Resource |
| 4 | Deposition of Miguel Del Toro ("Del Toro Deposition") |
| 5A | Medical Rationale: MSUD |
| 5B | Medical Rationale: Periflex |
| 5C | Medical Rationale: Periflex Reformulation |
| 5D | Medical Rationale: Neocate Junior |
| 5E | Medical Rationale: KetoCal |
| 6 | Deposition of Steven Yannicelli ("Yannicelli Deposition") |
| 7 | Bates Flip Chart at 0000046 MSUD |
| 8 | Dr. Essers Response to U.S. Government Q.2 During Deposition |
| 8A | Exhibit A to Dr. Essers Response to U.S. Government Q.2 During Deposition |
| 8B | Exhibit BA to Dr. Essers Response to U.S. Government Q.2 During Deposition |
| 8C | Exhibit C to Dr. Essers Response to U.S. Government Q.2 During Deposition |
| 8D | Exhibit D to Dr. Essers Response to U.S. Government Q.2 During Deposition |
| 8E | Exhibit E to Dr. Essers Response to U.S. Government Q.2 During Deposition |
| 9 | Definition: Phenylketonuria (PKU), Stedman's Medical Dictionary (27th ed. 2000) |
| 10 | NICHD |
| 11 | Bates Flip Chart 0000021 – Periflex Infant |
| 12 | Deposition of Dr. Jonah Essers ("Essers Dep.") |
| 13 | Insurance Template Letters |
| 14 | Bates Flip Chart 00000022 – Periflex Junior |
| 15 | Definition: Short Bowel Syndrome, Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013) |
| 16 | Bates Flip Chart 00000009 – Neocate |
| 17 | Explanatory Notes (ENs): Heading 2106 (2012-2016) and Heading 3004 (2012-2016) |
| 18 | Bates Flip Chart 0000091 – Ketocal |
| 19 | Product Studies |
| 20A | Sample Labels: MSUD |
| 20B | Sample Labels: Periflex Infant |
| 20C | Sample Labels: Periflex Junior |
| 20D | Sample Labels: Neocate Junior |
| 20E | Sample Labels: KetoCal |
| 21 | Declaration and Expert Report of Pablo Robles, Ph.D. ("Robles Report" or "Robles") |
| 22 | Deposition of Gerald Bruce ("Bruce Dep.") |
| 23 | Bates Doc 0000479 – Reimbursement |
| 24 | Headquarters Ruling HQ 083000 (Sept. 19, 1990) |

| 25 | New York Rulings NY N005717 (Jan. 26, 2007), NY N006048 (Feb. 6, 2007), and NY N006049 (Feb. 6, 2007) |
|----|----|
| 26 | Headquarters Ruling HQ 966779 (Jan. 16, 2004) |
| 27 | 48 Cus. Bul. & Dec. No. 35 (Sept. 3, 2014) |
| 28 | Headquarters Ruling HQ H121544 (Oct. 6, 2014) |
| 29 | Definition: Nutrition therapy, Mosby's Dictionary of Medicine, Nursing & Heal Professions (9th ed. 2013) |
| 30 | Expert Report of Dr. Jesse F. Gregory ("Gregory Report") |
| 31 | Definition: Medicaments, Merriam-Webster |
| 32 | Deposition of Rachel Ojha ("Ojha Dep.") |
| 33 | Definition: Amino Acid |
| 34 | Definition: Anaphylaxis |
| 35 | Definition: Branched-chain Amino Acids (BCAA) |
| 36 | Definition: Branched-chain Alpha Ketoacid Dehydrogenase complex (BCKDC) |
| 37 | Definition: Dravet Syndrome |
| 38 | Definition: Eosinophil |
| 39 | Definition: Epilepsy |
| 40 | Definition: Food Allergy |
| 41 | Definition: IgE |
| 42 | Definition: Infant Formula |
| 43 | Definition: Malabsorption |
| 44 | Definition: Metabolic Disorder |
| 45 | Definition: Myoclonic Astatic Epilepsy (Doose Syndrome) |
| 46 | Definition: Nutrition Therapy |
| 47 | Definition: Phenylketonuria (PKU) |
| 48 | Definition: Phenylalanine (Phe) |
| 49 | Definition: Prophylactic |
| 50 | Definition: Rett's Syndrome |
| 51 | Definition: Short Bowel Syndrome |
| 52 | Definition: Tuberous Sclerosis |