UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE
_____
                                                          :
NUTRICIA NORTH AMERICA, INC.,            :
                                                          :
                              Plaintiff,              :
                                                          :
                    v.                                   :         Court No. 16-00008
                                                          :
UNITED STATES,                                     :
                                                          :
                              Defendant.           :
_____:

## <u>ORDER</u>

Upon consideration of defendant's cross-motion for summary judgment and response in

opposition to plaintiff's motion for summary judgment, and upon consideration of all other

papers and proceedings had herein; it is hereby

**ORDERED** that defendant's cross-motion for summary judgment is granted;

**ORDERED** that plaintiff's motion for summary judgment is denied; and it is further

**ORDERED** that judgment is entered for defendant and this action is dismissed.


                                        _____
                                                            JUDGE


Dated: _____
          New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                                         :
NUTRICIA NORTH AMERICA, INC.,              :
                                                         :
                                    Plaintiff,         :
                                                         :
                    v.                                  :          Court No. 16-00008
                                                         :
UNITED STATES,                                    :
                                                         :
                                    Defendant.       :
_____:

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of International Trade

(USCIT), defendant, the United States, respectfully moves for an order granting defendant's

cross-motion for summary judgment, denying plaintiff's motion for summary judgment, and

dismissing this action.  The reasons for our cross-motion are set forth in the accompanying

memorandum, defendant's response to plaintiff's USCIT Rule 56.3 statement of facts not in

dispute, and defendant's USCIT Rule 56.3 statement of undisputed material facts.

WHEREFORE, defendant respectfully requests that an order be entered granting defendant's cross-motion for summary judgment, denying plaintiff's motion for summary judgment, entering judgment for defendant, dismissing this action, and granting defendant such other and further relief as may be just and appropriate.

<div style="margin-left:40%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By:    /s/ Aimee Lee
       AIMEE LEE
       Assistant Director

</div>

Of Counsel:

Yelena Slepak
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

<div style="margin-left:40%">

/s/ Luke Mathers
LUKE MATHERS
Trial Attorney
International Trade Field Office
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-9230 or 9236
*Attorneys for Defendant*

</div>

Dated: October 28, 2022

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                         :

NUTRICIA NORTH AMERICA, INC.,         :
                                           :

                    Plaintiff,     :      **PUBLIC VERSION**
                                           :

                  v.              :      Court No. 16-00008
                                           :

UNITED STATES,                              :
                                           :

                  Defendant.    :
_____:

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## RULE 56.3 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

      Pursuant to Rule 56 of the Rules of the United States Court of International Trade

(USCIT), defendant, United States, responds to plaintiff Nutricia North America, Inc.'s

(Nutricia's) USCIT Rule 56.3 statement of facts not in dispute as follows:

## PRELIMINARY STATEMENT

      Although we deny or object to several of Nutricia's statements, none of our responses

gives rise to a dispute of material fact that would preclude the Court from considering or granting

defendant's cross-motion for summary judgment.  Similarly, although we admit several of

Nutricia's statements (or admit to the extent supported by the material cited), none of our

responses precludes the Court from considering or granting defendant's cross-motion for

summary judgment.

## RESPONSES

      1.      Admits.

2.      Objection.  Plaintiff's citation to its own complaint does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). Notwithstanding and without waiving this objection, admits.

3.      Admits.

4.      Admits.

5.      Admits this statement, but denies that the last two digits of subheading 2106.90.99**98**, set forth in bold herein, and the corresponding text "Other" are relevant because they constitute a statistical suffix and a statistical annotation, respectively, and are not part of 19 U.S.C. § 1202, the statute which sets forth the Harmonized Tariff Schedule of the United States (HTSUS).

6.      Admits that on October 6, 2014, U.S. Customs and Border Protection (Customs) issued ruling HQ H121544.  Admits that HQ H121544 classified merchandise similar to the merchandise at issue in this case to the extent supported by HQ H121544, which is the best evidence of its contents.  Denies that HQ H121544 classified the subject merchandise.  Avers that HQ H121544 concerned Nutricia's protest of Customs' classification of the merchandise contained in the entry or entries covered by Protest No. 1101-10-100060, whereas this action concerns the subject merchandise contained in the four entries covered by Protest Nos. 1101-15-100252 and 1001-15-100172.  HQ H121544; Plaintiff's Rule 56.3 Statement of Material Facts Not in Dispute (Pl.'s SMF) at ¶ 1.

7.      Admits.

8.      Admits.

9.      Admits.

10.     Admits.

11.     Objection.  Plaintiff's citation to its own complaint does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). Notwithstanding and without waiving this objection, admits.

12.     Objection.  Plaintiff's citation to its own complaint and to the website www.medicalfood.com does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, admits.

13.     Objection.  Plaintiff's citation to its own complaint does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). Notwithstanding and without waiving this objection, admits.

14.     Objection.  Plaintiff's citation to its own complaint does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). Notwithstanding and without waiving this objection, admits.

15.     Objection.  Plaintiff's citation to its own complaint does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). Notwithstanding and without waiving this objection, admits.

16.     Admits.

17.     Admits.

18.     Admits that the statement that "Nutricia's largest wholesaler is a medical surgical wholesaler" is supported by Plaintiff's Exhibit (Pl.'s Ex.) 22, ECF No. 73-39, Deposition of Gerald Bruce (Bruce Dep.) at 14:11–14.  Denies the remainder of this statement because the cited medical wholesaler is not mentioned in the cited portion of the Bruce Deposition.  Bruce

Dep. at 14:11–14 ███████████████████████████████████████████████████

███████████████████████████████████████████████

19.      Admits that this statement is supported by Pl.'s Ex. 1, ECF No. 73-1, Expert

Report of Dr. Jonah Essers (Essers Report) at 35, and Pl.'s Ex. 21, ECF No. 73-38, Declaration

and Expert Report of Pablo Robles, Ph.D. (Robles Report) at 14, 16.

20.      Admits that this statement is supported by the Robles Report at Exhibit 5.

21.      Admits that this statement is supported by the Essers Report at 17.

22.      Admits that this statement is supported by the Essers Report at 17.

23.      Admits that this statement is supported by the Robles Report at 21–25, 11.

24.      Admits that this statement is supported by the Robles Report at 23.

25.      Admits that this statement is supported by the Robles Report at 23.

26.      Admits that this statement is supported by the Robles Report at 23.

27.      Admits that this statement is supported by the Robles Report at 23.

28.      Admits that this statement is supported by the Robles Report at 23.

29.      Admits that this statement accurately paraphrases the Robles Report at 25–26.

30.      Admits that this statement accurately paraphrases the Robles Report at 26.

31.      Objection.  Plaintiff fails to cite any evidence supporting its statement as required

by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, admits.

32.      Admits that this statement is supported by the Bruce Deposition at 13:4–10.

33.      Denies that the citation to 42 U.S.C. § 1395ww(t)(4) supports the statements in

the first and second sentences of this paragraph.  Section 1395ww(t)(4) states that "[t]he term

'HCPCS' means, with respect to hospital items and services, the code under the Healthcare

Common Procedure Coding System (HCPCS) (or a successor code) for such items and services."

Admits that the third sentence is supported by Pl.'s Ex. 13, ECF No. 73-23, in part, and the Robles Report at 26 & n.58, in part.

34.    Admits.

35.    Admits.

36.    Admits that Neocate® Junior has HCPCS number B4161, as stated in Pl.'s Ex. 16, ECF No. 73-26. Denies that Pl.'s Ex. 16 supports the statement that Neocate® Junior has HCPCS number B4153. The "Ordering/Reimbursement Information" chart depicted in Pl.'s Ex. 16, cited as support, provides only the HCPCS code "B4161" for each of three Neocate® Junior products listed.

37.    Admits.

38.    Objection. Plaintiff's citations to its own website do not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). *See, e.g.*, *King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL 5232454, at *14 (S.D.N.Y. Nov. 9, 2021) (webpages offered for the truth of the matter asserted are hearsay). Notwithstanding and without waiving this objection, admits that this statement is supported by the Essers Report at 17 and by Pl.'s Ex. 13. Defendant cannot admit or deny that the "Formula coverage" web page cited supports this statement because the cited web address defaults to a different web page, https://www.nutriciametabolics.com/formula-coverage/.

39.    As to the first sentence, admits. The second sentence consists of legal argument and/or conclusions of law to which no response is required. To the extent that a response is required to the second sentence, admits that "[t]he parties agree that MSUD Lophlex® LQ, Periflex® Infant, Periflex® Junior, and Ketocal® Liquid are used to treat persons with disabilities under the ADA." As to the third sentence, objection. Plaintiff fails to cite admissible

evidence supporting its statement as required by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, the third sentence consists of legal argument and/or conclusions of law to which no response is required.  To the extent that a response is required to the third sentence, admits that "[p]laintiff submits that Neocate Junior is also used to treat a disability."

## I.   Medical Definitions

Defendant objects to plaintiff's statements in ¶¶ 40–74 setting forth the definitions of various words and phrases as such definitions are not material facts supported by evidence as USCIT Rule 56.3(a) and (c) require.  *Nix v. Hedden*, 149 U.S. 304, 307 (1893) (dictionaries are not evidence in classification cases but rather "aids to the memory and understanding of the court"); *Porter v. Shineski*, 650 F. Supp. 2d 565, 568 (E.D. La. 2009) ("Statutes are not evidence.").  Defendant further objects to plaintiff's statements in ¶¶ 42, 45–48, 53–56, 60, 63–64, 68–69, 71, and 73 to the extent they are offered as facts on the ground that citations to websites do not constitute citation to admissible evidence as required by USCIT Rule 56.3(c).  *See, e.g.*, *King*, 2021 WL 5232454, at *14.  Notwithstanding and without waiving these objections, defendant responds as follows:

40.   Admits that this statement quotes the definition of "Amino Acid" from <u>Stedman's Medical Dictionary</u> (27th ed. 2000), Pl.'s Ex. 33, ECF No. 73-50, except that the term "amino acid" does not appear in the second sentence of the original definition.

41.   Admits that this statement quotes the definition of the term "anaphylaxis" from <u>Stedman's Medical Dictionary</u> (27th ed. 2000), Pl.'s Ex. 34, ECF No. 73-51, except that there is an "a." in the definition between the words "term" and "is" on the second line of the original definition that is missing from the quoted language in the statement.

42.     Admits that this statement quotes the definition of the term "antibody" from the Merriam-Webster Online Dictionary, except that the word "number" before "proteins" is not in the original definition.

43.     Admits that this statement accurately quotes the definition of the term "branched-chain amino acids (BCAA)" from Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013), Pl.'s Ex. 35, ECF No. 73-52.

44.     Admits that this statement accurately quotes the definition of the term "branched-chain a-keto acid dehydrogenase complex (BCKDC)" from Mark T. Johnson *et al.*, *Targeting E3 Component of α-keto Acid Dehydrogenase Complexes*, 324 Methods in Enzymology 465, 465 (2000), Pl.'s Ex. 36, ECF No. 73-53.  Denies that plaintiff's explanation of the term "acyl-CoAs" which follows in brackets is supported by the cited source.  The phrase "aceyl-coenzyme A compounds" does not appear in Pl.'s Ex. 36.

45.     Admits that this statement accurately quotes one of multiple definitions of the term "condition" from the Merriam-Webster Online Dictionary.

46.     Admits that this statement accurately quotes the definition of the term "milk allergy" found on the Mayo Clinic's website.

47.     Admits that this statement accurately quotes one of two definitions of the term "disease" from the Merriam-Webster Online Dictionary.

48.     Admits that this statement accurately quotes one of multiple definitions of the term "disorder" from the Merriam-Webster Online Dictionary.

49.     Admits that this statement quotes the definition of the term "Dravet Syndrome" from Epilepsy from A to Z, A Dictionary of Medical Terms (4th ed. 2004), Pl.'s Ex. 37, ECF

No. 73-54, except that the arrows in the original are either missing in the quoted statement or replaced by dashes.

50.  Admits that this statement quotes the definition of the term "eosinophil" from Epilepsy from A to Z, A Dictionary of Medical Terms (4th ed. 2004), Pl.'s Ex. 38, ECF No. 73-55, except that the arrows in the original are missing in the quoted statement.

51.  Admits that this statement accurately quotes in part the definition of the term "epilepsy" from Stedman's Medical Dictionary (27th ed. 2000), Pl.'s Ex. 39, ECF No. 73-56.

52.  Admits that this statement accurately quotes in part the definition of the term "food allergy" from Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013), Pl.'s Ex. 40, ECF No. 73-57.

53.  Admits that this statement accurately quotes the definition of the term "food intolerance" from the American Academy of Allergy, Asthma, & Immunology's website. Denies that the cited website defines the term "food sensitivity."

54.  Admits that this statement accurately quotes the definition of the term "Food Protein-Induced Enterocolitis Syndrome (FPIES)" from the American College of Allergy, Asthma, & Immunology's website, except that the phrase "food avoidance" does not appear in the first sentence of the definition in the original.

55.  Admits that the first sentence in this statement accurately paraphrases the definition of the term "gastrointestinal disorders" from the cited website, except that the word "compromising" does not appear in the original. Admits that the second sentence in this statement accurately paraphrases the second sentence in the second paragraph of the cited website.

56.     Admits that this statement accurately quotes the definition of the term "Glucose Transporter Type 1 Deficiency (GLUT 1)" from the National Institutes of Health Generic and Rare Diseases Information Center's website.

57.     Admits that this statement accurately quotes in part the definition of the term "IgE" from <u>Mosby's Dictionary of Medicine, Nursing & Health Professions</u> (9th ed. 2013), Pl.'s Ex. 41, ECF No. 73-58.

58.     Admits that this statement accurately quotes the definition of the term "infant formula" from Section 201(z) of the Federal Food, Drug, and Cosmetic Act, Pl.'s Ex. 42, ECF No. 73-59.

59.     Admits that this statement accurately quotes the definition of the term "malabsorption" from <u>Stedman's Medical Dictionary</u> (27th ed. 2000), Pl.'s Ex. 43, ECF No. 73-60.

60.     In addition to the objections articulated above, defendant objects to this statement providing a definition of "medicament" as it consists of legal argument and/or a conclusion of law to which no response is required.  To the extent a response is required, admits that this statement accurately quotes the definition of the term "medicament" from the <u>Merriam-Webster Online Dictionary</u>.

61.     Admits that this statement quotes the definition of the term "metabolic disorder" from <u>Mosby's Dictionary of Medicine, Nursing & Health Professions</u> (9th ed. 2013), Pl.'s Ex. 44, ECF No. 73-61, except that the bracketed language does not appear in the original.

