UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                              :

NUTRICIA NORTH AMERICA, INC.,    :    **PUBLIC VERSION**
                              :

              Plaintiff,   :    Court No. 16-00008
                              :

          v.               :
                              :

UNITED STATES,            :
                              :

             Defendant.   :
_____:


**PLAINTIFF'S  RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY
JUDGMENT AND REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

By:    John B. Brew
        Alex Schaefer
        Crowell & Moring LLP
        1001 Pennsylvania Avenue, N.W.
        Washington, D.C.  20004
        jbrew@crowell.com

        Maria Vanikiotis
        Alexander T. Rosen
        Crowell & Moring LLP
        590 Madison Avenue
        20th Floor
        New York, NY 10022

Dated: December 2, 2022
      New York, New York

## TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................................ 1

SUMMARY OF ARGUMENT ....................................................................................... 1

ARGUMENT ..................................................................................................................... 4

I.   CBP CONCEDES THAT NUTRICIA'S MEDICAL FOODS ARE "PRODUCTS
     FOR THERAPEUTIC USES," CONFIRMING THESE PRODUCTS ARE
     PROPERLY CLASSIFIED UNDER HEADING 3004 .................................................... 4

     A.   Heading 3004 Is a Use Provision that Is Not Limited to Drugs with Active
          Ingredients ......................................................................................................... 5

          1.   CBP's Cited Definitions Confirm Medicaments are Substances
               Used in Therapy ...................................................................................... 5

          2.   CBP Improperly Relies Upon Pharmaceutical Resources and Cases ........ 9

          3.   CBP's Interpretation of Heading 3004 Violates Basic Rules of
               Statutory Construction ............................................................................ 11

          4.   Even if CBP Is Correct That Heading 3004 Is an Eo Nomine
               provision, Medical Foods Still Are Classified Thereunder ..................... 14

     B.   CBP Improperly Relies on Chapter 30, Note 1(a) to Claim All Foods Are
          Excluded From Classification under Chapter 30 ................................................. 17

          1.   Reliance on Chapter 30 Note 1(a) Is Legally Impermissible .................... 17

          2.   Note 1(a) to Chapter 30 Does Not Include Medical Foods ..................... 19

     C.   The ENs Confirm that Medicaments for Therapeutic Use Include Foods
          that Consist of Nutrients ..................................................................................... 24

II.  NUTRICIA' MEDICAL FOODS CANNOT BE CLASSIFIED UNDER
     HEADING 2106 .................................................................................................... 27

     A.   Heading 2106 Is a Use Provision Not Covering Medical Foods ......................... 28

     B.   The FDA Does Not Regulate Medical Foods in the Same Manner as
          Conventional Foods ........................................................................................... 30

     C.   Canada Provides Duty-Free Treatment to Medical Food Imports ....................... 32

III. NUTRICIA'S MEDICAL FOODS ARE SPECIALLY DESIGNED FOR
     HANDICAPPED PERSONS AND MAYBE CLASSIFIED UNDER
     SUBHEADING 9817.00.96 .................................................................................... 33

     A.   The Term "Therapeutic" is Defined Differently in Chapter 98 and Medical
          Foods May Be Classified Subheading under 9817.00.96 ................................... 34

# TABLE OF CONTENTS
(continued)

B.    Necoate is Specially Designed for Use and Benefit of Children with Specific Ailments...................................................................................................... 36

CONCLUSION.................................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. Robins Co. v. Erbamont, Inc.*,
    No. C2-89-864, 1991 WL 229150 (S.D. Ohio Apr. 18, 1991) ...............................................10

*Alcan Food Packaging (Shelbyville) v. U.S.*, 929 F. Supp. 2d 1338 (Ct. Int'l Trade
    2013) ...........................................................................................................................................25

*Amcor Flexibles Singen Gmbh v. United States*, 425 F. Supp. 3d 1287, 1302 (Ct.
    Int'l Trade 2020) ........................................................................................................................11

*In re Anderson*,
    471 F.2d 1237 (C.C.P.A. 1973) ................................................................................................10

*Bauer Nike Hockey USA, Inc. v. U.S.*,
    393 F.3d 1246 (Fed. Cir. 2005) .......................................................................................3, 16, 17

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) .................................................................................................10

*Carl Zeiss, Inc. v. U.S.*,
    195 F.3d 1375 (Fed. Cir. 1999) ...........................................................................................14, 20

*Cummins Inc. v. United States*,
    454 F.3d 1361 (Fed. Cir. 2006) .................................................................................................32

*EM Indus. v. U.S.*,
    999 F. Supp. 1473 (Ct. Int'l Trade 1998) .................................................................. 18, 28, 34

*ENI Tech., Inc. v. U.S.*,
    641 F. Supp. 2d 1337 (Ct. Int'l Trade 2009) ...........................................................................19

*Ford Motor Co. v. U.S.*,
    926 F.3d 741 (Fed. Cir. 2019) ...........................................................................................14, 29

*In re Halley*,
    296 F.2d 774-75 (C.C.P.A. 1961) ............................................................................................10

*Hartmann Trunk Co. v. U.S.*,
    27 C.C.P.A. 254 (1940) ...............................................................................................................9

*Inabata Specialty Chemicals v. U.S.*,
    29 C.I.T. 419 (2005) ..................................................................................................................35

i

*Jana Sales Co., Inc. v. U.S.*,
    402 F.2d 1014 (C.C.P.A. 1968) ........................................................................11

*Kahrs Int'l, Inc. v. U.S.*,
    713 F.3d 640 (Fed. Cir. 2013).........................................................................13

*Kelly v. Kingston City Sch. Dist., Inc.*,
    No. 116CV00764MADDJS, 2017 WL 976943 (N.D.N.Y. Mar. 13, 2017) ..........................38

*LeMans Corp. v. United States*,
    660 F.3d 1311 (Fed. Cir. 2011)............................................................3, 16, 17, 18

*Lerner New York, Inc. v. U.S.*,
    37 C.I.T. 604 (2013), *aff'd sub nom. Victoria's Secret Direct, LLC v. U.S.*,
    769 F.3d 1102 (Fed. Cir. 2014)...................................................................9, 34

*Michael Simon Design, Inc. v. U.S.*,
    501 F.3d 1303 (Fed. Cir. 2007).......................................................................25

*R.T. Foods, Inc. v. U.S.*,
    757 F.3d 1349 (Fed. Cir. 2014).................................................................18, 28

*Richards Med. Co. v. U.S.*,
    910 F.2d 828 (Fed. Cir. 1990).........................................................................35

*Rubie's Costume Co. v. U.S.*,
    337 F.3d 1350 (Fed. Cir. 2003).........................................................19, 24, 25

*Sigvaris, Inc. v. U.S.*,
    227 F. Supp. 3d 1327 (Ct. Int'l Trade 2017), *aff'd but criticized*, 899 F.3d
    1308 (Fed. Cir. 2018).................................................................................35, 36

*Sports Graphic, Inc. v. U.S.*,
    24 F.3d 1390 (Fed. Cir. 1994).........................................................................20, 23

*Starkey Labs. v. U.S.*,
    22 CIT 360, 6 F. Supp. 2d 910 (1998) *adhered to on reconsideration,* 24
    C.I.T. 504 (2000) ........................................................................................34, 37

*Strauss v. U.S.*,
    43 Cust. Ct. 136 (1959)...................................................................................29

*In re Sulzberger*,
    56 F.2d 872 (C.C.P.A. 1932) .........................................................................10

*Travenol Lab'ys, Inc. v. U.S.*,
    813 F. Supp. 840 (Ct. Int'l Trade 1993) ......................................................34

*U.S. v. Carborundum Co.*,
    536 F.2d 737 (C.C.P.A. 1976) ............................................................12, 14, 29, 30

*Warner-Lambert Co. v. U.S.*,
    341 F. Supp. 2d 1272 (Ct. Int'l Trade 2004), *affirmed by* 425 F. 3d 1381 (Fed.
    Cir. 2005) ............................................................................6, 12, 13, 14

*Warner-Lambert Co. v. U.S.*,
    425 F.3d 1381 (Fed. Cir. 2005) ..................................................12, 13, 14

**Harmonized Tariff Schedule of the United States**

General Notes (2014)

    GRI 1 .................................................................................9, 18, 28

    GRI 3 ..................................................................................3, 17, 18

Chapter 21 (2014)

    Heading 2106 .............................................................................1, 18

    Note 1(f) ..................................................................................17

Chapter 29 (2014) ...............................................................................13

Chapter 30 (2014)

    Heading 3003 ..............................................................................10

    Heading 3004 ........................................................................ *passim*

    Note 1(a) ............................................................................ *passim*

Chapter 98 (2014)

    Heading 9817 ...............................................................................1

    U.S. Note 4(b) to Subchapter XVII ...........................................................34

**Rulings**

HQ 963172 (Aug. 10, 2000) ....................................................................27

HQ 966092 (Mar. 25, 2003) ....................................................................29

HQ W968402 (Jan. 8, 2009) ....................................................................29

HQ H044699 (Jan. 26, 2010) ...................................................................................29

HQ H243587 (July 16, 2014) ..................................................................................26

HQ H121544 (Oct. 2014) .........................................................................................1

HQ H253927 (Nov. 20, 2014) ..................................................................................27

**Statutes**

21 U.S.C. §321(g)(1) ..................................................................................................7

21 U.S.C. §321(g)(1)(B) ...............................................................................14, 15, 30

21 U.S.C. §343(q)(5)(A)(iv) ..............................................................................31, 32

21 U.S.C. §343I(5)(A) ..............................................................................................30

21 U.S.C. §360ee(b)(3) .........................................................................23, 26, 30, 32

42 U.S.C. §12102(1)(A) ...........................................................................................38

ADA.....................................................................................................................36, 37

Educational, Scientific, and Cultural Materials Importation Act of 1982 .....................................33

Food Drug and Cosmetics Act ..................................................................................31

Food Drug Device and Cosmetic Act .......................................................................29

*Tariff Act of 1930 Section 332* ................................................................................6

*Tariff Schedules of the United States Annotated*
(1987), USITC Pub. 1910 (1986) ..........................................................................7

**Other Authorities**

21 C.F.R. §101.9(j)(8).................................................................................... *passim*

21 C.F.R. §210.3(b)(7)....................................................................................3, 15, 16, 26

61 Fed. Reg. 60661 (Nov. 29, 1996)................................................................ *passim*

68 Fed. Reg. 19766 (Apr. 22, 2003) ........................................................................15

*Amino Acid Definition*, CollinsDictionary.com,
https://www.collinsdictionary.com/us/dictionary/english/amino-acid (last
visited Nov. 26, 2022)..............................................................................................8

iv

*Conversion of the Tariff Schedules of the United States Annotated into the Nomenclature Structure of the Harmonized System, Report on Investigation No 332-131 Under Section 332 of the Tariff Act of 1930, Annex III: Cross-Reference From Converted Tariff Schedule to Present TSUSA*, USITC Pub. 1400 (June 1983)..................................................................................................6

*Diabetic Definition, Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/diabetic (last visited Nov. 29, 2022) ................................................22

*Diabetics diet: Create your healthy eating plan*, MayoClinic.org, https://www.mayoclinic.org/diseases-conditions/diabetes/in-depth/diabetes-diet/art-20044295 (last visited Nov. 29, 2022) ........................................................22

*Diet Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/diet (last visited Nov. 27, 2022) ........................................................................................21

*Diet Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/diet (last visited Nov. 27, 2022) ........................................................21

*Dietetic Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/dietetic (last visited Nov. 27, 2022) ........................................................................................21

*Dietetic Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dietetic (last visited Nov. 27, 2022) ...........................................20, 21

*Drug Definition*, The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=drug (last visited Nov. 26, 2022) ........................................................................................7

*Drug Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/drug (last visited Nov. 26, 2022) ........................................................................................7

*Drug Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/drug (last visited Nov. 26, 2022) ........................................................7

Explanatory Notes (EN)

EN 2106 (2012) ...........................................................................22, 25

EN 3003 (2012) ...........................................................................25, 26

EN 3004 (2012) ...................................................................22, 24, 25, 27

v

*EarCentric EasyCharge Rechargeable Hearing Aids (Pair) for Seniors*, Amazon.com, https://www.amazon.com/EarCentric-Rechargeable-Ear-amplification-Cancellation/dp/B09K1RKQS6/ref=zg_bs_3775901_sccl_1/146-1123047-1488536?psc=1 (last visited Dec. 2, 2022)......................................................37