62.     Admits that this statement accurately quotes in part the definition of the term "myoclonic-astatic epilepsy of early childhood (MAEC)" set forth in Pl.'s Ex. 45, ECF No. 73-62.  Defendant cannot admit or deny that the quoted definition is from <u>Epilepsy from A to Z, a</u>

Dictionary of Medical Terms (4th ed. 2004), because the source of the definition in Pl.'s Ex. 45 is not identified therein.

63.      As to the first sentence, denies that the cited webpage from the Centers for Disease Control and Prevention defines the term "nutrition therapy."  The cited webpage defines the term "Medical nutrition therapy" as a "nutrition-based treatment provided by a registered dietitian nutritionist."  https://www.cdc.gov/diabetes/dsmes-toolkit/reimbursement/medical-nutrition-therapy.html.  As to the second sentence, admits that this statement accurately paraphrases in part the definition of the term "nutrition therapy" from Mosby's Dictionary of Medicine, Nursing & Health (9th ed. 2013), Pl.'s Ex. 46, ECF No. 73-63.

64.      Denies that the cited webpage and 42 U.S.C. § 1395x(vv)(1) define the term "medical nutritional therapy."  The cited webpage defines the term "Nutrition therapy," not "medical nutrition therapy," as "the treatment of a medical condition, for example diabetes mellitus, through changes in diet, by adjusting quantity, quality and methods of nutrient intake." https://www.nature.com/subjects/nutrition-therapy.  42 U.S.C. § 1395x(vv)(1) defines the term "medical nutritional therapy services," not "medical nutritional therapy," as "nutritional diagnostic, therapy, and counseling services for the purpose of disease management which are furnished by a registered dietitian or nutrition professional …."

65.      Admits that this statement accurately quotes in part the definition of the term "phenylketonuria (PKU)" from Stedman's Medical Dictionary (27th ed. 2000), Pl.'s Ex. 47, ECF No. 73-64.

66.      Admits that this statement accurately quotes the definition of the term "phenylalanine (Phe, F)" from Stedman's Medical Dictionary (27th ed. 2000), Pl.'s Ex. 48, ECF No. 73-65.

67.     Admits that this statement accurately quotes in part the definition of the term "prophylactic" from Dorland's Illustrated Medical Dictionary (29th ed. 2000), Pl.'s Ex. 49, ECF No. 73-66.

68.     Admits that this statement accurately quotes the description of "Pyruvate Dehydrogenase Deficiency" from the National Institute of Health U.S. National Library of Medicine's website.

69.     Objection.  Plaintiff fails to cite admissible evidence supporting its statement as required by USCIT Rule 56.3(c) because the cited webpage does not exist.  Notwithstanding and without waiving this objection, admits that this statement is supported by the Essers Report at 31.

70.     Admits that this statement accurately quotes in part the definition of the term "Rett's syndrome" from Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013), Pl.'s Ex. 50, ECF No. 73-67.

71.     As to the first sentence, admits that this statement accurately quotes the description of "soy allergy" from the John Hopkins Medicine website.  As to the second sentence, admits that this statement accurately quotes a description of "soy allergy" from the Cleveland Clinic's website.

72.     Admits that this statement accurately quotes the definition of the term "short-bowel syndrome" from Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013), Pl.'s Ex. 51, ECF No. 73-68.

73.     Admits that this statement accurately quotes one of two definitions of the term "syndrome" from the Merriam-Webster Online Dictionary.

CONFIDENTIAL INFORMATION REDACTED

74.     Admits that this statement accurately quotes in part the definition of the term "tuberous sclerosis" from Mosby's Dictionary of Medicine, Nursing & Health Professions (9th ed. 2013), Pl.'s Ex. 52, ECF No. 73-69.

## II.     Overview of Biochemistry and Amino Acid Metabolism

75.     Admits that these statements are supported by the Essers Report at 8.

76.     Admits that these statements are supported by the Essers Report at 9.

77.     Admits that these statements are supported by the Essers Report at 9.

78.     Admits that these statements are supported by the Essers Report at 10–17.

## III.     MSUD Lophlex LQ

79.     Denies that this statement is supported by the cited portion of Pl.'s Ex. 6, ECF No. 73-11, Deposition of Steven Yannicelli at 48:11–15 ███████████████████ ██████████████████████████████████████████████████████████████████████ ███████████████████████████

80.     Admits.

81.     Admits.

82.     As to the first sentence, denies that Pl.'s Ex. 8, ECF No. 73-13, and Pl.'s Ex. 8B, ECF No. 73-15, support the statement that the amino acids in MSUD Lophlex LQ were purchased from "pharmaceutical companies."  Neither exhibit describes the companies from which the amino acids were purchased as "pharmaceutical companies."  As to the second sentence, objection.  Plaintiff fails to cite admissible evidence supporting its statement as required by USCIT Rule 56.3(c) because the post-deposition declaration from Nutricia's expert witness stating that ██████████████████████████████████████████████ ██████████████████████████████████ is not itself supported by citation to admissible

14

CONFIDENTIAL
INFORMATION REDACTED

evidence.  Notwithstanding and without waiving this objection, admits that the statement in the second sentence is supported by Pl.'s Ex. 8.

83.    Admits.

84.    As to the first sentence, denies that the Essers Report at 18 supports the statement that the "provision of the amino acids" in MSUD Lophlex LQ is the "essence of why Nutricia's formula is unique."  The Essers Report at 18 states ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████  (Emphasis added.)  As to the second sentence, denies that the Essers Report at 18 supports the statement that "[n]o other food" could provide necessary amino acids without the BCAAs "that pose a risk to the child because their body cannot break those components down." The Essers Report at 18 states that ██████████████████████████████████ ██████████████  (Emphasis added.)

85.    Admits.

86.    Admits.

87.    Denies that this statement is supported by the Essers Report at 11.  The Essers Report at 11 states that █████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

88.    Admits that this statement is supported by the Essers Report at 11.

89.    Admits.

90.    Admits.

91.    Admits.

92.    Admits.

CONFIDENTIAL INFORMATION
REDACTED

93.     Admits that the statement that "[a]mino-acid based, BCAA-free formulas such as MSUD Lophlex® LQ are … nutritional therapy for patients who have MSUD" is supported by the Essers Report at 11.  Denies that the Essers Report at 11 supports the statement that such formulas are "requisite" nutritional therapy.  The Essers Report at 11 states that ███

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████  Emphasis added.)

94.     Objection.  Plaintiff's citation to the website www.emedicine.medscape.com does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, admits.

95.     Admits.

96.     Admits.

97.     Admits.

98.     This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

99.     This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

100.     This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

101.     This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

**IV.     Periflex Junior and Periflex Infant**

102.     Admits.

103.    Admits.

104.    Admits.

105.    Admits.

106.    Admits.

107.    As to the first sentence, denies that Pl.'s Ex. 8, ECF No. 73-13; Pl.'s Ex. 8C, ECF

No. 73-16; and Pl.'s Ex. 8D, ECF No. 73-17, support the statement that the amino acids in

Periflex Infant and Periflex Junior were purchased from "pharmaceutical companies."  None of

the cited exhibits describes the companies from which the amino acids were purchased as

"pharmaceutical companies."  As to the second sentence, objection.  Plaintiff fails to cite

admissible evidence supporting its statement as required by USCIT Rule 56.3(c) because the

post-deposition declaration from Nutricia's expert witness stating that ████████████████

████████████████████████████████████████████████████████████████████ is

not itself supported by citation to admissible evidence.  Notwithstanding and without waiving

this objection, admits that the statement in the second sentence is supported by Pl.'s Ex. 8.  As to

the third sentence, admits that this statement is supported by the Essers Report at 24.  As to the

fourth sentence, admits that this statement accurately quotes the Essers Report at 19.

108.    Admits.

109.    Objection.  Plaintiff's citation to its own complaint does not constitute citation to

admissible evidence supporting its statement as required by USCIT Rule 56.3(c).

Notwithstanding and without waiving this objection, admits that this statement is supported by

the Essers Report at 24–25.

110.    Admits.

111.    Admits.

112.   Admits.

113.   Objection.  Plaintiff's citation to its own website and complaint does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, admits that this statement is supported by the Essers Report at 12, 23.

114.   Objection.  Plaintiff's citation to its own website does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, admits that this statement is supported by the Essers Report at 23–24.

115.   Objection.  Plaintiff's citation to its own complaint does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, admits that this statement is supported by the Essers Report at 23–24.

116.   Objection.  Plaintiff's citation to its own complaint does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, admits that this statement is supported by the Essers Report at 24.

117.   Objection.  Plaintiff's citation to its own website does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c).  Notwithstanding and without waiving this objection, admits that the statement that "[n]ewborn screening in the United States includes testing for PKU" so that "treatment can be instituted prior to manifestation of symptoms" is supported by the Essers Report at 24.  The statement that "medicament treatment" is used for PKU consists of legal argument and/or a conclusion of law

CONFIDENTIAL INFORMATION REDACTED

to which no response is required.  To the extent a response is required, denies any inference that the use of medical foods prepared for persons with PKU constitutes "medicament" treatment because such medical foods are nutritional preparations that do not contain any medicinal substance, rather than "medicaments," as that term is used in the Harmonized Tariff Schedule of the United States (HTSUS).  Heading 3004, HTSUS; Note 1(a) to Chapter 30, HTSUS; Explanatory Note 30.04; Pl.'s SMF ¶¶ 80, 103, 105, 129, 161; Defendant's Exhibit (Def.'s Ex.) 1, Nutricia's Responses to the Government's First Interrogatories at 23–24.

118.    Objection.  Plaintiff's citation to its own website does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). Notwithstanding and without waiving this objection, admits that this statement is supported by the Essers Report at 24.

119.    Objection.  Plaintiff's citation to its own website does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). Notwithstanding and without waiving this objection, admits that this statement is supported by the Essers Report at 24.

120.    Admits that this statement is supported by the Essers Report at 24–25.

121.    Admits.

122.    Admits.

123.    Admits that the statement that a "Phe-free diet should begin as soon as possible after birth" is supported by the Essers Report at 11, but denies that the statement that "experts recommend such people stay on the diet throughout their lives" is supported by the Essers Report at 11 ██████████████████████████████

124.    Admits that this statement is supported by the Essers Report at 23–24.

125.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

126.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

127.    Admits.

**V.    Neocate Junior**

128.    As to the first sentence, admits.  As to the second sentence, denies that the "variety of syndromes and conditions" that Neocate Junior is used to manage "range[s] from Eosinophilic Esophagitis (EoE) to short bowel syndrome (SBS) due to the surgical removal of a large portion of the small intestine."  Neocate Junior is labeled "[f]or the dietary management of cow and soy milk allergy, multiple food protein intolerance, … and conditions of gastrointestinal tract impairment and malabsorption requiring an elemental diet," Pl.'s Ex. 20D, ECF No. 73-35, and is used to manage "food allergy associated conditions" and "[gastroesophageal] reflux disease" in addition to EoE and SBS, Pl.'s Ex. 2, ECF No. 73-3 at ¶ 66.

129.    Admits.

130.    Admits.

131.    As to the first sentence, denies that Pl.'s Ex. 8, ECF No. 73-13, and Pl.'s Ex. 8E, ECF No. 73-18, support the statement that the amino acids in Neocate Junior were purchased from "pharmaceutical companies."  Neither of the cited exhibits describes the companies from which the amino acids were purchased as "pharmaceutical companies."  As to the second sentence, objection.  Plaintiff fails to cite admissible evidence supporting its statement as required by USCIT Rule 56.3(c) because the post-deposition declaration from Nutricia's expert witness stating that ███████████████████████████████

███████████████████████████████ is not itself supported by citation to admissible

evidence.  Notwithstanding and without waiving this objection, admits that the statement in the

second sentence is supported by Pl.'s Ex. 8.  As to the third sentence, admits that this statement

is supported by the Essers Report at 20.  As to the fourth sentence, denies that the statement that

the "unique composition of the amino acids provides the essence of the product, targeting the

unique biology of a specific disease state" is supported by the Essers Report at 21.  The Essers

Report at 21 states that ███████████████████████████

████████████████████████████████

(Emphasis added.)

     132.    Admits.

     133.    Denies that this statement is supported by Pl.'s Ex. 32, ECF No. 73-49,

Deposition of Rachel Ohja at 48:19–49:2████████████████████████

████████████████████████████████

████████████████████

     **A.  Eosinophilic Esophagitis (EoE)**

     134.    Admits that this statement is supported by the Essers Report at 13–14.

     135.    Admits that this statement is supported by the Essers Report at 14.

     136.    Admits that this statement is supported by the Essers Report at 14.

     137.    Admits that this statement is supported by the Essers Report at 14.

     138.    Admits that this statement is supported by the Essers Report at 14.

     139.    This statement consists of legal argument and/or conclusion of law to which no

response is required.  To the extent a response is required, admits that this statement is supported

by the Essers Report at 14, 27.

140.    Admits that this statement is supported by the Essers Report at 28.

141.    Denies that the statement that dietary therapy is "the primary method" of treatment of pediatric EoE is supported by the Essers Report at 28 ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

142.    Denies that this statement is supported by the Essers Report at 14.  The Essers Report at 14 does not state that EoE is incurable.

143.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

144.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

145.    Admits.

146.    Admits that this statement is supported by the Essers Report at 28.

147.    Denies that this statement is supported by the Essers Report at 28–29.  The Essers Report at 28–29 states that a ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

B.  **Short Bowel Syndrome**

148.    Admits that this statement is supported by the Essers Report at 25.

149.    Admits that this statement is supported by the Essers Report at 25–26.

150.    Admits that "SBS treatment may require nutrition through a central vein (parenteral nutrition) to prevent malnutrition," but denies any inference that Neocate® Junior is for parenteral or intravenous use.  Pl.'s Ex. 12, ECF No. 73-22, Deposition of Dr. Jonah Essers

(Essers Dep.) at 87:2–5 ███████████████████████████████████

███████████████████████████

151.    Admits that this statement is supported by the Essers Report at 13.

152.    Objection.  Plaintiff's citation to a website does not constitute citation to admissible evidence supporting its statement as required by USCIT Rule 56.3(c). Notwithstanding and without waiving this objection, admits that this statement is supported by the Children's Health of Orange County website.  Denies that this statement is supported by the Essers Report at 13 ███████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

153.    Admits.

154.    Admits that this statement is supported by the Essers Report at 12.

155.    Admits that this statement is supported by the Essers Report at 13.

156.    Admits that this statement is supported by the Essers Report at 13.

157.    Admits that this statement is supported by the Essers Report at 13.

158.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

159.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

**VI.    Ketocal 4:1 LQ Liquid**

160.    Admits.

161.    Admits.

162.    Admits.

163.    Denies that this statement is supported by Pl.'s Ex. 4, ECF No. 73-5, USCIT Rule 30(b)(6) Deposition of Miguel Del Toro at 59:12–18 ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

164.    Admits.

165.    As to the first sentence, admits.  As to the second sentence, admits that the Essers Report at 21 and Pl.'s Ex. 8 support this statement.  As to the third sentence, objection.  Plaintiff fails to cite admissible evidence supporting its statement as required by USCIT Rule 56.3(c).  As to the fourth sentence, admits that the Essers Report at 21 supports this statement.  As to the fifth sentence, admits.