*Food Fortification*, WHO, https://www.who.int/health-topics/food-fortification#tab=tab_1 (last visited Nov. 29, 2022).....................................22

*Fortified Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/fortified (last visited Nov. 29, 2022)..............................22

*Medicament Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/medicament (last visited Nov. 25, 2022) ...........................................6

*Medicine Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/medicine (last visited Nov. 25, 2022) ......................................................................6

*Medicine Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/medicine (last visited Nov. 25, 2022) ................................6

Peggy Stanfield & Y.H. Hui, Nutrition and Diet Therapy: Self-Instructional Approaches 358 (5th ed. 2010) .......................................................23

S. Rep. No. 97-564 (1982) ............................................................35

*Substance Definition*, The American Heritage Dictionary of the English Language Online, https://www.ahdictionary.com/word/search.html?q=substance ...................8

*Substance Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/substance (last visited Nov. 25, 2022)...........................................................8

*Substance Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/substance?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited Nov. 25, 2022) .......................................8

*Tariff Schedules of the United States Annotated* (1987), USITC Pub. 1910 (1986) ...............7, 13

U.S. Drug & Admin., *U.S. Food & Drug Admin. Compliance Program Guidance Manual, Medical Foods Program – Import and Domestic* (Aug. 24, 2006)..........................30

U.S. Food & Drug Admin., *Guidance for Industry: Frequently Asked Questions About Medical Foods* (2d ed. 2016), https://www.fda.gov/media/97726/download.................................31, 32

vi

Webster's Third New International Dictionary of the English Language
    Unabridged..............................................................................................................5

## BACKGROUND

U.S. Customs and Broder Protection ("CBP") classified certain medical foods, which provide treatment to infants and children suffering from debilitating and life-threatening diseases, under Harmonized Tariff Schedule of the Untied Stated ("HTSUS") heading 2106, which provides for "food preparations, **not elsewhere specified or included**[.]" *See* Pl.'s Statement of Facts, at 1, para. 5 (Aug. 31, 2022); Def.'s Resp. to Pl.'s Statement of Facts, at 4, para. 5 (Nov. 1, 2022); HTSUS, Heading 2106 (2014) (emphasis added). Nutricia filed this action claiming that these medical foods are classified under HTSUS heading 3004 as "medicaments . . . consisting of mixed or unmixed products for therapeutic or prophylactic uses" and are secondarily classified under heading 9817 as "articles specifically designed . . . for the use or benefit of . . . physically or mentally handicapped persons[.]" Pl.'s Complaint, 9-11, ECF No. 9; HTSUS, Heading 3004 (2014); HTSUS, Heading 9817 (2014). In response to Nutricia's Motion for Summary Judgment ("Nutricia MSJ"), CBP filed a Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment ("CBP CMSJ"), again asserting that medical foods are classified under heading 2106, but for different reasons than CBP initially asserted. *See* Def.'s Mot. Summ. J., ECF No. 80, 1-2 (agreeing that medical foods are products for therapeutic uses, *cf.* HQ H121544 (Oct. 2014) (ruling that Nutricia's medical foods are not therapeutic)). As explained below, CBP's novel reasons why medical foods are classified under the basket heading 2106 are no more valid than its previous reasons, and accordingly this Court should deny CBP's CMSJ and grant Nutricia's MSJ.

## SUMMARY OF ARGUMENT

Nutricia's initial brief pointed out that to prevail CBP must do more than merely show that the products at issue are foods – that is because CBP's suggested HTUS heading (2106) covers only food preparations that are "not elsewhere specified or included" and it, therefore, must first demonstrate that medical foods are in fact not specified elsewhere. In particular, CBP must show

that the products are not specified in heading 3004 as medicaments for therapeutic or prophylactic use.  CBP has not made and cannot make that showing. For the most part CBP does not even attempt to do so, instead devoting much of its argument in its brief to the rather uncontroversial proposition that the products at issue are foods while providing precious little coherent analysis of why they are not medicaments for therapeutic uses.  In that regard, CBP repeatedly concedes that the subject products are therapeutic articles used in nutritional therapy.  Given that medicaments are described in heading 3004 as "mixed or unmixed products for therapeutic or prophylactic uses" this concession eliminates any remaining doubt as to the nature and use of the subject products as medicaments, and the inquiry should be at an end.

But rather than acknowledging the incontrovertible fact that the subject products are deployed as the treatment – and in many instances the only available treatment – for a slate of severe childhood diseases, CBP inappropriately attempts to recast the relevant tariff provisions.  It first contends that (1) medicaments by definition must feature one or more active ingredients, and (2) that Nutricia's products do not.  Both statements are wrong.  As to the first, there is nothing in the language of the HTSUS or Explanatory Notes to the Harmonized Commodity Description and Coding System ("ENs") in effect at the time even hinting that medicaments must feature active ingredients.  Moreover, review of dictionary and industry definitions confirms that medicaments are defined by their use, namely as substances deployed to treat illnesses or ailments. Nutricia's products meet those definitions.  And even if it were the case that "medicaments" must be possessed of active ingredients, Nutricia's products still would qualify because the chemically synthesized, medical grade, individual amino acids in the products are active ingredients.  The FDA defines "active ingredient" as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease . . . ." 21 C.F.R.

§210.3(b)(7).  CBP does not appear to dispute that these ingredients in medical products furnish the "direct effect" in the mitigation and treatment of disease; as such CBP's suggestion that the medical foods do not have "active ingredients" is unfounded.

CBP's other reconstruction of the tariff schedule yields its argument that food preparations cannot ever be classified in HTS heading 3004 because Note 1(a) to Chapter 30 excludes foods from that chapter.  But this argument runs headlong into the obvious problem that Chapter 21 similarly excludes medicaments for therapeutic uses from that chapter.  In short, CBP is selectively – and arbitrarily – choosing which exclusion to follow and which to ignore.  This is precisely what the Federal Circuit's decision in *Bauer Nike Hockey USA, Inc. v. U.S.*, 393 F.3d 1246, 1252, note 6 (Fed. Cir. 2005) instructed the agency not to do.  In such instances the mutual exclusions are not considered until after classification is determined based on the language of the competing headings.  CBP contends that *Bauer* does not control here because the classification in that case ultimately was determined via the application of the HTSUS' General Rule of Interpretation ("GRI") 3 analysis – this is baseless; nowhere did the *Bauer* court limit its analysis to cases decided via the application of GRI 3.  The *Bauer* decision and *LeMans Corp. v. United States*, 660 F.3d 1311 (Fed. Cir. 2011) control here because they establish that mutual chapter note exclusions effectively nullify one another, and as such the language of the competing headings is dispositive.

Finally, CBP relies upon its own concession that Nutricia's products are therapeutic as the basis on which to exclude them from secondary classification in heading 9817 as articles specially designed for the use of handicapped persons.  In so doing CBP points to the language of U.S. Note 4(b) to subchapter XVII of Chapter 98, which notes that subheading 9817.00.96 does not cover "therapeutic and diagnostic articles."  But this analysis presupposes that "therapeutic" in this context means the same as it does in the context of Chapter 30.  The courts have established that it

3

does not. Rather, "therapeutic articles" in the context of 9817.00.96 are those that heal or cure the underlying ailments. But the subject products here are not curative – they treat underlying conditions, but they do not cure them. As such the referenced language does not exclude to these products from the subheading 9817.00.96 and for the reasons already set forth in Nutricia's principal brief they qualify for secondary classification there.

## ARGUMENT

### I.    CBP Concedes that Nutricia's Medical Foods are "Products for Therapeutic Uses," Confirming These Products Are Properly Classified under Heading 3004

In its motion CBP concedes that medical foods are products for therapeutic uses, stating: "these foods are therapeutic"; "there again is no dispute that Nutricia's medical foods heal, making them 'therapeutic'"; "Nutricia's medical foods . . . are used therapeutically"; "Nutricia's medical foods . . . are all 'therapeutic' articles"; "all the medical foods in question are 'therapeutic' articles"; "Nutricia's medical foods are 'therapeutic' articles"; "Nutricia's medical foods . . . are nevertheless therapeutic articles"; "Nutricia's own expert admits that Nutricia's medical foods are therapeutic"; "[a]ll the subject medical foods are used in nutritional therapy"; "Nutricia's medical foods are therefore therapeutic articles"; "all of Nutricia's medical foods are 'therapeutic' articles[.]" ECF No. 80, 2, 7, 24, 30-33.

Heading 3004 provides for "medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses." HTSUS, Heading 3004 (2014). Having conceded that Nutricia's medical foods fall squarely within the terms of heading 3004, CBP futilely attempts to argue that products for therapeutic uses are not classified under heading 3004 by incorrectly asserting: (1) heading 3004 should be read as an *eo nomine* provision and the term "medicament" is limited to  drugs with active ingredients, (2) Note 1(a) to chapter 30 excludes all foods from heading 3004, and (3) the ENs confirm all foods are excluded

4

from heading 3004. *See* ECF No. 80, 16, 24-25, 16-21.   CBP's arguments are convoluted, contradictory, legally defective and they misconstrue the plain meaning of the terms of heading 3004.

### A.   Heading 3004 Is a Use Provision that Is Not Limited to Drugs with Active Ingredients

CBP argues that to be classified under heading 3004 medical foods must meet the *eo nomine* term "medicament," and that this word means a drug with active ingredients. *See* ECF No. 80, 24. To support its claim CBP cites three dictionary definitions, a publication from a dental association, patent cases, and a Seventh Circuit case on whether the marketing of two drugs violated Illinois state consumer protection laws. *Id*. at 13-15.   CBP also argues that the term medicament cannot mean "a substance used in therapy" because this would violate rules of statutory construction. *Id*. at 22-23.   CBP's arguments are without merit and even the sources  CBP cites do not actually define the term medicaments in the way CBP suggests.

### 1.   CBP's Cited Definitions Confirm Medicaments are Substances Used in Therapy

None of the dictionary definitions CBP identifies actually support the claim that a medicament must be a drug with an active ingredient, including <u>Webster's Third New International Dictionary of the English Language Unabridged</u>, defining medicament as "a substance (as a chemical, medicine, or an ointment) used in therapy." ECF No. 80 at 13 (citing *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 945 (7th Cir. 2001) (quoting *Medicament*, <u>Webster's Third New Int'l Dictionary of the English Language Unabridged</u> 1402 (1993)).  <u>Collins</u> defines "medicament" as "a healing substance; medicine; remedy." *Id*. at 13-14 (citing <u>Collins English Dictionary</u>).  The <u>American Heritage Dictionary</u> defines "medicaments" as an "agent that promotes recovery from injury or ailment; a medicine." *Id*. at 13 (citing <u>American Heritage Dictionary</u>).   The term

"medicine" is defined as a "substance or preparation used in treating a disease" or "a substance that you drink or swallow in order to cure an illness." *See Medicine Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/medicine (last visited Nov. 25, 2022); *Medicine Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/medicine (last visited Nov. 25, 2022). None of these definitions uses the words "drug" or "active ingredient." Rather, these definitions reflect the common meaning of the term "medicament," *i.e.*, the definition Nutricia has set out as well as the definition courts have deployed when construing the tariff schedule – namely, a "medicament" is defined as "a substance used in therapy." *Medicament Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/medicament (last visited Nov. 25, 2022); *Warner-Lambert Co. v. U.S.*, 341 F. Supp. 2d 1272, 1280 (Ct. Int'l Trade 2004) (explaining that medicaments must precipitate therapeutic or prophylactic properties), *affirmed by* 425 F. 3d 1381, 1385 (Fed. Cir. 2005) ("Here, 'medicaments' are described by their use for 'therapeutic or prophylactic' purposes.").

Notwithstanding this consensus as to the nature of medicaments, CBP argues that the term "medicament" in heading 3004 is "interchangeable" with a "drug" and "active ingredient." ECF No. 80, 16. The fact that a drug with an active ingredient may be a "medicament" does not mean that all medicaments are drugs with active ingredients. Drugs with active ingredients are a subset of medicaments. As proof of this proposition, the former Tariff Schedules of the United States ("TSUS") provision that was converted to heading 3004 explicitly distinguished medicaments from drugs, in that it included: "products suitable for medicinal uses, and drugs." *See* **Ex. 1** (*Conversion of the Tariff Schedules of the United States Annotated into the Nomenclature Structure of the Harmonized System, Report on Investigation No 332-131 Under Section 332 of the Tariff Act of*

*1930, Annex III: Cross-Reference From Converted Tariff Schedule to Present TSUSA*, USITC Pub.