166.    Admits that this statement is supported by the Essers Report at 16, 30.

### A.  Intractable or refractory epilepsy

167.    Admits.

168.    Denies that this statement accurately paraphrases the Essers Report at 31

████████████████████████████████████████████████████████

████████████████████████████████████████████

169.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

170.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

## B.  Glucose Transporter Type 1 deficiency (GLUT 1)

171.    As to the first sentence, admits that this statement is supported by the Essers Report at 31.  As to the second sentence, admits that the statement that GLUT 1 is "incurable" is supported by the Essers Report at 31, but denies that the Essers Report at 31 supports the statement that GLUT 1 "presents infancy."

172.    Admits.

173.    Admits that this statement is supported by the Essers Report at 32.

174.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

175.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

## C.  Pyruvate Dehydrogenase Deficiency (PDHD)

176.    Admits that this statement is supported by the Essers Report at 32.

177.    Admits.

178.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

179.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

180.    Admits.

## D.  Myoclonic Astatic Epilepsy (Doose syndrome)

181.    Admits that this statement is supported by the Essers Report at 32.

182.    Admits.

183.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

184.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

### E.  Tuberous Sclerosis Complex

185.    Admits that this statement is supported by the Essers Report at 33.

186.    Admits.

187.    Admits that this statement is supported by the Essers Report at 33.

188.    Admits that this statement is supported by the Essers Report at 33.

189.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

190.    This statement consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.

### F.  Rett Syndrome

191.    Admits that this statement is supported by the Essers Report at 33.

192.    The first sentence consists of legal argument and/or conclusion of law to which no response is required.  To the extent a response is required, admits.  As to the second sentence, admits that this statement is supported by the Essers Report at 33.

193.    Admits.

### G.  Dravet Syndrome

194.    Admits that this statement is supported by the Essers Report at 34.

195.    Admits that this statement is supported by the Essers Report at 34.

196.    Denies that this statement is supported by the Essers Report at 34. The Essers

Report at 34 does not state that "[m]ortality is elevated in persons with Dravet Syndrome above

that found in the general population of epilepsy patients."

197.    Admits that this statement is supported by the Essers Report at 34.

198.    Admits.

199.    Admits.

<div style="margin-left:40%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

</div>

By:     /s/ Aimee Lee
        AIMEE LEE
        Assistant Director

Of Counsel:

                        /s/ Luke Mathers

Yelena Slepak                       LUKE MATHERS
Office of the Assistant Chief Counsel   Trial Attorney
International Trade Litigation       International Trade Field Office
U.S. Customs and Border Protection  Department of Justice, Civil Division
                        Commercial Litigation Branch
                        26 Federal Plaza, Room 346
                        New York, New York 10278
                        (212) 264-9230 or 9236
                        *Attorneys for Defendant*

Dated:  October 28, 2022

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                                              :
NUTRICIA NORTH AMERICA, INC.,        :
                                                              :
                                 Plaintiff,          :          **PUBLIC VERSION**
                                                              :
                      v.                                  :          Court No. 16-00008
                                                              :
UNITED STATES,                                   :
                                                              :
                                 Defendant.        :
_____ :

### DEFENDANT'S RULE 56.3 STATEMENT OF UNDISPUTED MATERIAL FACTS

Rule 56.3 of the Rules of the United States Court of International Trade requires that

motions for summary judgment include a separate statement of material facts as to which it is

contended there exists no genuine issue to be tried.

Defendant, United States, identifies the following statements of material fact in support

of its cross-motion for summary judgment as to which there are no genuine issues to be tried:

### Background

1.        This action covers Entry Nos. 101-4134831-8 and 101-4134968-8 made at the

Port of Philadelphia, Pennsylvania, on November 26, 2014, and liquidated on October 9, 2015;

and Entry Nos. 101-4122568-0 and 101-4122571-4 made at the Port of Washington–Dulles,

D.C., on November 13, 2014, and liquidated on September 25, 2015.  ECF No. 7, Entry Papers;

Plaintiff's Rule 56.3 Statement of Material Facts Not in Dispute (Pl.'s SMF) at ¶ 1.

2.        Upon liquidation, U.S. Customs and Border Protection (Customs) classified the

five imported products at issue in this case—MSUD Lophlex LQ, Periflex Infant, Periflex

Junior, Neocate Junior, and Ketocal Liquid—under subheading 2106.90.99 of the Harmonized

Tariff Schedule of the United States (HTSUS).  ECF No. 7, Entry Papers; Pl.'s SMF ¶ 9.

CONFIDENTIAL INFORMATION REDACTED

3.      The four entries at issue were covered by two protests: Protest No. 1101-15-100252, covering the Philadelphia entries, which was filed on November 27, 2015; and Protest No. 1001-15-100172, covering the Washington, D.C. entries, which was filed on December 1, 2015.  ECF No. 7, Entry Papers; Pl.'s SMF ¶¶ 7–8.

4.      Protest No. 1101-15-100252 was deemed denied on December 28, 2015, while Protest No. 1001-15-100172 was deemed denied on January 1, 2016.  ECF No. 7, Entry Papers; Pl.'s SMF ¶¶ 7–8.

## The Subject Merchandise

5.      Nutricia's five imported products at issue are medical foods.  Pl.'s SMF ¶ 10.

6.      Unlike FDA-regulated drugs, FDA-regulated medical foods generally do not require ████████████████████████████████████████████████████ ███████████████████████████████████ Plaintiff's Exhibit (Pl.'s Ex.) 4, ECF No. 73-5, USCIT Rule 30(b)(6) Deposition of Miguel Del Toro (Del Toro Dep.) at 16:5–18:9; *see id.* at 15:7–24 ████████████████████████████████████████ ████████████████

7.      None of the imported products contains any active pharmaceutical ingredients or excipients.  Defendant's Exhibit (Def.'s Ex.) 1, Nutricia's Responses to the Government's First Interrogatories at 23–24.

8.      None of the imported products is administered intravenously.  Pl.'s Ex. 12, ECF No. 73-22, Deposition of Dr. Jonah Essers (Essers Dep.) at 87:2–5.

9.      The FDA regulates intravenous nutritional preparations as drugs.  Essers Dep. at 87:18–24.

CONFIDENTIAL INFORMATION
REDACTED

10.     Each of the imported products contains only proteins (or protein substitutes in the

form of amino acids), fats, carbohydrates, vitamins, minerals, trace elements, and, in the case of

MSUD Lophlex and Ketocal, water.  Pl.'s Ex. 7, ECF No. 73-12 (MSUD Lophlex); Pl.'s Ex. 11,

ECF No. 73-21 (Periflex Infant); Pl.'s Ex. 14, ECF No. 73-24 (Periflex Junior); Pl.'s Ex. 16,

ECF No. 73-26 (Neocate); Pl.'s Ex. 18, ECF No. 73-28 (Ketocal); *see* Pl.'s SMF ¶¶ 80, 103, 105,

129, 161.

11.     Proteins are broken down by the human body into amino acids, the basic building

blocks of proteins, which are in turn absorbed as nutrition at the epithelium of the small intestine

into the bloodstream and trafficked throughout the body for constructing new proteins,

converting into other amino acids, or metabolizing into energy.  Pl.'s Ex. 1, ECF No. 73-1,

Expert Report of Dr. Jonah Essers (Essers Report) at 9–10.

12.     One of the amino acids in MSUD Lophlex, Periflex Infant, Periflex Junior, and

Neocate—L-Carnitine—is described in Nutricia's raw material specifications as a ███████████

███████     Pl.'s Ex. 8B, ECF No. 73-15 at 2 (MSUD Lophlex); Pl.'s Ex. 8C, ECF No. 73-16 at 2

(Periflex Infant); Pl.'s Ex. 8D, ECF No. 73-17 at 2 (Periflex Junior); Pl.'s Ex 8E, ECF No. 73-18

at 2 (Neocate).

13.     In MSUD Lophlex, Periflex Infant, Periflex Junior, and Neocate, the ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████  Essers Report at 19–21.

14.     Nutricia's raw material specifications for the amino acids included in MSUD

Lophlex, Periflex Infant, Periflex Junior, and Neocate describe the products into which the amino

acids are incorporated as ████████████████████████     Pl.'s Ex. 8B, ECF No. 73-

3

CONFIDENTIAL INFORMATION REDACTED

15 at 32 (MSUD Lophlex); Pl.'s Ex. 8C, ECF No. 73-16 at 43 (Periflex Infant); Pl.'s Ex. 8D,

ECF No. 73-17 at 45 (Periflex Junior); Pl.'s Ex 8E, ECF No. 73-18 at 39 (Neocate).

15.     Each of the imported products is nutritionally complete or near nutritionally

complete.  Essers Report at 21 █████████████████████████████████ *id.* at 25

█████████████████████████████); Essers Dep. at 95:9–96:8 (█████████████

██████████████████████████████).

16.     None of the imported products is a dietary supplement.  Del Toro Dep. at 73:17–

20.

17.     Food supplements are not nutritionally complete or near nutritionally complete.

Essers Dep. at 166:12–18.

18.     The imported products largely replace normal foods in children's diets.  Essers

Dep. at 167:10–14.

19.     Any child who ingests any of the imported products will receive nutrition from

ingesting it.  Essers Dep. at 113:21–114:10.

*Periflex Infant and Periflex Junior*

20.     Periflex Infant and Periflex Junior provide those with phenylketonuria (PKU), a

disease which impairs one's ability to process the amino acid phenylalanine, █████████

████████████████████████████████████████████ Essers

Report at 11–12, 24.

21.     When used █████████████████████ for those with PKU, Periflex

Infant and Periflex Junior can ███████████████████ Essers Report at 12; Essers Dep. at

95:9–96:8; Pl.'s SMF ¶ 116.

CONFIDENTIAL INFORMATION REDACTED

*MSUD Lophlex*

22.     MSUD Lophlex allows those with maple syrup urine disease (MSUD), a disease which impairs one's ability to process the branch-chain amino acids isoleucine, leucine, and valine. ███████████████████████████████████████████████████████

███████████████ Essers Report at 10–11, 23; Pl.'s SMF ¶ 83 ████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████

23.     When eaten instead of regular food by those with MSUD, MSUD Lophlex can ███████████████████████ Essers Report at 11; Essers Dep. at 95:9–96:8.

*Ketocal*

24.     Ketocal is a high fat, low carbohydrate ketogenic formula that helps the body achieve and maintain ketosis, a metabolic process in which the body burns fats instead of carbohydrates for energy.  Pl.'s SMF ¶¶ 164–66.

25.     Ketocal provides a ████████████████████ Essers Dep. at 133:16–22.

26.     The ketogenic diet is used "when anti-epileptic medications have been found insufficient for seizure control."  Pl.'s SMF ¶ 160.

27.     Ketocal is prepared for children with certain seizure disorders, such as epilepsy, that can be treated through a ketogenic diet.  Pl.'s SMF ¶¶ 160, 165.

*Neocate*

28.     Neocate is prepared for children with food allergies and other gastrointestinal conditions which impair a person's ability to tolerate whole proteins, including cow's milk allergy, multiple food protein intolerance, gastroesophageal reflux disease, eosinophilic

esophagitis, short bowel syndrome, and malabsorption, among others.  Essers Report at 25–30;

Pl.'s Ex. 16, ECF No. 73-26.

29.     Neocate is a █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████  Essers Report at 13, 20, 26.

30.     ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████  Essers Report at 28.

31.     Nutricia sells Neocate on Amazon.com.  Def.'s Ex. 2, Nutricia's Response to the

Government's Second Requests for Admission at 10–11.

**Nutritional Therapy**

32.      All of the imported products are used in nutritional therapy ███████████████

███  Essers Dep. at 155:14–22.

33.     All of the imported products can ███████████████████████████████

████████████████████████████  Essers Report at 4.

34.     The imported products are sometimes used instead of medicines and drugs

(including anti-convulsants, steroids, and proton pump inhibitors).  Essers Report at 10, 14–16,

24, 28; Pl.'s Ex. 30, ECF No. 73-47, Expert Report of Dr. Jesse F. Gregory at 9.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By:    /s/ Aimee Lee
        AIMEE LEE
        Assistant Director

Of Counsel:

                                      /s/ Luke Mathers
Yelena Slepak                       LUKE MATHERS
Office of the Assistant Chief Counsel     Trial Attorney
International Trade Litigation          International Trade Field Office
U.S. Customs and Border Protection     Department of Justice, Civil Division
                                        Commercial Litigation Branch
                                        26 Federal Plaza, Room 346
                                        New York, New York 10278
                                        (212) 264-9230 or 9236
                                        *Attorneys for Defendant*

Dated:  October 28, 2022

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                                      :
NUTRICIA NORTH AMERICA, INC.,          :
                                                      :
                                    Plaintiff,    :        **PUBLIC VERSION**
                                                      :
                        v.                             :        Court No. 16-00008
                                                      :
UNITED STATES,                                  :
                                                      :
                                    Defendant.  :
_____:

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        PATRICIA M. McCARTHY
                                        Director

                                        JUSTIN R. MILLER
                                        Attorney-In-Charge
                                        International Trade Field Office

                                        AIMEE LEE
Of Counsel:                             Assistant Director

Yelena Slepak                           LUKE MATHERS
Office of the Assistant Chief Counsel   Trial Attorney
International Trade Litigation          International Trade Field Office
U.S. Customs and Border Protection      Department of Justice, Civil Division
                                        Commercial Litigation Branch
                                        26 Federal Plaza, Room 346
                                        New York, New York 10278
                                        (212) 264-9230 or 9236
                                        *Attorneys for Defendant*

Dated:  October 28, 2022

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................ii

BACKGROUND...............................................................................................2

QUESTIONS PRESENTED ...............................................................................6

SUMMARY OF ARGUMENT .............................................................................6

ARGUMENT ...................................................................................................7

    I.    Standard of Review .................................................................................7

    II.    Nutricia's Medical Foods Are Correctly Classified As "Food Preparations" Of Heading 2106...........................................................................................................9

    III.    Nutricia's Medical Foods Do Not Fall Within Heading 3004 Because They Are Not Medicaments ................................................................................................13