1400 (June 1983) (identifying the TSUS items covered by heading 3004 in the HTSUS); *Tariff*

*Schedules of the United States Annotated* (1987), USITC Pub. 1910 (1986) (providing the specific

TSUS provision text) (emphasis supplied)).  The wording of these provisions establishes that

medicaments and drugs are not interchangeable for tariff purposes.  If drugs with active ingredients

were interchangeable with medicaments, then these terms would appear in common definitions or

tariff provisions for medicaments.  They do not, and CBP offers no explanation for why the term

"drugs" is repeatedly used in other HTS headings but "medicaments" is used in Heading 3004.

Moreover, the FDA does not limit the definition of "drugs" to products with active

ingredients.  *See* 21 U.S.C. §321(g)(1).  The FDA definition of a "drug" includes: "articles intended

for use in the diagnosis, cure, mitigation, treatment, or prevention of diseases in a man or other

animals."  *Id*.  Although CBP relies upon FDA regulations to support certain of its claims, CBP

omits this portion of the FDA definition.  *See* ECF No. 80, 11.  For a product to be a drug, the FDA

requires that it be intended for use in the treatment or prevention of diseases; this again aligns with

the term's common meaning.  *See* 21 U.S.C. §321(g)(1); *Drug Definition*, Merriam-Webster.com,

https://www.merriam-webster.com/dictionary/drug (last visited Nov. 26, 2022) (stating that a drug

is "a substance used as a medication or in the preparation of medication"); *Drug Definition*,

CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/drug (last visited

Nov. 26, 2022) ("A drug is a chemical which is given to people in order to treat or prevent an illness

or disease); *Drug Definition*, The American Heritage Dictionary of the English Language,

https://www.ahdictionary.com/word/search.html?q=drug (last visited Nov. 26, 2022) (stating that

a drug is "substance used in the diagnosis, treatment, or prevention of a disease or as a component

of a medication").

CBP also argues that the subject medical foods are not "substances." *See* ECF No. 80, 22. Apart from being facially strange, this argument contradicts CBP's claims that medical foods are a "preparation," which CBP itself defined as a "substance." *Id.* at 10 (citing *Orlando Food Corp. v. U.S.*, 140 F. 3d 1439, 1441 (Fed. Cir. 1998)) (quoting The Oxford English Dictionary 374 (2d ed. 1989)). Because a "preparation" is a "substance," CBP effectively concedes that medical foods are substances and the Court should reject CBP's arguments to the contrary. The common meaning of the term "substance" is broad. *See Substance Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/substance?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited Nov. 25, 2022) ("physical material from which something is made or which has discrete existence"); *Substance Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/substance (last visited Nov. 25, 2022); *Substance Definition*, The American Heritage Dictionary of the English Language Online, https://www.ahdictionary.com/word/search.html?q=substance (last visited Nov. 25, 2022) ("a material of a particular kind or constitution"). CBP's definition of "substance" as a "chemical, a medicine, or an ointment" is too narrow, and contrary to this term's common meaning. Finally, even if CBP is correct, the subject medical foods are substances because they are mixtures of individually-defined chemicals (such as amino acids or, as in the case of Ketocal, a unique ratio of fat-to-protein-to-carbohydrate calorie formula). *See* Pl.'s Mot. Summ. J., ECF No. 73, 13, Exs. 8-8E (including the Ketocal unique formula ratio and chemical formulas for each amino acid ingredient); *see also Amino Acid Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/amino-acid (last visited Nov. 26, 2022) ("**Amino acids** are *substances* containing nitrogen and hydrogen that are found in proteins.")

(second emphasis added).  In short, there is no legal or factual basis for CBP's contention that medical foods are not a "substance."

### 2.    CBP Improperly Relies Upon Pharmaceutical Resources and Cases

CBP's reliance on an technical glossary by the American Dental Association, a pharmaceutical publication and pharmaceutical case law is equally flawed. *See* ECF No. 80, 15. The dental glossary states that a "medicament" is a "[s]ubstance . . . to prevent or treat diseases in humans," which is strikingly similar to the common definition of "medicament" as set out in Section III(A)(1)(a). *Id*. But this source then adds the phrase "intended to be pharmacologically active." *Id*. This is an outlier definition from a single source in the dental industry – as such, it cannot displace the more common understanding of the term "medicament" as it must be defined in the context of heading 3004.[1]  Absent an indication of specific legislative intent, outlier technical or commercial definitions are irrelevant to the meaning of tariff terms. *See Hartmann Trunk Co. v. U.S.*, 27 C.C.P.A. 254, 257, (1940) (holding that tariff acts are drawn in the language of commerce, which presumes their common use, and not in the language of science); *see also Lerner New York, Inc. v. United States*, 37 C.I.T. 604, 608 (2013), *a'ff'd sub nom. Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102 (Fed. Cir. 2014).  There is no such clear legislative intent to the contrary here.

The patent cases and case on state consumer protection law CBP relies upon are equally irrelevant.  These cases are limited to pharmaceutical products, and none of them addresses or defines the term "medicament." *See* ECF No. 80, 15.  These cases say only, in *dicta*, that drugs with active ingredients are medicaments.  *See In re Halley*, 296  F.2d  774-75  (C.C.P.A.  1961)

---

1 Chapter 30 is entitled "Pharmaceutical Products"; however, GRI 1 establishes that the titles of chapters are for "ease of reference" only and have no legal relevance in interpreting the terms of headings within the chapter. HTSUS, General Notes (2014).  As explained, the headings within Chapter 30 cover far more than pharmaceutical products.

(suggesting, in the context of a pharmaceutical patent application proceeding involving a tablet with an active pharmaceutical ingredient, that medicaments are separate and apart from "inert fillers"); *A.H. Robins Co. v. Erbamont, Inc.*, No. C2-89-864, 1991 WL 229150 at *5 (S.D. Ohio Apr. 18, 1991) (suggesting, in the context of a pharmaceutical patent infringement action, that medicaments may have active ingredients).[2]    It is not surprising that pharmaceutical cases, and other pharmaceutical resources like an Dental definition and pharmaceutical dosage publication, would consider drugs with active ingredients to be medicaments because the products in the pharmaceuticals industry typically do have active ingredients. *See* ECF No. 80, 14-15 (citing Loyd V. Allen, Jr. & Howard C. Ansel, *Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems* 763 (10 ed. 2014); *Medicament*, American Dental Association Glossary of Dental Clinical Terms, https://www.ada.org/publications/cdt/glossary-of-dental-clinical-terms)). But these sources do not change the common meaning of "medicaments" as used in the tariff schedule (*see* headings 3003 and 3004, HTSUS (2014)), do not confirm these terms are interchangeable, and cannot be used to limit the plain meaning of the terms of heading 3004.

---

[2] *See also Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368 (Fed. Cir. 2001) (considering the antitumor drug paclitaxel, which was an active ingredient in Bristol's anticancer drug, as part of a patent infringement case); *In re Anderson*, 471 F.2d 1237, 1242 (C.C.P.A. 1973) (describing, as part of an application for patent proceeding for a type of surgical dressing, statements made by the Patent Office Board of Appeals that "medicaments" include materials such as anti-coagulating agents and debriding agents); *In re Sulzberger*, 56 F.2d 872 (C.C.P.A. 1932) (considering an appeal from a patent application claim rejection covering certain laxative chewing gum, but not including a discussion of the term "active ingredient").

### 3.     CBP's Interpretation of Heading 3004 Violates Basic Rules of Statutory Construction

CBP asserts that Nutricia argued that the term "medicament" is limited to "a substance used in therapy" and that such an interpretation would make the other terms of heading 3004 superfluous in violation of rules of statutory construction. *See* ECF No. 80, 21-23.  CBP's argument is specious and the basic rules of statutory construction confirm CBP's interpretation of heading 3004 is wrong.

The correct focus of Nutricia's argument was that heading 3004 is a use provision, and that the Court must consider the use of medical foods (*Carborundom* factors) to confirm classification under this heading. *See* ECF No. 73, 25-35.  CBP's argument creates an *eo nomine* strawman, focusing solely on the term "medicament" to shift the Court's attention away from the fact that heading 3004 is a use provision.

First, CBP incorrectly defines the scope of heading 3004 because it defines the term "medicaments" without proper consideration of the other terms and context of the heading.   When construing a statute, like tariff provisions, the terms must be read together, in harmony and the context of the entire provision must be considered. *See Jana Sales Co., Inc. v. U.S.*, 402 F.2d 1014, 1015 (C.C.P.A. 1968) (holding that *in pari materia* is an elemental rule of construction that all the parts of an act relating to the same subject should be considered together, and not each by itself); *see also Amcor Flexibles Singen Gmbh v. United States*, 425 F. Supp. 3d 1287, 1302 (Ct. Int'l Trade 2020).  Heading 3004 states that "medicaments" are articles "**consisting of** mixed or unmixed products for therapeutic or prophylactic uses." HTSUS, Heading 3004 (2014) (emphasis added).  Heading 3004 clarifies and explains what constitutes a "medicament."   It does not create two separate categories of products (medicaments and products for therapeutic use).  The plain terms of

the heading confirm that medicaments may treat or prevent a disease (i.e., they consist of products that are "for therapeutic or prophylactic uses"), which medical foods do. *See* HTSUS, Heading 3004 (2014) ("Medicaments . . . consisting of mixed or unmixed products for therapeutic or prophylactic uses"). Reading all of the terms of heading 3004 in context and in harmony establishes that the heading terms are not in conflict with the common meaning of the term "medicament" (*e.g.*, a "substance used for therapy") and are not superfluous. To the contrary, the full terms of heading 3004 remove any ambiguity of what medicaments are classified under this heading and establish that confirming whether a product is a medicament requires examination of its use of the product (*i.e.*, the extent to which that use is therapeutic or prophylactic).

CBP cites *Warner* for the proposition that the term "medicaments" must be defined differently and more narrowly than its common meaning (*e.g.*, "drugs containing active ingredients). *See* ECF No. 80, 23-24. But, the court in *Warner* did not limit the way the term "medicament" is defined; in fact, it defined the term quite broadly. *See Warner-Lambert Co. v. U.S.*, 425 F.3d 1381, 1385 (Fed. Cir. 2005) (stating that "medicaments" are described by their use for therapeutic or prophylactic purposes). Specifically, the court held that Vitamin C lozenges were "medicaments" under heading 3004 because they cure or prevent scurvy (*i.e.*, they are substances with a therapeutic or prophylactic use), but the court ruled that to confirm the lozenges are classified under heading 3004 the products also must be principally used for therapeutic or prophylactic uses. *See id*. This required an analysis of the *Carborundum* factors, which showed that the products were not in fact promoted or sold for therapeutic or prophylactic uses. *See Warner-Lambert Co., v. U.S.*, 341 F. Supp. 2d, 1272, 1282 (Ct. Int'l Trade 2004), *aff'd*, 425 F.3d 1381 (Fed. Cir. 2005). Thus, the court ruled Vitamin C lozenges were not classified under heading 3004, even though they were "medicaments." *Id*. *Warner* supports Nutricia's position that the term "medicament" is broadly

defined, and the subsequent terms of the heading (*e.g.*, products for therapeutic uses) narrows and explains the class or kind of medicaments that are classified under heading 3004.