        A.    "Medicaments" are medicinal substances .............................................13

        B.    Note 1(a) to Chapter 30 excludes foods from heading 3004 ...................16

        C.    The Explanatory Notes confirm that heading 3004 does not cover foods ...............19

        D.    Nutricia's interpretation contradicts the plain text of heading 3004, Note 1(a) to Chapter 30 and the Explanatory Notes ..........................................................21

            i.    Nutricia ignores the terms of heading 3004...........................................21

            ii.    Nutricia's medical foods are not food supplements.............................25

            iii.    Nutricia's Note 1(a) arguments are unpersuasive.................................27

    IV.    Nutricia's Medical Foods Are Not Alternatively Classifiable As "Articles Specially Designed … For The Use Or Benefit Of … Physically Or Mentally Handicapped Persons" Of Subheading 9817.00.96...............................................................................30

        A.    Nutricia's medical foods are "therapeutic" articles excluded from classification under subheading 9817.00.96.............................................................................31

        B.    Nutricia failed to show that Neocate is "specially designed" for "handicapped persons".......................................................................................................34

CONCLUSION ...............................................................................................36

# TABLE OF AUTHORITIES

## Cases

*A.H. Robins Co. v. Erbamont, Inc.*,
  No. C2-89-864, 1991 WL 229150 (S.D. Ohio Apr. 18, 1991) ............................................. 15

*ABB, Inc. v. United States*,
  346 F. Supp. 2d 1357 (Ct. Int'l Trade 2004) ........................................................................ 9

*Airflow Tech., Inc. v. United States*,
  524 F.3d 1287 (Fed. Cir. 2008) ..................................................................................... 22, 23

*Am. Cyanamid Co. v. Nutraceutical Corp.*,
  54 F. Supp. 2d 379 (D.N.J. 1999) ...................................................................................... 26

*Applied Biosystems v. United States*,
  715 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ...................................................................... 17

*Bauer Nike Hockey USA, Inc. v. United States*,
  393 F.3d 1246 (Fed. Cir. 2004) .......................................................................................... 29

*Bober v. Glaxo Wellcome PLC*,
  246 F.3d 934 (7th Cir. 2001) ......................................................................................... 14, 22

*Border Brokerage Co. v. United States*,
  50 Cust. Ct. 115 (1963) ...................................................................................................... 23

*Bostock v. Clayton Cty.*,
  140 S. Ct. 1731 (2020) ........................................................................................................ 31

*Bragdon v. Abbott*,
  524 U.S. 624 (1998) ............................................................................................................ 17

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
  246 F.3d 1368 (Fed. Cir. 2001) .......................................................................................... 15

Chevron U.S.A. Inc. v. Mobil Producing Texas & New Mexico,
  281 F.3d 1249 (Fed. Cir. 2002) ............................................................................................ 8

*Drygel, Inc. v. United States*,
  541 F.3d 1129 (Fed. Cir. 2008) ............................................................................................ 9

*H. Reisman Corp. v. United States*,
  17 C.I.T. 1260 (1993) ......................................................................................................... 25

*Home Depot U.S.A., Inc. v. United States*,
  915 F.3d 1374 (Fed. Cir. 2019) .......................................................................................... 21

*In re Anderson*,
   471 F.2d 1237 (C.C.P.A. 1973) ....................................................................... 16

*In re Halley*,
   296 F.2d 774 (C.C.P.A. 1961) ........................................................................ 15

*In re Sulzberger*,
   56 F.2d 872 (C.C.P.A. 1932) ......................................................................... 16

*Jarvis Clark Co. v. United States*,
   733 F.2d 873 (Fed. Cir. 1984) ......................................................................... 9

*Jarvis Clark Co. v. United States*,
   739 F.2d 628 (Fed. Cir. 1984) ......................................................................... 9

*Kelly v. Kingston City Sch. Dist., Inc.*,
   No. 1:16-CV-00764 (MAD/DJS), 2017 WL 976943 (N.D.N.Y. Mar. 13, 2017) .................. 35

*LeMans Corp. v. United States*,
   660 F.3d 1311 (Fed. Cir. 2011) ...................................................................... 29

*Maxcell Bioscience, Inc. v. United States*,
   533 F. Supp. 2d 1261 (Ct. Int'l Trade 2007) ...................................................... 12

*Mondelez Glob. LLC v. United States*,
   253 F. Supp. 3d 1329 (Ct. Int'l Trade 2017) ...................................................... 17

*National Ass'n of Mfrs. v. Department of Def.*,
   138 S. Ct. 617 (2018) ............................................................................ 23, 33

*Orlando Food Corp. v. United States*,
   140 F.3d 1437 (Fed. Cir. 1998) ...................................................................... 10

*Richards Med. Co. v. United States*,
   720 F. Supp. 998 (Ct. Int'l Trade 1989) ................................................... 31, 32, 33

*Roche Vitamins, Inc. v. United States*,
   772 F.3d 728 (Fed. Cir. 2014) ....................................................................... 16

*Rocknel Fastener, Inc. v. United States*,
   267 F.3d 1354 (Fed. Cir. 2001) ....................................................................... 8

*StoreWALL, LLC v. United States*,
   644 F.3d 1358 (Fed. Cir. 2011) .............................................................. 9, 13, 20

*Sturges v. Collector*,
   79 U.S. 19 (1870) ................................................................................... 17

*Supernus Pharms., Inc. v. TWi Pharms., Inc.*,
   265 F. Supp. 3d 490 (D.N.J. 2017) ................................................... 15

*Travenol Labs., Inc. v. United States*,
   813 F. Supp. 840 (Ct. Int'l Trade 1993) ....................................... 30, 31

*United States v. Johnson*,
   529 U.S. 53 (2000) ............................................................................ 17

*Warner-Lambert Co. v. United States*,
   341 F. Supp. 2d 1272 (Ct. Int'l Trade 2004) .................................. 27

*Warner-Lambert Co. v. United States*,
   425 F.3d 1381 (Fed. Cir. 2005) .................................................. 23, 24

**Statutes**

21 U.S.C. § 321(ff) ............................................................................ 26, 27

21 U.S.C. § 321(g)(1)(C) .......................................................................... 11

21 U.S.C. § 360ee(b)(3) ................................................................ 2, 11, 18, 26

28 U.S.C. § 2639(a)(1) .............................................................................. 9

**Regulations**

21 C.F.R. § 101.9(j)(8) ............................................................. 10, 11, 27, 28

**Rules**

USCIT Rule 56(a) ................................................................................... 8

**Harmonized Tariff Schedule of the United States**

GRI 3(a) ............................................................................................... 29

GRI 6 ..................................................................................................... 12

Chapter 12

   Heading 1211 .................................................................................. 24

Chapter 21

    Note 1(f) to Chapter 21 ............................................................... 17

    Heading 2106 ............................................................................... 29

        Subheading 2106.90.99 ........................................................ 6

Chapter 30

    Note 1(a) to Chapter 30 ..................................................... *passim*

    Heading 3003 ............................................................................... 20

    Heading 3004 ..................................................................... *passim*

        Subheading 3004.50.50 ........................................................ 6

Chapter 98

    U.S. Note 4(a) to Subchapter XVII, Chapter 98 ......................... 35

    U.S. Note 4(b) to Subchapter XVII, Chapter 98 .............. 6, 7, 30, 33

    Subheading 9817.00.96 ................................................ 6, 7, 30, 34

**Other Authorities**

*Diet*, American Heritage Dictionary,
    https://ahdictionary.com/word/search.html?q=diet ............................ 18

*Diet*, Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/diet ............................ 18

*Dietary supplement*, Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/dietary%20supplement ................................ 26

*Dietetic*, American Heritage Dictionary,
    https://ahdictionary.com/word/search.html?q=dietetic ...................... 18

*Dietetic*, Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/dietetic ...................... 18

*Drug*, Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/drug .......................... 14

Explanatory Note 21.06 (2012) ............................................................ 26

Explanatory Note 30.03 (2012) ................................................................20, 21, 27

Explanatory Note 30.04 (2012) ...................................................................... *passim*

*Food,* American Heritage Dictionary,
    https://ahdictionary.com/word/search.html?q=food ........................................... 10

*Food,* Dorland's Illustrated Medical Dictionary 516 (26th ed. 1985) ................................. 10, 16

*Food,* Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/food ...................................... 10, 16

Kathryn M. Camp *et al.*, *Nutritional Treatment for Inborn Errors of Metabolism: Indications,*
    *Regulations, and Availability of Medical Foods and Dietary Supplements Using*
    *Phenylketonuria as an Example,* 107 Molecular Genetics & Metabolism 3 (2012) .............. 28

Loyd V. Allen, Jr. & Howard C. Ansel, *Ansel's Pharmaceutical Dosage Forms and Drug*
    *Delivery Systems* (10th ed. 2014) ........................................................ 15

*Medicament,* American Dental Association Glossary of Dental Clinical Terms,
    https://www.ada.org/publications/cdt/glossary-of-dental-clinical-terms .............................. 15

*Medicament,* American Heritage Dictionary,
    https://ahdictionary.com/word/search.html?q=medicament ................................................. 14

*Medicament,* Collins English Dictionary,
    https://www.collinsdictionary.com/us/dictionary/english/medicament .................................. 14

*Medicament,* Dorland's Illustrated Medical Dictionary 785 (26th ed. 1985) ........................... 14

*Medicament,* Stedman's Medical Dictionary 534050 (Nov. 2014) (Westlaw) .......................... 14

*Medication,* Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/medication .................................................. 14

*Medication,* Stedman's Medical Dictionary 534090 (Nov. 2014) (Westlaw) ........................... 14

*Nutricia N. Am. v. President of the Can. Border Servs. Agency,*
    2011 CarswellNat 7137 (C.I.T.T.) (WL) ........................................................ 21, 32

Peggy S. Stanfield & Y.H. Hui,
    *Nutrition and Diet Therapy: Self-Instructional Approaches* (5th ed. 2010) ............... 12, 18, 19

*Phenyl-Free® 1,* Mead Johnson Nutrition,
    https://www.hcp.meadjohnson.com/s/product/a4R4J000000PpR0UAK/phenylfree-1 .......... 12

*Prophylaxis,* Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/prophylaxis ................................................. 23

*Substance*, <u>Merriam-Webster Online Dictionary</u>,
    https://www.merriam-webster.com/dictionary/substance ...................................................... 22

*Therapy*, <u>*Merriam-Webster Online Dictionary*</u>,
    https://www.merriam-webster.com/dictionary/therapy ....................................................... 23

U.S. Food & Drug Admin.,
    *Guidance for Industry: Frequently Asked Questions About Medical Foods* (2d ed. 2016),
    https://www.fda.gov/media/97726/download ..................................................................... 11

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE
_____

|  |  |  |
|---|---|---|
| | : | |
| NUTRICIA NORTH AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 16-00008 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____:

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of International Trade (USCIT), defendant, United States (the Government), hereby submits this memorandum in support of its cross-motion for summary judgment and response in opposition to plaintiff Nutricia North America, Inc.'s (Nutricia's) motion for summary judgment.

This tariff classification case raises the question whether Nutricia's "medical food" products that contain only nutritional substances and replace normal food in the diet of children with various diseases are properly classified as "food preparations" of heading 2106, Harmonized Tariff Schedule of the United States (HTSUS),[1] or as "medicaments" of heading 3004, HTSUS.

The answer to this question is more straightforward than Nutricia's fifty-two exhibits and nearly two-hundred statements of fact let on.  The plain text of heading 3004 and Note 1(a) to Chapter 30, as the Explanatory Notes confirm, excludes food.  The subject medical foods, while

_____

[1] The versions of the HTSUS and Explanatory Notes cited are those in effect at the time of the four entries at issue in this case.

therapeutic, are still foods. That means all of Nutricia's medical foods are properly classified under heading 2106. Furthermore, because these foods are therapeutic, they are excluded from an alternative classification under subheading 9817.00.96, HTSUS, by U.S. Note 4(b) to Subchapter XVII, Chapter 98.

Accordingly, we respectfully request that judgment be entered in our favor and that this action be dismissed.

## **BACKGROUND**

This case concerns four entries of food formulas made at the ports of Philadelphia, Pennsylvania and Washington-Dulles, D.C., between November 13 and 26, 2014. Plaintiff's Rule 56.3 Statement of Material Facts Not in Dispute (Pl.'s SMF) ¶ 1. These formulas are regulated by the U.S. Food and Drug Administration (FDA) as "medical foods." *Id.* ¶ 10. A medical food is a "food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation." 21 U.S.C. § 360ee(b)(3).

Five of Nutricia's medical foods—Periflex Junior, Periflex Infant, MSUD Lophlex, Ketocal, and Neocate—are at issue. Pl.'s SMF ¶ 9. (For simplicity, we refer to Periflex Junior and Periflex Infant together as "Periflex.") These medical foods have much in common.

As for their composition, each medical food at issue contains only nutritional substances: fats, carbohydrates, proteins (in the form of whole proteins or amino acids), vitamins, and minerals, in varying quantities. Plaintiff's Exhibit (Pl.'s Ex.) 7, ECF No. 73-12 (MSUD Lophlex); Pl.'s Ex. 11, ECF No. 73-21 (Periflex Infant); Pl.'s Ex. 14, ECF No. 73-24 (Periflex Junior); Pl.'s Ex. 16, ECF No. 73-26 (Neocate); Pl.'s Ex. 18, ECF No. 73-28 (Ketocal); *see* Pl.'s

CONFIDENTIAL INFORMATION REDACTED

SMF ¶¶ 80, 103, 105, 129, 161.  Amino acids are essentially broken-down proteins which are absorbed as nutrition into the bloodstream and trafficked throughout the body to construct new proteins, convert into other amino acids, or metabolize into energy.  Pl.'s Ex. 1, ECF No. 73-1, Expert Report of Dr. Jonah Essers (Essers Report) at 9–10.  Accordingly, Nutricia's raw material specifications describe one of the amino acids in its products as a ███████████████   Pl.'s Ex. 8B, ECF No. 73-15 at 2 (MSUD Lophlex); Pl.'s Ex. 8C, ECF No. 73-16 at 2 (Periflex Infant); Pl.'s Ex. 8D, ECF No. 73-17 at 2 (Periflex Junior); Pl.'s Ex 8E, ECF No. 73-18 at 2 (Neocate).