Second, CBP improperly attempts to construe heading 3004 by including the terms "drugs" and "active ingredients," which do not appear in the heading.  The term "drug" appears in the HTSUS in over fifty individual tariff provisions – all of which fall within chapter 29 (Organic chemicals). *See* HTSUS, Chapter 29 (2014), **Ex. 2** (Excerpts of HTSUS (2014) reflecting provisions using the term "drug").  The historical versions of the tariff provisions preceding heading 3004, *i.e.*, TSUS items, demonstrate that the provisions were designed to cover more than just drugs. *See, e.g.*, TSUS (1987), Item 410.48-410.66 (providing for a category of merchandise described as "<u>Products suitable for medicinal use</u>" apart from "drugs"); **Ex. 1** (providing TSUS items that converted to "medicaments . . . for therapeutic and prophylactic uses" in heading 3004 include both "products for medicinal use, <u>and</u> <u>drugs</u>").  Congress clearly was well aware of the term "drugs," but declined to use it in crafting heading 3004, instead relying on the broader term "medicaments."  Had Congress wished or intended to limit products classified under heading 3004 to drugs with active ingredients it would have used those terms – but it did not.  Thus, interpreting heading 3004 as CBP suggests would violate basic rules of statutory construction. *See Kahrs Int'l, Inc. v. U.S.*, 713 F.3d 640, 646 (Fed. Cir. 2013) (court saw no reason to read additional limitations into the language of the tariff schedule).  For these reasons the Court should reject CBP's attempts to redefine the term "medicament."  Instead, to define this term the Court should rely on the numerous sources, Federal Circuit decisions (*see, e.g.*, *Warner-Lambert Co.*, 425 F.3d 1381 (Fed. Cir. 2005)) and the terms of the heading itself, which define a "medicament" as a substance for therapeutic or prophylactic uses.

13

**4.      Even if CBP Is Correct That Heading 3004 Is an *Eo Nomine* provision, Medical Foods Still Are Classified Thereunder**

Even if CBP's argument that heading 3004 is in part an *eo nomine* provision for "medicaments" that only includes drugs with active ingredients, medical foods meet this definition and therefore remain classified under heading 3004.  Under any definition, to confirm whether a product is a "medicament" or a "drug" requires an analysis of the product's use. *See Warner-Lambert Co. v. U.S.*, 341 F. Supp. 2d 1272, 1281-83 (Ct. Int'l Trade 2004), *aff'd* 425 F.3d 1381 (Fed. Cir. 2005) (holding that classification under heading 3004 requires an analysis of the *Carborundum* factors to identify the good's principal use); HTSUS, Heading 3004 (2014); 21 U.S.C. §321(g)(1)(B).  The sources on which CBP relies define the terms "medicament" and "drug" by "use" – for example, a definition for "medicament" as a substance used for therapy, and a U.S. Food and Drug Administration ("FDA") definition of a "drug" that, in its entirety, includes products "for use in" treating or preventing diseases. *See* ECF No. 80, 11, 13.  And in such circumstances, courts will consider the use of a product to confirm classification in an *eo nomine* provision.  The Federal Circuit has ruled that when interpreting certain *eo nominee* tariff terms, "the name itself inherently suggests a type of use." *Ford Motor Co. v. U.S.*, 926 F.3d 741, 750 (Fed. Cir. 2019) (quoting *Carl Zeiss, Inc. v. U.S.*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)).  Thus, even if the Court accepts CBP's tariff interpretation , the Court still must consider the use of medical foods to determine whether these products meet the definition of a "medicament."  As demonstrated, medical foods are used as "medicaments" in that they have therapeutic uses, and they meet the definition of "medicaments" under heading 3004. *See* ECF No. 73, 30-31; ECF No. 80, 2, 7, 24, 30-33.

Medical foods also meet the statutory definition of "drugs." *See* 21 U.S.C. §321(g)(1)(B). The FDA does not require a drug to have an active ingredient and includes products that are used

to prevent or treat diseases. *See* 21 U.S.C. §321(g)(1)(B). CBP concedes that medical foods are used to prevent or treat diseases; this necessarily means, that medical foods meet the definition of a drug. *See* ECF No. 80, 3, 31. The reason that medical foods are not regulated by the FDA as drugs (even though they meet the definition of a "drug") is simply because the FDA wanted to encourage the development of medical foods without restricting innovation and distribution to infants and children who suffer from rare and life-threatening diseases. *See* 61 Fed. Reg. 60661, 60662 (Nov. 29, 1996).[3] Thus, medical foods are exempted from FDA regulations on drugs. *See* 61 Fed. Reg. 60661, 60662 (Nov. 29, 1996).The last invented criterion that CBP argues is required for a product in heading 3004 is that the product have an active ingredient. *See* ECF No. 80, 16 ("[A] medicament is a medicinal substance containing an active pharmaceutical ingredient, such as a drug."). But, medical foods have "active ingredients" per the FDA regulations, which define "active ingredient" as:

> [A]ny component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or other animals. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect.

21 C.F.R. §210.3(b)(7) (emphasis added). The FDA defines this term broadly and ingredients do not need to furnish "pharmacological activity" to be considered an active ingredient. *Id*. As long as the ingredient provides any direct effect in the mitigation or prevention of disease it is an active ingredient. *Id.* Here, Nutricia's medical foods contain ingredients, *e.g.*, specially-produced, chemically synthesized, individual amino acids that are designed and combined to create a product

---

[3] The final rule regulating medical foods are proposed by the FDA in 61 Fed. Reg. 60661 (Nov. 29, 1996) was not promulgated. *See* 68 Fed. Reg. 19766 (Apr. 22, 2003). We cite and discuss the proposed rule herein because the historical context and discussion of the agency's regulation of medical foods remains accurate.

15

used to obtain the desired therapeutic effect; preventing rare and life-threatening diseases in infants and toddlers. *See* ECF No. 73, Exs. 7, 8A-8E, 11, 14, 16, 18.[4]  These ingredients meet the FDA definition of active ingredients, as well as CBP's unlawfully narrow definition of "medicament." *See* ECF No. 80, 13; ECF No. 73, Exs. 8A-8E.

For example, MSUD Lophlex® LQ is used as nutrition therapy for children who suffer from a severe, life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase complex deficiency, (also called Maple Syrup Urine Disease or MSUD), an inborn error of the metabolism. *See* ECF No. 73, Ex. 2, Compl. ¶¶ 25, 29, 31, 35; Ex. 5A, 2; Ex. 6, Yanicelli Dep. 46:22– 48:1; Ex. 1, 11.   In this permanent and potentially fatal condition, children have impaired ability to metabolize three of the twenty essential amino acids that appear in all foods required to sustain life: leucine, valine and isoleucine.  To treat this disease, Nutricia designed and produced MSUD Lophlex® LQ using individual amino acids (such as L-Tryptophan, L-Alanine, and L-Arginine) that are synthesized "chemicals" (per, *e.g.*, the chemical formulas [       ] for L-Tryptophan, [    ] for L-Alanine, and [   ] for L-Arginine) intended to have the direct effect of mitigating and preventing MSUD in infants. *See* ECF No. 73, Ex. 8B, 10-11, 18-19, 24-25.   The amino acid ingredients, therefore, fall squarely within the FDA definition of active ingredients. *See* 21 C.F.R. §210.3(b)(7).

---

[4] Ketocal's constituents are not individual amino acids but rather specific fats in a high fat-to-carbohydrate ratio that trigger a biological reaction in the patient's brain – as such they too have "active ingredients" though they differ from the active ingredients in the other subject products. *See* ECF No. 73, 13.

B.      **CBP Improperly Relies on Chapter 30, Note 1(a) to Claim All Foods Are Excluded From Classification under Chapter 30**

1.      **Reliance on Chapter 30 Note 1(a) Is Legally Impermissible**

CBP claims medical foods cannot be classified under heading 3004 because Note 1(a) to chapter 30 excludes all foods from chapter 30. *See* ECF No. 80 at 16-19.  However, Note 1(a) cannot be used to exclude products from chapter 30 in this case because Note 1(f) to chapter 21 excludes goods classified under heading 3004 from chapter 21. *See* Note 1(f), Chapter 21, HTSUS (2014).   Under *Bauer*, when there are mutually exclusive chapter notes classification is first determined according to the relative specificity of the competing headings' text. *See Bauer Nike Hockey USA, Inc. v. U.S.*, 393 F.3d 1246, 1252, note 6 (Fed. Cir. 2005).  CBP suggests that *Bauer* is inapplicable because the court ultimately applied a GRI 3(a) analysis, and cites *LeMans Corp. v. United States*, 660 F.3d 1311 (Fed. Cir. 2011) to support its claims. *See* ECF No. 80, 28-29.  CBP's assertions are in error.

The holding in *Bauer* is not limited to a GRI 3(a) analysis.  As CBP points out, the Federal Circuit in *Bauer* stated: "Resorting to the exclusionary note before applying the rule of specificity . . . would yield the somewhat arbitrary result that the subject merchandise could be classified under different chapters based solely on which chapter the analysis began." *See* ECF 80, 29; *Bauer Nike Hockey USA, Inc. v. U.S.*, 393 F.3d 1246, 1252-53, note 6 (Fed. Cir. 2005).  Despite the Federal Circuit's warning, this is exactly what CBP has done here.  CBP begins with the assumption that the medical foods are classified under heading 2106, and then concludes that medical foods cannot be classified under heading 3004 based on Note 1(a) to chapter 30.  While the court in *Bauer* had to confirm classification using GRI 3 because the product was *prima facie* classifiable under two headings, the court in *Bauer* first determined which competing heading was more specific, then merely cited the exclusionary note as support. *See id.* at 1252, note 6.  Had the *Bauer* court

17

interpreted the exclusionary notes as CBP suggests here, then the *Bauer* court would not have needed to apply GRI 3(a) and would have classified the goods pursuant to GRI 1 based on the exclusionary note. The fact that the *Bauer* court did apply GRI 3(a) confirms that it did not consider the competing exclusionary notes as part of its GRI 1 analysis.

*LeMans* does not support CBP's claims either because, as in *Bauer*, the court first determine whether or not there were competing headings based solely on the terms of the headings, and not did not consider the exclusionary note until after it confirmed there was only one viable heading. *See LeMans Corp. v. U.S.*, 660 F.3d 1311, 1322, note 7 (Fed. Cir. 2011). In *Lemans*, the Court ruled that motor jerseys, pants and jackets were not sports equipment in chapter 95, and thus were classified in chapters 61 and 62 as wearing apparel under GRI 1. *See LeMans Corp.* at 1316. Here, the Court should similarly apply a GRI 1 analysis and classify medical foods under heading 3004. There is no need to resort to a GRI 3(a) analysis because heading 2106 is a basket provision, only including goods "not elsewhere specified." HTSUS, Heading 2106 (2014). Thus, if medical foods are classified under heading 3004, the Court's job is done.

CBP's reliance on Note 1(a) to chapter 30 also is legally impermissible because for Note 1(a) to apply CBP must start with the assumption that medical foods are classified under heading 2106. But under GRI 1 and the terms of this heading, a good may only be classified under heading 2106 if the good is not classified elsewhere. *See* HTSUS, Heading 2106 (2014) (providing for "food preparations not elsewhere specified or included"). No good can be classified under heading 2106 until after it is established that no other heading covers the good. *See EM Indus. v. U.S.*, 999 F. Supp. 1473, 1480 (Ct. Int'l Trade 1998) ("'Basket' or residual provisions of HTSUS Headings . . . are intended as a broad catch-all to encompass the classification of articles for which there is no more specifically applicable heading."); *R.T. Foods, Inc. v. U.S.*, 757 F.3d 1349, 1354 (Fed. Cir.

18

2014) (describing heading 2106 as a basket provision and confirming that any products that are specified or included in another heading cannot be classified in heading 2106).  Thus, because classification under heading 2106 cannot be established until after classification under heading 3004 is precluded, the Court cannot apply note 1(a) to chapter 30.

### 2.    Note 1(a) to Chapter 30 Does Not Include Medical Foods

Assuming it is legally permissible to apply note 1(a) to chapter 30, CBP incorrectly suggests that this note covers medical foods. *See* ECF No. 80, 16.  CBP ignores the plain text of Note 1(a), which states that chapter 30 does not cover "[f]oods or beverages (such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters), other than nutritional preparations for intravenous administration (section IV) [.]" HTSUS, Heading 3004 (2014).  This note does not state all foods are excluded from chapter 30.  If Congress wanted to exclude all food and beverages from chapter 30, then the note would simply read "Articles of Chapters 21 and 22." It does not.  Instead, Congress drafted the terms of note 1(a) to exclude only specific categories of foods. *See ENI Tech., Inc. v. U.S.*, 641 F. Supp. 2d 1337, 1354-1355 (Ct. Int'l Trade 2009) (applying *expressio unius est exclusion alterius*—the expression of one thing is the exclusion of another—to limit a broad definition provided in the ENs to four enumerated examples); *see also Rubie's Costume Co. v. U.S.*, 337 F.3d 1350, 1357 (Fed. Cir. 2003) ("[A] reading of the exclusion in note 1(e) to Chapter 95, HTSUS, that focuses solely on the term 'fancy dress' and turns a blind eye to the immediately following words 'of textiles, of chapter 61 or 62' construes the term fancy dress in disregard of the context of the exclusion as a whole.").