None of the medical foods contains an active pharmaceutical ingredient.  Defendant's Exhibit (Def.'s Ex.) 1, Nutricia's Responses to the Government's First Interrogatories at 23–24.  Nor is any medical food administered intravenously.  Pl.'s Ex. 12, ECF No. 73-22, Deposition of Dr. Jonah Essers (Essers Dep.) at 87:2–5.  Each medical food largely replaces regular food in children's diets.  Essers Report at 12; Essers Dep. at 167:10–14.  A healthy child who eats one of the medical foods would obtain nutrition from it.  Essers Dep. at 113:21–114:10.  Furthermore, none of Nutricia's medical foods is a dietary supplement.  Pl.'s Ex. 4, ECF No. 73-5, USCIT Rule 30(b)(6) Deposition of Miguel Del Toro (Del Toro Dep.) at 73:17–20.  The medical foods are all nutritionally complete or near nutritionally complete, Essers Report at 21, 25; Essers Dep. at 95:9–96:8, whereas food supplements are not, Essers Dep. at 166:12–18.

But although the subject medical foods contain only nutritional substances, they all are used in nutritional therapy ███████████   Essers Dep. at 155:14–22.  Each medical food can act to ███████████████████████████████████████ ███████   Essers Report at 4.  A brief description of Nutricia's medical foods follows.

3

CONFIDENTIAL INFORMATION REDACTED

Periflex is a ███████████ that ██████████████ to children.  Pl.'s Ex. 8C, ECF
No. 73-16 at 43; Pl.'s Ex. 8D, ECF No. 73-17 at 45.  It is prepared for children with
phenylketonuria (PKU), a genetic metabolic disorder that impairs a person's ability to process an
amino acid called phenylalanine.  Periflex is a phenylalanine-free formula fed to children with
PKU █ ████████████████████████  Essers Report at 11–12.  A
█████████████  Periflex thus provides children ████████████████
█████████  Id. at 24.  Periflex is near nutritionally complete and, when used██
███████████████████████  Id. at 12; Essers Dep. at 95:9–
96:8; Pl.'s SMF ¶ 116 ("There is no cure for PKU, but it can be treated effectively with proper
diet and special nutritional products designed for persons with PKU.").

MSUD Lophlex is also a ██████████ that ██████████████ to children.  Pl.'s
Ex. 8B, ECF No. 73-15 at 32.  It is prepared for children with Maple Syrup Urine Disease
(MSUD), a genetic disorder which impairs a person's ability to process the amino acids leucine,
isoleucine, and valine.  MSUD Lophlex is a leucine-, isoleucine-, and valine-free amino-acid
formula that is fed to children with MSUD █ ████████████████████
█████████  Essers Report at 10–11; Pl.'s SMF ¶¶ 83, 91.  Children with MSUD need a product
like MSUD Lophlex ██████████████████████████  Essers Report
at 23.  MSUD Lophlex, like Periflex, is near nutritionally complete and, when eaten instead of
regular food, can ███████████████████  Essers Report at 11; Essers Dep. at 95:9–96:8.

Neocate is likewise a █████████████ that ██████████████ to children.  Pl.'s Ex.
8E, ECF No. 73-18 at 39.  Unlike the other products at issue, however, Neocate is primarily
given to children with food allergies and other gastrointestinal conditions that impair one's
ability to tolerate whole proteins.  Essers Report at 25–30.  These conditions include cow's milk

CONFIDENTIAL INFORMATION
REDACTED

allergy, multiple food protein intolerance, gastroesophageal reflux disease, eosinophilic

esophagitis, short bowel syndrome, and malabsorption, among others.  *Id.*; Pl.'s Ex. 20D, ECF

No. 73-35.  Neocate is a ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ Essers Report at 13, 20, 26.  A nutritionally complete

formula, █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ *Id.*

at 13–14, 28.  Also unlike the other medical foods at issue, Nutricia sells Neocate on

Amazon.com.  Def.'s Ex. 2, Nutricia's Response to the Government's Second Requests for

Admission at 10–11.

   Ketocal is prepared for children with certain seizure disorders such as epilepsy that can

be treated through a ketogenic diet.  Pl.'s SMF ¶ 160.  Ketocal is effectively a ████████████

████ Essers Dep. at 133:16–22.  "The ketogenic diet is a high fat, low carbohydrate,

controlled protein diet used for the treatment of epilepsy … when anti-epileptic medications have

been found insufficient for seizure control."  Pl.'s SMF ¶ 160.  Ketocal is thus a high fat, low

carbohydrate formula that helps the body achieve and maintain ketosis, a metabolic process in

which the body burns fats instead of carbohydrates for energy.  *Id.* ¶¶ 164–66.  "The dearth of

carbohydrate is what induces the ketogenic state that has high efficacy in treating intractable

seizures."  *Id.* ¶ 165 (citing Essers Report at 21).  Ketocal, like Neocate, is nutritionally

complete.  *Id.*

   At liquidation, Customs classified the subject medical foods under subheading

2106.90.99, HTSUS, as "Food preparations not elsewhere specified or included: Other: Other."

Nutricia protested, arguing that they should instead be classified under subheading 3004.50.50,

HTSUS, as "Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses, put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale: Other, containing vitamins or other products of heading 2936: Other."  Alternatively, Nutricia argued that the medical foods were secondarily classifiable under subheading 9817.00.96, HTSUS, as "Articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons; parts and accessories (except parts and accessories of braces and artificial limb prosthetics) that are specially designed or adapted for use in the foregoing articles: Other."  *See generally* ECF No. 7, Entry Papers.  Customs denied Nutricia's protest, and this litigation followed.

## QUESTIONS PRESENTED

Whether the imported medical foods at issue are properly classified as "food preparations" of subheading 2106.90.99, HTSUS, or as "medicaments" of subheading 3004.50.50, HTSUS; and whether these medical foods are alternatively classifiable under subheading 9817.00.96, HTSUS, as "[a]rticles specially designed or adapted for the use or benefit of … physically or mentally handicapped persons," or are excluded from classification thereunder by U.S. Note 4(b) to Subchapter XVII, Chapter 98, as "therapeutic" articles.

## SUMMARY OF ARGUMENT

Nutricia's imported products are medical foods, containing only nutritional substances, that have been prepared to meet the unique dietary needs of children with various diseases. These medical foods are not mere food supplements.  They replace normal food in children's diets.  Nutricia does not dispute these facts.  The products thus squarely fall within heading 2106.

Nutricia instead emphasizes that its products are therapeutic and travel through similar medical channels of trade as medicines do to support its claimed classifications. However, the medical foods are still not "medicaments" of heading 3004, as Nutricia suggests. The text of heading 3004 and Note 1(a) to Chapter 30 make clear that medicaments are medicinal substances—not nutritional ones—so foods are excluded from heading 3004. Moreover, the Explanatory Note to heading 3004 provides that the heading does not cover "food preparations containing only nutritional substances." As Nutricia's medical foods contain only nutritional substances, they are excluded from classification under heading 3004 and are correctly classified under heading 2106 as "food preparations."

Nor are Nutricia's medical foods alternatively classifiable under subheading 9817.00.96 as "[a]rticles specially designed … for the use or benefit of … physically or mentally handicapped persons." This subheading is qualified by U.S. Note 4(b) to Subchapter XVII, Chapter 98, which excludes "therapeutic" articles from classification thereunder. There again is no dispute that Nutricia's medical foods heal, making them "therapeutic" within the meaning of U.S. Note 4(b) and relevant caselaw. That means that all the medical foods are excluded from alternative classification under subheading 9817.00.96, even if they are specially designed for handicapped persons.

Accordingly, our cross-motion for summary judgment should be granted, Nutricia's motion for summary judgment should be denied, and this action should be dismissed.

## **ARGUMENT**

## I.   **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

USCIT R. 56(a).  "In evaluating a motion for summary judgment, the evidence of the non-movant is to be believed and all justifiable inferences are drawn in favor of the non-movant. This standard is not changed when the parties bring cross-motions for summary judgment, each nonmovant receiving the benefit of favorable inferences." *Chevron U.S.A. Inc. v. Mobil Producing Texas & New Mexico*, 281 F.3d 1249, 1252–53 (Fed. Cir. 2002) (citation omitted).

Where the material facts are undisputed, "[d]etermining whether imported merchandise has been properly classified under an appropriate tariff provision is ultimately a question of law" that "entails a two step process: (1) ascertaining the proper meaning of specific terms in the tariff provision; and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed." *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999).  This two-step process "is governed by the principles set forth in the General Rules of Interpretation ('GRIs')" of the HTSUS, which are applied in numerical order.  *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1366 (Fed. Cir. 2013).

At the first step, GRI 1 calls for classification "according to the terms of the headings and any relative section or chapter notes …."  Where a tariff term is not defined in the HTSUS, "the term's correct meaning is its common meaning," which is "presumed to be the same as its commercial meaning."  *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir. 2001) (quoting *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994)).  "In order to determine the common commercial meaning of a tariff term, courts may consult dictionaries, encyclopedias, scientific authorities, and other reliable information sources." *StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011).  That includes the non-binding Explanatory Notes, which "are 'generally indicative' of the proper interpretation of a tariff provision." *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008).  Courts

credit "the unambiguous text of relevant explanatory notes absent persuasive reasons to disregard it." *Id.*

At the second step, Customs' classification decisions are statutorily entitled to a presumption of correctness.  28 U.S.C. § 2639(a)(1).  Thus, where a plaintiff challenges Customs' decision to classify its merchandise under a certain tariff provision, "a court presumes that Customs applied the provision correctly, which means that the plaintiff is left with the burden of showing by a preponderance of the evidence that Customs' decision was incorrect." *ABB, Inc. v. United States*, 346 F. Supp. 2d 1357, 1364 (Ct. Int'l Trade 2004).  Additionally, the court "must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).  Although the court must satisfy itself that Customs' classification is correct, the plaintiff still must provide sufficient evidence to prove that Customs' classification is incorrect. *Jarvis Clark Co. v. United States*, 739 F.2d 628, 630 (Fed. Cir. 1984).

## II.  Nutricia's Medical Foods Are Correctly Classified As "Food Preparations" Of Heading 2106

Nutricia's medical foods are classifiable under heading 2106 because they are "food preparations" not classifiable under heading 3004 or any other heading of the HTSUS.  Heading 2106 covers "[f]ood preparations not elsewhere specified or included."

Dictionaries define food as "material consisting essentially of protein, carbohydrate, and fat used in the body of an organism to sustain growth, repair, and vital processes and to furnish energy[;] *also* : such food together with supplementary substances (such as minerals, vitamins, and condiments)." *Food*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/food; *Food,* American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=food.  Dorland's similarly defines food as "anything which, when taken into the

body, serves to nourish or build up the tissues or to supply body heat; aliment; nutriment." *Food*, Dorland's Illustrated Medical Dictionary 516 (26th ed. 1985), Def.'s Ex. 3.  Finally, a preparation is "a substance specially prepared, or made up for its appropriate use or application, e.g. as food or medicine …." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998) (quoting 12 The Oxford English Dictionary 374 (2d. ed. 1989)).

Nutricia's products meet the terms of the heading.  Food preparations, by definition, are specially prepared, nourishing combinations of proteins, fats, carbohydrates, vitamins, and minerals.  Nutricia's products contain only nourishing combinations of nutritional substances—primarily fats, carbohydrates, proteins or amino acids, vitamins, and minerals.  Each product is nutritionally complete or near nutritionally complete.  All the subject medical foods largely replace normal foods in the diets of children with certain medical conditions.  Nutricia specially prepares these products to supply nourishment to children with certain conditions.  Neocate contains amino acids in place of whole proteins, MSUD Lophlex and Periflex lack certain amino acids but provide others, and Ketocal contains extra fat and a dearth of carbohydrates to provide a ketogenic diet.  In fact, by law, the subject medical foods are "foods" that are "specially formulated and processed product[s] (as opposed to a naturally occurring foodstuff used in its natural state) for the partial or exclusive feeding of a patient …."  21 C.F.R. § 101.9(j)(8). Nutricia's products are therefore food preparations.

That Nutricia's foods are "medical" foods, or that they are particular formulations of proteins or amino acids, carbohydrates, and fats, does not transform them into something other than foods.  A number of sources demonstrate that medical foods are foods, and not medicine or drugs.

CONFIDENTIAL INFORMATION REDACTED

To begin, the Federal Food, Drug and Cosmetic Act distinguishes between medical foods on the one hand and drugs on the other.  The Act classifies medical food as "food" for the "dietary management" of certain conditions, 21 U.S.C. § 360ee(b)(3), but defines the term "drug" as, among other things, "articles (other than food) intended to affect the structure or any function of the body of man or other animals," *id.* § 321(g)(1)(C).  FDA regulations likewise bear out the distinction between medical foods and drugs.  The FDA regulates medical foods as foods, not drugs, and imposes special food-labeling requirements.  21 C.F.R. § 101.9(j)(8).  Thus, unlike drugs, medical foods generally do not require ████████████████████

████████████████████████████████████████████████████████████████

████████████   Del Toro Dep. at 16:5–18:9.

FDA industry guidance says it outright: "Medical foods are not drugs," and are thus neither subject to drug-labeling requirements nor provided National Drug Code numbers.  U.S. Food & Drug Admin., *Guidance for Industry: Frequently Asked Questions About Medical Foods* 5, 8 (2d ed. 2016), https://www.fda.gov/media/97726/download.  This same FDA guidance distinguishes between "drug therapy" and the "use of a medical food" to manage inborn errors of metabolism.  *Id.* at 9.  While this regulatory framework is not controlling for tariff purposes, it sheds light on the common and commercial understanding of the distinction between medical foods and medicinal substances.  *See Maxcell Bioscience, Inc. v. United States*, 533 F. Supp. 2d 1261, 1270 n.21 (Ct. Int'l Trade 2007) (finding FDA labeling requirements relevant to tariff classification).

This distinction is made clear in medical sources as well.  As one treatise explains, companies like "Mead Johnson, Abbott Nutrition, and Wyeth" specialize in distributing "formulas to feed infants, children, and even adults" who maintain "therapeutic diets."  Peggy S.

Stanfield & Y.H. Hui, *Nutrition and Diet Therapy: Self-Instructional Approaches* 358 (5th ed. 2010), Def.'s Ex. 4.  The Stanfield treatise describes these formulas, such as "Phenyl-Free 1" made by Mead Johnson for children with PKU,[2] as "dietetic products"—not medicinal substances.  *Id.*  The Stanfield treatise later provides a "Sample Menu Plan for a 9-Month-Old Child with PKU" which lists portions of "Lofenalac formula" at mealtimes along with portions of fruits, rice, and other foods—but separately discusses a PKU "drug" called "Kuvan (sapropterin dihydrochloride)." *Id.* at 397–98.  In other words, medical foods are still foods, but drugs (medicinal substances) are not.