CBP ignores the exemplars and construction of note 1(a) to improperly broaden the scope of the exclusion. *See* ECF 80, 16-18.  The exemplars inform and limit the scope of the exclusion to foods that are, or are similar to, dietetic, diabetic or fortified foods, and food supplements. *See* Note

19

1(a), Chapter 30, HTSUS.  When such exemplars and text appear, they require an *ejusdem generis* analysis to confirm whether the products are within the same class or kind as the products listed in the exemplars. *See Sports Graphic, Inc. v. U.S.*, 24 F.3d 1390, 1392 (Fed. Cir. 1994) ("As applicable to classification cases, ejusdem generis requires that the imported merchandise possess the essential characteristics or purposes that unite the articles enumerated *eo nomine* in order to be classified under the general terms.") (omitting internal citation).  Medical foods are not similar to the listed exemplars, contrary to CBP's claim. *See* ECF No. 80, 16-18.  To substantiate its claim, CBP points to Exhibit 8B-8E to Nutricia's MSJ, which represent the amino acid specifications for MSUD Lophlex, Periflex Infant, Periflex Junior, and Neocate. *Id*. at 18-19.  Among the eighteen or more ingredient specifications comprising each product, in each case approximately four chemical specifications for certain individual amino acids describe the ingredients as used for manufacturing "dietetic goods" that "provid[e] nutrition." *See, e.g.*, ECF 73, Ex. 8B, 32 (L-Aspartic acid), 42 (L-Cystine), 91 (L-Threonine), 100 (L-Tyrosine).  Importantly, other specifications confirm the individual amino acids as being for used for "medical" purposes. *Id*. 24-30 (L-Arginine).

The term "dietetic" is not defined in the HTSUS.  To ascertain its meaning, we must apply the common and commercial meaning of the term. *See Carl Zeiss, Inc. v. U.S.*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) ("Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same.  A court may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources.").  The term "dietetic" means "of or relating to diet" and the term "diet" means "what a person or animal usually eats and drinks; daily fare"; "a special or limited selection of food and drink, chosen or prescribed to promote health or a gain or loss of weight." *See Dietetic Definition*, Merriam-Webster.com, https://www.merriam-

20

webster.com/dictionary/dietetic (last visited Nov. 27, 2022) (defining "dietetic" as "of or relating to diet"); *Diet Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/diet (last visited Nov. 27, 2022) (defining "diet" as "food and drink regularly provided or consumed" and "the kind and amount of food prescribed for a person or animal for a special reason" and a regimen of eating and drinking sparingly so as to reduce one's weight"); *Dietetic Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/dietetic (last visited Nov. 27, 2022) (defining "dietetic" as the "food or drink that that has been specially produced so that it does not contain many calories"); *Diet Definition*, CollinsDictionary.com, https://www.collinsdictionary.com/us/dictionary/english/diet (last visited Nov. 27, 2022) (defining "diet" as what a person or animal usually eats and drinks; daily fare" and "a special or limited selection of food and drink, chosen or prescribed to promote health or a gain or loss of weight").

Medical foods are not "dietetic" foods as provided in Note 1(a) to chapter 30, and are distinct from foods that a person usually eats or foods designed for special dietary use (*e.g.*, for weight loss). For instance, fat-free foods (*e.g.*, skim milk) are substances that one can ingest for better dietetic balance, but one can also achieve the same goal simply by simply avoiding certain food in one's diet – and it therefore is not a medical food.   In contrast, a medical food is specially designed product containing chemically synthesized individual amino acids that treat and prevent diseases and must be taken by patients because modification of a normal diet will not work. *See* ECF No. 73, Exs. 7, 8A-8E, 11, 14, 16, 18.

Note 1(a) also excludes diabetic or fortified foods and food supplements.  Note 1(a), Chapter 30, HTSUS (2014).  There is no dispute that medical foods are not diabetic or fortified foods or food supplements. *See* ECF No. 80, 25 ("Nutricia's medical foods are not food supplements"); *see*

21

*generally* ECF No. 80 (setting forth no argument that Nutricia's medical foods are diabetic or fortified foods). Food supplements are designed to promote general health and wellbeing and, as described above, are considered an additive to one's diet of conventional foods. *See* EN 2106 (2012) (instructing that food supplements contain added vitamins and sometimes iron compounds and "are often put up in packaging with indications that they maintain general health or well-being"); EN 3004 (2012) (describing food supplements containing vitamins or mineral salts that are put up for maintaining health or well-being). Diabetic or fortified foods are consumed to manage the nutrients (*e.g.*, vitamins or sugar) using a modified diet of conventional food. *See Diabetic Definition, Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/diabetic (last visited Nov. 29, 2022) (defining "diabetic" as "of or relating to diabetes or diabetics"); *Diabetics diet: Create your healthy eating plan*, MayoClinic.org, https://www.mayoclinic.org/diseases-conditions/diabetes/in-depth/diabetes-diet/art-20044295 (last visited Nov. 29, 2022) ("A diabetes diet is a healthy-eating plan that's naturally rich in nutrients and low in fat and calories. . . . In fact, a diabetes diet is the best eating plan for most everyone."); *Fortified Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/fortified (last visited Nov. 29, 2022) (defining "fortified" as "enriched (as with vitamins or minerals) so that nutritional value is improved"); *Food Fortification*, WHO, https://www.who.int/health-topics/food-fortification#tab=tab_1 (last visited Nov. 29, 2022) ("Fortification is the practice of deliberately increasing the content of one or more micronutrients (i.e., vitamins and minerals) in a food or condiment to improve the nutritional quality of the food supply . . . .").

The unifying theme among all the exemplars in note 1(a) to chapter 30 is that they are complements to a person's typical diet or part of an avoidance or fortification diet that can be managed by modifying one's normal diet. The exemplar products are marketed and sold in a

fashion similar to conventional foods.  Medical foods do not fall within this class or kind of foods because by definition medical foods are taken only under medical supervision, when modification of a conventional diet is impossible or insufficient. *See* 21 U.S.C. §360ee(b)(3); 21 C.F.R. §101.9(j)(8).  In addition, Nutricia's medical foods are specially formulated substances made from medical-grade, chemically-synthesized amino acids that are  sold to medical distributors, purchased from pharmacists or distributed in health institutions (e.g., hospitals), and covered by insurance. *See* ECF No. 73 at 17-18.  Medical foods are not of the same class or kind of substances excluded from heading 3004 by note 1(a), and this note does not apply. *See Sports Graphic, Inc. v. U.S.*, 24 F.3d 1390, 1392 (Fed. Cir. 1994) ("As applicable to classification cases, *ejusdem generis* requires that the imported merchandise possess the essential characteristics or purposes that unite the articles enumerated *eo nomine* in order to be classified under the general terms.") (omitting internal citation).  Thus, medical foods are not covered by note 1(a) to chapter 30 and the Note does not exclude medical foods from classification under heading 3004.

CBP's reliance on a diet therapy publication, which broadly covers any illness a child may have, does not confirm medical foods are in the same class or kind as dietetic and other products described in the chapter 30, note 1(a) exemplars. *See* ECF No. 80, 11-12, 18-19.  This publication does not provide any insight into the unique physical characteristics of medical foods, or how medical foods are used, advertised, marketed and sold compared with normal foods and dietetic foods. *See generally* Peggy Stanfield & Y.H. Hui, Nutrition and Diet Therapy: Self-Instructional Approaches 358 (5th ed. 2010) (providing no discussion of the term "medical foods").  As established above, examining the relevant factors confirms medical foods are not similar to the exemplars in note 1(a) to chapter 30.

Finally, CBP's suggestion that the clause "other than nutritional preparations for intravenous administration" expands the scope of note 1(a) chapter 30 to cover all foods except those taken intravenously – ignores the exemplars and violates the rules of grammar. *See* ECF No. 80, 17-18; *Alcan Food Packaging (Shelbyville) v. U.S.*, 929 F. Supp. 2d 1338, 1345 (Ct. Int'l Trade 2013) (finding that, when separated by a comma, a limiting clause modifies the entire preceding clause or clauses). The clause "other than nutritional preparations for intravenous administration" modifies and limits the entire preceding phrase "[f]oods or beverages (such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters)," and only the types of foods and beverages of the same kind as those listed that are taken intravenously are excluded from the note. *See* Note 1(a), Chapter 30, HTSUS (2014). The modifying clause, which begins with the phrase "other than," cannot be used to expand the products covered by the preceding clause.

### C.   The ENs Confirm that Medicaments for Therapeutic Use Include Foods that Consist of Nutrients

CBP states that the ENs "unambiguously" confirm that heading 3004 does not cover any foods preparations containing only proteins, carbohydrates, fats, vitamins and minerals. *See* ECF 80, 21. The ENs to heading 3004 state:

> The provisions of the heading text do not apply to foodstuffs or beverages such as dietetic, diabetic or fortified foods . . . which fall to be classified **under their own appropriate headings**. This is **essentially** the case as regards food preparations containing only nutritional substances.

EN 3004 (2012) (second emphasis added). But, the ENs do not exclude all foodstuffs or preparations with nutrients from heading 3004, and CBP may not use the ENs to limit the terms of the heading itself. *See Rubie's Costume Co. at* 1359 ("Although the examples in the Explanatory Notes are probative and sometimes illuminating, we shall not employ their limiting characteristics, to the extent there are any, to narrow the language of *the classification heading itself*.") (emphasis

added); *see also Michael Simon Design, Inc. v. U.S.*, 501 F.3d 1303, 1307 (Fed. Cir. 2007) (holding

that, where the tariff provision was unambiguous and an amendment was made to the ENs that was

contrary to U.S. customs court precedent, the court would not afford the ENs any weight) (citing

*Rubie's Costume Co.* at 1359).

The ENs provide two consistent guidelines on when food preparations or other products

with nutrients are classified under heading 3004: (1) if the product is for the general health and

well-being of individuals (*e.g.*, a better dietetic balance), then it is not classified under heading

3004, and (2) if the product is for therapeutic or prophylactic use, then it is classified under heading

3004. For example, the ENs to heading 3003 and 3004 state that foodstuffs and beverages with

medicinal substances are <u>not</u> classified under these headings if the medicinal substances are added

"solely to ensure a better dietetic balance to increase the energy giving or nutritional value of the

product or to improve its flavor" and further explain that "food supplements containing vitamins or

mineral salts which are put up for the purpose of maintaining health or well-being <u>but have no</u>

<u>indication as to use for the prevention of any disease or ailment</u>" also are <u>not</u> classified under these

headings. EN 3003 (2012); EN 3004 (2012) (emphasis added). In comparison, preparations that

contain foodstuffs that serve merely as a support or vehicle or sweetening agent for a medicinal

substance remain classified under heading 3004. EN 3003 (2012); EN 3004 (2012). The ENs to

heading 2106 further state that food supplements containing vitamins that indicate they are for

maintaining general health or well-being are classified under heading 2106; but that "[s]imilar

<u>preparations . . . intended for the prevention or treatment of diseases or ailments</u>" are classified

under headings 3003 or 3004. EN 2106 (2012) (emphasis added).

As demonstrated, medical foods are not dietetic foods for the purpose of maintaining general

health and well-being, but rather are intended for use in the treatment and prevention of diseases.

25

*See* 21 U.S.C. §360ee(b)(3); 21 C.F.R. §101.9(j)(8).  Medical foods contain nutritional substances, as well as chemically synthesized individual amino acids, which are the medicinal substances or active ingredients that provide the direct effect in treating and preventing diseases.  *See* ECF No. 73, Exs. 7, 8-8E, 11, 14, 16, 18; *see also* 21 C.F.R. §210.3(b)(7).  Because medical foods are not for the general health and well-being of individuals, but rather are indicated in the treatment and prevention of specific diseases, the ENs confirm that these products are classified under heading 3004 and not 2106.