Nutricia's medical foods are thus "food preparations" of heading 2106, and, if not specified or included in any other heading, remain in 2106.  As explained below, heading 3004 does not cover the subject medical foods, and no other heading within Section IV or Chapter 21, HTSUS, specifies or includes them.  Nor has Nutricia disputed that its medical foods, if not classifiable as "medicaments" of heading 3004 or as articles "specially designed … for the use or benefit of … handicapped persons" of subheading 9817.00.96, are appropriately classified under subheading 2106.90.99. *See* GRI 6.  The other subheadings of heading 2106 (which are specific to various articles such as dairy, protein, and fruit juice products) do not encompass the subject medical foods.

All of Nutricia's medical foods are therefore classifiable as "food preparations" of subheading 2106.90.99, as Customs classified them at liquidation.

---

[2] "Phenyl-Free 1 is an iron-fortified infant formula and medical food powder that is free of the essential amino acid phenylalanine for infants and young children with documented phenylketonuria (PKU)."  *Phenyl-Free® 1*, Mead Johnson Nutrition, https://www.hcp.meadjohnson.com/s/product/a4R4J000000PpR0UAK/phenylfree-1.

III.    **Nutricia's Medical Foods Do Not Fall Within Heading 3004 Because They Are Not Medicaments**

Nutricia asserts that its medical foods fall within heading 3004, but medical foods are not medicaments of heading 3004.  Heading 3004 covers "Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses, put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale[.]"  The terms of the heading are further narrowed by Note 1(a) to Chapter 30, which excludes "Foods or beverages (such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters), other than nutritional preparations for intravenous administration (section IV)[.]"  Therefore, by its plain terms, the tariff draws a distinction between medicaments and foods.  But Nutricia's medical foods are foods—not medicaments, which are medicinal substances—and are thus not classifiable under heading 3004.

A.    **"Medicaments" are medicinal substances**

The plain meaning of medicament, as shown by "dictionaries, encyclopedias, scientific authorities, and other reliable information sources," *StoreWALL, LLC*, 644 F.3d at 1363, is a medicinal substance.

Webster's defines "medicament" as "a substance (as a chemical, a medicine, or an ointment) used in therapy."  *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 945 (7th Cir. 2001) (Wood, J., concurring) (quoting *Medicament*, Webster's Third New International Dictionary of the English Language Unabridged 1402 (1993)).  Other dictionaries similarly define "medicament" as synonymous with "medicine" or "medication."  *See, e.g.*, *Medicament*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=medicament ("An agent that promotes recovery from injury or ailment; a medicine."); *Medicament*, Collins English

13

Dictionary, https://www.collinsdictionary.com/us/dictionary/english/medicament ("[M]edication[;] a healing substance; medicine; remedy."). Indeed, dictionaries treat "medicament," "medicine," "medication," and "drug" as interchangeable. Both Webster's Third New International Dictionary and the Merriam-Webster Online Dictionary define "medication" as "a medicinal substance : MEDICAMENT." *Medication*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/medication; *Bober*, 246 F.3d at 945 (Wood, J., concurring) (quoting *Medication*, Webster's Third New International Dictionary of the English Language Unabridged 1402 (1993)). Drug, in turn, also means "a substance used as a medication or in the preparation of medication." *Drug*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/drug.

Next, consider medical dictionaries and authorities. Dorland's defines "medicament" as "a medicinal substance or agent." *Medicament*, Dorland's Illustrated Medical Dictionary 785 (26th ed. 1985), Def.'s Ex. 3. Stedman's likewise defines "medicament" as "[a] medicine, medicinal application, or remedy." *Medicament*, Stedman's Medical Dictionary 534050 (Nov. 2014) (Westlaw), Def.'s Ex. 3; *see also Medication*, *id.* 534090 ("A medicinal substance, or medicament."). *Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems*, a pharmaceutical treatise, defines "active ingredient" as interchangeable with "medicament" and "drug substance": an "active ingredient" is "the ingredient or ingredients of a pharmaceutical product responsible for its pharmacologic activity (also medicament, drug substance, active pharmaceutical ingredient [API])." Loyd V. Allen, Jr. & Howard C. Ansel, *Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems* 763 (10th ed. 2014), Def.'s Ex. 3.[3]

---

[3] *Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems* has served as a prior art reference for pharmaceutical patents. *Tris Pharma, Inc. v. Teva Pharms. USA, Inc.*, Civ. No. 20-

Finally, the American Dental Association defines "medicament" with even greater specificity as a "[s]ubstance or combination of substances intended to be pharmacologically active, specially prepared to be prescribed, dispensed or administered by authorized personnel to prevent or treat diseases in humans or animals." *Medicament*, American Dental Association Glossary of Dental Clinical Terms, https://www.ada.org/publications/cdt/glossary-of-dental-clinical-terms.

Additionally, reliable legal sources shed light on the common and commercial meaning of "medicament." Caselaw, often in the realm of pharmaceutical patent litigation, speaks of medicaments as containing or comprising a medicinal substance (that is, an active ingredient). *In re Halley*, 296 F.2d 774, 774–75 (C.C.P.A. 1961), for instance, described a patentee's "sustained action pharmaceutical tablet containing an active pharmaceutical ingredient" as made of compressed granules "prepared from a mixture of medicament and the usual inert fillers or extenders such as corn starch and milk sugar …." *Accord A.H. Robins Co. v. Erbamont, Inc.*, No. C2-89-864, 1991 WL 229150, at *5 (S.D. Ohio Apr. 18, 1991) ("Lubricants and other materials which are not part of the active ingredients of a medicament but are added for other purposes are referred to as excipients."), *vacated as moot by settlement*, 944 F.2d 913 (Fed. Cir. 1991). This is likely because patentees have long used the word "medicament" to disclose inventions containing active ingredients. *See, e.g.*, *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1371–72 (Fed. Cir. 2001) (antitumor drug paclitaxel); *In re Anderson*, 471 F.2d 1237, 1242 (C.C.P.A. 1973) (surgical dressing containing medication); *In re Sulzberger*, 56 F.2d 872, 872 (C.C.P.A. 1932) (laxative chewing gum).

---

05212 (KM)(ESK), 2022 WL 4082190, at *8 (D.N.J. Sept. 6, 2022); *see Supernus Pharms., Inc. v. TWi Pharms., Inc.*, 265 F. Supp. 3d 490, 515 (D.N.J. 2017) (expert witness recognized Ansel's as a "reputable" treatise), *aff'd*, 747 F. App'x 852 (Fed. Cir. 2018).

All these reliable sources point in the same direction: a medicament is a medicinal substance containing an active pharmaceutical ingredient, such as a drug.  It is undisputed that Nutricia's products do not contain any active ingredients, but are comprised of nutritional substances such as fats, carbohydrates, proteins or amino acids, vitamins, and minerals. Accordingly, Nutricia's products are not medicaments of heading 3004.

### B. Note 1(a) to Chapter 30 excludes foods from heading 3004

Note 1(a) to Chapter 30 also provides that foods are excluded from heading 3004. Chapter notes "are an integral part of the HTSUS" and carry "the same legal force as the text of the headings."  *Roche Vitamins, Inc. v. United States*, 772 F.3d 728, 731 (Fed. Cir. 2014).  Note 1(a)'s exclusion of "Foods or beverages (such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters), other than nutritional preparations for intravenous administration (section IV)," reinforces that the plain text of heading 3004 does not cover any foods, and Nutricia's medical foods in particular.

Note 1(a) leaves little room for interpretation: "Foods … other than nutritional preparations for intravenous administration" are not classifiable under heading 3004.  As discussed, the word "food" means "nutriment," *Food*, Dorland's Illustrated Medical Dictionary 516 (26th ed. 1985), Def.'s Ex. 3; or, more specifically, "material consisting essentially of protein, carbohydrate, and fat" along with "supplementary substances (such as minerals, vitamins, and condiments)," *Food*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/food.  The word "foods" may even be construed more broadly as including any substance intended to be ingested.  *Mondelez Glob. LLC v. United States*, 253 F. Supp. 3d 1329, 1335–36 (Ct. Int'l Trade 2017).

All foods consisting entirely of proteins, carbohydrates, fats, minerals, and vitamins—and lack any medicinal ingredient—therefore fall within Note 1(a)'s exclusion.  This rule is proven by Note 1(a)'s sole exemption for "nutritional preparations for intravenous administration." Without the exemption, such preparations would be classified, like all other preparations containing only nutritional substances, according to their composition alone and not their use. *See Sturges v. Collector*, 79 U.S. 19, 27–28 (1870) (an exemption from additional duty for certain specified goods "prove[d] the rule" as to goods not specifically exempted).  As the note makes clear, all non-intravenously administered nutritional preparations are thus excluded from heading 3004.  *See id.*; *United States v. Johnson*, 529 U.S. 53, 58 (2000) (exceptions in a statute are limited to those that Congress set forth in the statute).  Correspondingly, the FDA regulates parenteral (that is, intravenous) nutritional preparations as drugs, Essers Dep. at 87:18–24, whereas enterally administered foods, including medical foods, are not so regulated.

Note 1(a)'s singling out for exclusion certain foods "such as dietetic" ones, among others, also fortifies the border between foods and medicaments.  These foods are listed in a parenthetical beginning "such as," meaning that they are "illustrative, not exhaustive" examples of excluded products.  *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998); *Applied Biosystems v. United States*, 715 F. Supp. 2d 1327, 1333 n.13 (Ct. Int'l Trade 2010).  This illustrative list ensures that those foods and beverages that might be confused with medicine—dietetic foods being the first example—are like all other foods excluded from Chapter 30.  Note 1(f) to Chapter 21 does the same for medicine that might be confused for food.  Its enumeration of "[y]east put up as a medicament" ensures that that product is excluded, without narrowing the following exclusion of "other products of heading 3003 or 3004" to products containing yeast as an active ingredient.

Medical foods, moreover, are expressly excluded as "dietetic" foods.  The plain meaning of "dietetic" is "of or relating to diet[;] adapted for use in special diets," *Dietetic*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/dietetic, or "[s]pecially prepared or processed for restrictive diets," *Dietetic*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=dietetic.  "Diet," in turn, means "[a] regulated selection of foods, as for medical reasons or cosmetic weight loss."  *Diet*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=diet; *accord Diet*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/diet.  "Dietetic foods," therefore, are foods that have been specially prepared for medical reasons or weight loss.  Medical foods fit that description.  They are, by definition, foods specially formulated "for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."  21 U.S.C. § 360ee(b)(3).  Tellingly, the Stanfield treatise calls medical food formulas like "Phenyl-Free 1" for children with PKU "dietetic products."  Peggy S. Stanfield & Y.H. Hui, *Nutrition and Diet Therapy: Self-Instructional Approaches* 358 (5th ed. 2010), Def.'s Ex. 4.

Note 1(a), therefore, excludes all non-intravenous foods containing only nutritional substances, including medical foods, from classification under heading 3004.  Nutricia's products are undisputedly not intravenous foods but rather are medical foods, akin to dietetic foods, excluded from heading 3004.  The words "dietetic" and "diet" are even used to describe Nutricia's products and similar ones.  Nutricia's own amino acid specifications describe the products into which the amino acids are incorporated (that is, MSUD Lophlex, Periflex, and Neocate) as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pl.'s Ex. 8B, ECF No. 73-15 at 32 (MSUD Lophlex); Pl.'s Ex. 8C, ECF No. 73-16 at 43 (Periflex Infant); Pl.'s Ex. 8D, ECF No.

73-17 at 45 (Periflex Junior); Pl.'s Ex 8E, ECF No. 73-18 at 39 (Neocate).  Dr. Essers agrees that

Ketocal provides a ██████████████████ Essers Dep. at 133:16–22.  The Stanfield treatise

describes medical foods similar to Nutricia's as "dietetic products."  Peggy S. Stanfield & Y.H.

Hui, *Nutrition and Diet Therapy: Self-Instructional Approaches* 358 (5th ed. 2010), Def.'s Ex. 4.

Accordingly, Nutricia's products are also precluded from classification under heading 3004 on

the basis of Note 1(a).

### C.  The Explanatory Notes confirm that heading 3004 does not cover foods

While the plain text of heading 3004 and Note 1(a) alone shows that products containing

only nutritional substances are not classifiable as medicaments of heading 3004, the Explanatory

Notes resolve whatever ambiguities linger.  Explanatory Note 30.04 provides that

> The provisions of the heading text do not apply to foodstuffs or beverages such as
> dietetic, diabetic, or fortified foods, tonic beverages or mineral waters (natural or
> artificial), which fall to be classified under **their own appropriate headings.**
> This is essentially the case as regards food preparations containing only
> nutritional substances.  The major nutritional substances in food are proteins,
> carbohydrates and fats.  Vitamins and mineral salts also play a part in nutrition.
>
> Similarly foodstuffs and beverages containing medicinal substances are **excluded**
> from the heading if those substances are added solely to ensure a better dietetic
> balance, to increase the energy-giving or nutritional value of the product or to
> improve its flavour, always provided that the product retains its character of a
> foodstuff or a beverage. …
>
> Further, this heading **excludes** food supplements containing vitamins or mineral
> salts which are put up for the purpose of maintaining health or well-being but
> have no indication as to use for the prevention or treatment of any disease or
> ailment.  These products which are usually in liquid form but may also be put up
> in powder or tablet form, are generally classified in **heading 21.06** or **Chapter
> 22.**
>
> On the other hand, the heading covers preparations in which the foodstuff or the
> beverage merely serves as a support, vehicle or sweetening agent for the
> medicinal substances (e.g., in order to facilitate ingestion).

Def.'s Ex. 6 (Emphasis in original.)

In other words, the "provisions of the heading text do not apply to" food preparations that contain "only nutritional substances"—proteins, carbohydrates, fats, vitamins, and mineral salts. Nor are "food supplements containing vitamins or mineral salts" with "no indication as to use for the prevention or treatment of any disease" covered. Heading 3004 does not even apply to food preparations that contain "medicinal substances," unless the food "merely serves as a support, vehicle or sweetening agent for the medicinal substances." Explanatory Note 30.04 thus confirms, consistent with common and commercial meaning, that a "medicament" is a "medicinal substance," and that "foods," which consist solely of nutritional substances, are not medicaments. *See StoreWALL*, 644 F.3d at 1363 (courts may, consistent with common and commercial meaning, "import[]" clarifications from an Explanatory Note into definitions of tariff terms).