CBP also states that goods that contain "only nutritional substances" may not be classified under heading 3004.  *See* ECF No. 80, 19.  As a threshold matter, it is not the case that Nutricia's products contain "only nutritional substances" as CBP suggests.  To the contrary, they also contain flavors, binders, texturizers, and the like, none of which has meaningful nutritive value.  *See* ECF No. 73, Exs. 7, 11, 14, 16, 18.  Putting this aside the ENs squarely contravene CBP's interpretation, as numerous products entirely made of or derived from nutritional substances are classified as medicaments for therapeutic uses under headings 3003 or 3004.  For example, according to the ENs to heading 3003 (which provides for medicaments consisting of constituents for therapeutic or prophylactic purposes that are not put up in measured doses) includes: certain salts, oils, plant mixtures, and vegetable extracts, all of which only contain nutrients and are classified under heading 3003 because of their use as therapeutic products.  *See* EN 3003 (2012).  CBP has routinely classified products containing only nutritional ingredients such as oils, plants and vegetable extracts in heading 3004.  *See* HQ H243587 (July 16, 2014) (classifying certain liquid-filled chewing gum containing artificial sweeteners and certain plant ingredients for natural stress relief under heading 3004); HQ 963172 (Aug. 10, 2000) (classifying tablets containing a semisynthetic derivative of Galantamine, a naturally-occurring vegetable alkaloid obtained from certain species of flowers for

therapeutic uses, under heading 3004); HQ H253927 (Nov. 20, 2014) (classifying Ergocalciferol capsules (Vitamin D), soybean oil, gelatin, glycerol, water and coloring under heading 3004). *See* **Ex. 3** (CBP Rulings).

Finally, CBP argues that medical foods are not food supplements.[5]  ECF No. 80, 25-27. Based on the ENs, CBP must acknowledge that products such as food supplements that are made only of nutrients remain classified under heading 3004 as long as they are intended for therapeutic uses. *See* EN 3004 (2012); *see also* **Ex. 3**.  But the ENs to heading 3004 indicate that other food preparations and nutritional products for therapeutic uses classified under heading 3004 are not limited to food supplements – *i.e.*, similar food preparations and foodstuffs that contain medicinal substances (which may be nutritional) remain classified under heading 3004, if the products have therapeutic uses. *See* EN 3004 (2012).  The ENs do not specifically mention medical foods, but it defies logic to suggest that food supplements, similar food preparations, and medicinal substances with foodstuffs or beverages containing only nutritional ingredients and for therapeutic uses all are classified under heading 3004 according to the ENs, and yet somehow medical foods are not.

**II.** **Nutricia's Medical Foods Cannot Be Classified under Heading 2106**

CBP improperly begins its classification analysis by stating that medical foods are food preparations under heading 2106, which provides for food preparations not elsewhere specified or included. *See* ECF No. 80, 9.  Heading 2106 is a basket provision , which is to say that classification there is possible only where the goods are not specified or included elsewhere. *See EM Indus.* at

---

[5] The fact that food supplements for therapeutic uses are classified under heading 3004 contradicts CBP's argument that all food preparations (which include food supplements) are excluded from heading 3004 pursuant to chapter 30, note 1(a).  Also, despite CBP's argument that medical foods are not put up for sale in the same doses as food supplements, there can be no dispute that the subject medical foods are put up for retail sale in measured doses. *See* ECF No. 73, Ex. 1 (Essers Report), 5: ¶37, 6: ¶48, 7: ¶58, 8: ¶69, ¶77 (stating that, for each Nutricia product at issue, the administration and dosage taken by an individual patient is determined by a physician or healthcare professional).

1480 ("'Basket' or residual provisions of HTSUS Headings . . . are intended as a broad catch-all to encompass the classification of articles for which there is no more specifically applicable heading."); *R.T. Foods, Inc. v. U.S.* at 1354 (Fed. Cir. 2014) (describing heading 2106 as a basket provision and confirming that any products that are specified or included in another heading cannot be classified in heading 2106); *see also* HTSUS, General Notes, GRI 1.  The classification analysis must begin with the question, "Are the Nutricia goods medicaments of heading 3004?"  If CBP could demonstrate that the goods are not medicaments, then, and only then, may the Court consider whether the products are food preparations of heading 2106.  As established, Nutricia's medical foods do fall within the terms of heading 3004 as medicaments for therapeutic use and, therefore, the classification analysis ends there without having to consider heading 2106 pursuant to GRI 1.

CBP's analysis of why medical foods are classified under heading 2106 is also flawed because it (1) does not consider how the products are used, (2) incorrectly suggests that medical foods are regulated by the FDA like foods, and (3) improperly relies on a Canadian case that was later overturned by the Canadian government.

### A.     Heading 2106 Is a Use Provision Not Covering Medical Foods

CBP defines the term "food" as "material consisting generally of protein, carbohydrate, and fat used in the body of an organism to sustain growth, repair, and vital processes and to furnish energy[.]"  ECF No. 80, 9.  CBP concludes that Nutricia's medical foods meet this definition because the "products contain only nourishing combination of nutritional substances[.]" ECF No. 80, 10.  However, heading 2106 is a use provision (a material "used" in the body), and to confirm classification of a product under this provision requires an examination of the product's use.  *See Strauss v. U.S.*, 43 Cust. Ct. 136 (1959) (holding that chewing gum, which contained certain nutrients including sugar and dextrose syrup, was not an "edible preparation for human

consumption" because it is not customarily eaten and swallowed (*i.e.*, used) as a food); *Ford Motor Co.* at 750 (reasoning that a use limitation may be read into an *eo nomine* provision when "the name itself inherently suggests a type of use" and that an article's use may define its identity when determining whether it falls within the scope of defined tariff terms); *see also* HQ H044699 (Jan. 26, 2010) ("As heading 3004 and 2106 are principal use provisions, we analyze the instant merchandise [fish oil capsules] under the Carborundum factors[.]"); HQ W968402 (Jan. 8, 2009) (stating that headings 2106 and 3004 "are principal use provisions"); HQ 966092 (Mar. 25, 2003) ("Heading 2106 is a 'principal use' provision.").   An examination of how medical foods are principally used under the *Carborundum* factors confirms that the products are classified under heading 3004, not 2106. *See* ECF No. 73, 29-35.  Specifically, medical foods:

- Have unique physical characteristics, including individual amino acids that are synthesized medical grade chemicals allowing the products to treat infants and children with rare diseases (*e.g.*, PKU, MSUD or short gut syndrome).[6]

- Are used exclusively as medicaments (*i.e.*, as nutritional therapy); healthy children do not consume them (in some cases such consumption would be dangerous).

- Are produced and marketed in the same manner as other medicaments, with the marketing principally focused on healthcare providers rather than consumers.

- Are understood to be medicaments by both the doctors who prescribe/recommend them and the consumers who ultimately purchase them.  Their costs may be eligible for reimbursement by health insurers as would be the case for other medicaments.

- Are priced as medicaments – the record shows prices as much as [            ] higher than their non-medical food counterparts.

---

[6] CBP oversimplifies the ingredients in medical foods as including "proteins or amino acids," reflecting its continued lack of appreciation and understanding of the subject medical foods.  These foods (apart from Ketocal) do not contain "proteins" because infants or children suffering from the specified diseases cannot ingest proteins.  That being so the products need to be mixtures of the <u>components</u> of proteins, namely individual amino acids that here are chemically synthesized. *See* ECF No. 80, 2, 10, 16; *see, e.g.*, ECF No. 73, Ex. 1, 12 (explaining that Short Gut Syndrome often prevents afflicted children from completing digestion of proteins and absorption of amino acids, and providing broken down protein components (*i.e.*, amino acids) allows for absorption to take place).

- Are sold in the same channels as medicaments – through medical distributors, and consumers typically must purchase them through a doctor and/or "behind the counter" at a pharmacy; they are not sold in conventional retail food channels.

*See U.S. v. Carborundum Co.*, 536 F.2d 737 (C.C.P.A. 1976) (setting forth seven factors to determine whether a product falls within the class or kind of goods in a principal use provision); ECF No. 73, 29-35.

## B.  The FDA Does Not Regulate Medical Foods in the Same Manner as Conventional Foods

CBP states that "The FDA regulates medical foods as foods, not drugs, and imposes special food labeling requirements." ECF No. 80, 11.  This is inaccurate and misrepresents the manner in which FDA regulates medical foods.  First, as explained above, under the Food Drug Device and Cosmetic Act medical foods meet the definition of a "drug." *See* 21 U.S.C. §321(g)(1)(B) (defining "drug," in relevant part, as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals").  Historically, the FDA regulated medical foods like drugs, but ultimately the FDA determined that it needed to encourage production of medical foods, foster their development, and limit barriers to market entry to ensure that infants and children with rare diseases could secure treatment.  *See* 61 Fed. Reg. 60661, 60662 (Nov. 29, 1996) (**Ex. 4**). The FDA wanted to ensure that these products could be made readily available to patients at a reasonable cost, and concluded that the close monitoring of product usage by medical professionals would ameliorate any safety concerns. *Id.*  Thus, in 1988 and 1990, Congress created a special definition for "medical foods" and exempted such products from the labeling and health claim requirements that the statute imposed on other products that meet the definition of 'drugs.' *See* 21 U.S.C. §360ee(b)(3) (defining "medical foods" as part of the Orphan Drug Amendments of 1988); 21 U.S.C. §343(q)(5)(A)(iv) (exempting medical foods from nutrition labeling, health claim, and nutrient content claim requirements applicable to most other foods, as part of the Nutrition Labeling

and Education Act of 1990); 21 U.S.C. §343(r)(5)(A) (providing medical foods an exemption from health claim requirements); 21 C.F.R. §101.9(j)(8) (implementing the final rule to exempt medical foods from labeling requirements and incorporating the statutory definition of "medical foods" into the FDA regulations); *see also* 61 Fed. Reg. 60661, 60662-63 (Nov. 29, 1996).

The FDA implemented regulations that specifically defined "medical foods," imposing numerous requirements for a product to be considered a "medical food" that are separate and distinct from regulations on foods, foods for special dietary use and foods that make health care claims. *See* 21 C.F.R. §101.9(j)(8); U.S. Drug & Admin., *U.S. Food & Drug Admin. Compliance Program Guidance Manual, Medical Foods Program – Import and Domestic* (Aug. 24, 2006) (**Ex. 5**); *see generally* 61 Fed. Reg. 60661 (Nov. 29, 1996).  For example, unlike foods, medical foods must be: (1) used under medical supervision, (2) specially formulated and processed (as opposed to naturally occurring foodstuff), (3) intended for a patient who because of therapeutic or chronic medical needs requires the product as a major treatment modality, (4) provides nutritional support specifically modified for the unique needs that result from a specific disease or condition as determined by medical evaluation, and (5) intended for a patient receiving active and ongoing medical supervision and instructions on use. *Id.*  Contrary to CBP's assertion, medical foods are not subject to FDA food labeling or health claim regulations, but are subject to FDA safety regulations. *See* ECF No. 80, 11; *see also* 21 U.S.C. §343(q)(5)(A)(iv) (providing medical foods an exemption from nutrition labeling requirements); 21 U.S.C. §343(r)(5)(A) (providing medical foods an exemption from health claim requirements); U.S. Food & Drug Admin., *Guidance for Industry: Frequently Asked Questions About Medical Foods*, 8-9 (2d ed. 2016), https://www.fda.gov/media/97726/download (stating that medical food ingredients must be safe

and in compliance with all applicable provisions of the Food Drug and Cosmetics Act and FDA regulations).

CBP cites an FDA "Frequently Asked Questions" or "FAQ" publication as evidence that medical foods are regulated by the FDA like foods and not drugs. *See* ECF No. 80 at 11.  But this same FDA manual states that medical foods are distinct. *See* U.S. Food & Drug Admin., *Guidance for Industry: Frequently Asked Questions About Medical Foods*, 4 (2d ed. 2016), https://www.fda.gov/media/97726/download ("[m]edical foods are <u>distinguished</u> from the broader category of foods for special dietary use by the requirement that medical foods be intended to meet distinctive nutritional requirements of a disease or condition, used under medical supervision, and intended for the specific dietary management of a disease or condition.  Medical foods are not those simply recommended by a physician as part of an overall diet to manage the symptoms or reduce the risk of a disease or condition.").  A careful examination of the FDA statutes, regulations and history of the treatment of medical foods (rather than a sampling of incomplete quotations from manuals), confirms that the FDA does not regulate medical foods like foods, but rather treats them as a discrete and distinct category. *See* 21 U.S.C. §360ee(b)(3); 21 U.S.C. §343(q)(5)(A)(iv); 21 C.F.R. §101.9(j)(8); 61 Fed. Reg. 60661 (Nov. 29, 1996).