Explanatory Note 30.03 further confirms the parameters of heading 3004. Similar to heading 3004, heading 3003 covers "[m]edicaments … consisting of two or more constituents which have been mixed together for therapeutic or prophylactic uses" (so long as they are not dosed or packaged for sale). Def.'s Ex. 6. Explanatory Note 30.03 provides that heading 3003 "covers medicinal preparations," including, among other products, "[m]ixed medicinal preparations such as those listed in an official pharmacopoeia … [that] contain sufficiently high levels of active ingredients," "[p]reparations containing a single pharmaceutical substance together with an excipient," "[n]utritional preparations for intravenous administration only," medicinal plant extracts, and medicinal bath salts. If "put up in measured doses or in forms or packings for retail sale," these products would "fall in heading 30.04." Explanatory Note 30.03 (emphasis omitted). Non-intravenous foods and medical foods, however, resemble none of these products. They contain only nutritional substances, rather than medicinal substances—or

preparations containing "sufficiently high levels of active ingredients," "pharmaceutical substance[s]," or medicinal extracts or salts, in the words of Explanatory Note 30.03.  But Explanatory Note 30.03 excludes "food preparations containing only nutritional substances" in essentially the same terms that Explanatory Note 30.04 does.

The unambiguous terms of the Explanatory Notes thus reinforce that heading 3004 does not cover foods containing only proteins, carbohydrates, fats, vitamins, and minerals such as Nutricia's products here.  There is no dispute over what Nutricia's medical foods are:  they are foods containing only nutritional substances, with no nutrient serving as a "support, vehicle or sweetening agent" (an excipient, in other words) for any active ingredient.  The subject medical foods are therefore not classifiable under heading 3004.[4]

### D.  Nutricia's interpretation contradicts the plain text of heading 3004, Note 1(a) to Chapter 30 and the Explanatory Notes

Nutricia's contrary interpretation of heading 3004 runs up against the plain meaning of heading 3004 and Note 1(a) to Chapter 30, as confirmed by the Explanatory Notes.

#### i.  Nutricia ignores the terms of heading 3004

Nutricia first suggests that medical foods can be classified under heading 3004 because the Merriam-Webster Online Dictionary defines "medicament" as "a substance used in therapy,"

Memorandum of Law and Authorities in Support of Plaintiff's Motion for Summary Judgment

---

[4] Although not binding, a persuasive 2011 decision of the Canadian International Trade Tribunal confirms that Nutricia's medical foods are excluded from heading 3004.  *See Home Depot U.S.A., Inc. v. United States*, 915 F.3d 1374, 1379 n.1 (Fed. Cir. 2019) (Tribunal decisions are not dispositive but are still "entitled to respectful consideration").  In *Nutricia North America v. President of the Canada Border Services Agency*, the Tribunal concluded that, despite being "effective in the treatment of[] various gastrointestinal diseases and ailments," Neocate was excluded from classification under heading 3004 because it contained only nutritional substances.  2011 CarswellNat 7137, paras. 71, 93–96 (C.I.T.T.) (WL), Def.'s Ex. 7.  The same reasoning applies to MSUD Lophlex, Periflex, and Ketocal, which also contain only nutritional substances.

(Pl.'s Br.) at 26, but this suggestion proves too much.  Nutricia's understanding of a medicament as a "substance used in therapy" is both too broad and too narrow.

While "substance" might have broad meanings in other contexts, "substance" in the context of defining the term "medicament" means something in the nature of "a chemical, a medicine, or an ointment."  *Bober*, 246 F.3d at 945 (Wood, J., concurring) (quoting *Medicament*, Webster's Third New International Dictionary of the English Language Unabridged 1402 (1993)).  The Merriam-Webster Online Dictionary, for its part, defines "substance" as not just any discrete "physical material" but also "matter of particular or definite chemical constitution" or "something (such as drugs or alcoholic beverages) deemed harmful and usually subject to legal restriction."  *Substance*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/substance (giving as examples the phrases "possession of a controlled *substance*" and "*substance* abuse").  Thus, in this context, the word "substance" is not broad enough to encompass a combination of nutritional substances, as the Explanatory Notes and dictionaries contemporaneous to the HTSUS's enactment like Webster's and Dorland's confirm.  *Airflow Tech., Inc. v. United States*, 524 F.3d 1287, 1291 n.2 (Fed. Cir. 2008) (using the 1986 edition of Webster's Third New International Dictionary as it closely preceded the HTSUS's 1989 enactment).

More important, though, this overbreadth problem becomes apparent when placing Nutricia's definition in the context of heading 3004.  Courts are "obliged to give effect, if possible, to every word Congress used" in a statute.  *National Ass'n of Mfrs. v. Department of Def.*, 138 S. Ct. 617, 632 (2018) (quotation omitted).  But had Congress meant for heading 3004 to cover any "substance used in therapy," it could have omitted the word "medicaments" and simply provided for "mixed or unmixed products for therapeutic use."  For "medicaments" to

mean something, then, it must limit heading 3004's reach to medicinal substances, rather than swallow the language Congress used. *See Airflow Tech.*, 524 F.3d at 1292 (noting that the HTSUS's drafters could have used a "broader term" than the one they used, had they wanted the subheading at issue to encompass more merchandise).

On the other hand, Nutricia's definition is also flawed in that it is too narrowly limited to "therapy." Plugging Nutricia's definition into heading 3004 would render the heading tautological—"substances used in therapy … for therapeutic or prophylactic uses"—leaving no work for the word "therapeutic" to do. *Border Brokerage Co. v. United States*, 50 Cust. Ct. 115, 118 (1963) (rejecting a tautological interpretation of a tariff provision). For "therapeutic" to have meaning, it must limit which "medicaments" heading 3004 covers. *Warner-Lambert Co. v. United States*, 425 F.3d 1381, 1384 (Fed. Cir. 2005) ("While heading 3004 identifies the products it covers as 'medicaments', it further limits the category to those products for specified uses."). Similarly, Nutricia's interpretation creates problems for the phrase "or prophylactic uses." Heading 3004's plain text distinguishes between therapy and prophylaxis.[5] But if the word "medicament" requires a substance to be used in "therapy," then that substance is either not being put to "prophylactic uses" (rendering that phrase inoperative) or is always used both therapeutically and prophylactically (rendering the entire phrase "for therapeutic or prophylactic uses" surplus). So rather than giving effect to each word Congress used, Nutricia essentially, and incorrectly, whittles heading 3004 down to its desired understanding of the word "medicament." As discussed above, the only interpretation that gives effect to every word and is supported by

---

[5] Therapy is the "therapeutic medical treatment of impairment, injury, disease, or disorder," *Therapy*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/therapy, while prophylaxis refers to "measures designed to preserve health (as of an individual or of society) and prevent the spread of diseases," *Prophylaxis*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/prophylaxis.

heading 3004, Note 1(a), and the Explanatory Notes is that heading 3004 covers "medicinal substances … for therapeutic or prophylactic uses."

Nutricia responds that this interpretation imposes an atextual active-pharmaceutical-ingredient-requirement, noting that not all "'therapeutic' or 'medicinal' goods" have active ingredients.  Pl.'s Br. at 36.  This requirement, however, inheres in the text that heading 3004 actually uses: "medicaments."  As noted, many reliable sources understand "medicament" to mean a medicinal substance—a medication or drug containing an active ingredient.

Nutricia further contends that heading 3004 requires a principal use analysis using the *Carborundum* factors.  *See* Pl.'s Br. at 14–18, 29–35, 38–39.  But a principal use analysis cannot turn food into a medicament.  "While heading 3004 identifies the products it covers as 'medicaments,' it *further limits* the category to those products for specified uses." *Warner-Lambert Co.*, 425 F.3d at 1384 (emphasis added).  Thus, to be classified under heading 3004, a product must first meet the *eo nomine* description of a medicament—that is, a medicinal substance.  By analogy, heading 1211 provides for "Plants … of a kind used primarily … in pharmacy …."  One would not determine if an article were a plant by reviewing the *Carborundum* factors.  Even if a *Carborundum* analysis showed that a chemical synthesized in a laboratory is exclusively used in pharmacy, that chemical is still not a plant.  The same is true for Nutricia's medical foods.  Even though they are used therapeutically, because they contain only nutritional substances, they are not medicaments.

Consistent with this plain meaning, Explanatory Note 30.04 provides that heading 3004's text does not apply to "food preparations containing only nutritional substances" or even "foodstuffs and beverages containing medicinal substances …."  It is only when food "serves as a support, vehicle or sweetening agent for the medicinal substance" in a product that the product

becomes a medicament. Explanatory Note 30.04. All that, in so many words, is a rule requiring an active ingredient. The exemption for intravenously administered foods in Note 1(a)—which would be unnecessary if there were no active-ingredient-requirement—proves the rule.

<div align="center">ii. <u>Nutricia's medical foods are not food supplements</u></div>

Falling back on Explanatory Note 30.04's suggestion that "food supplements containing vitamins or mineral salts" having an "indication as to use for the prevention or treatment of [a] disease" are classifiable as medicaments of heading 3004, Nutricia counters that all therapeutic foods must be so classifiable. Pl.'s Br. at 39. But Nutricia misinterprets the Explanatory Note. Nutricia's argument ignores the surrounding paragraphs clarifying that "food preparations containing only nutritional substances" and "foodstuffs … containing medicinal substances … added solely to ensure a better dietetic balance [or] to increase the energy-giving or nutritional value of the product" are not covered by heading 3004. Explanatory Note 30.04. Those paragraphs describe medical foods. One would need to discard much of heading 3004, Note 1(a), and Explanatory Note 30.04 to arrive at Nutricia's interpretation. *See H. Reisman Corp. v. United States*, 17 C.I.T. 1260, 1264 (1993) (declining to "ignore the careful listing of" the Chapter Note at issue "and essentially all of the explanatory notes").

Nutricia thus contends that its products are sufficiently like "food supplements[] based on extracts from plants, fruit concentrates, honey, fructose, etc." that are classifiable under heading 3004 because they are "intended for the prevention or treatment of diseases," Pl.'s Br. at 39–40 (quoting Explanatory Note 21.06), but this argument fails for a few reasons. For one, Nutricia's food-supplement argument breezes past Note 1(a)'s exemption for "nutritional preparations for intravenous administration." That exemption proves that any nutritional preparation, like Nutricia's medical foods, must be intravenously administered to be classifiable under heading

<div align="center">25</div>

3004.  It also suggests that only those nutritional preparations that the FDA regulates as drugs (which includes intravenous nutrition but not medical foods) are classifiable under heading 3004.

Regardless, Nutricia's medical foods are not food supplements.  A "food supplement" or "dietary supplement" is "a product taken orally that contains one or more ingredients (such as vitamins or amino acids) that are intended to supplement one's diet and are not considered food." *Dietary supplement*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/dietary%20supplement.  Nutricia, however, admitted that its medical foods are not dietary supplements.  Del Toro Dep. at 73:17–20.  They are nutritionally complete (or near nutritionally complete) replacements for normal food in children's diets, rather than supplementations.  But food supplements are not nutritionally complete or near nutritionally complete.  Essers Dep. at 166:12–18.  Nor has Nutricia shown that its medical foods are "based on extracts from plants, fruit concentrates, honey, fructose, etc." like Explanatory Note 21.06 suggests they ought to be.  Def.'s Ex. 6.  The evidence instead shows that Nutricia's medical foods are dietetic food preparations, rather than food supplements based on plant extracts and the like (such as St. John's Wort, Ginkgo Biloba, Ginseng, Echinacea, and Saw Palmetto).  *Cf. Am. Cyanamid Co. v. Nutraceutical Corp.*, 54 F. Supp. 2d 379, 382 n.4 (D.N.J. 1999).

Besides Nutricia's admissions, there are other important distinguishing characteristics between medical foods and food supplements.  Federal law regulates medical foods separately from dietary supplements.  *Compare* 21 U.S.C. § 321(ff) *with id.* § 360ee(b)(3).  A dietary supplement is "intended to supplement the diet," must be "labeled as a dietary supplement," and must not be represented for use "as a sole item of a meal or the diet," among other things.  21 U.S.C. § 321(ff).  Under 21 C.F.R. § 101.9(j)(8), however, the FDA mandates that a medical food be for "partial or exclusive feeding" for the "dietary management" of a disease.  Food

supplements thus are not for "partial or exclusive feeding" or "dietary management," but rather are intended to supplement one's diet.

Furthermore, medical foods do not deliver concentrated medicinal doses of compounds like botanical extracts and vitamins (that is, active ingredients), unlike food supplements intended to treat disease. *See Warner-Lambert Co. v. United States*, 341 F. Supp. 2d 1272, 1280 (Ct. Int'l Trade 2004) (noting that "there must be a connection between a dosage" of vitamin C in a cough drop "and any therapeutic or prophylactic effect therefrom" for it to be classified under heading 3004, and looking to the recommended daily allowance of vitamin C), *aff'd*, 425 F.3d 1381 (Fed. Cir. 2005); Explanatory Note 30.03 (medicaments must have "sufficiently high levels of active ingredients"; "food supplements" that "prevent possible nutritional deficiencies or correct sub-optimal levels of nutrients" are not medicaments). That is consistent with not only Explanatory Note 30.04, which accounts for medicinal substances added to foods merely for "dietetic balance" and "nutritional value," but also common and commercial understanding. Medical foods like Nutricia's are distinct from drugs and dietary supplements like "[s]ingle amino acids, amino acid mixtures, vitamins, and several other compounds" that are administered in "large doses" that "far exceed [daily recommended intake] levels" to "treat [inborn errors of metabolism.]" Kathryn M. Camp *et al.*, *Nutritional Treatment for Inborn Errors of Metabolism: Indications, Regulations, and Availability of Medical Foods and Dietary Supplements Using Phenylketonuria as an Example*, 107 Molecular Genetics & Metabolism 3, 7 (2012), Def.'s Ex. 5. Medical foods, in so many words, are unlike these drugs and food supplements.

### iii.   Nutricia's Note 1(a) arguments are unpersuasive

Finally, Nutricia mounts two unpersuasive challenges to Note 1(a) to Chapter 30. First, Nutricia argues that Note 1(a)'s exclusion applies only "to specific types of foods and

beverages—dietetic, diabetic, or fortified foods, food supplements, tonic beverages and mineral waters—none of which provide nutritional therapy to ameliorate disease." Pl.'s Br. at 37. But, as already explained, heading 3004 does not cover any foods, and medical foods are regardless encompassed within the common and commercial meaning of "dietetic foods" excluded by Note 1(a). It is no wonder that the words "dietetic" and "diet" are used to describe Nutricia's products: they are dietetic foods, or foods that have been specially prepared for medical reasons. Each medical food at issue is specially prepared—lacking whole proteins or certain amino acids, or providing a unique ratio of fats to carbohydrates—to meet the dietary needs of children with medical conditions, as FDA regulations require. 21 C.F.R. § 101.9(j)(8) (medical foods are intended for those with "special medically determined nutrient requirements"). In response, Nutricia offers only its unsupported assertion in its brief that dietetic and diabetic foods cannot "provide nutritional therapy to ameliorate disease," Pl.'s Br. at 37—which is contradicted by one of Nutricia's own statements of undisputed material fact, Pl.'s SMF ¶ 64 ("Nutrition therapy is the treatment of a medical condition, for example diabetes mellitus, through changes in diet, by adjusting quantity, quality and methods of nutrient intake.")) In any event, were heading 3004 and Note 1(a) unclear, Explanatory Note 30.04 clarifies that products containing only nutritional substances are excluded from heading 3004. Medical foods fall squarely within that exclusion.