## C.    Canada Provides Duty-Free Treatment to Medical Food Imports

CBP cites a Canadian International Trade Tribunal ("CITT") decision to support its claim that medical foods are classified under heading 2106. *See* ECF No. 80, 32 n.6 (citing ECF No. 80, Ex. 7 (*Nutricia N. Am. v. President of the Can. Border Servs. Agency*, 2011 CarswellNat 7137 (C.I.T.T.) (WL)).  It is well settled that such decisions are not binding in the United States.  *See* *Cummins Inc. v. United States*, 454 F.3d 1361, 1366 (Fed. Cir. 2006) (explaining that foreign classification determinations are "not given deference by United States courts" and that "[t]he

Supreme Court has rejected any notion of deference or obligation to a foreign tribunal's decisions")

(citations omitted).  Regardless, this CITT decision is inapplicable here.  Although the initial CITT

decision involved Neocate imports into Canada, Nutricia subsequently brought another CITT action

appealing the Canadian Customs and Border Security Agency's ("CBSA") classification of certain

Nutricia medical foods, including Periflex, Ketocal, Lophlex, *and* Neocate. *See* **Ex. 6**, Declaration

of Miguel Del Toro (Del Toro Dec.), ¶¶ 2-3, Ex. A (Jan. 23, 2018 Notice of Appeal).  In 2019,

CBSA agreed to settle the second case and changed the classification of all of the medical foods at

issue, including the Neocate products, to the duty-free Nairobi Protocol provisions under Tariff

Item 9979.00.00[7] as "goods specifically designed to assist persons with disabilities, in alleviating

the effects of those disabilities." *See* Del Toro Dec., ¶ 4, Ex. B (Aug. 30, 2019 Notice of Settlement

Letter to CITT).  As a result, all of Nutricia's medical foods now are imported into Canada duty-

free. *See* Del Toro Dec., ¶ 5.  The CITT decision CBP cited is factually and legally irrelevant to the

instant proceeding.

**III.    Nutricia's Medical Foods are Specially Designed for Handicapped Persons and Maybe Classified under Subheading 9817.00.96**

CBP argues that (1) medical foods cannot be classified under subheading 9817.00.96

because products for therapeutic uses are excluded from this provision, and (2) Neocate is not

specially designed for handicapped persons. *See* ECF No. 80, 30-35.  Contrary to CBP's arguments,

medical foods may be secondarily classified under subheading 9817.00.96 even if they are

therapeutic as defined under heading 3004, and Neocate is specifically designed for infants and

children who suffer from diseases that impair major life activities.

---

[7] Subheading 9817.00.96, HTSUS—the United States corollary to this provision—was also implemented under the Nairobi Protocol.

A.    The Term "Therapeutic" is Defined Differently in Chapter 98 and Medical
       Foods May Be Classified Subheading under 9817.00.96

After conceding that medical foods are substances for therapeutic uses, CBP incorrectly asserts that chapter 98, subchapter XVII, U.S. note 4(b) precludes classification in heading 9817. ECF No. 80, 30.  U.S. Note 4(b) to Subchapter XVII, Chapter 98 provides that subheading 9817.00.96 does not cover "(i) articles for "(iii) therapeutic and diagnostic articles[.]"  The master rule when construing terms in tariff statutes is to carry out legislative intent. *See Lerner New York, Inc.*, 37 C.I.T. at 607 ("Tariff acts are construed to carry out the intent of Congress[.]").   The plain meaning of a tariff term should be used unless there is clear legislative intent that the term should be interpreted differently.   *EM Indus., Inc.* at 1479 (Ct. Int'l Trade 1998) ("[E]ven where merchandise falls within the literal language of the statute, such literal interpretation should be rejected if it produces a result contrary to the apparent legislative intent."); *see also Lerner New York, Inc.*, 37 C.I.T. at 607 ("Where a tariff term has various definitions or meanings and has broad and narrow interpretations, the court must determine which definition best expresses the congressional intent.").

The terms in chapter 98 are special provisions of U.S. law that were enacted separately from chapters 1-97, which are based on the Harmonized System nomenclature.   U.S. note 4(a) and subheading 9817.00.96 were implemented as part of the Educational, Scientific, and Cultural Materials Importation Act of 1982, which implemented the Nairobi Protocol. *See Starkey Labs. v. U.S.*, 22 C.I.T. 360, 361, 6 F. Supp. 2d 910 (1998); *see also* ECF No. 73, 40.  These provisions were intended to liberally and broadly encourage the importation of articles for handclapped persons. *Travenol Lab'ys, Inc. v. U.S.*, 813 F. Supp. 840, 847 (Ct. Int'l Trade 1993); *see also* ECF No. 73, 41-42.  The Federal Circuit has held that "Congress intended to encourage the importation of that merchandise which is designed to compensate for, or help adapt to, the handicapped

34

condition. At the same time, Congress did not want to allow duty-free importation of merchandise which is used to heal or cure the condition causing the handicap." *Richards Med. Co. v. U.S.*, 910 F.2d 828, 831 (Fed. Cir. 1990).[8]

Because there is clear legislative intent to provide duty-free benefits to a broad range of products for all handicapped persons, courts have construed the U.S. note 4(a) exclusion for "therapeutic" products more narrowly than this term's plain meaning as appearing in heading 3004. *See Richards Med. Co.*, 910 F.2d at 831 (Fed. Cir. 1990).  Specifically, for purposes of U.S. note 4(a) courts have confirmed that for the purpose of subheading 9817.00.96, HTSUS, the term "therapeutic" means "heal" or "cure," and consequently only those  that heal or cure a disability are excluded from that subheading. *Id.* ("Congress intended to encourage the importation of that merchandise which is designed to compensate for, or help adapt to, the handicapped condition. At the same time, Congress did not want to allow duty-free importation of merchandise which is used to heal or cure the condition causing the handicap.") (referring to S. Rep. No. 97-564 (1982)); *see also Sigvaris, Inc. v. U.S.*, 227 F. Supp. 3d 1327, 1336 (Ct. Int'l Trade 2017), *aff'd but criticized*, 899 F.3d 1308 (Fed. Cir. 2018) ("The subheading [9817.00.96] does not cover therapeutic articles, which have been defined as 'having healing or curative powers.'") (internal citations omitted); **Ex. 7**, S. Rep. No. 97-564 (1982), at 16-17.  Here, there is no dispute that while the medical foods at issue are designed to "compensate for, or help adapt to, the handicapped condition[s]," they do not cure the diseases they are designed to treat. *See* ECF No. 73, Ex. 12, 176:23-177:2; Ex. 1, 8, 16,

---

[8] The provision at issue in *Richards*, which was decided under the Tariff Schedules of the United States, is now part of HTSUS chapter 98. *See Inabata Specialty Chemicals v. U.S.*, 29 C.I.T. 419, 423 (2005).

19, 22-23.  Because these medical foods do not cure the patients who must take these products, they
are not excluded from classification under heading 9817.00.96 under the terms of U.S. note 4(b).

**B.      Neocate is Specially Designed for Use and Benefit of Children with Specific
          Ailments.**

CBP concedes that MSUD Lophlex®, Periflex® Infant, Periflex® Junior, and Ketocal®
Liquid are "specially designed" for the use of "handicapped persons," but argue that Neocate®
Junior, is not.  *See* ECF No. 80, 34 n.7.  To support its argument CBP asserts that Neocate was not
designed to treat persons with physical handicaps and that children who take Neocate are not
handicapped.  *See* ECF No. 80, 30-35.  The record refutes both assertions.

CBP argues that the "class of persons" for whom Neocate was designed is "not sufficiently
specific" and maybe "designed for use by a variety of persons."  *See* ECF No. 80, 34.  But, as CBP
concedes throughout its brief, Neocate is a medical food, like each of the other products that CBP
concedes are a specially designed for handicapped persons.  *See* ECF No. 80, 34 n.7.  By law medical
foods must be designed (formulated and processed) and intended for patients with a limited or
impaired capacity to ingest, digest, absorb or metabolize foods that cannot be addressed by a
modification of a normal diet.  *See* 21 C.F.R. §101.9(j)(8).  This precisely describes the class of
persons for whom Neocate was conceived, designed, produced, marketed and sold.  The fact that
the above impairments or handicaps may be the result of a variety different diseases and disorders
does not change the scope of the class or make it ambiguous.

In *Sigvaris*, the Federal Circuit examined a number of factors in assessing whether a product
is specially designed to benefit a certain class, including "the physical properties of the
merchandise, whether the merchandise is solely used by the handicapped, the specific design of the
merchandise, the likelihood the merchandise is useful to the general public, and whether the

36

merchandise is sold in specialty stores." *Id.* (from Customs Implementation, 28 Cust. Bull. & Dec. at 242–45). Each of these factors confirms that Neocate is specially designed to benefit a class of persons who have impairments of major life activities. As a medical food, Neocate is designed and formulated to meet the medical needs of children with the listed ailments. *See* 21 C.F.R. §101.9(j)(8). It is not useful to the general public, should not be taken by healthy children, and in many instances would be dangerous if administered to healthy children. *See* ECF No. 73, Ex. 12, 113:3-5; 123:19-124:5. Moreover, the vast majority of Neocate is sold through healthcare channels. *See* ECF No. 73, Ex. 21, 32.[9] Accordingly, Neocate is specially designed for the use and benefit of children in a defined class.

CBP also incorrectly claims that children who must take Neocate under the constant supervision of a medical professional are not handicapped because they do not suffer impairment of major life activities, and wrongly suggests that children with simple allergies (*e.g.*, milk allergies) take Neocate. ECF No. 80, 34. Children who have only milk, gluten or other simple allergies do not need to take Neocate because they may resolve their conditions through modification of their normal diet by avoidance of the relevant allergen. By definition, Neocate is designed for use by patients who cannot obtain relief through an avoidance diet. 21 C.F.R. §101.9(j)(8). Medical foods, including Neocate, are used by patients who are handicapped under the ADA and suffer from major

---

[9] CBP reliance on the fact that Neocate Junior may be sold on Amazon is confusing and misplaced. ECF No. 80, 34. As CBP knows the vast majority of Neocate is sold through healthcare channels. *See* ECF No. 73, Ex. 21, 32. Moreover, hearing aids are sold on Amazon and remain classified under subheading 9817.00.9600, HTSUS, *see Starkey Labs., Inc. v. United States*, 22 C.I.T. 360, 364 (1998), *adhered to on reconsideration,* 24 C.I.T. 504 (2000). *See EarCentric EasyCharge Rechargeable Hearing Aids (Pair) for Seniors*, Amazon.com, https://www.amazon.com/EarCentric-Rechargeable-Ear-amplification-Cancellation/dp/B09K1RKQS6/ref=zg_bs_3775901_sccl_1/146-1123047-1488536?psc=1 (last visited Dec. 2, 2022) As such it is inappropriate for CBP to rely on potential fugitive sales on amazon to suggest one classification over another.

life activities – most notably eating. ECF No. 73, 43-44; 42 U.S.C. §12102(1)(A) (major life activities under the ADA include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, **eating**, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.") (emphasis added).

*Kelly v. Kingston City Sch. Dist., Inc.*, No. 116CV00764MADDJS, 2017 WL 976943 (N.D.N.Y. Mar. 13, 2017) does not support CBP's position.  The plaintiff in *Kelly* had a gluten allergy (celiac disease), and the court dismissed the plaintiff's ADA claim because the plaintiff did not present facts on how this impacted a major life activity.  *Id.* at *4.  Here, the facts confirm that children who must take Necoate will suffer adverse metabolic, gastrointestinal or neurological symptoms (*e.g.*, brain damage, seizures, coma or death). *See* ECF No. 73, Ex. 12, 10, 13; Ex. 6, 84:13-85:8, 86:12-89:7.  CBP's implicit assertion that a child with short gut syndrome or another major digestive diseases and disorder, who must be fed Neocate through a tube, does not have any major life activities impaired is outrageous.  Neocate, like the other medical foods at issue in this case, is "specially designed" for the use of "handicapped persons" and properly classified under subheading 9817.00.17.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court find that the subject medical foods are classifiable as "medicaments consisting of mixed and unmixed products for therapeutic or prophylactic uses" under heading 3004, and secondarily classifiable under as "articles specially designed for persons with mental or physical handicaps" under subheading 9817.00.96.