Second, perhaps recognizing Note 1(a)'s dispositive effect, Nutricia contends that a footnote in *Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246 (Fed. Cir. 2004), requires the Court to ignore Note 1(a) to Chapter 30 because of the mutually exclusive Note 1(f) to Chapter 21. Pl.'s Br. at 37–38. That is not the case. *Bauer* holds that, when conducting a GRI 3(a) analysis—that is, when a good is *prima facie* classifiable under two or more headings—the Court must ignore mutually exclusive exclusionary notes. *Bauer*, 393 F.3d at

1252 & n.6 ("Resorting to the exclusionary note … would yield the somewhat arbitrary result that the subject merchandise could be classified under different chapters based solely on [with] which chapter the analysis began."). But this is not a GRI 3(a) case. "*The first step* in analyzing the classification issue is to determine the applicable heading, if possible, by looking to the terms of the headings *and section or chapter notes*, in accordance with GRI 1." *Bauer*, 393 F.3d at 1250 (emphasis added). Under GRI 1, heading 2106 applies only if the subject merchandise is "not elsewhere specified or included," so the analysis turns on heading 3004 and Note 1(a) to Chapter 30. Put differently, based on the terms of heading 2106, no good can be *prima facie* classifiable in both heading 2106 and heading 3004, so *Bauer* does not apply. Thus, to ignore the binding statutory language of Note 1(a) to Chapter 30 excluding foods from heading 3004, as Nutricia would have it, the Court would have to skip past GRI 1 to GRI 3(a)—which it cannot do. *LeMans Corp. v. United States*, 660 F.3d 1311, 1322 n.7 (Fed. Cir. 2011) (distinguishing *Bauer* on the same grounds), *aff'g* 675 F. Supp. 2d 1374, 1385 (Ct. Int'l Trade 2010) ("In this case, the court bases its decision on GRI 1 and finds no need to resort to an analysis under GRI 3. Therefore, the court finds that *Bauer* does not control its analysis.").

In sum, Nutricia's tautological interpretation of heading 3004 hinges on one dictionary definition, one paragraph of Explanatory Note 30.04, and one footnote from *Bauer*, all lifted out of their context. Our holistic interpretation of heading 3004 instead consults a wealth of reliable sources and considers all relevant context from the binding text of the tariff and the instructive Explanatory Notes. Heading 3004, properly construed, does not encompass foods such as medical foods that contain only nutritional substances. For all these reasons, Nutricia's medical foods are not classifiable under heading 3004.

IV.   **Nutricia's Medical Foods Are Not Alternatively Classifiable As "Articles Specially Designed … For The Use Or Benefit Of … Physically Or Mentally Handicapped Persons" Of Subheading 9817.00.96**

Nutricia's medical foods are not alternatively classifiable as "[a]rticles specially designed … for the use or benefit of … physically or mentally handicapped persons" of subheading 9817.00.96, because they are all "therapeutic" articles excluded from that subheading by U.S. Note 4(b) to Subchapter XVII, Chapter 98.  The subject medical foods are therefore classifiable under heading 2106 alone.

As Nutricia notes, subheading 9817.00.96 is a special provision of U.S. law implementing the Nairobi Protocol.  Contracting states agreed in the Nairobi Protocol to exempt from duty "[a]ll materials specially designed for the education, employment and social advancement of other physically or mentally handicapped persons," among other things. *Travenol Labs., Inc. v. United States*, 813 F. Supp. 840, 846–47 (Ct. Int'l Trade 1993) (quotation omitted).  As enacted, subheading 9817.00.96 permits the duty-free importation of "[a]rticles specially designed … for the use or benefit of … physically or mentally handicapped persons"; however, U.S. Note 4(b) provides that subheading 9817.00.96 does not cover "(i) articles for acute or transient disability; (ii) spectacles, dentures, and cosmetic articles for individuals not substantially disabled; (iii) therapeutic and diagnostic articles; or (iv) medicine or drugs."

Thus, even though Congress "apparently intended" to exempt more articles from duty than the Nairobi Protocol obligated it to, the unambiguous text of the statute controls over extratextual considerations.  *Travenol Labs.*, 813 F. Supp. at 847; *see Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1737 (2020).  That statutory text excludes the "most immediately and directly beneficial" articles—therapeutic articles, medicines, and drugs—from classification under subheading 9817.00.96.  *Travenol Labs.*, 813 F. Supp. at 846.  While we do not dispute that the

30

products at issue, with the exception of Neocate, are "specifically designed or adapted for the use

or benefit of … handicapped persons," the undisputed evidence nevertheless shows that all the

medical foods in question are "therapeutic" articles excluded from classification under

subheading 9817.00.96 by U.S. Note 4(b).

### A. Nutricia's medical foods are "therapeutic" articles excluded from classification under subheading 9817.00.96

"Therapeutic" articles are those that "heal or cure," meaning articles that "lessen[] the

disease which caused [a] handicapped condition." *Richards Med. Co. v. United States*, 720 F.

Supp. 998, 1000–01 (Ct. Int'l Trade 1989), *aff'd*, 910 F.2d 828 (Fed. Cir. 1990). An article thus

need not rid a person of a disease to be considered therapeutic; it need only lessen or treat the

disease itself, rather than compensate for it. *Id.* at 1001; *cf. Nobelpharma U.S.A. Inc. v. United

States*, 955 F. Supp. 1491, 1499 (Ct. Int'l Trade 1997) (an article was not therapeutic because it

did not "treat[] the underlying causes" of the condition at issue). Although Nutricia's medical

foods are foods rather than medicaments, they are nevertheless therapeutic articles excluded

from classification under subheading 9817.00.96 because they "lessen" underlying diseases

themselves. The subject medical foods are not mere "compensatory," "alleviative," or

"palliative" remedies. A prosthetic hip, by contrast, does not treat arthritis itself but is akin to an

external prosthesis that "relieve[s] the discomfort of, or artificially compensate[s] for," arthritis.

*Richards Med. Co.*, 720 F. Supp. at 1001. Instead, Nutricia's foods are used to treat or lessen

inborn errors of metabolism and other diseases directly as part of nutritional therapy.

Nutricia's own expert admits that Nutricia's medical foods are therapeutic. All the

subject medical foods are used in nutritional therapy ███████████████ Essers Dep. at

155:14–22. Each medical food can ██████████████████████████████████████

██████████████ Essers Report at 4. In fact, Nutricia's medical foods can in some

CONFIDENTIAL
INFORMATION REDACTED

instances be used in place of medicines and drugs.  Ketocal, for instance, is used to treat

conditions like intractable seizures when pharmaceuticals fail.  Essers Report at 16; *accord* Pl.'s

Ex. 30, ECF No. 73-47, Expert Report of Dr. Jesse F. Gregory at 9 ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.  Nutricia's medical foods are therefore therapeutic

articles, not compensatory ones.[6]

Nutricia may argue that because many of the conditions for which their medical foods are

prepared are incurable, the foods cannot be "therapeutic."  But this overlooks the full standard

for "therapeutic"—healing *or* curing, including the *partial* elimination or *lessening* of disease.

*Richards Medical Co.*, 720 F. Supp. at 1000–01.  An article does not need to completely

eliminate a disease for it to be considered therapeutic.  It need only aim to lessen or treat the

disease itself, rather than compensate for it.  *Cf. Nobelpharma U.S.A.*, 955 F. Supp. at 1499 (an

article was not therapeutic because it did not "treat[] the underlying causes" of the condition at

issue).  Nutricia's medical foods meet that standard.

Furthermore, while a disease's incurability may in some circumstances indicate that an

article is not therapeutic—for instance, the prosthetic hip in *Richards Medical Co.*—that does not

hold true in all circumstances.  Incurable diseases are still treated with articles that attempt to

---

[6] This result is also consistent with the Canadian International Trade Tribunal's decision in *Nutricia North America*.  The Tribunal held that Neocate is not classifiable under Canada's tariff provision implementing the Nairobi Protocol, which accords duty-free treatment to "[g]oods specifically designed to assist persons with disabilities in alleviating the effects of those disabilities."  *Nutricia N. Am. v. President of the Can. Border Servs. Agency*, 2011 CarswellNat 7137, para. 112 (C.I.T.T.) (WL), Def.'s Ex. 7.  Neocate, the Tribunal held, is "a form of nutritional therapy indicated for use in the treatment of the underlying gastrointestinal disorders themselves" rather than a good "alleviat[ing] the effects of the disabilities resulting from these gastrointestinal disorders."  *Id.*, paras. 126–29.  The same reasoning applies to MSUD Lophlex, Periflex, and Ketocal.

lessen the conditions themselves in the course of therapeutics. That is true in the context of the very diseases for which Nutricia's medical foods are prepared. Doctors try to lessen incurable seizure conditions with medicines and drugs—and when those fail, with medical foods. Essers Report at 16. Thus, while a disease's incurability may be a factor in the U.S. Note 4(b) analysis, it is not dispositive. Otherwise, an article that all but cures an incurable condition, or only sometimes cures a condition, would be non-therapeutic. The standard therefore asks whether an article, on the one hand, compensates for or alleviates the pain caused by a disease; or, on the other hand, treats, lessens, or partially eliminates the disease itself. *Richards Med. Co.*, 720 F. Supp. at 1000–01. Thus, by way of comparison, subheadings 9817.00.92 and 9817.00.94's "[a]rticles for the blind" encompass certain written materials "in raised print," "[b]raille tablets, cubariths, and special apparatus, machines, presses, and types," but not treatments for blindness.

To give effect to each provision of U.S. Note 4(b), there must be some articles that are "therapeutic," but not medicines or drugs. *National Ass'n of Mfrs.*, 138 S. Ct. at 632 (courts must "give effect, if possible, to every word Congress used" (quotation omitted)). It is tough to imagine what articles would qualify as therapeutic if Nutricia's medical foods do not. The subject medical foods are effective nutritional therapies that are used to treat disease states and are sometimes even used in place of medicines and drugs. Thus, while it stands to reason that a prosthetic hip does not lessen a disease, there must be some non-pharmaceutical articles that do lessen diseases. Nutricia's medical foods fit that bill.

Accordingly, because all of Nutricia's medical foods are "therapeutic" articles within the meaning of U.S. Note 4(b), they are excluded from classification under subheading 9817.00.96, and are classifiable solely under subheading 2106.90.99.

**B. Nutricia failed to show that Neocate is "specially designed" for "handicapped persons"**

U.S. Note 4(b) aside, Neocate is still not classifiable under subheading 9817.00.96 because Nutricia has failed to show that it is "specially designed" for the use of "handicapped persons."[7]  The test is not simply whether some persons who use Neocate—like those with eosinophilic esophagitis and short bowel syndrome—are handicapped.  *Contra* Pl.'s Br. at 42. Neocate must instead be "intended for the use or benefit of a specific class of persons to an extent greater than for the use or benefit of others," and that "specific class of persons" must be "handicapped."  *Sigvaris, Inc. v. United States*, 899 F.3d 1308, 1314 (Fed. Cir. 2018).

The class of persons for whom Neocate is designed, however, is at its narrowest, children who cannot tolerate whole cow's milk or soy proteins—including children with food allergies or gastrointestinal issues.  Pl.'s Ex. 16, ECF No. 73-26.  That class of persons is not sufficiently specific.  Tellingly, Nutricia sells Neocate (unlike the other products at issue) on Amazon.com, Def.'s Ex. 2 at 10–11, which suggests that Neocate is "designed for use by a variety of persons." *Sigvaris*, 899 F.3d at 1314–15 (courts should consider, among other factors, "whether the merchandise is solely used by the handicapped, … the likelihood the merchandise is useful to the general public, and whether the merchandise is sold in specialty stores").  Moreover, that general class of persons is not necessarily handicapped, unlike the specific classes of persons for whom the other medical foods at issue are prepared.  But not one of Nutricia's 199 statements of fact establishes that children with cow's milk, soy, or other allergies are substantially limited in major life activities.  *See* U.S. Note 4(a) to Subchapter XVII, Chapter 98.  Nor can Nutricia rest on the

---

[7] As noted above, we do not dispute that Nutricia's other products at issue are "specially designed or adapted for the use or benefit of … handicapped persons"; nevertheless, for the reasons stated above, they are excluded from alternative classification under subheading 9817.00.96 as therapeutic articles of U.S. Note 4(b).

law alone.  *See, e.g.*, *Kelly v. Kingston City Sch. Dist., Inc.*, No. 1:16-CV-00764 (MAD/DJS), 2017 WL 976943, at \*4 (N.D.N.Y. Mar. 13, 2017) (digestive problems like celiac disease are not necessarily disabilities under the Americans with Disabilities Act).  Regardless of whether Neocate is a therapeutic article, Nutricia has not shown that it is an article "specially designed" for the use of "handicapped persons" of subheading 9817.00.96.

## **CONCLUSION**

For these reasons, we respectfully request that the Court grant our cross-motion for

summary judgment, deny plaintiff's motion for summary judgment, enter judgment in our favor,

and dismiss this action.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By:   /s/ Aimee Lee
AIMEE LEE
Assistant Director

Of Counsel:

Yelena Slepak
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

/s/ Luke Mathers
LUKE MATHERS
Trial Attorney
International Trade Field Office
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-9230 or 9236
*Attorneys for Defendant*

Dated:  October 28, 2022

36

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE
_____
                                                    :
NUTRICIA NORTH AMERICA, INC.,          :
                                                    :
                                Plaintiff,          :
                                                    :
                        v.                          :        Court No. 16-00008
                                                    :
UNITED STATES,                                 :
                                                    :
                                Defendant.      :
_____:

## CERTIFICATE OF COMPLIANCE

I, LUKE MATHERS, a trial attorney in the Office of the Assistant Attorney General,

Civil Division, Commercial Litigation Branch, International Trade Field Office, who is

responsible for the foregoing memorandum in support of defendant's cross-motion for summary

judgment and response in opposition to plaintiff's motion for summary judgment, relying upon

the word count feature of the word processing program used to prepare the memorandum, certify

that this memorandum complies with type-volume limitation under USCIT Standard Chamber

Procedure 2(B) and contains 10,764 words.


                                                    /s/ Luke Mathers
                                                    Luke Mathers