By:    */s/ John B. Brew*
John B. Brew
Alex Schaefer
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
jbrew@crowell.com


Maria Vanikiotis
Alexander T. Rosen
Crowell & Moring LLP
590 Madison Avenue
20th Floor
New York, NY 10022

Dated: December 2, 2022
      New York, New York

39

**<u>CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT</u>**
**<u>STANDARD CHAMBER PROCEDURE 2(B)</u>**

I, Alexander T. Rosen, counsel at Crowell & Moring LLP, who is responsible for the foregoing brief, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with the type-volume limitation of 14,000 words under USCIT Standard Chamber Procedure 2(B) and contains 12,432 words.

*<u>/s/ Alexander T. Rosen</u>*

Dated:  December 2, 2022
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: Hon. Timothy C. Stanceu, Chief Judge

_____
                                          :
NUTRICIA NORTH AMERICA, INC.,             :
                                          :
                        Plaintiff,        :        Court No. 16-00008
                                          :
            v.                            :
                                          :
UNITED STATES,                            :
                                          :
                        Defendant.        :
_____     :

## PLAINTIFF'S RESPONSE TO DEFENDANT'S 56.3 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56 of the Rules of the United States Court of International Trade (USCIT), Plaintiff Nutricia North America, Inc. (Nutricia) responds to Defendant's USCIT Rule 56.3 statement of facts not in dispute as follows:

1.      Admits.

2.      Admits, but Nutricia clarifies that more specifically, CBP liquidated the four entries of the subject merchandise under subheading 2106.90.99**98**, HTSUS (emphasis added), which provides for "Food preparations not elsewhere specified or included: Other…Other." ECF No. 73, Ex. 2, Compl. ¶ 6; Answer, ¶ 6.

3.      Admits.

4.      Admits.

5.      Admits.

6.      Admits that this statement accurately quotes the cited portions of ECF No. 73, Ex. 4, Deposition of Miguel Del Toro (Del Toro Deposition).  But, denies that medical foods are regulated the same as foods, and asserts that the manner in which FDA regulates medical foods is

1

a legal conclusion to which no response is necessary.  *See* U.S. Food & Drug Admin., *Guidance for Industry: Frequently Asked Questions About Medical Foods*, 4 (2d ed. 2016), https://www.fda.gov/media/97726/download ("Medical foods are <u>distinguished</u> from the broader category of foods for special dietary use by the requirement that medical foods be intended to meet distinctive nutritional requirements of a disease or condition, used under medical supervision, and intended for the specific dietary management of a disease or condition.  Medical foods are not those simply recommended by a physician as part of an overall diet to manage the symptoms or reduce the risk of a disease or condition.") (emphasis added).

7.     This statement consists of legal argument and/or conclusion of law to which no response is required. To the extent a response is required, admits that this statement is supported by Nutricia's Responses to the Governments First Interrogatories, ECF No. 83, Ex. 1 at 23-24, to the extent it pertains to "active *pharmaceutical* ingredients" but clarifies that Nutricia's medical foods contain "active ingredients" as defined by the FDA, 21 C.F.R. §210.3(b)(7), as they contain ingredients, namely specially-produced, chemically synthesized, individual amino acids that are designed and combined to create a product used to obtain the desired therapeutic effect, preventing rare and life-threatening diseases in infants and toddlers. See ECF No. 73, Exs. 7, 8A-8E, 11, 14, 16, 18.

8.     Admits that this statement is supported by  ECF No. 73, Ex. 12, Deposition of Dr. Jonah Essers (Essers Deposition) at 87:2–5.

9.     Denies that this statement is supported by the Essers Deposition at 87:18–24 (which instead states, in relevant part, that "*total parenteral nutrition*, or TPN, is an IV form of nutrition which is regulated *like* a drug") (emphasis added).

2

10.    Denies.  Nutricia's products also contain binders, texturizers, and the like, none of which has meaningful nutritive value.  *See* ECF No. 73, Exs. 7, 11, 14, 16, 18.  Also denies that the imported products, except Ketocal, contain "proteins (or protein substitutes in the form of amino acids)" because infants or children suffering from the specified diseases cannot ingest certain proteins that appear in all foods, requiring the mixture of chemically synthesized individual amino acids.  *See, e.g.*, ECF No. 73, Exs. 1, 12 (explaining that Short Gut Syndrome often prevents afflicted children from completing digestion of proteins and absorption of amino acids, and providing broken down protein components (*i.e.*, amino acids) allows for absorption to take place).

11.    Denies as this is an incomplete characterization of the protein digestion process explained in ECF No. 73, Ex. 1, Expert Report of Dr. Jonah Essers (Essers Report) at 9-10.  The full statement, in relevant part, reads:

> Humans source amino acids by ingesting plant and animal-based foods. Once consumed, the protein undergoes digestion, whereby the protein is slowly broken down into its individual amino acids. This process starts in the stomach where hydrochloric acid begins to break apart whole proteins into smaller particles called peptides. It continues with enzymes released by the pancreas, which further breaks down the peptides into even smaller particles until only amino acids—the basic building blocks of proteins--are left.
>
> Once digestion is complete, amino acids are absorbed into the blood stream. The actual absorption of nutrition occurs at the epithelium, which is the inner lining of the wall of the small intestine. The epithelium has receptors that specialize in bring the amino acid from the lumen of the bowel into the bloodstream. Once in the bloodstream, the amino acid can then be trafficked to the right organs or tissues.

*Id.*

12.    Admits that the quoted language appears in ECF No. 73, Exs. 8B at 2, Ex. 8C at 2, 8D at 2, and 8E, ECF at 2.  But, clarifies that vitamins may be classified under heading 3004, and medical foods are not "dietetic" as this term is defined in the tariffs.  EN 2106 (2012).

13.    Denies.  Nutricia's products also contain binders, texturizers, and the like, none of which has meaningful nutritive value.  *See* ECF No. 73, Exs. 7, 11, 14, 16, 18.

14.     Admits that the quoted language appears in ECF No. 73, Exs. 8B at 32, 8C at 43, 8D at 45, and 8E at 39, but clarifies that among the eighteen or more ingredient specifications comprising each product, in each case approximately four chemical specifications for certain individual amino acids describe the ingredients as used for manufacturing "dietetic goods" that "provid[e] nutrition." *See, e.g.*, ECF No. 73, Ex. 8B at 32 (L-Aspartic acid), 42 (L-Cystine), 91 (L-Threonine), 100 (L-Tyrosine).  Others describe the individual amino acids as being for used for "medical" purposes. *See, e.g.*, EFC No. 73, Ex. 8B at 25.

15.     Admits that the Essers Report at 21 and 25 supports this statement as it pertains to Ketocal and Neocate.  Denies that the quoted language accurately characterizes the Essers Deposition at 95:9–96:8 as it pertains to MSUD Lophlex and Periflex.  While Dr. Essers testified that MSUD Lophlex and Periflex are "nearly complete" nutritionally, *id.* at 96:6-8, Dr. Essers also testified that MSUD Lophlex and Periflex are "not [nutritionally] complete" and that it was "hard" to "quantify how [nutritionally] complete" these products are.  *Id.* at 95:14-17.

16.     This statement consists of legal argument and/or conclusion of law to which no response is required. To the extent a response is required, admits.

17.     This statement consists of legal argument and/or conclusion of law to which no response is required. To extent a response is required, admits that this statement accurately characterizes the Essers Deposition at 166:12-18, except that in the Essers Deposition, the cited statement is qualified by the word "generally."  *Id.* at 166:12-16 ("Q. Using our working understanding of 13 what a food supplement is, would you say that food supplements are *generally* nutritionally complete? A. No.") (emphasis added).

18.     Admits that this statement is supported by the Essers Deposition at 167:10-14.  But, clarifies that these medical foods are required because infants and children who suffer from major

life impairing diseases, treatment for which cannot be accomplished through modification of a normal diet.  Essers Report at 10 ("[T]hese Medical Foods in question are often the only treatment available to staving off disease, debilitation, and/or death in certain disease states.") (emphasis in original).

19.     Admits that this statement is supported by the Essers Deposition at 113:21-114:10.  But, clarifies that any child who eats dirt or takes a drug with an active ingredient will also receive nutrition from ingesting it.  Essers Deposition at 87:11-12.

20.     Admits that this statement is supported by the Essers Report at 11-12, 24. But clarifies  that conventional foods needed to sustain life contain phenylalanine.  Essers Report at 24.

21.     Admits that this statement is supported by the Essers Report at 12.  Denies that this statement is supported, in any way, by the Essers Deposition at 95:9-96:8.

22.     Admits that this statement is supported by the Essers Report at 10-11, 23 and that this statement accurately quotes ECF No. 73, Pl.'s Statement of Facts, at 17, para. 83 (Aug. 31, 2022).

23.     Denies that this statement is supported by the Essers Report at 11.  Rather, the Essers Report provides that "[b]y avoiding toxic buildup of these three amino acids [isoleucine, leucine and valine], the disease process is halted" *id.* at 10-11, and also that "there are small amounts of [isoleucine, leucine and valine] contained in the added juice concentrates [in MSUD Lophlex]." *Id.* at 18. Denies that this statement is supported, in any way, by the Essers Deposition at 95:9-96:8.

24.     Admits that this statement is supported by Pl.'s Statement of Facts, at 28-29, paras. 164-66 (Aug. 31, 2022), but clarifies that Ketocal is unique in that it provides a 4:1 ratio of fat calories to "non-fat" protein and  carbohydrate calories.  *Id.* at para. 165; Essers Report at 21.

25.     Admits that this statement is supported by the Essers Deposition at 133:16-22.

26.     Admits.

27.     Admits.

28.     Denies that this statement accurately characterizes the severity of the conditions for which Neocate is indicated.   Neocate is not prepared for children with simple food allergies or gastrointestinal conditions, but rather, for children for whom there is no "naturally occurring diet that will allow them to survive."  Essers Deposition at 119:17-24.

29.     Admits this statement is supported by the Essers Report at 13, 20, and 26, but clarifies that the amino acids in Neocate are chemically synthesized individual amino acids.  *See* ECF No. 73, Ex. 8E.

30.     Admits that this statement is supported by the Essers Report at 28. But, clarifies that Neocate is not for use by healthy children with simple allergies for which modification of the conventional diet is possible to avoid the allergy.  Essers Deposition at 158:6-25, 119:17-24.

31.     Admits.  But clarifies that these were temporary, fugitive or *de minimis* sales, and the principal channels of trade for Neocate are through medical distribution networks similar to those for medicaments.  *See* ECF No. 73, Ex. 21 at 28-29.

32.     Admits.

33.     Admits that this statement is supported by the Essers Report at 4.

34.     This statement consists of legal argument and/or conclusion of law to which no response is required. To the extent a response is required, admits.

Respectfully Submitted,

/s/ *John B. Brew*
John B. Brew
Alex Schaefer
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
jbrew@crowell.com

Maria Vanikiotis
Alexander T. Rosen
Crowell & Moring LLP
590 Madison Avenue
20th Floor
New York, NY 10022

Dated: December 2, 2022
        New York, New York

**Plaintiff's Exhibit List**

| Exhibit No. | Description |
|---|---|
| 1 | *Conversion of the Tariff Schedules of the United States Annotated into the Nomenclature Structure of the Harmonized System, Report on Investigation No 332-131 Under Section 332 of the Tariff Act of 1930, Annex III: Cross-Reference From Converted Tariff Schedule to Present TSUSA*, USITC Pub. 1400 (June 1983) |
| 2 | Excerpts of HTSUS (2014) reflecting provisions using the term "drug" |
| 3 | CBP Rulings |
| 4 | 61 Fed. Reg. 60661, 60662 (Nov. 29, 1996) |
| 5 | U.S. Drug & Admin., U.S. Food & Drug Admin. Compliance Program Guidance Manual, Medical Foods Program – Import and Domestic (Aug. 24, 2006) |
| 6 | Declaration of Miguel Del Toro |
| 6A | Jan. 23, 2018 Notice of Appeal |
| 6B | Aug. 30, 2019 Notice of Settlement Letter to CITT |
| 7 | S. Rep. No. 97-564 (1982) |